**Reddy's Brief Statement Of Its Intended Proofs**

The Reddy defendants are pharmaceutical companies that seek U.S. FDA approval to market a generic version of the antibacterial drug moxifloxacin.

The Bayer plaintiffs sell moxifloxacin under the trade name Avelox®. Bayer sued Reddy under the Hatch Waxman Act on two Bayer patents that cover moxifloxacin. Bayer's first patent, United States Patent 4,990,517, claims moxifloxacin as part of a genus. Bayer's second patent, United States Patent 5,607,942, claims moxifloxacin as a species.

Reddy asserts the following five defenses against Bayer's two moxifloxacin patents:

1. Inequitable conduct makes Bayer's first patent unenforceable;

2. The inequitable conduct in the prosecution of Bayer's first patent carries forward and makes Bayer's second patent unenforceable as well.

3. The asserted claims of Bayer's first patent are invalid because they are obvious over the prior art under 35 U.S.C. § 103;

4. The asserted claims of Bayer's second patent are invalid for nonobviousness-type double patenting over Bayer's first patent under the holding in *In re Schneller*;

5. The asserted claims of Bayer's second patent are invalid for obviousness-type double patenting because they are obvious variants of certain claims in Bayer's first patent;

**1.    Inequitable Conduct Makes Bayer's First Moxifloxacin Patent Unenforceable**

Bayer, through its in-house patent agents, its inventors and/or its outside attorney engaged in inequitable conduct in the procurement of its first patent by its initial failure to submit material prior art to the PTO during prosecution on the merits and then, later, by submitting some of the omitted prior art references in a manner calculated to deceive the PTO. One of the prior art references, the "Liebigs Reference," was never submitted to the PTO, despite its high materiality to the claims of Bayer's first patent. Three other material references were sent to the PTO after the payment of the issue fee in a manner contrary to the provisions of the MPEP and intended to avoid the scrutiny of the PTO examiner.

587735                                                          1

A. Inequitable conduct with respect to the "Liebigs Reference"

When it was filed, Bayer's application for its first moxifloxacin patent included claims that covered the following two compounds:

original claim 19
"The Bayer 5/5 Bicycle"

original claim 10

The compound to the left is the "Bayer 5/5 Bicycle". It was one of the compounds covered by original claim 19. The compound to the right is the compound of original claim 10. The compound of original claim 10 has the Bayer 5/5 Bicycle attached to the 7-position of a "quinolone" nucleus. The only structural difference between original claim 10 and the prior art was the presence of the Bayer 5/5 Bicycle at the 7-position.

The Bayer 5/5 Bicycle was highly material to the issued patent because the Examiner allowed original claim 10 to issue while acting under the assumption that *the Bayer 5/5 Bicycle was not in the prior art*. This was a reasonable assumption on the part of the Examiner because the inventors had declared under penalty of perjury that they were entitled to claim the Bayer 5/5 Bicycle as well the compound in original claim 10. In fact, the Bayer 5/5 Bicycle had been published 25 years earlier in the "Liebigs Reference". Quite shockingly, two of the inventors, their German patent agents and their United States attorney *all knew that the Bayer 5/5 Bicycle had already been published.*

Shortly before the application was filed, inventors Schenke and Petersen clearly knew that the Bayer 5/5 Bicycle had been published in the Liebigs Reference. Bayer's in-house German patent agent (Dr. Bailly) and Bayer's United States patent attorney (Mr. Horn) clearly knew about the Liebigs Reference and its disclosure of the Bayer 5/5 Bicycle before the patent issued. Nevertheless, the Liebigs Reference was not cited in the prosecution of Bayer's first patent.

587735                                    2

The failure to cite the highly material Liebigs reference in the prosecution of Bayer's first patent could only have been with intent to deceive. This constitutes inequitable conduct that renders Bayer's first patent unenforceable.

> B. Mr. Horn prevented the Examiner from considering three other <u>material references during the prosecution Bayer's first patent</u>

In addition to withholding the Liebigs Reference from the prosecution of Bayer's first patent, Mr. Horn deceived the Patent Office by submitting three other material references in a way that was calculated to prevent the Patent Office from considering the references during prosecution. The materiality of the three other references, and Mr. Horn's intent to deceive, is apparent from the prosecution history.

On March 23, 1990, the Examiner told Mr. Horn that the claimed subject matter needed to be "restricted" to a narrower subset. Mr. Horn made a provisional election with traverse. By making a provisional election with traverse, Mr. Horn was arguing that it was improper for the Examiner to require the applicants to narrow their claims.

