## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BAYER AG, BAYER HEALTHCARE AG, and BAYER PHARMACEUTICALS CORPORATION,<br><br>Plaintiffs,<br><br>v.<br><br>DR. REDDY'S LABORATORIES, LTD. and DR. REDDY'S LABORATORIES, INC.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | C. A. No. 04-179 (SLR) |
| DR. REDDY'S LABORATORIES, LTD. and DR. REDDY'S LABORATORIES, INC.,<br><br>Counterclaim Plaintiffs,<br><br>v.<br><br>BAYER AG, BAYER HEALTHCARE AG, and BAYER PHARMACEUTICALS CORPORATION,<br><br>Counterclaim Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | |

## REDDY'S OPENING POST TRIAL BRIEF

### PART 1 OF 2

Louis H. Weinstein
David J. Novack
A. Michael Covino
Michael H. Imbacuan
BUDD LARNER, P.C.
150 John F. Kennedy Parkway CN1000
Short Hills, New Jersey 07078
Tel: (973) 379- 4800

Dated: October 6, 2006

Richard L. Horwitz (#2246)
David E. Moore (#3983)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 North Market Street
Wilmington, Delaware 19801
Tel: (302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Defendants/Counterclaim Plaintiffs*
*Dr. Reddy's Laboratories, Ltd. and*
*Dr. Reddy's Laboratories, Inc.*

# TABLE OF CONTENTS

**Page**

NATURE AND STAGE OF THE PROCEEDING.................................................1

SUMMARY OF REDDY'S ARGUMENT.....................................................1

1.    The asserted claims of the '517 patent are obvious ...................................2

2.    The '942 patent is invalid for double patenting under *In re Schneller*,
      397 F.2d 350, 355 (C.C.P.A. 1968) ..............................................3

3.    The '942 patent is invalid for obviousness-type double patenting ..............4

4.    The '517 patent is unenforceable for inequitable conduct...........................5

5.    The '942 patent is also unenforceable for inequitable conduct ...................9

STATEMENT OF FACTS .............................................................10

1.    Background .................................................................10

      A.    This lawsuit.........................................................10

      B.    The Bayer quinolone project.........................................11

2.    Facts compelling a finding that the asserted claims of the '517
      patent are obvious under 35 U.S.C. § 103 ......................................12

3.    Facts compelling a finding that the asserted claims of the '942
      patent are obvious under the holding in *In re Schneller* ...................16

4.    Facts compelling a finding that the asserted claims of the '942
      patent are invalid for obviousness-type double patenting...........................17

5.    Facts compelling a finding that the '517 patent is unenforceable
      because of inequitable conduct ...............................................19

      A.    Facts concerning the materiality of the Liebigs Reference................20

      B.    Facts concerning intent to deceive with respect to the
            Liebigs Reference ...............................................21

      C.    Facts concerning the materiality of the X Reference.........................26

i

D.   Facts showing intent to deceive with respect to the three
     X References ................................................................................29

E.   Facts concerning the relationship between the relief sought
     in the '517 patent and the relief sought in the '942 patent ................35

ARGUMENT ................................................................................................36

1.   The '517 patent is obvious ................................................................36

     A.   The law of obviousness ..........................................................36

     B.   The Bicyclic Analogs of Dainippon Compound AT-3295
          and Sankyo Compound 1-130 were obvious over the prior art .........38

     C.   Bayer has no competent evidence of nonobviousness .....................42

     D.   Claims 1 and 2 of the '517 patent are obvious ..............................43

     E.   Claims 8, 9 and 11 of the '517 patent are obvious ..........................44

2.   The '942 patent is invalid under *In re Schneller* ...............................44

     A.   The claims of the '942 patent are fully disclosed in the
          '517 patent ............................................................................45

     B.   The claims of the '942 patent are fully covered by the
          '517 patent ............................................................................45

     C.   Nothing prevented Bayer from obtaining the claims of
          the '942 patent in the earlier '517 patent ....................................46

     D.   *In re Schneller* is good law and applies to this case ...........................46

     E.   Unexpected properties are not relevant to Schneller-type
          double patenting .....................................................................47

3.   The '942 patent is invalid for obviousness-type double
     patenting ........................................................................................48

4.   The '517 patent is unenforceable for inequitable conduct ...................51

A.  The law of inequitable conduct – judicial oversight of compliance with the duties of candor and disclosure .........................51

B.  The Liebigs Reference was material to the '434 application.........................................................................................54

C.  The Liebigs Reference was withheld with intent to deceive ............56

    i.  Dr. Schenke withheld the Liebigs Reference with intent to deceive ........................................................................56

    ii.  Bayer cannot rely on a false declaration as a defense to Dr. Schenke's inequitable conduct ......................................59

    iii.  Dr. Petersen withheld the Liebigs Reference with intent to deceive ........................................................................62

    iv.  Mr. Horn withheld the Liebigs Reference with intent to deceive ........................................................................63

D.  The X References were material and were improperly submitted with intent to deceive ..........................................................64

E.  The events after the Notice of Allowance demonstrate intent to deceive the Patent Office .............................................70

F.  A finding of inequitable conduct is compelled in light of all of the circumstances present here .......................................75

5.  The '942 patent is also unenforceable for inequitable conduct .................79

CONCLUSION       82

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Alza Corp. v. Mylan Laboratories, Inc.*, No. 06-1019, 2006 WL 2556356
(Fed. Cir. Sept. 6, 2006)................................................................................... 36, 37

*B.F. Goodrich Co. v. Aircraft Braking Systems Corp.*, 72 F.3d 1577 (Fed.
Cir. 1996) ................................................................................................................. 36

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141(1989).............................. 36

*Brasseler, U.S.A. I, L.P. v. Stryker Sales Corp.*, 267 F.3d 1370 (Fed. Cir.
2001) ............................................................................................................. 53, 63, 75

*Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc.*, 326 F.3d 1226
(Fed. Cir. 2003)....................................................................................................... 53

*Brown & Williamson Tobacco Corp. v. Philip Morris Inc.*, 229 F.3d 1120
(Fed. Cir. 2000)....................................................................................................... 37

*Bruno Independent Living Aids, Inc. v. Acorn Mobility Services, Ltd.*, 394
F.3d 1348 (Fed. Cir. 2005)................................................................................ 52, 63

*Cornell and Co., Inc. v. Occupational Safety and Health Comm'n*, 573 F.2d
820 (3d Cir. 1978)................................................................................................... 61

*Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.*, 120 F.3d 1253
(Fed. Cir. 1997)................................................................................................. 52, 56

*Dayco Products, Inc. v. Total Containment, Inc.*, 329 F.3d 1358 (Fed. Cir.
2003) ........................................................................................................................ 55

*Dystar Textilfarben GmbH & Co. Deutschland KG v. C.H. Patrick Co.*,
No. 06-1088, 2006 WL 2806466 (Fed. Cir. Oct. 3, 2006)..................................... 37

*Eli Lilly & Co. v. Barr Labs., Inc.*, 251 F.3d 955 (Fed. Cir. 2001)..................................... 48

*FMC Corp. v. Manitowoc Co.*, 835 F.2d 1411 (Fed. Cir. 1987) ....................................... 64

*Fox Industries, Inc. v. Structural Preservation Systems, Inc.*, 922 F.2d. 801
(Fed. Cir. 1990)....................................................................................................... 54

*Geneva Pharms. v. GlaxoSmithKline PLC*, 349 F.3d 1373 (Fed. Cir. 2003) ............. 48, 51

*GFI, Inc. v. Franklin Corp.*, 265 F.3d 1268 (Fed. Cir. 2001) ................................. 52, 53, 54

*Glaxo Inc. v. Novopharm Ltd.*, 52 F.3d 1043 (Fed. Cir. 1995) ............................................. 57

*Graham v. John Deere Co.*, 383 U.S. 1 (1966) ............................................................ 36, 42

*Heyl & Patterson Int'l, Inc. v. F.D. Rich Housing of the Virgin Islands,*
*Inc.*, 663 F.2d 419 (3d Cir. 1981) .................................................................................. 61

*Hotchkiss v. Greenwood*, 52 U.S. 248 (1850) ............................................................. 41, 42

*In re Dillon*, 919 F.2d 688 (Fed. Cir. 1990) .................................................................... 67

*In re Greenfield*, 571 F.2d 1185 (C.C.P.A. 1978) ............................................................ 42

*In re Kahn*, 441 F.3d 977 (Fed. Cir. 2005) ..................................................................... 36

*In re Lintner*, 458 F.2d 1013 (C.C.P.A. 1972) ................................................................. 44

*In re Longi*, 759 F.2d 887 (Fed. Cir. 1985) ............................................................... 48, 49

*In re O'Farrell*, 853 F.2d 894 (Fed Cir. 1988) ................................................................. 37

*In re Schneller*, 397 F.2d 350 (C.C.P.A. 1968) ........................................................ *passim*

*In re Tiffin*, 448 F.2d 791 (C.C.P.A 1971) ...................................................................... 42

*Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240 ..................................... 79, 80

*Kingsdown Med. Consultants, Ltd. v. Hollister, Inc.*, 863 F.2d 861 (Fed.
Cir. 1988) .................................................................................................................. 54, 81