On April 4, 1990, the Examiner issued a formal restriction requirement and asked Mr. Horn to affirm his provisional election. The Examiner put Mr. Horn on formal written notice that if Mr. Horn elected with traverse the Examiner could use any art that anticipated the non-elected subject matter to reject the elected subject matter. The Examiner explicitly stated:

```
Should applicant traverse on the ground that the
species are not patentably distinct, applicant should
submit evidence or identify such evidence now of record
showing the species to be obvious variants, or clearly
admit on the record that this is the case.  In either
instance, if the examiner finds one of the inventions
anticipated by the prior art, the evidence of admission
may be used in a rejection under 35 U.S.C. 103 of the
other invention.
```

On July 19, 1990, Mr. Horn affirmed the election with traverse. In support of his traverse, Mr. Horn admitted that the elected and the non-elected subject matter shared "a great deal of common structure and utility".

On August 10, 1990, Mr. Horn agreed to cancel the non-elected subject matter.

On August 27, 1990, the Examiner allowed the elected subject matter.

On October 31, 1990, Mr. Horn paid the Issue Fee.

Now that the issue fee had been paid, Bayer's first moxifloxacin patent was set to issue. Then, on November 7, 1990, the European Patent Office issued a Search Report in the European counterpart application. The European Search Report listed a number of "X" references which had not been cited to or by the United States Examiner. Three of the "X" references anticipated the non-elected subject matter from original claim 1. When Bayer received the European Search Report, inventor Petersen and in house patent agent Bailly both clearly knew that the X references cited against the European counterpart had to be submitted to the United States Examiner.

Mr. Horn, however, was in a quandary. The applicable regulation, 37 C.F.R. § 1.106(c) (1990), provided that the Examiner could use Mr. Horn's admission about a "great deal of common structure and utility" to reject the allowed claims. Because of his admission, Mr. Horn clearly knew that there was a high likelihood that the Examiner would have considered three references that anticipated the non-elected subject matter to be highly material to the patentability of the claims that were about to issue. Because Mr. Horn had known about one of the X references for almost a year and because two of the named inventors (Dr. Schenke and Dr. Petersen) had known about all three of the X references for almost three years, Mr. Horn had no easy explanation for why the references had not been submitted earlier. In fact, over the coaching of Bayer's counsel that Dr. Schenke did not remember anything on the subject, Dr. Schenke confessed at his deposition that, before the application was filed, *he was disappointed to see that some of his then recent work had already been published by others.*

On November 16, 1990, Mr. Horn did submit the three X references in the prosecution of Bayer's first patent. However, Mr. Horn did it in a deceitful way that was calculated to ensure that the X references would not be considered before the patent issued. In particular, because he had already paid the issue fee, the Manual of Patent Examining Procedure (the "MPEP") told Mr. Horn that these X references would not ordinarily be considered unless Mr. Horn took one of the specific actions stated in the MPEP for post-issue fee submissions. Although Mr. Horn had every reason to believe that the Examiner would consider the X references material, Mr. Horn chose not to take any of these actions.

On or about January 17, 1991, the Patent Office notified Mr. Horn that the application would issue on February 5, 1991. At this time, Mr. Horn had no reason to think that any of the three X references had been considered by the Examiner and Mr. Horn took no action to withdraw the application from issue.

As he expected it would, Bayer's first moxifloxacin patent issued on February 5, 1991. As intended by Mr. Horn, none of the three X references were considered by the Examiner before the patent issued.

Mr. Horn's intent to deceive with respect to the X references is made even clearer by his course of conduct in a divisional application that was filed after the first application was allowed. The three X references were highly material to the division application. Mr. Horn could have easily filed the three X references in the division application at any time between November 16, 1990 and the February 5, 1991 issue date of the first patent. Nevertheless, he did not submit the three X references in the prosecution of the division until February 14, 1991. The clear implication is that on November 16, 1990 Mr. Horn submitted the three X references in a way to keep them from being considered, and then he deliberately chose not to submit the X references in the division application until after Bayer's first moxifloxacin patent had safely issued.

Bayer obtained two Certificates of Correction for its first patent. The first, requested in March of 1992 and issued in May of 1993, addressed certain typographical errors in the patent, but made no mention of any additional prior art references allegedly considered by the examiner. The second, obtained four years after the patent issued, added the late submitted X references. However, to the extent the Certificate of Correction implies that the three X references were considered by the Examiner during prosecution, the Certificate of Correction is clearly invalid. There is nothing in the application file to indicate that any of the X references were considered before the patent issued. To the extent the X references were considered by the Examiner they were considered after the patent issued. Any consideration of the late submitted X references after the patent issued can do nothing to cure the inequitable conduct before the patent issued.