*LaBounty Mfg., Inc. v. U.S. Int'l Trade Comm'n*, 958 F.2d 1066 (Fed.
Cir. 1992) .................................................................................................................. 52, 74

*Merck & Co., Inc. v. Danbury Pharmacal, Inc.*, 873 F.2d 1418 (Fed. Cir.
1989) ......................................................................................................................... 51, 52

*Molins PLC v. Textron, Inc.*, 48 F.3d 1172 (Fed. Cir. 1995) ....................................... 51, 53

*Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059 (Fed. Cir. 1998) ................................................................................................................. 51

*Norton v. Curtiss*, 433 F.2d 779 (C.C.P.A. 1970) .............................................................. 51

*Novo Nordisk Pharm., Inc. v. Bio-Technology Gen. Corp.*, 424 F.3d 1347 (Fed. Cir. 2005) ................................................................................... 51, 53, 54, 63

*Ortho Diagnostic Sys. Inc. v. Miles Inc.*, 865 F. Supp. 1073 (S.D.N.Y. 1994) ................ 73

*Paragon Podiatry Lab., Inc. v. KLM Labs., Inc.*, 984 F.2d 1182 (Fed. Cir. 1993) .............................................................................................................. 52, 53

*Pharmacia Corp. v. Par Pharm., Inc.*, 417 F.3d 1369 (Fed. Cir. 2005) ........................... 52

*Refac Int'l, Ltd. v. Lotus Development Corp.*, 81 F.3d 1576 (Fed. Cir. 1986) ................. 59

*Rohm & Haas Co. v. Crystal Chem. Co.*, 722 F.2d 1556 (Fed. Cir. 1983) ................ 53, 59

*Sakraida v. AG Pro, Inc.*, 425 U.S. 273 (1976) .................................................................. 37

*Semiconductor Energy Lab. Co., Ltd. v. Samsung Elec. Co., Ltd.*, 24 F. Supp. 2d 537 (E.D. Va. 1998) ...................................................................................... 79

*Superior Fireplace Co. v. Majestic Fireplace Co.*, 270 F.3d 1358 (Fed. Cir. 2001) .................................................................................................................. 75

*Truth Hardware Corp. v. Ashland Products, Inc.*, No. 02-1541, 2003 WL 22005839 (D. Del 2003) ........................................................................ 79, 80, 81

## Statutes and Regulations

35 U.S.C. § 103 ....................................................................................................... *passim*

35 U.S.C. § 112 .............................................................................................................. 45

35 U.S.C. § 254 .............................................................................................................. 75

35 U.S.C. § 255 .............................................................................................................. 75

37 C.F.R. § 1.56(a) (1991) ............................................................................................. 51

37 C.F.R. § 1.56(c)(2)(1989) ......................................................................................... 59

37 C.F.R. § 106(c)(1990) ............................................................................................... 68

**Other Authorities**

MPEP § 201.07 .................................................................................................................... 80

MPEP 5th Ed. § 1305 ........................................................................................................... 69

MPEP 5th Ed. § 2001.06(a), 3rd Revision (May 1986)....................................................... 65

MPEP 5th Ed. § 1308 ........................................................................................................... 70

MPEP 5th Ed. Revision 8, § 609 ..................................................................... 33, 70, 71, 77

MPEP 804 .............................................................................................................................. 46

**Rules**

Fed. R. Civ. P. 15(b) ............................................................................................................. 61

## NATURE AND STAGE OF THE PROCEEDING

This Hatch Waxman Act case was initiated by Bayer AG, Bayer Healthcare AG, and Bayer Pharmaceuticals Corporation (collectively "Bayer") against Dr. Reddy's Laboratories, Ltd. and Dr. Reddy's Laboratories, Inc. (collectively "Reddy") in March of 2004 and a bench trial was held August 7-16, 2006. The parties dispute the validity and enforceability of Bayer's two patents-in-suit, U.S. Patent 4,990,517 ("the '517 patent) and U.S. Patent 5,607,942 ("the '942 patent"). Opening Briefs are being filed concurrently and Answering Briefs will be filed concurrently on November 8, 2006

## SUMMARY OF REDDY'S ARGUMENT

This case is about a large pharmaceutical company, motivated by greed, which engaged in a pattern of deception and inequitable conduct to obtain a broad generic patent covering obvious subject matter in the highly competitive field of quinolone antibacterial compounds. And if this were not bad enough, this same company improperly extended its monopoly by obtaining a second patent covering subject matter that had already been fully disclosed and fully covered by the first ill-gotten patent.

Reddy asserts five defenses against Bayer's two patents : 1) the claims of the '517 patent are invalid under 35 U.S.C. § 103 because they are obvious over the prior art; 2) the claims of the '942 patent are invalid for double patenting under *In re Schneller*, 397 F.2d 350, 355 (C.C.P.A. 1968); 3) the claims of the '942 patent are invalid for obviousness-type double patenting; 4) the '517 patent is unenforceable for inequitable conduct; and, 5) under the doctrine of infectious unenforceability, the inequitable conduct in the '517 patent carries forward and makes the '942 patent unenforceable as well.

1.     <u>The asserted claims of the '517 patent are obvious</u>

At least two of the many compounds covered by the claims asserted against Reddy are obvious, rendering those claims invalid.

Reddy's obviousness case is based on two prior art compounds: Dainippon Compound AT-3295 and Sankyo Compound 1-130. A person of ordinary skill would have been motivated to make certain "bicyclic" analogs of these compounds because the prior art disclosed bicyclic substituents at the "7-position" that resulted in antibacterial compounds that were as good or better than ciprofloxacin, which was the undisputed "Gold Standard". Reddy calls these analogs the "Bicyclic Analog of Dainippon Compound AT-3295" and the "Bicyclic Analog of Sankyo Compound 1-130". The person of ordinary skill would have had a reasonable expectation that these particular bicyclic analogs would be active antibacterial compounds. Thus, the two bicyclic analogs are obvious under 35 U.S.C. § 103.

Claims 1 and 2 of the '517 patent are obvious because they cover the two bicyclic analogs. If those claims are obvious, the remaining asserted claims of the '517 patent are obvious because they only add obvious limitations. Even if the asserted claims cover some other compounds with proven unexpected properties or commercial success, as a matter of law, any claim that includes the obvious analogs is still invalid.

Moreover, Bayer introduced no competent evidence of unexpected properties or secondary considerations to rebut the clear and convincing evidence of obviousness. Although Bayer presented evidence comparing <u>some</u> of the many compounds covered by the claims of the '517 patent to <u>some</u> prior art compounds, Bayer presented no evidence whatsoever comparing the prior art compounds relied on by Reddy to the particular

2

bicyclic analogs asserted to be obvious. The evidence presented by Bayer is thus legally insufficient to rebut Reddy's clear and convincing showing of obviousness. If Bayer's blanket assertion of unexpected properties were truly correct, and if the two bicyclic analogs are, in fact, unexpectedly better than their prior art analogs, it should have been a simple matter for Bayer to introduce a direct head-to-head comparison. Inexplicably, no such head-to-head comparison was introduced at trial and, hence, Bayer's assertion of unexpected properties is legally and factually insufficient to overcome the strong and clear evidentiary showing at trial of obviousness, a showing that, surprisingly, was confirmed by the stunning admissions during cross-examination of Bayer's expert witness, Dr. Taylor.

2.    The '942 patent is invalid for double patenting under
      *In re Schneller*, 397 F.2d 350, 355 (C.C.P.A. 1968)

The double patenting law established by the predecessor to the Federal Circuit in *In re Schneller*, 397 F.2d 350, 355 (C.C.P.A. 1968), prevents Bayer from using the '942 patent to wrongly extend the monopoly it obtained through the earlier issued '517 patent. Specifically, the asserted claims of the '942 patent are fully disclosed and fully covered by the '517 patent and nothing prevented the applicants or Bayer from obtaining the asserted claims of the '942 patent in the '517 patent. In the face of these simple and undisputable facts, the asserted claims of the '942 patent are invalid under *Schneller*. No amount of unexpected results or secondary considerations can overcome *Schneller*-type double patenting because it is based on the improper extension of the right to exclude and not on whether the claims of a later patent are obvious over the prior art or obvious variants of a claim in an earlier patent.

Bayer is likely to argue that *Schneller* is bad law. Bayer might also argue that Schneller is distinguishable on its facts. Such arguments would, however, directly contradict the position Bayer took during the prosecution of the '942 patent. During prosecution Bayer told the Examiner that Bayer took no issue with the holding of *Schneller* and Bayer admitted that *Schneller* was controlling.

3.    The '942 patent is invalid for obviousness-type double patenting

In addition to *Schneller*-type double patenting, the claims of the '942 patent are invalid for "obviousness-type" double patenting because they are obvious variants of certain claims in the '517 patent. The compound in claim 2 of the '942 patent is an obvious variant of claims 4 and 5 of the '517 patent because the only difference between the claims is a methoxy group at the 8-position and the person of ordinary skill would have been motivated by the prior art to use methoxy.