2. **The inequitable conduct in the prosecution of Bayer's first patent carries forward and makes Bayer's second patent unenforceable as well**

The application for Bayer's second moxifloxacin patent was filed after the issue of Bayer's first moxifloxacin patent. Most significantly, Bayer published the structure of moxifloxacin after the issue of the first moxifloxacin patent and more than one year before the filing of the application for the second moxifloxacin Patent. Thus, the second patent needed to rely, and did indeed rely, on the filing date of the first patent to avoid the intervening art. The parties have stipulated that the asserted claims of the second patent are fully disclosed in and fully covered by Bayer's first patent. Nothing prevented Bayer from prosecuting the claims of its second moxifloxacin patent in the prosecution of its first moxifloxacin patent. Accordingly, there is a necessary and immediate relationship between the inequitable conduct in the prosecution of Bayer's first patent and the claims of Bayer's second patent. Therefore, the inequitable conduct in the prosecution of the first Bayer's first moxifloxacin patent carries forward and renders Bayer's second moxifloxacin patent unenforceable as well.

3.  **The asserted claims of Bayer's first moxifloxacin patent
    are invalid because they are obvious under 35 U.S.C. § 103**

    Reddy's second defense is that the asserted claims of the first patent are invalid for obviousness under 35 U.S.C. § 103 because they are directed to two compounds that are obvious over preferred compounds from the prior art. The obviousness of the asserted claims of Bayer's first patent will be the subject of expert testimony at trial.

4.  **The asserted claims of Bayer's second moxifloxacin patent are invalid for double patenting over the first moxifloxacin patent under *In re Schneller***

    The parties have stipulated that the asserted claims of Bayer's second moxifloxacin patent are fully disclosed in Bayer's first moxifloxacin patent (Stipulated Fact 41). The parties have also stipulated that the practice of any of the asserted claims of the second patent would infringe at least one claim of the first patent (Stipulated Fact 40). On these facts, Reddy asserts that the asserted claims of the second patent are invalid for double patenting under the holding in *In re Schneller*, 397 F.2d 350 (C.C.P.A. 1968). The MPEP refers to this type of double patenting as "non-obviousness type" double patenting.

    During the prosecution of the second moxifloxacin patent the Examiner did in fact rely on *In re Schneller* to reject the claims of the Bayer's second patent over Bayer's first patent. Applicants admitted on the record during prosecution of the second patent that *In re Schneller* controlled, and they expressly took no issue with the holding in that case. Rather, the applicants argued that their second moxifloxacin patent was patentable because they had been prevented from making the claims of the second patent in the prosecution of their earlier patent because it would have constituted "new matter". Bayer has now recanted this position, and no longer maintains that the claims of its second patent were new matter.

    Because nonobviousness-type double patenting does not depend on whether the claims of the second patent are obvious variants of claims in the first patent, Reddy maintains that objective indicia of non-obviousness are not relevant or admissible with respect to this type of double patenting. Reddy also maintains that, at least with respect to Reddy, it is now too late for Bayer to file a terminal disclaimer to "cure" the double patenting.

5.  **The asserted claims of Bayer's second patent are invalid
    for obviousness-type double patenting because they are
    obvious variants of certain claims in Bayer's first patent**

    The asserted claims of the second moxifloxacin patent are also invalid over the first moxifloxacin patent because of obviousness-type double patenting. The subject

587735                                      6

matter claimed in the second patent is an obvious variant, in light of the prior art, of the invention defined in certain claims of the first patent. In fact, during prosecution of the second patent, the claims were rejected for obviousness-type double patenting and the applicants did not contest the Examiner's position that the claims appeared to be obvious variants. Rather, the applicants relied on objective indicia of non-obviousness to overcome the obviousness-type double patenting rejection. Here, Reddy contends that the Patent Office erred because, as a matter of law, objective indicia of non-obviousness are not relevant to the question of obviousness-type double patenting.

The parties have stipulated that if objective indicia of non-obviousness are admissible with respect to obviousness-type double patenting, the asserted claims of the second patent would not be invalid for obviousness-type double patenting.

Reddy also maintains that, at least with respect to Reddy, it is too late for Bayer to file a terminal disclaimer with respect to obviousness-type double patenting.