The compound of claim 1 of the '942 patent is also an obvious variant of claims 4 and 5 of the '517 patent. Claim 1 is simply one of the four stereoisomers included within claim 2 of the '942 patent. Bayer did not dispute that the person of ordinary skill would have been motivated to separate the stereoisomers. If claim 2 of the '942 patent is an obvious variant of claims 4 and 5 of the '517 patent, claim 1 of the '942 patent is an obvious variant of these claims as well.

If claims 1 and 2 of the '942 patent are obvious variants, the other asserted claims of the '942 are obvious variants because they merely add obvious limitations.

Reddy maintains as a matter of law that unexpected desirable properties are irrelevant to obviousness-type double patenting. If they are relevant, Reddy has

stipulated that the asserted claims of the '942 patent are not invalid for obviousness-type double patenting.

    4.    <u>The '517 patent is unenforceable for inequitable conduct</u>

The '517 patent is unenforceable because of a pattern of inequitable conduct with respect to four prior art references. Three of these references (the so-called "X References") were untimely and deceptively disclosed to the PTO in a manner calculated to conceal them from the Examiner. As conceded by Bayer's counsel during opening argument, these three X References were considered by the Examiner only after the '517 patent issued -- consideration which was too little and too late. The fourth (and perhaps most important) of these references (referred to as "the Liebigs Reference") was <u>never</u> disclosed to, or considered by, the Examiner, and the improper, deceptive and untimely disclosure of the X References cannot cure Bayer's wrongful and intentional failure to disclose the Liebigs Reference.

There is no dispute that each of the four concealed prior art references anticipated the original application and there is no dispute that the inventors, in-house Bayer patent counsel Peter Bailly, and U.S. outside patent attorney Leonard Horn, each of whom owed a duty of disclosure to the Patent Office, were aware of, and were repeatedly confronted by, these references well before the '517 patent issued. Further, there is clear and convincing evidence that either they knew about the importance of the references to the application for the '517 patent or that they deliberately avoided learning of the importance of these references.

Each one of the four references was highly material to the claims that issued and not one of them was considered by the Examiner before the patent issued. The inventors,

Dr. Bailly and Mr. Horn each had an independent duty to make sure that these four references were considered by the Examiner prior to issuance of the '517 patent. Instead, they engaged in culpable misconduct the impact of which was to conceal these four critical references from the Examiner.

Intent to deceive can properly be inferred from the facts and circumstances here, including the culpable acts of misconduct of the inventors (who knew about the references), Dr. Bailly (who failed to make sure that U.S. counsel disclosed the references to the Examiner), and Mr. Horn (who contrary to well known MPEP requirements, submitted the three X References in a manner designed to make sure that they would not be timely considered by the Examiner, and who failed to ever disclose the Liebigs Reference in the prosecution of the '517 patent despite the fact that he knew or should have known of its clear materiality). In the face of this mountain of evidence, Bayer has utterly failed to produce sufficient credible evidence to support an assertion that the inventors and their legal representatives acted in good faith, and that their pattern of inexplicable failures to disclose constituted merely a string of coincidences. Bayer's inequitable conduct with respect to the four references is clear and manifest, rendering the '517 patent unenforceable.

The reference that was never submitted in the prosecution of the '517 patent, the Liebigs Reference, was highly material because its disclosure of the "Bayer 5/5 Bicycle" anticipated one of the claims as filed and because the Bayer 5/5 Bicycle could have formed the basis for rejecting at least some of the issued claims. The evidence is clear and convincing that at least two of the inventors (Dr. Schenke and Dr. Petersen) knew of the Liebigs Reference and its importance to the '517 patent at the time they signed their

6

Inventors Declaration. There is also undisputed evidence that Bayer's United States attorney (Mr. Horn) knew that the Liebigs Reference anticipated one of the original claims at the time he paid the issue fee and there is clear and convincing evidence that he must have known of its importance to the claims that were about to issue. Nevertheless, Dr. Schenke, Dr. Petersen and Mr. Horn did nothing to cite the Liebigs Reference in the prosecution of the '517 patent and Bayer has not offered any evidence that would excuse or explain this material non-disclosure.

Bayer may argue that Dr. Schenke did not commit inequitable conduct because he did not understand what was in his application when it was filed, and that the signing of his Inventors Declaration was a mere formality. The evidence belies such asserted ignorance, which is flatly contradicted by Dr. Schenke's express certification -- under penalty of perjury -- in his Inventors Declaration that he had read and that he understood the contents of his application, including the specification and the claims. Nevertheless, if Bayer chooses to defend on the ground that Dr. Schenke did not know that the Liebigs Reference was important because he did not understand what was claimed in his application, Reddy asserts that the '517 patent is unenforceable on the ground that Dr. Schenke submitted a false Inventors Declaration.

The submission of an Inventors Declaration is a critical component of the patent application process -- indeed, the Patent Office will not issue a patent without one. The Patent Office relies heavily on the certification of the inventors that they have read and that they understand their application and that there are good grounds for the assertions and claims to the inventions therein. If, in fact, Dr. Schenke did not read and understand his application when he filed it, then his Inventors Declaration contained false and

materially misleading assertions sufficient without more to render the '517 patent unenforceable.

The three other references are referred to as the "X References" because they were cited as X References in a Search Report that issued in the prosecution of the European counterpart to the patents-in-suit. These references were highly material because they anticipated the unelected subject matter following the applicants' traverse of a restriction requirement, and the Examiner had explicitly told the applicants that any prior art which anticipated the unelected subject matter after an election with traverse could be used to reject the claims that were ultimately allowed.

The European Search Report citing the X References came to the attention of the inventors, in-house Bayer patent counsel (Dr. Bailly), and outside U.S. patent counsel (Mr. Horn), after prosecution on the merits of the application for the '517 patent was closed. Specifically, after the elected subject matter was allowed and the issue fee was paid, the X References were cited with an "X" in the Search Report of the European counterpart to the '517 patent, and that Search Report was then forwarded by Bayer's in-house patent counsel to inventor Petersen and outside U.S. patent counsel Horn. However, despite Mr. Horn's reputation for being a master of patent office practice and procedure, Mr. Horn deliberately and with intent to deceive failed to follow the MPEP's requirements for submitting art after payment of the issue fee. Instead, Mr. Horn deliberately and with intent to deceive submitted the X References to the Patent Office in a manner which clearly was calculated to substantially reduce the likelihood that the X References would be timely considered before the patent issued.

8

Mr. Horn's manipulative scheme was successful. The undisputed evidence is that the Examiner considered the X References only after the '517 patent issued, consideration that was too little, too late and which cannot shield Mr. Horn or Bayer from a finding of inequitable conduct in this case.

Mr. Horn's intent to deceive is all the more apparent because he, Bayer's in-house patent attorney (Dr. Bailly), and the inventors had all known about the importance of these references to Bayer's work for a long time. In fact, when he made moxifloxacin for the very first time Dr. Petersen had used an intermediate that he knew to be from one of the X References. Further, Mr. Horn deliberately waited until the '517 patent issued before he cited it in a continuation of the '517 patent. Mr. Horn's plan of deceit came to fruition when the '517 patent issued without any consideration of the X References.

5.    The '942 patent is also unenforceable for inequitable conduct

Under the doctrine of infectious unenforceability, the inequitable conduct in the '517 patent carries forward and renders the '942 patent unenforceable because there is a necessary and immediate relationship between the inequitable conduct in the '517 patent and the relief sought in the assertion of the '942 patent. The inequitable conduct in the '517 patent infects the '942 patent because the relief sought in asserting the two patents is exactly the same.

In particular, the '517 patent and the '942 patent are both being asserted to keep Reddy's generic moxifloxacin product off the market as long as possible. All of the asserted claims of the '942 patent could have been obtained in the '517 patent. If Bayer had obtained the claims of the later patent in the earlier patent (as it clearly could have), there is no question that all of the claims being asserted would be unenforceable upon a

9

finding of inequitable conduct in the earlier patent. That Bayer chose to obtain a second

moxifloxacin patent years after committing inequitable conduct in the prosecution of its

first moxifloxacin patent does nothing to remove the stain lingering from its earlier

misdeeds.

## STATEMENT OF FACTS

1.    Background

A.    This lawsuit

Bayer sells antibacterial drug products containing moxifloxacin hydrochloride

under the tradename Avelox® [JTX 1 at ¶22]. Avelox® is sold under a New Drug

Application ("NDA") held by Bayer which was approved by the United States Food and

Drug Administration ("the FDA") [JTX 1 at ¶25]. As part of its NDA, Bayer listed the

'517 patent and the '942 patent in the FDA Orange Book as patents which covered its

moxifloxacin product [JTX 1 at ¶25].

Reddy filed an Abbreviated New Drug Application ("ANDA") with the FDA

seeking approval to market a generic drug product containing moxifloxacin

hydrochloride prior to the expiration of the '517 and the '942 patents [JTX 1 at ¶26].

On March 24, 2004, Bayer filed this action against Reddy and asserted a technical

act of infringement of the '517 and '942 patents based upon the filing of Reddy's ANDA

[D.I. 1]. Bayer asserts infringement of claims 1, 2, 8, 9, and 11 of the '517 patent and

claims 1, 2, 3, 4, 5, and 7 of the '942 patent [JTX 1 at ¶27]. Bayer's Complaint [D.I. 1]

does not allege willful infringement. Reddy filed its Answer and Counterclaim [D.I. 6]

on May 24, 2004. Reddy defended and counterclaimed on the grounds that the '517 and

'942 patents are invalid and unenforceable [D.I. 6].

10

B.    The Bayer quinolone project

Bayer spent millions of dollars on its quinolone research and development project [Tr. 349:5-9]. The mission was to find a successor to Bayer's highly successful and profitable quinolone antibacterial known as "ciprofloxacin" [Tr. 394:5-9]. Ciprofloxacin was discovered at Bayer in 1981 by Drs. Zeiler, Metzger, and Grohe [Tr. 240:9-12, 243:3-5, 390:7-9] and it became a standard in quinolone research [Tr. 207:20-24, 242:8–12]. Of course, once its ciprofloxacin patents expired, Bayer would lose its market dominance and face substantial generic competition. Like all major companies facing this dilemma, Bayer was desperate to preserve its profit flow and protect its investment in quinolone research and development. To do so, Bayer needed to develop -- and obtain patent protection for -- a next generation quinolone product.

Moreover, from a medical perspective, ciprofloxacin had shortcomings. Although quite effective against gram-negative bacteria, it suffered from relatively low activity against gram-positive bacteria. Aside from the goal of maintaining and expanding profitability, the aim of the quinolone project was to develop a compound that improved on the gram-positive activity of ciprofloxacin while maintaining or improving its activity against gram-negative bacteria [Tr. 207:20–208:4, 243:19-25]. Five Bayer chemists worked on the project: Drs. Petersen, Grohe, Krebs, Schenke, and Schriewer [Tr. 240:16-21]. Dr. Petersen joined the project in 1982, after ciprofloxacin was invented and after Bayer had decided that it needed to strengthen its research in the field of quinolones [Tr. 240:3-15]. The team also included microbiologists [Tr. 241:3-5].

The quinolone project team met about ten times per year, approximately once per month. The purpose of the meetings was to discuss recently published literature,

11

including any relevant patents, and the recent work of the members of the group [Tr. 106:18-24]. Recently published literature was discussed in order to keep members of the group abreast of developments in the quinolone field, as well as the activities of competitors [Tr. 106:25-107:5]. In addition to the scheduled meetings, important journals and references were circulated in the quinolone group for review. These included the Journal of Medicinal Chemistry as well as literature about synthetic organic chemistry, abstracts of new patent literature, and patent applications [Tr. 87:14-25].

By 1988, the Bayer quinolone project had developed two compounds with "bicyclic" substituents at the 7-position which were considered to be potential successors to ciprofloxacin. These compounds were known at Bayer as BAY 8801 and BAY 3118 [Tr. 393:2-394:4, DTX 17; 396: 4-10, DTX 18]. The Bayer patent application that covered these compounds was given the designation "Le A 26 108" and was considered to be a "very important application for the quinolone project" that would provide patent protection to the successor to ciprofloxacin [DTX 17, DTX 18, Tr. 394:1-396:14]. Bayer "needed to get patent protection for the successor to ciprofloxacin in order to make it worth [its] while." [Tr. 394:21-395:3]. The two patents-in-suit (the '517 and the '942 patents) are both based on the Le A 26 108 application [JTX 1 at ¶19].

> 2. Facts compelling a finding that the asserted claims of the '517 patent are obvious under 35 U.S.C. § 103

Ciprofloxacin was the undisputed "Gold Standard" among prior art quinolone and naphthyridone antibacterial compounds [Tr. 197:21-22]. Ciprofloxacin's perceived shortcoming was that it had relatively weak activity against gram-positive bacteria [Tr. 243:16-24, 1163:9-1164:4].

12

In 1985, the prior art disclosed Dainippon Compound AT-3295 as an intriguing

naphthyridone antibacterial compound, compared to the ciprofloxacin Gold Standard,

because it had superior activity against gram-positive bacteria and similar activity in the

gram-negative range [PTX 48, Tr. 373:5-12; DTX 13, Tr. 390:15-391:13, 1275:12-

1277:12, 1281:4-19, 1471:23-1472:1; DTX 115, Tr. 1290:12-19]. Plainly, a person of

ordinary skill would have considered AT-3295 to be an important compound [Tr. 273:2-

275:4, 895:5-896:23; DTX 14, Tr. 1083:20-1084:1; DTX 16, Tr. 1092:1-20; DTX 115,

Tr. 1292:3-5, 1316:12-19; Tr. 1554:6-20, 1645:20-1646:4, 1650:12-23; PTX 222, Tr.

1689:5-21].

European patent application 241,206 [DTX 28, "the Sankyo '206 Application"]

published in October 1987. The Sankyo '206 Application disclosed a number of

quinolone antibacterial compounds. A person of ordinary skill clearly would have

understood Sankyo Compound 1-130 to be one of the most important compounds

disclosed by the Sankyo '206 Application [DTX 28; DTX 501; PTX 2118-B; Tr. 892:24-

893:8, 996:9-15, 1266:14-1267:9, 1268:21-1269:2, 1273:1-17].

In addition, the uncontradicted, undisputed evidence at trial established that at all

relevant times a person of ordinary skill would have been motivated to modify the 7-

position substituents of existing quinolone- and naphthyridone-based compounds [Tr.

960:11-13, 1296:2-17, 1320:9-18, 1548:10-18].

The 7-position substituent on AT-3295 and Sankyo Compound 1-130 is the

monocyclic substituent called "3-amino-4-methyl pyrrolidine" [DTX 503; Tr. 897:9-23].

In addition to "monocyclic" substituents, the prior art also taught the use of "bicyclic"

13

substituents at the 7-position [DTX 161, Tr. 196-200; DTX 299, Tr. 901:4-14; DTX 256, Tr. 901:22-902:19, 1015:7-21; DTX 260, Tr. 908:2-909:19].

There was nothing new about using bicyclic substituents at the 7-position, and researchers in the field had focused from time to time on both monocyclic substituents and bicyclic substituents in their work. In fact, there were clear teachings in the prior art that would motivate persons of ordinary skill to use bicyclic substituents at the 7-position in their efforts make additional antibacterial compounds. As admitted by two of the inventors of the '517 patent, Dr. Schenke and Dr. Petersen, their own prior art patent application [DTX 161] taught that antibacterial compounds with bicyclic 7-position substituents that were "diazabicyclo octanes" were "quite good" compared to ciprofloxacin [Tr. 197:23-25, 419:25-422:6]. In fact, the only structural difference between Examples 1 and 12 of DTX 161 and ciprofloxacin is that ciprofloxacin has a monocycle at the 7-position and Examples 1 and 12 have a bicycle [DTX 161; DTX 511; Tr. 200:24-202:1]. Each and every one of the compounds compared to ciprofloxacin in DTX 161 had a "diazabicyclo octane" substituent at the 7-position [Tr. 420:9-20]. There can be no question that DTX 161 suggested--indeed it strongly encouraged--the use of diazabicyclo octanes at the 7-position.

Thus there is clear and convincing evidence that a person of ordinary skill would have been motivated to modify the monocyclic substituent at the 7-position of AT-3295 and Sankyo Compound 1-130 to make "bicyclic analogs" of those compounds [Tr.

14

899:18-22, 1654:23-1655:5, 1657:21-1658:10]. In particular, a person of ordinary skill plainly would have been motivated to make the compounds referred to by Dr. LaVoie (Reddy's expert) as the "Bicyclic Analog of Dainippon Compound AT-3295" and the "Bicyclic Analog of Sankyo Compound 1-130" and the person of ordinary skill would have had a reasonable expectation that these bicyclic analogs would be active antibacterial compounds [DTX 504; Tr. 910:19-914:14, 1038:11-13, 1052:18-1053:2, 1053:20-1054:3, 1546:10-17, 1637:4-1638:4]. Both analogs fall within the scope of claims 1 and 2 of the '517 patent [Tr. 914:15-23], rendering them obvious.

Moreover, both these analogs have the "Bayer 5/5 Bicycle" attached at the 7-position [DTX 504, Tr. 1364:21-1365:6]. The Bayer 5/5 Bicycle was available to the person of ordinary skill [DTX 218-B, Tr. 935:24-936:6]. The Bayer 5/5 Bicycle is "2, 7 diazabicyclo[3.3.0.]octane" [Tr. 1299:17-19]. In a stunning admission, Bayer's medicinal chemistry expert (Dr. Taylor) testified that if the person of ordinary skill was told to make a diazabicyclo octane derived from the 7-position substituent on Dainippon Compound AT-3295 or Sankyo Compound 1-130, the person of ordinary skill "would have made the Bayer Bicycle" [Tr. 1546:10-17]. This admission is clear and convincing evidence that all but concedes Reddy's obviousness defense. But there is much more than this admission. The inventors' own prior art patent application [DTX 161] strongly encouraged researchers to use diazabicyclo octanes at the 7-position.

Bayer does not seriously dispute that if claims 1 and 2 of the '517 patent are obvious, the other claims the other claims are obvious as well. Claim 8 of the '517 patent adds the limitations that an antibacterially effective amount of a compound from claim 1 is combined with a diluent to make an antibacterial composition [PTX 1, col. 105, lns.

15

34-36, Tr. 917:5-9]. These limitations were described in the prior art and were within the routine knowledge and expertise of the person of ordinary skill [DTX 28, DTX 254, Tr. 917:10-918:22].

Similarly, claim 9 of the '517 patent claims the composition of claim 8 in a tablet, capsule or ampule [PTX 1, col. 105, lns. 37-38, Tr. 919:12-18]. This limitation was described in the prior art and was within the routine knowledge of the person of ordinary skill [DTX 28, Tr. 919:23-920:3].

And claim 11 of the '517 patent is likewise obvious. Claim 11 encompasses a method of combating bacteria in a patient in need thereof which comprises the step of administering to such patient an antibacterially effective amount of the compound of claim 1 [PTX 1, col. 106, lns. 1-4, Tr. 920:4-11]. This limitation also was clearly described in the prior art and was within the routine knowledge of the person of ordinary skill [DTX 28, DTX 254, Tr. 920:12-921:16].

Thus, claims 1, 2, 8, 9 and 11 of the '517 patent are invalid for obviousness under 35 U.S.C. § 103.

### 3. Facts compelling a finding that the asserted claims of the '942 patent are obvious under the holding in *In re Schneller*

The '942 patent is merely a subset of claims in the '517 patent. Every claim of the '942 patent could have been included in the '517 patent because each asserted claim of the '942 patent was fully disclosed and fully enabled by the application for the '517 patent (the '434 application) when it was filed in the United States Patent and Trademark Office ("the Patent Office") [JTX 1 at ¶41]. It is undisputed that each asserted claim of the '942 patent is covered by at least one claim of the '517 patent [JTX 1 at ¶40]. Bayer AG was the assignee of the applications leading to the '517 and '942 patents during their

prosecution at the Patent Office [JTX 1 at ¶20]. Nothing prevented the applicants or their assignee from obtaining each asserted claim of the '942 patent in the '517 patent [Tr. 697:18-698:1]. A terminal disclaimer of the '942 patent over the '517 patent has not been filed in the Patent Office [JTX 1 at ¶21].

These facts compel a finding that claims 1, 2, 3, 4, 5 and 7 of the '942 patent are invalid under the holding in *In re Schneller*, 397 F.2d 350, 355 (C.C.P.A. 1968).

    4.    Facts compelling a finding that the asserted claims of the
           '942 patent are invalid for obviousness-type double patenting

In addition to the facts listed in subsection 3 (immediately above) the asserted claims of the '942 patent are invalid for obviousness-type double patenting because:

The compound claimed in claim 2 of the '942 patent [DTX 3, col. 99, lns. 8-17] is the same as the compounds defined by either claim 4 or claim 5 of the '517 patent [DTX 1, col. 104, lns. 30-39, 50-60], except that where the 8-position substituent in claim 2 of the '942 patent is methoxy, the 8-position substituent in claims 4 and 5 of the '517 patent is fluorine and chlorine, respectively [Tr. 922:3-923:23].

Claim 2 of the '942 patent is an obvious variant of claims 4 and 5 of the '517 patent because the Sankyo '206 Application [DTX 28] would have motivated the person of ordinary skill to replace the 8-position substituents of the compounds in claim 4 and claim 5 of the '517 patent with a methoxy group [Tr. 922:18-923:18]. All of the "most preferred" compounds of the Sankyo '206 Application [DTX 28] have a methoxy at the 8-position [Tr. 892:13-18, 1519:17-20]. The Sankyo '206 Application suggests to the person of ordinary skill that a methoxy substituent at the 8-position was associated with excellent antibacterial activity [Tr. 893:9-16]. The person of ordinary skill would have

17

had a reasonable expectation that the resulting compound (i.e., claim 2 of the '942 patent) would be an effective antibacterial agent [Tr. 925:4-14].

The compound defined by claim 1 of the '942 patent [DTX 3, col. 98, ln. 52 - col. 99, ln. 2] is the same as the compounds defined by claims 4 and 5 of the '517 patent except that in claim 1 of the '942 patent the 8-position substituent is methoxy and the compound of claim 1 in the '942 patent is directed to one of the four stereoisomers [DTX 506, Tr. 925:15-18, 929:13-18].

Claim 1 of the '942 patent is an obvious variant of claims 4 and 5 of the '517 patent because the person of ordinary skill would have been motivated to replace the 8-position substituent of the compounds defined by claims 4 and 5 of the '517 patent with a methoxy group [Tr. 922:18-923:18] and to resolve the resulting mixture of stereoisomers into the individual stereoisomers [Tr. 929:19-930:1]. The compound in claim 1 of '942 patent is one of the four stereoisomers [Tr. 930:14-16]. The person of ordinary skill would have had a reasonable expectation that at least one of the four stereoisomers would be an effective antibacterial agent [Tr. 925:4-14, 930:6-10].[1]

Claims 3 and 4 of the '942 patent are obvious variants of claims 4 and 5 of the '517 patent. Claim 3 of the '942 patent adds the limitations that an antibacterially effective amount of a compound from claim 1 is combined with a diluent to make an antibacterial composition [DTX 3, col. 99, lns. 21-23, Tr. 930:17-21]. Claim 4 of the '942 patent adds the limitations that an antibacterially effective amount of a compound

_____

[1] There was no dispute at trial that the prior art would have motivated the person of ordinary skill to resolve pharmaceutical drugs that were mixtures of stereoisomers into the individual stereoisomers [DTX 304, DTX 305, Tr: 927:3-929:5] and that the person of ordinary skill would have had a reasonable expectation that one of the stereoisomers would be as active or more active than the mixture of the stereoisomers [Tr. 930:6-10].

from claim 2 is combined with a diluent to make an antibacterial composition [DTX 3. col. 100, lns. 1-3, Tr. 930:22-931:2]. These limitations were described in the prior art and were within the routine knowledge and expertise of the person of ordinary skill [DTX 28, DTX 254, Tr. 917:10-918:22].

Claims 5 and 7 of the '942 patent are obvious variants of claims 4 and 5 of the '517 patent. Claim 5 of the '942 patent claims a method of combating bacteria in a patient in need thereof which comprises the step of administering to such patient an antibacterially effective amount of the compound of claim 1 [DTX 3, col. 100:4-5-8, Tr. 931:3-8]. Claim 7 of the '942 patent claims a method of combating bacteria in a patient in need thereof which comprises the step of administering to such patient an antibacterially effective amount of the compound of claim 2 [DTX 3, col. 100, lns. 13-16, Tr. 931:18-24]. This limitation was described in the prior art and was within the routine knowledge of the person of ordinary skill [DTX 28, DTX 254, Tr. 920:12-921:16].

These facts compel a finding that claims 1, 2, 3, 4, 5 and 7 of the '942 patent are invalid for obviousness-type double patenting over claims 4 and 5 of the '517 patent.

5.    Facts compelling a finding that the '517 patent
      is unenforceable because of inequitable conduct

This part of the fact section is organized as follows: A) facts concerning the materiality of the "Liebigs Reference"; B) facts concerning intent to deceive with respect to the Liebigs Reference; C) facts concerning the materiality of the "X References"; and, D) facts concerning intent to deceive with respect to the "X References".

A.    Facts concerning the materiality of the Liebigs Reference

It is undisputed that the Liebigs Reference [Justus Liebigs Ann. Chemie, 677, 154 (1964), DTX 218-B] disclosed the "Bayer 5/5 Bicycle" (2,7-diazabicyclo[3.3.0] octane) in the year 1964 [Tr. 935:24-936:21].

The Liebigs Reference was highly material to the application for the '517 patent (the '434 application) because the Liebigs Reference discloses the Bayer 5/5 Bicycle and the '434 application [PTX 2 at BL020-000338 to 000528] explicitly claimed the Bayer 5/5 Bicycle in original claim 19 [PTX 2 at BL020-000527; Tr. 400:24-401:2].

Moreover, the Bayer 5/5 Bicycle was highly material to issued claim 7 of the '517 patent [PTX 1, col. 105:15-16] because issued claim 7 claims a compound with the Bayer 5/5 Bicycle attached at the 7-position [Tr. 139:1-7]. Claim 7 of the '517 patent issued from original claim 10 of the '434 application [PTX 2 at BL020-000523].

If the Bayer 5/5 Bicycle is attached to the 7-position of a particular prior art intermediate disclosed as "Compound II" in DTX 341, the resulting compound is the compound claimed in claim 7 of the '517 patent [DTX 161; DTX 341; DTX 510; Tr. 206:6-207:13, 939:5-11]. A reasonable examiner could have issued a rejection of issued claim 7 of the '517 patent over a combination of the Liebigs Reference (which discloses the Bayer 5/5 Bicycle) and DTX 341 (which discloses Compound II) [DTX 161; DTX 341; DTX 510; Tr. 206:6-207:13, 939:5-11]. But, when the Examiner allowed claim 7 of the '517 patent, the Examiner had not been told that the Bayer 5/5 Bicycle was in the prior art. To the contrary, the Examiner had every reason to believe that the Bayer 5/5 Bicycle was not in the prior art because the named inventors of the '434 application had all sworn that they were entitled to claim the Bayer 5/5 Bicycle [DTX 74].

The Bayer 5/5 Bicycle was material to issued claim 1 of the '517 patent because issued claim 1 includes the compound claimed by issued claim 7 [PTX 2, col. 105, ln. 16]. It is undisputed that issued claims 1, 2, and 3 of the '517 patent all include compounds with the Bayer 5/5 Bicycle at the 7-position [Tr. 139:9-25]. A reasonable Examiner would have also considered the Bayer 5/5 Bicycle important because Example 26 of the '517 patent shows the use of the Bayer 5/5 Bicycle to make the compound claimed in claim 7 of the '517 patent [PTX 1, col. 90; Tr. 138:17-25].

These facts clearly and convincingly establish a finding that the Liebigs Reference was material to the prosecution of the '517 patent.

B.    Facts concerning intent to deceive
        with respect to the Liebigs Reference

The following facts show that in June of 1989, when they signed their Inventors Declaration for the '434 application [DTX 74], Dr. Schenke and Dr. Petersen both knew that the Bayer 5/5 Bicycle was material to the '434 application and they both knew that the Bayer 5/5 Bicycle had already been published in the Liebigs Reference

First, the '434 application is based on the German application given the designation "Le A 26 108" [JTX 1 at ¶8; PTX 2 at BL0020-000714 to 000844, Tr. 150:8-11]. The Le A 26 108 application was considered by Drs. Schenke and Petersen, and more generally, the members of the Bayer quinolone project, to be an important application because it was thought to cover the likely commercial successor to ciprofloxacin [DTX 17, DTX 18, Tr. 394:1-396:14]. The Le A 26 108 application explicitly claimed the Bayer 5/5 Bicycle by chemical name in claim 11 [PTX 2 at BL020-000844] and it described a method of making the Bayer 5/5 Bicycle [Tr. 149:-19-150:7]. The Le A 26 108 application was filed in Germany in July of 1988 [JTX 1 at ¶8].

There can be no dispute that Dr. Schenke knew that the Le A 26 108 application was directed, in part, to the Bayer 5/5 Bicycle. Specifically, in December of 1988, Dr. Schenke reported to the quinolone project team that the Bayer 5/5 Bicycle was one of the substituents that worked well at the 7-position and that the Bayer 5/5 Bicycle was part of "Le A 26 108" [DTX 76 at 5; Tr. 144:20-145:19].

Several months later (and just several months before signing his Inventors Declaration for the '434 application) Dr. Schenke was working in March and April of 1989 on another patent application given the designation "Le A 26 686" [PTX 15; Tr. 130:3-6]. The Le A 26 686 application is directed to making bicyclic pyrrolidines similar to the Bayer 5/5 Bicycle for use in making quinolone antibacterial compounds [PTX 15 at DRLMOX 042556, DRLMOX 042737; Tr. 102:5-17]. Most significantly, as Dr. Schenke and Dr. Petersen clearly knew, the Le A 26 686 application explicitly acknowledged on its very first page that the Bayer 5/5 Bicycle had been already published in the Liebigs Reference [PTX 15 at DRLMOX 042556, DRLMOX 042737]. Although smoking guns are rare in patent cases, this is a proverbial smoking gun -- proving that Drs. Schenke and Petersen were well aware of the Liebigs Reference and its importance to their work in Bayer's quinolone project, including work that was related to the subject matter of the '517 patent.

Although Dr. Schenke first disingenuously and incredibly testified that there was no relationship between the Le A 26 686 application and the application that formed the basis for the '517 patent [Tr. 154:22-24], Dr. Schenke later reluctantly admitted that there was in fact an overlap between the subject matter claimed in the two applications [Tr. 157:4-158:21].

Dr. Schenke and Dr. Petersen (the two co-inventors of Le A 26 686) filed the Le A 26 686 application in April of 1989 [Tr. 165:17-21]. Dr. Schenke testified that, to his knowledge, in April of 1989 Dr. Petersen also knew that the Bayer 5/5 Bicycle had been disclosed in the Liebigs Reference [Tr. 165:17-21]. Dr. Schenke further testified that in May and June of 1989 Dr. Schenke fully knew that the Bayer 5/5 Bicycle had been disclosed in the Liebigs Reference [Tr. 163:13-18].

Shortly thereafter, in June of 1989, Dr. Schenke and Dr. Petersen signed the Inventors Declaration for the '434 application. In doing so, they certified that they had reviewed and that they understood the specification, "including the claims" [DTX 74]. Assuming that he told the truth in his declaration, and in view of his central role in connection with the Le A 26 686 application filed in April 1989, Dr. Schenke clearly must have understood that the Bayer 5/5 Bicycle was important to the '434 application and that claim 19 of the '434 application claimed the Bayer 5/5 Bicycle [Tr. 135:9-12, 19].

Even if Dr. Schenke only relied on his reading of the German Le A 26 108 application when he signed the declaration for the '434 application, he admitted that he "knew exactly what was synthesized and what the invention was about . . ." [Tr. 135:4-8]. Moreover, when Dr. Schenke signed the declaration he was "focused on the bicycles" and "the Bayer 5/5 Bicycle was one of the bicycles" [Tr. 140:20-25]. Assuming that Dr. Schenke truly read and understood his Le A 26 108 application, he could not have missed the fact that it specifically claimed the Bayer 5/5 Bicycle, nor could he have missed the clear relevance of the Leibigs Reference to the '434 application.

23

A little less than one year later, on March 20, 1990, Dr. Schenke and Dr. Petersen signed another Inventors Declaration so that the Le A 26 686 Application could be filed in the United States [PTX 15 at DRLMOX 042631-632; Tr. 171:18-172:2]. Like the German version, the United States version explicitly disclosed on its first page that the Bayer 5/5 Bicycle had been published in the Liebigs Reference [Tr. 129:23-130:12, 359:23-360:10]. Assuming that Dr. Schenke and Dr. Petersen told the truth when they signed the Inventors Declaration for this application, they both understood on March 20, 1990 that the Bayer 5/5 Bicycle had been disclosed in the Liebigs Reference, yet they did nothing at this time to disclose the Liebigs Reference to the Examiner responsible for the '434 application, where a claim to the Bayer 5/5 Bicycle was still pending.

At trial, Bayer offered no good faith explanation for why Drs. Schenke and Petersen and their in-house and outside counsel failed to make sure that the Liebigs Reference was disclosed in the prosecution of the '434 application. Given the fact that they were repeatedly confronted with the Leibigs References in connection with their work on the co-pending German and United States Le A 26 686 applications and their sworn representation in the Inventors Declaration that they read and understood the claims of the '434 application, they could not possibly have failed to understand the clear relevance of the Liebigs Reference to the '434 application. Given the high degree of materiality of the Liebigs Reference and the clear awareness that Dr. Schenke and Dr. Petersen had of this reference, their failure to disclose it during prosecution of the '434 application cannot possibly have been an innocent mistake. Even putting the best possible "spin" on the situation from Bayer's perspective, at the very least these Bayer scientists exhibited culpable indifference to their duties of candor and disclosure.

24

But there is even more evidence of deceptive intent, because even after the prosecution of the '434 application was officially closed, Dr. Petersen, in-house counsel Dr. Bailly and Mr. Horn were again confronted with the Liebigs Reference in circumstances in which they must certainly have realized its clear relevance to the '434 application. Yet, as shown below, no steps were taken to cure the previous improper and deceptive non-disclosure. Rather, the deception continued unabated and the Liebigs Reference was never disclosed in the prosecution of the '434 application.

The '434 application was allowed on August 27, 1990, on which date prosecution was officially closed [PTX 2 at BL020-001216 to 001217; Tr. 528:17-19; JTX 1 at ¶ 54]. Shortly thereafter, in September of 1990, Mr. Horn filed a division of the '434 application ("the '906 division application") [PTX 11; Tr. 542:6-9; JTX 1 at ¶ 59]. This division included original claim 19 of the '434 application (i.e., the claim that was anticipated by the Liebigs Reference) [PTX 11 at DRLMOX 036479].

On October 1, 1990, Mr. Horn, acting on information from Dr. Petersen [Tr. 338:12-20], submitted the Liebigs Reference in the prosecution of the '906 division application [PTX 11 at DRLMOX 036491-493]. Mr. Horn amended claim 19 of the division application to delete the Bayer 5/5 Bicycle because he and Dr. Petersen knew that claim 19 was anticipated by the Liebigs Reference [*Id.*; Tr. 542:22-543:15, 702:8-23, 753:18-25]. Incredibly, however, when Mr. Horn submitted the Liebigs Reference in the prosecution of the '906 division application he did not direct it to the attention of the Examiner of the parent application [DTX 98 at BL001-011200; Tr. 221:10-222:21]. It is stunning, in these circumstances, that Mr. Horn and Dr. Petersen did nothing to submit the Liebigs Reference in the prosecution of the parent application (i.e., the allowed '434

application that was to issue as the '517 patent), even though both of them knew or should have known that the Liebigs Reference was highly material to the claims that would ultimately issue in the '517 patent.

        C.     Facts concerning the materiality of the X References

In addition to the Liebigs Reference's anticipation of claim 19, it is undisputed that original claim 1of the '434 application was anticipated by three other references [Tr. 185:10-14, 186:16-21, 214:21-215:3][2]. The three references that anticipated original claim 1 were the Sankyo '206 Application [DTX 28], the Dainippon Abstract [DTX 87] and the Egawa Article [DTX 4]. These three references are referred to as the "X References" because they were later cited as "X" references in a Search Report issued by the European Patent Office in the prosecution of the European counterpart to the patents-in-suit [DTX 279; Tr. 591:20-592:17, 593:16-18, 595:17-596:4].

On March 23, 1990, Mr. Horn conducted a telephonic interview with Examiner Dentz in the prosecution of the '434 application [PTX 2 at BL020-000855]. Examiner Dentz told Mr. Horn that the claims needed to be restricted because they were too broad [Id.]. On the telephone call, Mr. Horn made a verbal provisional election to prosecute a subset of what was claimed in the original application [Id.]. Mr. Horn made clear in this telephone interview that he objected to the Examiner's restriction requirement--i.e., that his provisional election was made with "traverse" [Id.].

On April 4, 1990, Examiner Dentz issued a written Examiner's Action in the prosecution of the '434 application [PTX 2 at BL020-000852 to 000859]. In the Examiner's Action, Examiner Dentz repeated his position that the claims were too broad

---

[2] Original claim 1 of the '434 application was directed to a broad genus of claims based on three types of 7-position substituents [PTX 2 at BL020-000513].

and he repeated in writing his restriction requirement [PTX 2 at BL020-000852 to

000856]. In so doing, Examiner Dentz explicitly put Mr. Horn on notice that if the

applicants were to elect with traverse, the Examiner could reject the elected subject

matter over any prior art that anticipated the non-elected subject matter:

```
      Should applicant traverse on the ground that the
species are not patentably distinct, applicant should
submit evidence or identify such evidence now of record
showing the species to be obvious variants, or clearly
admit on the record that this is the case.  In either
instance, if the examiner finds one of the inventions
anticipated by the prior art, the evidence of admission
may be used in a rejection under 35 U.S.C. 103 of the
other invention.
```
[PTX 2 at BL020-000855].

On July 19, 1990, Mr. Horn filed an Amendment in the '434 application which

affirmed the provisional election that was made during the telephone call of March 23,

1990 [PTX 2 at BL020-000892 to 000895]. Despite the warning in the April 4, 1990

Examiner's Action, Mr. Horn objected to the restriction requirement, making it clear that

his election was made "with traverse". To support the traverse Mr. Horn made a critical

admission:  that the non-elected and the elected compounds "share a great deal of

common structure" and that the structural differences were not "remote" enough to

require restriction:

```
      Applicants affirm their election of Group IV, claims
1 to 3, 7 to 10 and 12 to 18, with traverse.  The compounds
share a great deal of common structure and utility.  They
further share R³ as B, i.e. an amino-pyrrolidine, with A and
C which merely have the amino group as part of a further
ring but not really so remote structurally.
```
[PTX 2 at BL020-000893].

As an experienced practitioner, Mr. Horn clearly understood that by supporting his traverse on the ground that the elected and non-elected compounds "share a great deal of common structure" he was acknowledging that any prior art that could support a rejection by the Examiner of the non-elected claims might also support a rejection of the elected claims.

On August 10, 1990, Mr. Horn conducted a telephone interview with Examiner Dentz in the '434 application and Mr. Horn gave the Examiner the authority to issue an Examiner's Amendment that canceled the non-elected subject matter [PTX 2 at BL020-001216 to 001217]. Mr. Horn did not, however, withdraw the admission he had made to support the traverse. While the non-elected subject matter would now be cancelled, the admission of structural similarity remained a part of the prosecution history.

The Examiner allowed the claims of the '434 application on August 27, 1990 [PTX 2 at BL020-001213 to 001216]. At this point in time, prosecution on the merits was closed [PTX 2 at BL020-001213]. Mr. Horn paid the issue fee for the '434 application on October 31, 1990 [PTX 2 at BL020-001219; JTX 1 at ¶54].

On November 7, 1990, the European Patent Office mailed the Search Report for European Patent Application 89111950 to the Bayer Patent Department [PTX 2 at BL020-001230 to 001234; JTX 1 at ¶56]. This application was the European counterpart to the '434 application. The European Search Report lists the Sankyo '206 Application [DTX 28], the Dainippon Abstract [DTX 87] and the Egawa Article [DTX 4] as "X" references, i.e., "of particular relevance when considered alone" [PTX 2 at BL020-001230 to 001234; DTX 88 at BL005-051705 (translation)]. Plaintiffs do not dispute that each of the X References anticipated the non-elected subject matter from claim 1 of the

28

'434 application. Nor can it reasonably be disputed that the X References could have been cited by a reasonable patent examiner to support a *prima facie* obviousness rejection of the elected subject matter. Indeed, one of the X References (the Sankyo '206 Application) supports Reddy's obviousness defense in this case.

The '434 application issued as the '517 patent on February 5, 1991 [PTX 1; JTX 1 at ¶6]. Although the X References anticipated the non-elected subject matter, Bayer's counsel candidly admitted at trial that none of the X References were considered in the prosecution of the '434 application before it issued as the '517 patent [Tr. 52:24-53:2; *see also* Tr. 638:2-7, 638:23-639:24, 642:8-20; PTX 2 at BL020-001562].

These facts clearly show that the "X References" were material to the claims that issued in the '517 patent. The X References anticipated claims as originally filed and remained highly material to the claims as issued, particularly in light of Mr. Horn's admission that the elected and the non-elected subject matter "share a great deal of common structure."

      D.    Facts showing intent to deceive with respect to the
              three X References

Dr. Petersen and Dr. Schenke knew about the three X References, and their importance to Bayer's work, before they signed their Inventors Declaration. On November 24, 1987, Dr. Schenke sent Dr. Petersen a memorandum to inform Dr. Petersen of three references found in a literature search commissioned by Dr. Schenke [Tr. 109:8-16, 187:5-9]. Dr. Schenke's memorandum provided a citation to the Egawa Article [DTX 4] (one of the X References) and it included a copy of the Dainippon Abstract [DTX 5, Tr. 185:17-187:19] (another of the X References). Dr. Schenke testified that Dr. Petersen was aware of these references, that Dr. Petersen had knowledge

29

of the compounds and that Dr. Petersen "should have" submitted these references to the

Bayer Patent Department so they could be submitted to the United States Patent Office in

the prosecution of the '517 patent [Tr. 189:15-192:7].

The Dainippon Abstract and the Egawa Article each disclose a compound that

anticipated original claim 1 of the '434 application [DTX 5, Tr. 185:6-14; DTX 4,

186:16-21]. Dr. Petersen kept a copy of the Dianippon Abstract [DTX 600] in his

collection of quinolone patent abstracts [Tr. 384:5-8]. On his personal copy of the

Dainippon Abstract, Dr. Petersen highlighted the formula for the compound that

anticipated original claim 1 of the '434 application [Tr. 383:18-385:23]. Dr. Petersen

could not remember when he made the highlighting, but he testified that he could have

done it anytime during his research in the 1980's [Tr. 385:15-21].

The inventors were also aware of the Sankyo '206 Application before they signed

their Inventors Declaration. Thus, for example, on November 25, 1987, Dr. Grohe

reported to the Bayer quinolone project team, including Dr. Schenke and Dr. Petersen,

that the Sankyo '206 Application [DTX 28] was "New Literature" [DTX 1 at BL005-

001286 to BL005-001287; Tr. 107:6-20, 177:10-178:13].

Then, on January 26, 1988, Dr. Schenke informed the Bayer quinolone project

team that a publication by "Ube/Sankyo" showed some of the same compounds that he

had been working on in his laboratory for use in 8-alkoxy quinolones [DTX 2 at BL005-

01278]. Dr. Schenke could not remember whether he had the Sankyo '206 Application in

hand when he wrote in DTX 2 about "Ube/Sankyo" [Tr. 180:8-10], but it certainly seems

that he did because the assignees of the Sankyo '206 Application are stated on the first

page to be "Ube" and "Sankyo" [DTX 28] and Dr. Schenke agreed that the material he

wrote in DTX 2 is consistent with the Sankyo '206 Application [Tr. 180:11-14]. In regard to what he wrote in DTX 2 in January of 1988, Dr. Schenke admitted that he was "disappointed" that some of his work had already been published [Tr. 120:24-121:8]. This remarkable admission conclusively demonstrates that Dr. Schenke understood that the Sankyo '206 Application (or some other prior art by the same assignees) was highly relevant to some of his work that eventually became part of the application for the '517 patent.

The Sankyo '206 Application also came to Bayer's attention in a quinolone patent application being examined by a different Examiner from the one who was examining the application for the '517 patent. That other application, United States application 07/298,459 ("the '459 application") was another quinolone patent application being prosecuted by Mr. Horn on behalf of Bayer [PTX 14; Tr. 547:14-25, 548:20-549:6, 619:17-19; JTX 1 at ¶60]. On January 10, 1990, Mr. Horn had an interview with the Examiner of the '459 application (Examiner Bernhardt) and attention was directed to the Sankyo '206 Application [PTX 14 at DRLMOX 040604, Tr. 549:15-550:7].

On April 23, 1990, Examiner Bernhardt rejected the '459 application over the Sankyo '206 Application [PTX 14 at DRLMOX 040675-679; Tr. 550:4-22]. Dr. Petersen, Dr. Bailly and Mr. Horn participated in preparing a response [Tr. 308:3-309:5, 551:6-552:3, 625:23-626:20, 627:3-18, 628:2-7].

On or about July 26, 1990, Dr. Petersen directed his laboratory assistant to synthesize "racemic moxifloxacin" for the first time [Tr. 445:10-446:2; PTX 1079 at BL008-012351; JTX 1 at ¶61]. Racemic moxifloxacin is the compound claimed in claim 2 of the '942 patent [Tr. 194:10-17, 445:10-18; JTX 1 at ¶71]. When Dr. Petersen

instructed his laboratory assistant to make racemic moxifloxacin for the first time, the Sankyo '206 Application still anticipated the '434 application and Dr. Petersen knew he was instructing his laboratory assistant to use an intermediate compound described in the Sankyo '206 Application [JTX 1 at ¶¶63-64; Tr. 445:10-446:2, PTX 1079 at BL008-012394].

On August 22, 1990 Mr. Horn filed a response in the '459 application to the April 23, 1990 rejection over the Sankyo '206 Application [PTX 14 at DRLMOX 040868-870; Tr. 553:11-554:11].

These facts demonstrate that Mr. Horn and Drs. Schenke, Petersen and Bailly were repeatedly confronted with the Sankyo '206 Application between the filing of the '434 application and the allowance of the claims for the '517 patent.

The claims of the '434 application were allowed on August 27, 1990 [PTX 2 at BL020-001213 to 001216; Tr. 528:17-19, 727:9-17]. The Notice of Allowance states in underlined bold capital letters that **PROSECUTION ON THE MERITS IS CLOSED** [PTX 2 at BL020-001213].

On September 10, 1990, Mr. Horn filed application 07/580,906 ("the '906 division application") as a division of the '434 application [PTX 11; Tr. 614:20-25, 635:19-24; JTX 1 at ¶59].

On or about September 25, 1990, Dr. Petersen reminded his co-inventors of the Sankyo '206 Application when he reported to the Bayer quinolone project on his work to distinguish the Sankyo '206 Application in the prosecution of the '459 application [DTX 3 at BL002-101023; Tr. 375:9-376:11]. This report mentioned the intermediate that he

had used in July to make racemic moxifloxacin (i.e., PEW 6893) and which he would soon use to make moxifloxacin [DTX 3 at BL002-101023; *see also* JTX 1 at ¶¶63-64].

On or about October 4, 1990, Dr. Petersen instructed his laboratory assistant to synthesize moxifloxacin for the very first time [PTX 1079 at BL008-012124]. Dr. Petersen admitted he was aware he was instructing his assistant to use an intermediate disclosed in the Sankyo '206 Application [Tr. 446:3-16; JTX 1 at ¶66].

Mr. Horn paid the issue fee for the '434 application on October 31, 1991 [PTX 2 at BL020-001230 to -001234; Tr. 531:3-6, 582:4-19, 729:3-6; JTX 1 at ¶55]. However, Mr. Horn and Dr. Petersen were soon confronted yet again with the three X References. Specifically, on November 12, 1990, Dr. Bailly sent Dr. Petersen and Mr. Horn a copy of the European Search Report and the cited references from the European counterpart of the '434 application [Tr. 533:23-534:4; JTX 1 at ¶58]. Dr. Bailly knew that these materials had to be sent to the United States Patent Office for consideration by the Examiner [Tr. 534:19-535:2].

On November 16, 1990, Mr. Horn submitted the European Search Report (and copies of the cited references) to the Patent Office in the prosecution of the '434 application [PTX 2 at BL020-001221; Tr. 532:2-17, 776:11-20]. Mr. Horn recognized that there was "some urgency" in submitting the European Search Report because the issue fee for the '434 application had already been paid [Tr. 843:2-24]. Although Mr. Horn was familiar with the MPEP [Tr. 723:3-13] and was known to follow it [Tr. 724:19-24], Mr. Horn did not follow the procedure listed in Section 609 of the MPEP for the submission of art after payment of the issue fee. That section of the MPEP explicitly states that art submitted without following the listed requirements "will not ordinarily be

considered" [DTX 97 at 600-66; Tr. 724:19-24]. There is no record in the file history of the '434 application [PTX 2] that Mr. Horn had any conversation with the Examiner of the '434 application concerning the European Search Report or the X References.

Moreover, when Mr. Horn submitted the European Search Report and the X References in the prosecution of '434 application (where prosecution on the merits was closed), Mr. Horn violated his regular practice of citing art "as soon as possible" [Tr. 835:1-3] by refraining from submitting these materials in the '906 division application (where prosecution was still pending and where claim 1 was anticipated by at least the Sankyo '206 Application [Tr. 933:2-17]). Mr. Horn's delay in citing the X References in the '906 division application was clearly intentional.

There is no doubt that Mr. Horn and his clients at Bayer were focused on the X References between the time that Mr. Horn sent them to the Patent Office without following the MPEP and the time the '517 patent issued. Specifically, on November 27, 1990, January 16, 1991, and January 18, 1991, Dr. Petersen, Dr. Bailly and Mr. Horn exchanged privileged correspondence concerning the Sankyo '206 Application in the context of the '434 application [DTX 214 at 36, 39, and 41].

On or about January 17, 1991, the Patent Office informed Mr. Horn that the '434 application would issue as the '517 patent on February 5, 1991 [DTX 95 at BL001-01367, BL001-01369; Tr. 644:11-645:9]. At this point in time, Mr. Horn had no reason to believe that the European Search Report or any of the X References had been considered in the prosecution of the '434 application and Mr. Horn did nothing to withdraw the '517 patent from issue.

The '434 application issued as the '517 patent on February 5, 1991 [PTX 1; JTX 1 at ¶6]. On February 11, 1991, Examiner Dentz sent a letter to Mr. Horn indicating that the X References were considered on February 8, 1991 [PTX 2 at BL020-001562 to 001563]. The words "Notice of Allowance", printed at the top of the letter, were crossed out [PTX 2 at BL020-001562], indicating that the letter was not a Notice of Allowance.

On February 14, 1991, after the '517 patent had safely issued, Mr. Horn submitted the European Search Report and the X References in the '906 division application [PTX 11 at DRLMOX 036501-036508; Tr. 754:1-18]. Bayer offered no evidence to explain why Mr. Horn did not follow his ordinary practice and submit the X References three months earlier. The only logical explanation is that Mr. Horn was clearly focused on the devastating materiality of the X References and that he was waiting for the dust to settle.

E.    Facts concerning the relationship between the relief sought
in the '517 patent and the relief sought in the '942 patent

The '517 patent and the '942 patent share the same specification, the same inventors and the same assignee [compare PTX 1 and PTX 3].

The subject matter claimed by the '942 patent is a subset of the subject matter claimed in the '517 patent [JTX 1 at ¶40; PTX 4 at BL020-001929, BL020-001933].

Each claim of the '942 patent could have been obtained in the '517 patent [JTX 1 at ¶41]. In fact, to avoid intervening art, Bayer insisted during prosecution that the '942 patent was entitled to claim priority back to the application for the '517 patent [Tr. 785:9-23].

Bayer caused both the '517 patent and the '942 patent to be listed in the FDA Orange Book as covering moxifloxacin [JTX 1 at ¶27]. Bayer is suing Reddy under both

patents to keep generic moxifloxacin off the market for as long as possible [JTX 1 at ¶27].

**ARGUMENT**

1.    The '517 Patent is obvious

    A.    The law of obviousness

The nonobviousness requirement of 35 U.S.C. § 103 excludes from patentability "that which could be readily deduced from publicly available material by a person of ordinary skill in the pertinent field of endeavor." *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 150 (1989). Under 35 U.S.C. § 103(a), a claim is invalid when "the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art." The following inquiries are relevant to the question of whether a claimed invention is obvious under 35 U.S.C. § 103: (1) the scope and content of the prior art; (2) the level of ordinary skill in the art; (3) the differences between the claimed invention and the prior art; and (4) any objective indicia of non-obviousness. *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966).

According to the Federal Circuit, "a court must ask 'whether a person of ordinary skill in the art, possessed with the understandings and knowledge reflected in the prior art, and motivated by the general problem facing the inventor, would have been led to make the combination recited in the claims.'" *Alza Corp. v. Mylan Laboratories, Inc.*, No. 06-1019, 2006 WL 2556356, at *3 (Fed. Cir. Sept. 6, 2006) (quoting *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2005)) (Ex. A hereto). The suggestion or motivation to modify the teaching of a prior art reference does not need to be expressly stated in the prior art. *B.F. Goodrich Co. v. Aircraft Braking Systems Corp.*, 72 F.3d 1577, 1583 (Fed. Cir.