## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| BAYER AG, BAYER HEALTHCARE AG, and BAYER PHARMACEUTICALS CORPORATION, <br><br> Plaintiffs, <br><br> v. <br><br> DR. REDDY'S LABORATORIES, LTD. and DR. REDDY'S LABORATORIES, INC., <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) |

C. A. No. 04-179 (SLR)

| |
|---|
| DR. REDDY'S LABORATORIES, LTD. and DR. REDDY'S LABORATORIES, INC., <br><br> Counterclaim Plaintiffs, <br><br> v. <br><br> BAYER AG, BAYER HEALTHCARE AG, and BAYER PHARMACEUTICALS CORPORATION, <br><br> Counterclaim Defendants. |

## REDDY'S OPENING POST TRIAL BRIEF

### PART 2 OF 2

Louis H. Weinstein
David J. Novack
A. Michael Covino
Michael H. Imbacuan
BUDD LARNER, P.C.
150 John F. Kennedy Parkway CN1000
Short Hills, New Jersey 07078
Tel: (973) 379- 4800

Dated: October 6, 2006

Richard L. Horwitz (#2246)
David E. Moore (#3983)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 North Market Street
Wilmington, Delaware 19801
Tel: (302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Defendants/Counterclaim Plaintiffs
Dr. Reddy's Laboratories, Ltd. and
Dr. Reddy's Laboratories, Inc.*

1996); *Alza*, 2006 WL 2556356, at *4 (Ex. A) ("motivation may be found <u>implicitly</u> in the prior art") (emphasis in original). "The motivation . . . may be found in any number of sources, including common knowledge, the prior art as a whole, or the nature of the problem itself." *Dystar Textilfarben GmbH & Co. Deutschland KG v. C.H. Patrick Co.*, No. 06-1088, 2006 WL 2806466, at *9 (Fed. Cir. Oct. 3, 2006) (Ex. B hereto). The "ultimate determination of obviousness 'does not require absolute predictability of success. . . . [A]ll that is required is a reasonable expectation of success.'" *Brown & Williamson Tobacco Corp. v. Philip Morris Inc.*, 229 F.3d 1120, 1125 (Fed. Cir. 2000), (quoting *In re O'Farrell*, 853 F.2d 894, 903-04 (Fed. Cir. 1988)) (ellipses in original).

Significantly, on October 3, 2006, the Federal Circuit, for the first time since its inception, acknowledged and explicitly cited with approval the vitality of the longstanding Supreme Court precedent that an alleged invention that reflects nothing more than the work of a skilled mechanic is not patentable because it is obvious. *Dystar*, 2006 WL 2806466, at *12-*13 (discussing and quoting *Sakraida v. AG Pro, Inc.*, 425 U.S. 273 (1976)) (Ex. B). In *Dystar*, the Federal Circuit explicitly acknowledged that its opinion was intended to respond to criticism in academic and professional circles that it had strayed from proper application of Supreme Court precedent governing the law of obviousness. In so doing, the Federal Circuit made clear that its often criticized motivation, teaching or suggestion test is a flexible test that does not require an explicit teaching in a prior art publication. Rather, motivation should be determined on a case-by-case basis and can be found in the knowledge of a person of ordinary skill, the problem to be solved, common sense or in many other places. *Dystar*, 2006 WL 2806466, at *11 (Ex. B).

B.    The Bicyclic Analogs of Dainippon Compound AT-3295 and
      Sankyo Compound 1-130 were obvious over the prior art

The asserted claims of the '517 patent are obvious because the person of ordinary

skill would have been motivated to modify two prior art compounds to make two

"bicyclic" analogs that are covered by the asserted claims.

One of the prior art compounds relied on by Reddy was referred to at trial as

"Dainippon Compound AT-3295" [DTX 502, DTX 503]. This compound was reported

in the prior art [PTX 48, DTX 115] to have excellent antibacterial activity compared to

ciprofloxacin [DTX 48, Tr. 373:5-12, DTX 13, Tr. 390:-15-391:13; Tr. 1275:12-1277:12,

1281:4-19; DTX 115, Tr. 1290:12-19]. Ciprofloxacin [PTX 2143] was considered to be

the "Gold Standard" [Tr. 197:21-22]. Bayer's own microbiology expert (Dr. Zhanel)

testified that Dainippon Compound AT-3295 was "intriguing" [Tr. 1554:18].

Significantly, many of the named inventors of the '517 patent (including all the inventors

of ciprofloxacin) stated in an annual report of their research that AT-3295 had

antibacterial activity which satisfied the criteria sought by them in a successor to

ciprofloxacin [DTX 13 at Summary]. Dr. Petersen, the lead inventor of the '517 patent,

admitted on cross examination that Dainippon Compound AT-3295 could have been a

lead compound for Bayer but for the fact that it belonged to a competitor [Tr. 392:7-19].

There is no doubt that the prior art disclosed Dianippon Compound AT-3295 to be an

important compound.

Reddy also relies on Sankyo Compound 1-130 [DTX 501, DTX 503]. This

compound is one of the 13 compounds described by the Sankyo '206 Application as the

ones that were "most preferred" because of their "excellent activity" [DTX 28 at 50-51].

Bayer's microbiology expert (Dr. Zhanel) reluctantly conceded that starting with the

Sankyo '206 Application [DTX 28], the person of ordinary skill would have considered

Sankyo Compound 1-130 to be one of the three most important compounds disclosed in

the reference [Tr. 1273:1-20, PTX 2118-B].

Starting with the references that disclose AT-3295 and Sankyo Compound 1-130,

Reddy's obviousness case is very simple:  a) AT-3295 and Sankyo Compound 1-130

have a certain monocyclic substituent at the 7-position [see compounds at the top of DTX

503]; b) the person of ordinary skill would have been motivated to make particular

bicyclic analogs of these compounds [see compounds at the bottom of DTX 503]; and c)

the asserted claims of the '517 patent are obvious because these particular analogs are

included within the many compounds covered by the asserted claims.

Dr. LaVoie (Reddy's expert) explained that, starting with AT-3295 and Sankyo

Compound 1-130 the person of ordinary skill would have been motivated to replace the

7-position substituents of those compounds with the "Bayer 5/5 Bicycle" [DTX 504, Tr.

910:19-914:14]. In particular, Dr. LaVoie testified that the Bayer 5/5 Bicycle is the

simplest diazabicylo derivative of 3-amino-4-methyl pyrrolidine which allows the 3-

amino group and the 4-methyl group to remain in approximately the same location in

space [Tr. 913:6-19].

Replacing the 7-position substituent of AT-3295 and Sankyo Compound 1-130

with the Bayer 5/5 Bicycle yields the compounds referred to by Dr. LaVoie as "the

Bicyclic Analog of Dainippon Compound AT-3295" and "the Bicyclic Analog of Sankyo

Compound 1-130" [DTX 504, Tr. 910:19-914:14].  A person of ordinary skill would have

had a reasonable expectation that these analogs would be active antibacterial compounds

[Tr. 912:18-913:25, 914:8-14, 1038:11-13, 1052:18-1053:2, 1053:20-1054:3; *see also* Tr.

1637:23-1638:4]. Because these analogs fall within the scope of claims 1 and 2 of the
'517 patent they render those claims obvious.

Significantly, the testimony of the Bayer witnesses supports and reinforces the
conclusion that a person of ordinary skill would have been motivated to use the Bayer 5/5
Bicycle at the 7-position.

First, Dr. Taylor (Bayer's medicinal chemistry expert) admitted that a person of
ordinary skill would have been motivated to modify the 7-position substituents of prior
art compounds [Tr. 1548:10-18]. Given this admission, there is no question that a person
of ordinary skill would have been motivated to modify the 7-position substituent of AT-
3295 and Sankyo Compound 1-130.

Second, the Bayer 5/5 Bicycle is a diazabicyclo octane [DTX 512, Tr. 134:18-21,
139:1-7, 202:11-204:4]. Two of the named inventors of the '517 patent (Dr. Schenke and
Dr. Petersen) testified that one of their own prior art patent applications [DTX 161] was
directed to compounds with diazabicyclo octane substituents at the 7-position [196:10-
202:1, 420:25-422:6]. According to Dr. Schenke and Dr. Petersen, DTX 161 described
compounds with diazabicyclo octane substituents at the 7-position that had activity which
was as good or better than ciprofloxacin [Tr:199:22-200:1, 203:15-204:4, 420:9-23].
Dr. Petersen, the lead inventor of the '517 patent, testified that he was pleased with his
discovery that diazabicyclo octane substituents at the 7-position increased the activity of
ciprofloxacin, and he admitted that he published in DTX 161 the data that showed this
discovery [Tr. 421:21-422:6]. DTX 161 clearly provided a motivation to use
diazabicyclo octane substituents at the 7-position.

Third, Bayer's own medicinal chemistry expert (Dr. Taylor) admitted that, starting with the 7-position substituent of AT-3295 and Sankyo Compound 1-130, the person of ordinary skill who was motivated to make diazabicyclo octane derivates would have made the Bayer Bicycle:

> Q.    If the person had been told to make a diazabicyclo octane
> substituent derived from three amino 4-methyl pyrrolidine, i.e., the
> 7 position substituent of Sankyo Compound 1-130 and Dainippon
> compound AT-3295, do you have an opinion as to which
> diazabicyclo octane substituent the person of ordinary skill in the
> art would have made?
>
> A.    *I think he would have made the Bayer bicycle.*

[Tr: 1546:10-17 (emphasis supplied)]. This stunning admission from Bayer's expert, combined with the teaching in DTX 161 that diazabicyclo octane substituents improved the activity of the industry's "Gold Standard", and Dr. Taylor's other testimony that the person of ordinary skill would have been motivated to modify the 7-position substituents of prior art compounds, is clear and convincing evidence that it would have been obvious to replace the 7-position of Dainippon Compound AT-3295 and Sankyo Compound 1-130 with the Bayer 5/5 Bicycle.

The obviousness of the Bayer Bicycle is further supported by a poster presented by four of the named inventors of the '517 patent [DTX 223A at SH000001-005237]. In the "Introduction" of that poster, Dr. Schenke, Dr. Petersen, Dr. Metzger and Dr. Krebs all admit that the Bayer Bicycle was found by "systematic variation" of the 7-position substituents. This admission supports the obviousness of the Bayer Bicycle because there is no testimony that "systematic variation" of the 7-position was beyond the ability of the person of ordinary skill, and the patent laws do not allow the patenting of subject matter which is merely the work of a skilled mechanic. *Hotchkiss v. Greenwood*, 52 U.S. 248,

267 (1850); *see also Graham*, 383 U.S. at 3-4 ("We have concluded that the 1952 Act was intended to codify judicial precedents embracing the principle long ago announced by this Court in [*Hotchkiss*], and that, while the clear language of [35 U.S.C. § 103] places emphasis on an inquiry into obviousness, the general level of innovation necessary to sustain patentability remains the same.")

        C.     Bayer has no competent evidence of nonobviousness

    Bayer will likely argue that the claims of the '517 patent are not obvious because the claimed invention allegedly shows unexpected properties. It is not enough, however, for Bayer to argue that <u>some</u> of the compounds covered by the claims may have unexpected properties over <u>some</u> of the prior art. *In re Greenfield*, 571 F.2d 1185, 1189 (C.C.P.A. 1978) ("Establishing that one (or a small number of) species gives unexpected results is inadequate proof, for 'it is the view of this court that objective evidence of non-obviousness must be commensurate in scope with the claims which the evidence is offered to support.'") (quoting *In re Tiffin*, 448 F.2d 791, 792 (C.C.P.A 1971)). Rather, if Bayer wants to rely on unexpected properties to save its claims, the burden is on Bayer to show that the Bicyclic Analog of Dainippon Compound AT-3295 and the Bicyclic Analog of Sankyo Compound 1-130 have unexpected properties compared to the particular prior art analogs cited by Reddy in support of its obviousness defense. *Tiffin*, 448 F.2d at 792 (when claim includes subject matter that is *prima facie* obvious, objective evidence of non-obviousness must rebut the *prima facie* case for the subject matter that is *prima facie* obvious). Here, the only unexpected result is that Bayer made no attempt whatsoever to run a head-to-head comparison of the two prior art compounds

relied on by Reddy to the two bicyclic analogs that are alleged to be obvious. Thus, unexpected results cannot overcome Reddy's showing of obviousness.

In fact, Bayer's microbiology expert, Dr. Zhanel, admitted on cross examination that, because of the "unpredictable" nature of the technology at issue, it would be necessary to actually run a head-to-head comparison in order to give a "reasoned opinion" that one compound had unexpected properties compared to another [Tr. 1258:25-1259:4]. No head-to-head comparison between the particular compounds relied on by Reddy and the particular compounds asserted to be obvious was either presented at trial or relied on by Dr. Zhanel. Dr. Zhanel admitted he did not make a single comparison between a pair of compounds where the difference was that one of the compounds had the prior art 7-position substituent relied on by Reddy (3-amino-4-methyl pyrrolidine) and the other had the 7-position substituent asserted to be obvious (the Bayer 5/5 Bicycle) [Tr. 1301:7-12]. It is curious indeed that Bayer did not present any head-to-head comparison of the particular prior art compounds relied on by Reddy to the particular bicyclic analogs asserted to be obvious. It is therefore reasonable to conclude that Bayer was either too afraid to let its testifying expert run the experiment, or that Bayer arranged to have the experiment run by a non-testifying expert and Bayer is withholding the results under a claim of work-product immunity.

D.    Claims 1 and 2 of the '517 patent are obvious

When the 7-position substituent of Dainippon Compound AT-3295 and Sankyo Compound 1-130 is replaced with the Bayer 5/5 Bicycle, the resulting compounds are within the scope of claims 1 and 2 of the '517 patent [DTX 504; Tr. 914:15-23]. The inclusion of these obvious compounds within the scope of claims 1 and 2 of the '517

43

patent renders those claims invalid for obviousness under 35 U.S.C. § 103. *In re Lintner*, 458 F.2d 1013, 1015 (C.C.P.A. 1972). It is not relevant that claims 1 and 2 of the '517 patent may also cover patentable subject matter in addition to the unpatentable compounds. *Id.* ("Claims which are broad enough to read on obvious subject matter are unpatentable even though they also read on nonobvious subject matter.")

### E.    Claims 8, 9 and 11 of the '517 patent are obvious

The remaining asserted claims of the '517 patent (claims 8, 9 and 11) are also invalid for obviousness because they only add obvious limitations to the invalid independent claim 1 from which they depend. In particular: claim 8 merely adds the limitation that an antibacterially effective amount of a compound from claim 1 is combined with a diluent to make an antibacterial composition; claim 9 merely claims the composition of claim 8 in a tablet, capsule or ampule; and claim 11 merely claims a method of combating bacteria in a patient by administering to such patient an antibacterially effective amount of the compound of claim 1. If claim 1 is obvious, dependant claims 8, 9 and 11 are obvious as well.

### 2.    The '942 patent is invalid under *In re Schneller*

Reddy's asserts that the '942 patent is invalid for double patenting under *In re Schneller*, 397 F.2d 350 (C.C.P.A. 1968). Under *Schneller*, a later patent is invalid over an earlier patent if: a) the subject matter claimed in the later patent was disclosed in the earlier patent; b) the subject matter claimed in the later patent is covered by claims in the earlier patent; and, c) there is no reason why the patentee was prevented from presenting the claims of the later patent for examination in the prosecution of the earlier patent. *Id.* at 355. The purpose of the rule is to "prevent unjustified timewise extension of the right

to exclude granted by a patent. . . ." *Id.* at 354. All of the conditions for *Schneller*-type double patenting are met by the claims of the '942 patent. Accordingly, the '942 patent is invalid for double patenting.

> A.    The claims of the '942 patent are fully disclosed in
>        the '517 patent

The parties stipulated that the written description and enablement requirements of 35 U.S.C. § 112 were satisfied for each asserted claim of the '942 patent at the time the application for the earlier '517 patent (U.S. Patent Application 07/375,434) was filed at the Patent Office [JTX 1 at ¶41]. Therefore, each asserted claim of the '942 patent was fully disclosed by the specification of the '517 patent.

> B.    The claims of the '942 patent are fully covered by
>        the '517 patent

The parties also stipulated that each asserted claim of the '942 patent cannot be practiced without infringing at least one claim of the '517 patent [JTX 1 at ¶40]. Thus, each asserted claim of the '942 patent is fully covered by the '517 patent.

C.    Nothing prevented Bayer from obtaining the
claims of the '942 patent in the earlier 517 patent

Bayer has not contended in this litigation that it was prevented from obtaining any

of the asserted claims of the '942 patent during the prosecution of the '517 patent. To the

contrary, Dr. Bailly (Bayer's in-house patent agent) testified that a claim specifically

directed to moxifloxacin could have been included in the '517 patent [Tr. 697:3-7].

Clearly, nothing prevented Bayer from obtaining any of the asserted claims of the '942

patent in the earlier issued '517 patent.

Thus, the asserted claims of the '942 patent are invalid because all the factual

predicates for double patenting under *Schneller* are satisfied.

D.    *In re Schneller* is good law and applies to this case

Because Bayer has no factual basis to dispute that the claims of the '942 patent

must fall if *Schneller* is applied, Bayer's only recourse is to argue that *Schneller* is not

good law or, even if it is good law, that it does not apply here. The Court should reject

such argument as litigation-driven posturing. Indeed, during the prosecution of the '942

patent, Bayer told the Examiner that Bayer took no issue with the holding of *Schneller*

and Bayer admitted that the law of *Schneller* was controlling:

> It is noted that [the Examiner] cites *In re Schneller* 158 USPQ 210 in
> support of his position. Applicants <u>in no way are taking issue with that
> case</u>.
>
> *        *        *
>
> The Examiner also cites MPEP 804 but that merely confirms that *In re
> Schneller* governs, with which the applicants <u>are in full agreement</u>.

[PTX 4 at BL020-002164; BL020-002176 (emphasis added).] In light of Bayer's

position during prosecution, any argument that there is no such thing as *Schneller*-type

double patenting rings hollow. To the extent that Bayer might argue that *Schneller* does

46

not apply, the argument would be specious given the stipulations and testimony of record.

Moreover, any argument that *Schneller* is distinguishable on its facts can be rejected

simply on the ground that Bayer admitted during prosecution that the claims of the '942

patent were governed by the holding in *Schneller*.

Bayer's report of *Schneller's* demise is greatly exaggerated. Especially probative

to the issue of *Schneller's* legal viability is the fact that the Patent Office continues to

recognize *Schneller* as a valid basis for double patenting rejections [PTX 64 at 800-26

(quoting *Schneller*, 397 F.2d at 355 ("'The controlling fact is that patent protection for

the [claimed subject matter], fully disclosed in and covered by the claims of the [earlier]

patent, would be extended by the allowance of the appealed claims.'")); JTX 5 at ¶10

(stipulating that PTX 64 is from the current version of the MPEP)]. It was Bayer -- not

Reddy -- who admitted during the prosecution of the '942 patent that *Schneller* governed.

The inquiry should end there. Bayer should not be allowed to reject or parse its earlier

admission for the benefit of this litigation. *Schneller*, as Bayer agreed, is good law and it

governs the '942 patent.

  E. Unexpected properties are not relevant
    *Schneller*-type double patenting

Bayer's fear of the common sense *Schneller* holding is no doubt occasioned by

the fact that unexpected properties have no place in a determination of *Schneller*-type

double patenting. There is no room to argue that unexpected properties are relevant

because *Schneller*-type double patenting is not dependent on whether the claim of the

later patent is anticipated by, or an obvious variant of, a claim in the earlier patent.

Rather, the only issues are whether the later claim is fully disclosed and fully covered by

the earlier patent and whether anything prevented the patentee from obtaining the later

claims in the earlier patent. Unexpected properties have no place in this inquiry. The

Patent Office agrees [*see* PTX 64 at 800-26 (*Schneller* applies "even where the

inventions claimed in two or more patents/applications are considered nonobvious over

each other")].

      3.    The '942 patent is invalid for obviousness-type double patenting

Under the judicially created doctrine of obviousness-type double patenting, a

party cannot extend its patent monopoly by obtaining a patent to an obvious variant of the

invention claimed in an earlier patent. *Geneva Pharms. v. GlaxoSmithKline PLC*, 349

F.3d 1373, 1377-78 (Fed. Cir. 2003); *Eli Lilly & Co. v. Barr Labs., Inc.*, 251 F.3d 955,

967-68 (Fed. Cir. 2001); *In re Longi*, 759 F.2d 887, 892 (Fed. Cir. 1985). "[T]he

fundamental reason for the rule [of obviousness-type double patenting] is to prevent

unjustified timewise extension of the right to exclude granted by a patent no matter how

the extension is brought about." *Lilly*, 251 F.3d at 968.

The inquiry into obviousness-type double patenting involves a two-step analysis.

First, the Court construes the claims in the earlier patent and the later patent and it

determines the differences between the claims. *Id.* Second, the Court determines

whether the claim in the later patent is patentably distinct from the claim in the earlier

patent, i.e., the Court determines whether the later claim is obvious over, or anticipated

by, the earlier claim. *Id.* "A later claim that is not patentably distinct from an earlier

claim in a commonly owned patent is invalid for obviousness-type double patenting." *Id.*

Here, the question is whether the subject matter of the asserted claims of the '942

patent are invalid over the subject matter claimed in claims 4 and 5 of the '517 patent.

Because Reddy does not allege that the claims of the '942 patent are anticipated by the

claims of the '517 patent, the proper inquiry is "whether the claimed invention in the application for the second patent would have been obvious from the subject matter of the claims in the first patent, in light of the prior art." *In re Longi*, 759 F.2d at 893.

Determining the differences between claim 2 of the '942 patent and claims 4 and 5 of the '517 patent, the only difference is the substituent at the 8-position. Claim 2 of the '942 patent has a methoxy group at the 8-position. In contrast, claim 4 of the 517 patent has a fluorine at the 8-postion and claim 5 of '517 patent has a chlorine at the 8-position. Replacing the 8-position substituent with a methoxy group would have been an obvious modification in light of the Sankyo '206 Application [DTX 28], which plainly directs the person of ordinary skill to the use of methoxy at the 8-position [Tr. 922:18-923:18]. All of the "most preferred" compounds in the Sankyo '206 Application have methoxy at the 8-position [DTX 28, pp. 50-51, Tr. 892:13-18, 1520:17-20]. Even Dr. Taylor (Bayer's own expert) agreed on cross that the Sankyo '206 Application speaks to the "worthwhileness" of methoxy at the 8-position [Tr. 1520:25-1521:2] Because the Sankyo '206 Application teaches the "worthwhileness" of methoxy at the 8-position, claim 2 of the '942 patent is an obvious variant of each of claims 4 and 5 of the commonly owned '517 patent.

Likewise, claim 2 of the '942 patent, claim 1 of the '942 patent also has a methoxy group at the 8-position. In addition, where claim 2 of the '942 patent encompasses four stereoisomers, claim 1 of the '942 patent is directed to one of the four stereoisomers [DTX 506, Tr. 925:15-926:20, 929:13-18]. Dr. LaVoie (Reddy's expert) testified that the person of ordinary skill would have been motivated to separate the four enantiomers with the expectation that one of the enantiomers would be as good or better

49

than the mixture of the enantiomers [Tr. 929:19-930:1]. Bayer did not challenge Dr. LaVoie's opinion regarding the separation of the enantiomers. Accordingly, if claim 2 of the '942 patent is an obvious variant of claims 4 and 5 of the '517 patent, claim 1 is an obvious variant as well.

The remaining asserted claims of the '942 patent merely add obvious limitations to either claim 1 or claim 2 of the '942 patent. Adding the limitations of an antibacterially effective amount, a diluent, formulation into a tablet, capsule or ampule, or the use of the compound to combat bacteria in a human, adds nothing to the patentability of claims 3, 4, 5 and 7 of the '942 patent.

Finally, holding the asserted claims of the '942 patent invalid for double patenting over the '517 patent comports with and furthers the public policy behind the doctrine of obviousness-type double patenting. It is undisputed that Bayer has enjoyed the right to exclude the public from practicing the subject matter claimed in the '942 patent ever since the '517 patent issued on February 5, 1991. Indeed, Bayer has sued Dr. Reddy on both the '517 patent and the '942 patent to prevent the public from obtaining lower cost generic moxifloxacin for as long as possible. Bayer has not filed a terminal disclaimer of the '942 patent over the '517 patent. Accordingly, the asserted claims of the '942 patent are invalid for obviousness-type double patenting.

The parties have stipulated that the asserted claims of the '942 patent are not invalid for obviousness-type double patenting if it is found as a matter of law that unexpected desirable properties are relevant to the determination of obviousness-type double patenting. In its only pronouncement on the issue to date, the Federal Circuit explained (in a footnote) that although obviousness under the patent statute requires an

50

inquiry into objective criteria suggesting non-obviousness, the inquiry into obviousness-type double patenting does not. *Geneva Pharms.*, 349 F.3d at 1379 n.1. As the proponent of unexpected properties, the burden is on Bayer to show that unexpected properties are relevant to the issue of obviousness-type double patenting.

      4.     The '517 patent is unenforceable for inequitable conduct

          A.     The law of inequitable conduct -- judicial oversight of compliance with the duties of candor and disclosure

"Inequitable conduct occurs when a patent applicant breaches his or her 'duty of candor and good faith' to the PTO." *Novo Nordisk Pharm., Inc. v. Bio-Technology Gen. Corp.*, 424 F.3d 1347, 1359 (Fed. Cir. 2005) (citation omitted). Given the *ex parte* nature of patent prosecution, the highest standards of honesty and candor on the part of applicants are essential to a working patent system. *Norton v. Curtiss*, 433 F.2d 779, 794 (C.C.P.A. 1970). "[I]nequitable conduct is a broader, more inclusive concept than common law fraud. . . ." *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1069 (Fed. Cir. 1998). The party asserting inequitable conduct does not need to establish either "but for" causation or actual reliance. *Merck & Co., Inc. v. Danbury Pharmacal, Inc.*, 873 F.2d 1418, 1421 (Fed. Cir. 1989). Rather, the party asserting inequitable conduct has the burden of proving by clear and convincing evidence that material information was misrepresented or withheld with intent to deceive the Patent Office. *E.g.*, *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1178 (Fed. Cir. 1995).

     Inequitable conduct is assessed through a two-step analysis. First, the Court determines materiality. At all relevant times, information was material if there was a "substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent." 37 C.F.R. § 1.56(a)

(1991). Second, the Court determines whether there is direct evidence or circumstantial evidence, based on the conduct, that the patentee had the intent to deceive the PTO. *Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.*, 120 F.3d 1253, 1256 (Fed. Cir. 1997).

Information can be material even if it is not outcome determinative, and even if it was not, or would not have been, cited or specifically relied upon by the patent examiner in making the ultimate decision on whether to issue the patent. *Pharmacia Corp. v. Par Pharm., Inc.*, 417 F.3d 1369, 1373 (Fed. Cir. 2005). "To be material, a misrepresentation need not be relied on by the examiner in deciding to allow the patent. The matter misrepresented need only be within a reasonable examiner's realm of consideration." *Merck*, 873 F.2d at 1421. "Materiality is not limited to prior art but instead embraces *any* information that a reasonable examiner would be substantially likely to consider important in deciding whether to allow an application to issue as a patent." *GFI, Inc. v. Franklin Corp.*, 265 F.3d 1268, 1274 (Fed. Cir. 2001) (emphasis in the original). "Close cases should be resolved by disclosure, not unilaterally by the applicant." *LaBounty Mfg., Inc. v. U.S. Int'l Trade Comm'n*, 958 F.2d 1066, 1076 (Fed. Cir. 1992).

"'[S]moking gun' evidence is not required in order to establish an intent to deceive." *Paragon Podiatry Lab., Inc. v. KLM Labs., Inc.*, 984 F.2d 1182, 1189 (Fed. Cir. 1993). "To satisfy the intent to deceive element of inequitable conduct, 'the involved conduct, viewed in light of all the evidence, including evidence indicative of good faith, must indicate sufficient culpability to require a finding of intent to deceive.'" *Id.* (citation omitted). The Federal Circuit has consistently said that direct evidence of intent is rarely available and is unnecessary. *See, e.g., Bruno Indep. Living Aids, Inc. v. Acorn Mobility*

*Serv., Ltd.*, 394 F.3d 1348, 1354 (Fed. Cir. 2005). Rather, this element of inequitable conduct must generally be inferred from the facts and circumstances surrounding the applicant's overall conduct. *Id.*; *see also Rohm & Haas Co. v. Crystal Chem. Co.*, 722 F.2d 1556, 1571 (Fed. Cir. 1983) ("[P]roof of the actual state of mind of the applicant or persons associated with or representing an applicant is not required.").

The Federal Circuit has stated that "when balanced against high materiality, the showing of intent can be proportionally less." *Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc.*, 326 F.3d 1226, 1234 (Fed. Cir. 2003) (citation omitted). "'The more material the omission, the less culpable the intent required, and vice versa.'" *GFI*, 265 F.3d at 1273 (citation omitted).

Further, the Federal Circuit has made clear that courts can infer deceptive intent based on a finding that persons subject to the duty of candor "knew or should have known" of the materiality of the information withheld from, or misrepresented to, the Patent Office. *See, e.g., Novo Nordisk*, 424 F.3d at 1362 (citing *Molins*, 48 F.3d at 1178). In particular, the Federal Circuit has found an inference of intent to deceive where an experienced practitioner was on notice of the likelihood that material information existed but the practitioner demonstrated a "studied refusal" to learn information that he "should have known." *Brasseler, U.S.A. I, L.P. v. Stryker Sales Corp.*, 267 F.3d 1370, 1374-78, 1379-80 (Fed. Cir. 2001). "[A] patentee facing a high level of materiality and clear proof that it knew or should have known of that materiality, can expect to find it difficult to establish 'subjective good faith' sufficient to prevent the drawing of an inference of intent to mislead." *GFI*, 265 F.3d at 1275. The Federal Circuit does not look kindly on the submission of a "half truth." *Paragon*, 984 F.2d at 1192. The "mere denial of intent to

mislead (which would defeat every effort to establish inequitable conduct) will not suffice." *GFI*, 265 F.3d at 1275.

Once materiality and intent to deceive have been established, the Court applies a balancing test to determine whether, in light of all the circumstances, a finding of inequitable conduct is warranted. *Novo Nordisk*, 424 F.3d at 1359. A finding of inequitable conduct with respect to any one claim of the patent will render the entire patent unenforceable. *Kingsdown Med. Consultants, Ltd. v. Hollister, Inc.*, 863 F.2d 861, 877 (Fed. Cir. 1988) (*en banc* in pertinent part).

B.    <u>The Liebigs Reference was material to the '434 application</u>

Because the Bayer 5/5 Bicycle anticipated an original claim, the Liebigs Reference satisfied the highest standard of materiality at the time the '434 application was filed. *Fox Indus., Inc. v. Structural Pres. Sys., Inc.*, 922 F.2d. 801, 804 (Fed. Cir. 1990) ("A finding that a withheld reference anticipates a claim in a patent satisfies the most stringent standard of materiality.")

The Liebigs Reference was also highly material to claims that issued. As Dr.

Schenke admitted, issued claim 7 is the compound obtained by attaching the Bayer 5/5

Bicycle to the 7-position of a known quinolone intermediate that was disclosed in DTX

341 [DTX 510, Tr. 207:6-13]:



**Claim 7 of the '517 Patent**



**The Bayer 5/5 Bicycle**                **Compound II of DTX 341**

By including the Bayer 5/5 Bicycle in original claim 19, the applicants were

explicitly representing to the Examiner that the Bayer 5/5 Bicycle was a patentable

compound [DTX 74 ("I believe I am . . . an original, first and joint inventor . . . of the

subject matter claimed . . . .")]. Relying on this representation and assuming the Bayer

5/5 Bicycle to be patentable, the Examiner would certainly conclude that any compound

incorporating the Bayer 5/5 Bicycle was also patentable. Therefore, the Liebigs

Reference was highly material to issued claim 7 because, if the Examiner had known the

truth, i.e., that the Bayer 5/5 Bicycle was in the prior art, the Examiner could have

rejected issued claim 7 over a combination of the Liebigs Reference and DTX 341.

*Dayco Products, Inc. v. Total Containment, Inc.*, 329 F.3d 1358, 1365 (Fed. Cir. 2003)

(information is material when it "could have conceivably served as the basis" for a rejection). Where the only point of novelty between issued claim 7 and the prior art is the attachment of the Bayer 5/5 Bicycle at the 7-position [see DTX 512], the only possible conclusion is that the Bayer 5/5 Bicycle was highly material. *Critikon,* 120 F.3d at 1258 (withheld reference that disclosed point of novelty was material). [3]

    C.    <u>The Liebigs Reference was withheld with intent to deceive</u>

        i.    Dr. Schenke withheld the Liebigs Reference
                with intent to deceive

      Dr. Schenke flatly admitted that at the time he signed the Inventors Declaration for the '434 application he knew that the Bayer 5/5 Bicycle was in the prior art [Tr. 163:13-18]. Thus, there is no dispute that Dr. Schenke knew about the Liebigs Reference and that he knew it disclosed the Bayer 5/5 Bicycle. The only possible dispute is whether Dr. Schenke knew that the Bayer 5/5 Bicycle was important to his application. Any contention by Bayer or Dr. Schenke that Dr. Schenke did not connect in his mind the Bayer 5/5 Bicycle to the subject matter of his application is belied by the facts.

---

[3] DTX 512 shows claim 7 of the '517 patent on the left and Example 4 of DTX 341 on the right. It is readily apparent to even the casual observer that the only difference between the two structures is that Bayer 5/5 Bicycle is attached to the 7-position in claim 7 of the '517 patent and a different bicycle is attached to the compound from the prior art:



Claim 7 of the '517 Patent            Example 4 of DTX 341

First, when he signed the Inventors Declaration [DTX 74] Dr. Schenke certified under penalty of perjury that he had reviewed and that he understood the specification, including the claims. The '434 application described the Bayer 5/5 Bicycle, it described how to make the Bayer 5/5 Bicycle, it described the use of the Bayer 5/5 Bicycle to make the compound of original claim 10, it claimed a compound with the Bayer 5/5 Bicycle attached at the 7-position, and it claimed the Bayer 5/5 Bicycle by name in claim 19. If Dr. Schenke had reviewed and understood his application, as he declared under penalty of perjury that he did, then, in his own words, he would have understood that the application claimed the Bayer 5/5 Bicycle [Tr. 135:9-19]. Clearly, it can be presumed that Dr. Schenke read and understood the specification and the claims of his application and that he understood that the Bayer 5/5 Bicycle was material. *Glaxo Inc. v. Novopharm Ltd.*, 52 F.3d 1043, 1051 (Fed. Cir. 1995). ("It is therefore presumed that Crookes, the inventor and applicant, must have reviewed the specification and signed the required declaration before the application was filed.")

Second, Dr. Schenke testified that he relied on reading the German Le A 26 108 Application as his basis for understanding what was claimed in the '434 application [Tr. 134:11-17]. This only confirms that Dr. Schenke knew the Bayer 5/5 Bicycle was material because Dr. Schenke admitted that Le A 26 108 describes a method of making the Bayer 5/5 Bicycle and that it claims the Bayer 5/5 Bicycle in claim 11 [Tr. 149:19-150:7]. Faced with the document [DTX 76 at 5] that he wrote between the filing of the Le A 26 108 application in Germany and the filing of the '434 application in the United States, Dr. Schenke admitted that he told the members of the quinolone project that the Bayer 5/5 Bicycle was an important part of Le A 26 108 [Tr. 144:20-145:19]. These

57

facts show that Dr. Schenke knew that the Bayer 5/5 Bicycle was material to the '434 application.

Third, Dr. Schenke testified that he knew "exactly" what the invention was about [Tr. 135:4-6]. If Dr. Schenke in fact knew what the '434 application was about, he would have known that it was about the Bayer 5/5 Bicycle.

Fourth, Dr. Schenke testified that when he signed the declaration he was "focused on the bicycles" and "the Bayer 5/5 Bicycle was one of the bicycles" [Tr. 140:20-25].

Most significantly, Dr. Schenke's testimony about whether or not he read the claims was simply not credible. First he testified that he did not review the claims because it was Dr. Petersen's task to review the claims [Tr. 96:25-97:2]. Then he changed his testimony to state that "normally it was the case" that he did read the claims [Tr. 134:14-15]. Finally he testified that "perhaps" he read the claims but that he could not "remember" [Tr. 136:1-2]. There is simply no way to square Dr. Schenke's emphatic testimony on direct that he "did not" read the claims of the Le A 26 108 application with his testimony on cross that "perhaps" he did read the claims. Perhaps Dr. Schenke changed his testimony because he was confronted on cross examination with the pointed accusation that he lied in his declaration when he stated that he understood the claims [Tr. 136:21-22].

Dr. Schenke knew he had a duty of disclosure to the United States Patent Office [DTX 74; Tr. 164:21-24]. In light of all the evidence, the inescapable conclusion is that Dr. Schenke knew that the Bayer 5/5 Bicycle was material to the '434 application and that he withheld the Liebigs Reference from the Patent Office with intent to deceive.

       ii.  Bayer cannot rely on a false declaration as a
           defense to Schenke's inequitable conduct

It seems that Bayer might choose to defend on the basis that Dr. Schenke did not

have the requisite deceptive intent because he did not read and understand the claims of

his application.  If Bayer takes this position, the '517 patent should be held unenforceable

based on the signing and submission of a false declaration.

Specifically, in his Inventors Declaration Dr. Schenke unambiguously declared

that he understood the claims of his application: "I hereby state that I have reviewed and

understand the contents of the above identified specification, <u>including the claims</u> . . ."

[DTX 74 (emphasis added)].  Clearly, if Dr. Schenke did not review and understand the

claims of his application then his declaration was false [DTX 74].  If his declaration was

false it was *per se* material.  *Rohm & Haas Co. v. Crystal Chemical Co*, 722 F.2d 1556,

1571 (Fed. Cir. 1983) ("there is no room to argue that submission of false affidavits is not

material").

If Dr. Schenke did not read and did not understand the claims, that fact would

have been highly material because a reasonable Examiner could have used the

information to strike the application.  37 C.F.R. § 1.56(c)(2)(1989) ("Any application

may be stricken from the files if . . . [a]n oath or declaration pursuant to § 1.63 is signed

without review of the specification, <u>including the claims</u>, as required by § 1.63(b)."

(emphasis added)).  If Dr. Schenke did not read and understand the claims, the

submission of the false declaration must have been with intent to deceive.  *Refac Int'l,*

*Ltd. v. Lotus Dev. Corp.*, 81 F.3d 1576, 1583 (Fed. Cir. 1986) ("The affirmative act of

submitting an affidavit must be construed as being intended to be relied upon.")

Declarations matter. Consistent with Patent Office rules and Federal Circuit precedent, Reddy maintains that the Inventors Declaration should be taken at face value as proof that Dr. Schenke knew that the Bayer 5/5 Bicycle was material to his application. Bayer should not be allowed to avoid a finding of inequitable conduct by arguing that Dr. Schenke was too busy signing and submitting a false Inventors Declaration. However, if Bayer chooses to maintain that Dr. Schenke did not review and understand the claims of the '434 application, Reddy submits that the '517 patent is unenforceable based on the filing of a false Inventors Declaration. This inequitable conduct would embrace and render unenforceable the '942 patent as well because the very same Inventors Declaration was used there [PTX 4 at BL020-001920].

During trial, Reddy asserted that if Bayer should maintain that Dr. Schenke did not review and did not understand his claims, then Reddy would assert inequitable conduct based on a false Inventors Declaration [Tr. 1307:17-23, 1309:7-15]. At first, Bayer objected on the ground of "extreme prejudice" [Tr. 1310:17-20]. In this regard, the Court asked Bayer whether it believed it needed the opportunity to present evidence that it would not have presented otherwise [Tr. 1313:3-8]. Counsel for Bayer asked for "time to confer" before giving its response to the Court and the Court gave Bayer "at least two more days to think about it" [Tr. 1313:12-15]. By the time the trial ended (four calendar days later), Bayer had let the matter drop. Bayer did not indicate that there was a single piece of additional evidence that it would have wanted to introduce. Bayer did not seek to exclude any evidence. Bayer did not seek a continuance. Bayer did not ask for any relief at all.

It has long been the law that "undue prejudice is 'the touchstone for the denial of leave to amend.'" *Heyl & Patterson Int'l, Inc. v. F.D. Rich Housing of the Virgin Islands, Inc.*, 663 F.2d 419, 426 (3d Cir. 1981) (quoting *Cornell and Co., Inc. v. Occupational Safety and Health Comm'n*, 573 F.2d 820, 823 (3d Cir. 1978)). "In the absence of substantial or undue prejudice, denial must be grounded in bad faith or dilatory motives, truly undue or unexplained delay, repeated failure to cure deficiency by amendments previously allowed or futility of amendment." *Heyl*, 57 F.2d at 823. Amendment of the pleadings to conform to the evidence at trial is governed by Fed. R. Civ. P. 15(b).

In the instant action, Bayer made no attempt to show prejudice. To the contrary, Bayer declined the Court's invitation to explain if there was any additional evidence that it would want to present if the pleadings were amended as requested by Reddy. Moreover, Bayer did not seek a continuance as provided for in the Federal Rules. Fed. R. Civ. P. 15(b) ("The court may grant a continuance to enable the objecting party to meet such evidence.") Here, Bayer did not object to the evidence concerning Dr. Schenke's state of mind when he signed his declaration. In fact, it was Bayer who insisted that it examine Dr. Schenke first and it was on Bayer's direct examination that Dr. Schenke unexpectedly testified that ***he did not review the claims of his application*** [Tr. 96:25-97:2 ("No, I didn't review the claims.")].

Dr. Schenke's testimony that he "didn't review the claims" directly contradicts his signed Inventors Declaration where he stated under penalty of perjury that he had reviewed and that he understood the claims [DTX 74]. Moreover, there was nothing in Dr. Schenke's deposition to put Reddy on notice that the declaration was false. If Bayer

is going to defend on the new theory that Dr. Schenke did not review or understand his claims, it is Reddy who would be prejudiced if it is denied the opportunity to allege inequitable conduct on the basis of a false declaration.

### iii. Dr. Petersen withheld the Liebigs Reference with intent to deceive

There is no dispute that Dr. Petersen was the "lead inventor" of the '434 application and that Dr. Petersen knew what it contained. Moreover, there is ample evidence that Dr. Petersen knew that the Bayer 5/5 Bicycle was in the prior art. In particular, Dr. Petersen was also Dr. Schenke's co-inventor of the Le A 26 686 application. This application (with its front page acknowledgement that the Bayer 5/5 Bicycle was in the prior art) was filed in Germany only two months before the '434 application was filed in the United Stated [PTX 2073]. And, Dr. Schenke testified that, to his knowledge, Dr. Petersen knew shortly before signing the Inventors Declaration that the Bayer 5/5 Bicycle was in the prior art [Tr. 165:17-21].

Like Dr. Schenke, Dr. Petersen also knew that he had a duty of disclosure to the Patent Office [DTX 74]. Like Dr. Schenke, Dr. Petersen knew that the Bayer 5/5 Bicycle was material to his application and he knew that it was disclosed in the prior art. Like Dr. Schenke, Dr. Petersen withheld the Liebigs Reference from the prosecution of the '434 application with intent to deceive.

To avoid a finding of intent to deceive, Bayer may try to split the blame between Dr. Schenke and Dr. Petersen. Bayer may try to argue that only Dr. Schenke knew that the Bayer 5/5 Bicycle was in the prior art and that only Dr. Petersen knew that the Bayer 5/5 Bicycle was material to their application. Such an argument must fail because it runs counter to the clear documentary and testimonial evidence. Moreover, such an argument

is the type of circular finger pointing that is plainly rejected by the Federal Circuit. *Brasseler*, 267 F.3d at 1380 ("We refuse to pursue the circular logic of [the patentee's] request and decline to carve out an exception to the inequitable conduct law to shield those guilty of inequitable conduct from responsibility for their actions."); *Novo Nordisk*, 424 F.3d at 1362 (rejecting inequitable conduct defense based on "circular logic").

iv. <u>Mr. Horn withheld the Liebigs Reference with intent to deceive</u>

On October 1, 1990, Mr. Horn plainly knew that the disclosure of the Bayer 5/5 Bicycle in the Liebigs Reference anticipated claim 19 of the '434 application. He said as much in his own words in the Information Disclosure Statement that he filed in the '906 division application [PTX 11 at DRLMOX 036493]. Because Mr. Horn knew that the Liebigs Reference anticipated claim 19 of the '434 application, he clearly was on notice to check whether the Bayer 5/5 Bicycle was material to any of the allowed claims. There are only two possibilities. Either he looked to see if the Bayer 5/5 Bicycle was material or he did not. Either way he must have acted with intent to deceive.

If he looked, he would have seen that the Bayer 5/5 Bicycle was material to the allowed claim that was set to issue as claim 7 of the '517 patent [DTX 510]. Under this scenario, Mr. Horn acted with intent to deceive by not submitting the Liebigs Reference in the '434 application. If he did not look, it could only be because he deliberately chose to put his head in the sand. Under this scenario he acted with intent to deceive because a patent practitioner cannot avoid learning of material information when on notice that it is likely to exist. *Brasseler*, 267 F.3d at 1383 (duty to investigate exists when "information of which the attorney is aware suggests the existence of specific information that may be material"); *Bruno,* 394 F.3d at 1352 ("'an applicant who knew of the art or information

63

cannot intentionally avoid learning of its materiality'") (quoting *FMC Corp. v. Manitowoc Co.*, 835 F.2d 1411, 1415 (Fed. Cir. 1987)).

Knowing that the Liebigs Reference anticipated one of the original claims, Mr. Horn clearly had a duty to investigate the materiality of the Liebigs Reference to the allowed claims of the '434 application. Mr. Horn is deceased and cannot tell us whether or not he satisfied this duty. Nevertheless, it can be fairly concluded that Mr. Horn acted with intent to deceive by either shirking his duty to investigate or by deliberately withholding the Liebigs Reference after his investigation determined that the Liebigs Reference was material.

> D.    The X References were material and were
> <u>improperly submitted with intent to deceive</u>

In addition to never submitting the Liebigs Reference in the prosecution of the '517 patent, Bayer intentionally failed to properly disclose the three highly material X References that were cited in the European counterpart to the '517 patent. Specifically, Bayer's experienced United States patent attorney, Mr. Horn, failed to follow the MPEP's procedure for the late submission of prior art even though: (a) the inventors were aware of these references prior to the issue of the '517 patent and had used or considered them in their work; (b) the references <u>anticipated</u> the original application; (c) the Examiner put Mr. Horn on written notice that his admission in traversing the restriction requirement could be used to reject the allowed claims; (d) the European Patent Office identified each of the X References as particularly relevant to the European counterpart to the '517 patent-in-suit; and (e) it was surely the routine practice of any ethical patent practitioner to take the necessary steps so that prior art deemed particularly

relevant in a counterpart European Search Report was properly disclosed to the Examiner of the U.S. patent application.[4]

Bayer's only justification is that Mr. Horn disclosed the X References after the issue fee was paid. This, however, is unavailing because Mr. Horn disclosed the references in a manner calculated to make sure that they would not be timely considered. In fact, the indisputable record demonstrates that the Examiner considered the references only after the patent issued. That Mr. Horn acted with intent to deceive is confirmed by the fact that his treatment of the X References here was a clear departure from his usual practice.

There is no doubt that the inventors of the '517 patent were well aware of the X References. In November 1987, inventor Schenke sent a memorandum to inventor Petersen which cited the Egawa Article and attached a copy of the Dainippon Abstract [DTX 5; Tr. 109:8-16, 185:17-187:19]. Dr. Schenke acknowledged that both he and Dr. Petersen were aware of these references, and he admitted that Dr. Petersen should have sent these references to the Bayer Patent Department so as to assure that they were disclosed to the United States Patent Office in the prosecution of the '517 patent [Tr. 189:15-192:7]. Thus, one of the inventors, Dr. Schenke, has admitted under oath that these two references were material and should have been disclosed to the Patent Office. There is no evidence that Dr. Petersen ever gave these references to the Bayer Patent

---

[4] Section 2001.06(a) of the MPEP 5th Edition, 3rd Revision (May 1986) [DTX 188 at 2000-6], entitled "Prior Art Cited in Related Foreign Applications" put applicants and their attorneys on notice that that they "have a duty to bring to the attention of the Office any material prior art or other information cited or brought to their attention in any foreign application." According to the MPEP, "The inference that such prior art or other information is material is especially strong where it is the only prior art cited or where it has been used in rejecting the same or similar claims in the foreign application." [Id ]

Department. There is no evidence that Dr. Schenke did anything to check if Dr. Petersen fulfilled his obligation to give these references to the Bayer Patent Department or to check if the Bayer Patent Department fulfilled its obligation to disclose these references to the U.S. Patent Office.

Also in November 1987, an internal memorandum by Dr. Grohe reported to the Bayer quinolone project team (including inventors Schenke and Petersen) that the Sankyo '206 Application [DTX 28] was "New Literature" [DTX 1 at BL005-001286 to BL005-001287; Tr. 107:6-20, 177:10-178:13]. Soon thereafter, in January 1988, Dr. Schenke informed the members of the quinolone team (including Dr. Petersen) that "Ube/Sankyo" had published some of the same compounds that Dr. Schenke had developed for the quinolone project [DTX 2 at Bl005-001278]. In this regard, Dr. Schenke admitted that he was "disappointed" to learn that compounds on which he had been working had already been disclosed in the prior art [Tr. 120:24-121:8].

Given this clear evidence, there is no question that the inventors were aware of the three X References well prior to filing the application for the '517 patent. Moreover, the inventors clearly knew that the prior art had actually published some of the compounds on which they had been working. Thus, when the time came to prepare their application for the '517 patent, the inventors clearly had every reason to believe that the Sankyo '206 Application, the Egawa Article and the Dainippon Abstract contained material information that had to be disclosed to the Patent Office. It is undisputed that these references actually anticipated claim 1 of the application for the '517 patent when it was filed.

During prosecution, Examiner Dentz' first substantive action was to issue a restriction requirement [PTX 2 at BL020-000855]. In other words, the Examiner told the applicants that the application's broad claims covered too many separate inventions. He required the applicants to "restrict" the application to a more narrow set of compounds constituting a single invention [*Id.*].

In July of 1990, Bayer complied with the Examiner's request to elect a narrower subset of the claimed subject matter. However, Mr. Horn made it very clear that Bayer objected to the Examiner's position [PTX 2 at BL020-000892 to -000895]. In patent parlance, Bayer agreed to restrict the claims "with traverse." In so doing, Mr. Horn, Bayer's U.S. patent attorney, made a crucial admission. Specifically, Mr. Horn admitted that all of the quinolone compounds in the original patent application were "close in structure" and Mr. Horn admitted they were "not really so remote structurally" [PTX 2 at BL020-000893].

Later, in August of 1990, Bayer accepted the restriction requirement and the subject matter that was anticipated by the three X References was excluded from the '434 application [PTX 2 at BL020-001216 to -001217]. Nonetheless, the three X References remained highly relevant to the application because Mr. Horn had admitted structural similarity in connection with the "traverse". This meant that the Examiner could have used any or all of the three X References to support a rejection of the elected subject matter as *prima facie* obvious. *In re Dillon*, 919 F.2d 688, 692 (Fed. Cir. 1990) (reaffirming *en banc* that structural similarity gives rise to a *prima facie* case of obviousness when the prior art gives a reason to use the prior art compounds); 37 CFR §

67

106(c)(1990) ("In rejecting claims the examiner may rely upon admissions by the applicant . . . as to any matter affecting patentability. . . .")

If there is any doubt about the continuing relevance of the three X References, one need only look to Examiner Dentz's warning when he made the restriction requirement. There, Examiner Dentz explicitly put the applicants and Mr. Horn on notice that any admission made in support of a traverse could be used to reject the elected subject matter over any prior art that anticipated the non-elected subject matter. Mr. Horn surely realized that any prior art anticipating the non-elected subject matter would be very important to Examiner Dentz in deciding whether to allow the elected subject matter to issue.

In addition, during the time that Bayer and Mr. Horn were dealing with the restriction requirement in the '434 application, Mr. Horn and the inventors repeatedly considered the Sankyo '206 Application in a manner that should have called their attention to the relevance of this reference. First, in the prosecution of the '459 application, pending before a different Examiner, the Examiner drew Mr. Horn's attention to the Sankyo '206 Application in a January 1990 interview [PTX 14 at DRLMOX 040604; Tr. 549:15-550:7]. Two months later, in April 1990, that other Examiner rejected the '459 application in view of the Sankyo '206 Application [PTX 14 at DRLMOX 040675-679; Tr. 550:4-22]. Thereafter, Mr. Horn, inventor Dr. Petersen and Bayer in-house counsel Dr. Bailly participated in preparing a response [Tr. 308:3-309:5, 551:6-552:3, 625:23-626:20, 627:3-18, 628:2-7]. Thus, during the same time that they were dealing with the restriction requirement in the '434 application, Mr. Horn, Dr. Petersen and Dr. Bailly were focused on the Sankyo '206 Application in the context of

another Bayer patent application concerning Bayer's quinolone work. Surely they knew or should have known during this time period that the Sankyo '206 Application was potentially relevant to the '434 application, but they failed to disclose this reference to Examiner Dentz.

Even more incredibly, on July 26, 1990 (also during the time period in which Bayer was sorting out its response to the Examiner Dentz's restriction requirement), Dr. Petersen instructed his laboratory assistant to synthesize racemic moxifloxacin for the first time, using an intermediate compound that he knew to be described in the Sankyo '206 Application [Tr. 445:10-446:2; PTX 1079 at BL008-012351, -012394; JTX 1 at ¶¶ 61, 63, and 64]. Thus, once again, Dr. Petersen was confronted with the Sankyo '206 Application in the context of the work that led to the patents which cover moxifloxacin. Yet, D₁. Petersen did nothing at this (or any other) time to assure that this reference was considered by the Examiner.

On August 27, 1990, Examiner Dentz issued a Notice of Allowance of the '434 application, indicating in bold capital underscored letters that "**PROSECUTION ON THE MERITS IS CLOSED**" [PTX 2 at BL020-001213]. The mailing of a Notice of Allowance was a significant milestone in the prosecution of a patent application because: "Jurisdiction of the application remains with the primary examiner until the notice of allowance is mailed." [DTX 290, MPEP 5th Ed. § 1305 at 1300-9]. By the time prosecution on the merits was closed, none of the three X References had been disclosed to Examiner Dentz.

The facts surrounding the failure by the inventors, Mr. Horn and Dr. Bailly to disclose the three X References prior to the August 27 Notice of Allowance might be

sufficient to support an inference of intent to deceive. However, the events after August

27, 1990 demonstrate conclusively that there was an intentional failure to properly

disclose the X References.

           E.     The events after the Notice of Allowance
                   demonstrate intent to deceive the Patent Office

On October 31, 1990, Mr. Horn paid the "issue fee" for the '517 patent [PTX 2 at

BL020-001230 to -001234; Tr. 531:3-6, 582:4-19, 729:3-6; JTX 1 at ¶55]. This meant

that the patent would in due course be sent for publication and issue [DTX 290, MPEP

5th Ed., § 1308 at 1300-10 (stating that an allowed application generally received a patent

number and issue date within two weeks after the issue fee was received)].

Nonetheless, it was well recognized that, from time to time, after a Notice of

Allowance and prior to issue, previously undisclosed prior art, which might have a

substantive impact on whether the patent should issue, could become known.

Accordingly, Section 609 of the MPEP included specific guidelines which practitioners

were directed to follow in the event that new prior art became known after the Notice of

Allowance, or even after the issue fee was paid.

In particular, the MPEP informed practitioners that art cited after a Notice of

Allowance "will not ordinarily be considered by the examiner unless the citation is

accompanied by:

          a.     a proposed amendment canceling or further limiting at least
                one independent claim and narrowing the scope of the
                protection sought;

          b.     a timely affidavit under 37 C.F.R. 1.131 with respect to the
                material cited; or

      c.    a statement by the applicant or his attorney or agent that, in the judgment of the person making the statement, the information cited

          (1) raises a serious question as to the patentability of the claimed subject matter, or

          (2) is closer than that of record, or

          (3) is material to the examination of the application as defined in 37 C.F.R. 1.56 (a) and is filed with an explanation as to why it was not earlier presented, e.g. information recently cited in a corresponding foreign application."

[DTX 97, MPEP 5th Ed., Revision 8, § 609 at 600-66].

The MPEP warned practitioners that "[a]fter all claims have been indicated as allowable there is no duty on the part of the examiner to consider any citation which does not conform to the listed requirements." [*Id.*]

After the issue fee was paid, the requirements for submitting art to be considered by the Examiner became even stricter. Specifically, "in addition to meeting the requirements" for information submitted after the Notice of Allowance, information submitted after the Issue Fee was paid had to be accompanied by a petition, the appropriate fee and "a showing of good and sufficient reasons why the material was not earlier submitted." [*Id.*]

Kurt Briscoe, Mr. Horn's former partner, portrayed Mr. Horn as a distinguished patent practitioner [Tr. 716:12-19] who was certainly familiar with the MPEP [Tr. 723:5] and who would follow the MPEP if he knew that a section was relevant [Tr. 724:21-22]. From all accounts, it would seem that Mr. Horn was an experienced attorney who would know how to "do the right thing" if a special or difficult problem were to arise.

71

Just such a problem arose in this case when, in early November 1990, Bayer received a copy of the Search Report from the European Patent Office which identified the three X References as particularly relevant to the European counterpart of the now allowed '434 application. On November 12, 1990, Bayer in-house counsel Dr. Bailly transmitted the European Search Report to Dr. Petersen and Mr. Horn [Tr. 533:23-534:15; JTX 1 at ¶58]. Dr. Petersen and Dr. Bailly both clearly knew that Mr. Horn was already familiar with at least the Sankyo '206 Application. It appears that Dr. Petersen and Dr. Bailly deferred to Mr. Horn to handle the problem raised by the citation of the X References in the European Search Report.

Mr. Horn is deceased and we have no testimony from him concerning the relevant events. But the circumstantial evidence speaks loudly. Mr. Horn either intentionally concealed the three X References from the PTO knowing that they were material or he intentionally chose not to learn of their materiality.

First of all, it is undisputed that Mr. Horn treated the problem posed by the European Search Report with special care and dispatch. Mr. Briscoe was sure that the matter was considered to be urgent and that someone brought the matter to Mr. Horn for his personal attention [Tr. 843:2-21].

Second, it is clear that Mr. Horn did not follow his usual practice when it came to citing and considering the X References. Mr. Horn's general practice was not to read the references cited in a European Search Report [Tr. 836:11-14]. Generally, Mr. Horn would not have made a determination as to the materiality of the references [Tr. 732:4-9]. Rather, "out of an abundance of caution," and following his general practice, Mr. Horn would have sent the X References to the Patent Office "as soon as possible" [Tr. 835:1-

3]. This is not what happened here. Here, Mr. Horn was focused on the potential materiality of these references. Here, Mr. Horn made the deliberate choice to submit the X References in a way that they would ordinarily not be considered in the prosecution of the application that was about to issue as the '517 patent. Here, there were privileged communications with Bayer about the X References between the time he submitted them in the prosecution of the '517 patent and the time the patent issued [DTX 214 at 36, 39, and 41]. Here, Mr. Horn made the deliberate choice to delay his submission of the three X References in the '906 division application. Here, Mr. Horn delayed his submission of the X References in the '906 division application for almost three months, which, by coincidence or design, was just two weeks after the '434 application had issued as the '517 patent [PTX 11 at DRLMOX 036501-036508; Tr. 754:1-18].

Given the special care that Mr. Horn gave to the X References, his failure to follow the procedures required by the MPEP for submitting references after the payment of the issue fee can only be explained as part of a calculated effort to make sure that the X References would not be considered by Examiner Dentz prior to the issuance of the '517 patent. Mr. Horn, an experienced patent attorney, "knew or should have known that in these circumstances the additional art would not be considered by the [Patent Office]." *Ortho Diagnostic Sys. Inc. v. Miles Inc.*, 865 F. Supp. 1073, 1082 (S.D.N.Y. 1994). Mr. Horn was clearly put on notice that it was likely that each of the X References was highly material to each of the allowed claims because the European Search Report characterized these references as having "particular relevance when considered alone". Either Mr. Horn did a proper investigation as to the materiality of the X References with respect to

73

the about-to-issue '517 patent or he made a deliberate choice not to know. Either way, Mr. Horn acted with intent to deceive.

Mr. Horn clearly had a duty to his client and to the Patent Office to investigate the materiality of the X References. For all Mr. Horn knew, each one of the X References cited in the European Search Report fully anticipated or otherwise invalidated each of the allowed claims in the allowed application that was set to issue. And this was not just any application, this was the application that would cover the successor to ciprofloxacin, the most important quinolone on the market to date. If Mr. Horn did what he should have done (i.e., investigate the X References) he would have seen that they anticipated the non-elected subject matter and he would have known that it was highly likely that Examiner Dentz would have considered the X References to be important to the patentability of the allowed claims. Examiner Dentz had already said as much in the April 1990 Examiner's Action.

Even if Mr. Horn thought that his admission of structural similarity did not necessarily rise to the level of admissions that would unambiguously support a rejection, close cases are to be resolved by disclosure. *LaBounty*, 958 F.2d at 1076 ("Close cases should be resolved by disclosure, not unilaterally by the applicant."). Thus, if Mr. Horn investigated the X References he knew that he had a duty to disclose these references so that they would be considered by the Examiner, and his failure to follow MPEP procedure is culpable conduct that could only have been with intent to deceive.

Alternatively, if Mr. Horn chose to bury his head in the sand to in order to avoid learning whether the X References were material to the allowed '434 application, that would also be culpable conduct that provides clear and convincing evidence of intent to

deceive. *Brasseler*, 267 F.3d at 1382 (person with a duty of disclosure cannot deliberately avoid learning of material information when on notice that material information is likely to exist).

Any attempt by Bayer to rely on the Certificate of Correction that it obtained with respect to the X References is unavailing. Under the patent laws, a Certificate of Correction based on an alleged error by the Patent Office can only be issued if the Patent Office's error is "clearly disclosed" in the written record of the prosecution history. 35 U.S.C. § 254. Here, the written record clearly discloses that the X References were not considered until after the '517 patent issued. To the extent the Certificate of Correction is in conflict with that clear fact, the Certificate of Correction is invalid. *See Superior Fireplace Co. v. Majestic Fireplace Co.*, 270 F.3d 1358, 1373 (Fed. Cir. 2001) (holding that 35 U.S.C. § 255, which does not even contain the words "clearly disclosed," also requires that the error be "clearly evident" from the written record before a Certificate of Correction can properly issue).

> F.    A finding of inequitable conduct is compelled
> in light of all of the circumstances present here

A finding of inequitable conduct is compelled by the undisputed evidence showing an overwhelming pattern of improper behavior during the prosecution of the '517 patent. Without limitation:

There is no dispute that there were four prior art references that anticipated at least one of the claims of the application for the '517 patent at the time it was filed;

There is no dispute that Dr. Schenke and Dr. Petersen were aware of the four references before the application for the '517 patent was filed, that they were aware that

each of these references related to their work on the Bayer quinolone project and that

they did nothing to submit any of those references in the prosecution of the '517 patent;

There is no dispute that Dr. Schenke admitted that Dr. Petersen was aware of the

compounds in the Dainippon Abstract and the Egawa Article and that Dr. Petersen should

have submitted those references to the United States Patent Office in the prosecution of

the '517 patent--and there is no dispute that Dr. Petersen did nothing to submit those

references;

There is no dispute that Dr. Petersen highlighted on his personal copy of the

Dainippon Abstract the compound that anticipated original claim 1 of the '434

application;

There is no dispute that Dr. Schenke was disappointed that a publication by

"Ube/Sankyo" anticipated some of his work, that the Sankyo '206 Application was

assigned on its face to "Ube" and "Sankyo", that Dr. Schenke testified that the Sankyo

'206 Application was consistent with what he wrote about the "Ube/Sankyo" publication,

and that he did nothing to cite either "Ube/Sankyo" or the Sankyo '206 Application in the

prosecution of the application for the '517 patent;

There is no dispute that claim 19 of the application for the '517 patent explicitly

claimed the Bayer 5/5 Bicycle, that Dr. Schenke was aware at the time he signed the

Inventors Declaration for the '517 patent that the Liebigs Reference had disclosed the

Bayer 5/5 Bicycle, that Dr. Schenke certified under penalty of perjury that he had

reviewed and that he understood the claims of the application for the '517 patent, that Dr.

Schenke first testified that he did not read the claims; that Dr. Schenke later testified that

76

"perhaps" he read the claims, and that Dr. Schenke did nothing to submit the Liebigs Reference in the prosecution of the '517 patent;

There is no dispute that not one of the four references was cited in the prosecution of the application for the '517 patent before the issue fee was paid;

There no dispute that one of four references, the Liebigs Reference, was never cited at all in the prosecution of the application for the '517 patent;

There is no dispute that Dr. Petersen, Dr. Bailly and Mr. Horn were aware that three of the four references were cited as X References in the prosecution of the European counterpart to the '517 patent after the issue fee for the '517 patent was paid;

There is no dispute that the Examiner warned Mr. Horn about the possible consequence of an election with traverse should the Examiner discover references which anticipated the non-elected subject matter, that Mr. Horn elected with traverse, and that the three X References from the European Search Report anticipated the non-elected subject matter of the application for the '517 patent;

There is no dispute that Mr. Horn submitted the three X References without following the listed requirements in Section 609 of the MPEP, that the MPEP told practitioners that if the requirements were not met the late-cited references would ordinarily not be considered, and that there are entries on Bayer's privilege log showing that Dr. Petersen, Dr. Bailly and Mr. Horn exchanged three privileged communications concerning two of the X References in the context of the application for the '517 patent between the time that the X References were submitted to the Patent Office and the time the '517 patent issued;

There is no dispute that Mr. Horn departed from his usual practice in how he handled the three X References when he received them from Bayer;

There is no dispute that before the Sankyo '206 Application was cited in the prosecution of the European counterpart of the application for the '517 patent that Dr. Petersen used an intermediate that he knew to be from the Sankyo '206 Application to make moxifloxacin for the very first time; and

Finally, there is no dispute that Bayer's counsel admitted during Bayer's opening statement that none of the four references was considered by the Patent Office before the '517 patent issued.

Bayer might try to defend its patent by asserting that the foregoing are just a series of unrelated, unfortunate and innocent coincidences. But in view of the talent, resources and expertise which Bayer and its attorneys devoted to these patent applications, it strains credibility to the extreme to believe that all of this is the product of coincidence. And except for the to-be-expected denials of the witnesses in the hot seat, there is little, if any, evidence of good faith. Bayer has not offered, nor could it possibly offer, a coherent theory concerning how all of these coincidences could all happen on the watch of experienced, well-paid, highly motivated scientists and patent attorneys. Thus, the undisputed evidence clearly and convincingly establishes that Bayer engaged in a pattern of misconduct that evidences an intent to deceive.

The doctrine of inequitable conduct is designed to bring accountability for the conduct of participants in the *ex parte* patent prosecution process. Companies like Bayer who stand to reap billions of dollars of profits from procuring patent protection have an undeniable duty to act with the utmost candor and good faith in dealing with the Patent

Office. Bayer, its scientists and attorneys should not be able to avoid being held

accountable for their clear misconduct merely by pointing fingers at each other, denying

recollection of the details, or claiming that a long string of mistakes and improper

conduct reflects inadvertence and coincidence. Rather, this Court plays a crucial role in

maintaining the integrity of our nation's patent system by holding unenforceable patents

procured by culpable misconduct from which it is reasonable to infer intent to deceive.

Adding the pattern of misconduct to the high materiality of multiple references to

the strong evidence of intent on the part of the inventors and their attorneys, and

considering these facts in light of all the circumstances and equities, the record evidence

clearly and convincingly supports a finding that inequitable conduct renders the '517

patent unenforceable.

5.    The '942 patent is also unenforceable for inequitable conduct

As this Court noted in *Truth Hardware Corp. v. Ashland Products, Inc.*, No. 02-

1541, 2003 WL 22005839 (D. Del. Aug. 19, 2003) (Ex. C hereto):

> It is well-settled that a patentee's inequitable conduct renders
> unenforceable all patent claims having "an immediate and necessary
> relation" to that conduct, regardless of whether the claims are contained in
> a single patent or a series of related patents. *See Keystone Driller Co. v.*
> *General Excavator Co.*, 290 U.S. 240, 245-46, 54 S.Ct. 146, 78 L.Ed. 293
> (1933); *Semiconductor Energy Lab. Co., Ltd. v. Samsung Elec. Co., Ltd.*,
> 24 F. Supp. 2d 537, 543-44 (E.D.Va. 1998). Indeed, a patent that issues
> from a divisional or continuation application may be held unenforceable
> where (i) there is inequitable conduct with respect to the prosecution of an
> earlier related application in the chain leading to the challenged patent and
> (ii) the inequitable conduct relates to the asserted claims of that [divisional
> or continuation] patent. Were this not the rule, a party committing
> inequitable conduct could avoid the consequences of that conduct through
> a scheme of divisional and continuation applications. The law does not
> countenance such a manipulation of the patent process.

*Id.* at * 1.

79

These standards apply here. The key concept articulated in *Truth Hardware* is that parties who engage in inequitable conduct cannot avoid the consequences of their conduct by filing divisional and continuation applications of the parent patent. Consequently, a party who engages in inequitable conduct will find not only the patent where the inequitable conduct took place unenforceable, but also any division or continuation of that patent where there is an "immediate and necessary relationship" between the inequitable conduct in the one patent and the relief sought in the other. *Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 245-46 (1933). To find otherwise would be "to countenance . . . a manipulation of the patent process". *Truth Hardware*, 2003 WL 22005839, at *1 (Ex. C). Under this standard the '942 patent is unenforceable in light of Bayer's inequitable conduct in the prosecution of the '517 patent.

In *Truth Hardware*, the parent patent was found unenforceable due to inequitable conduct. Subsequently, the Court undertook to determine whether a continuation patent was also unenforceable under the concept of infectious unenforceability. The patentee argued, among other things, that the two patents were "unrelated" because they were different patents with different claims. Judge Sleet rejected this position.

Judge Sleet found that the two patents were properly related because the second patent was a continuation patent and, therefore, "cannot include new information and must rely on the same specification [as the original patent]." *Id.* at *2 (citing MPEP § 201.07). Judge Sleet further found it important that the later patent and the earlier patent shared the same priority date. *Id.*

Here, the facts are even more compelling. As in *Truth Hardware*, the '942 patent does not include new information and relies on the same specification as the '517 patent. The '942 patent also relies upon the earlier patent's priority date. However, and of crucial significance, it is undisputed that each and every one of the asserted claims in the '942 is simply a narrower subset of what was already claimed in the '517 patent. As admitted by Bayer, each and every asserted claim of the '942 patent is covered by at least one claim of the '517 patent [JTX 1 at ¶40]. Thus, the relief sought by Bayer in asserting the '942 patent is exactly the same as the relief it seeks in asserting the '517 patent.

Moreover, while specific claims for moxifloxacin are set forth in the '942 patent, they could have been claimed in the earlier '517 patent. Indeed, during prosecution of the '942 patent, Bayer relied on the specification of the '517 patent to avoid intervening art that disclosed moxifloxacin between the issue of the '517 patent and the filing of the application for the '942 patent [Tr. 785:9-23]. Bayer has articulated no reason why it could not have asserted the claims of the '942 patent in the '517 patent. Had the claims of the '942 patent been obtained in the '517 patent, there is no doubt that inequitable conduct in the prosecution of the '517 patent would have rendered all of the claims unenforceable. *See, Kingsdown*, 863 F.2d at 877.

Ultimately, this Court is faced with an equitable choice as to whether to punish Bayer for its inequitable conduct with regard to the '517 patent. If the Court declines to find the '942 patent infectiously unenforceable, Bayer will have committed inequitable conduct with no consequence, still able to market moxifloxacin exclusively. If, however, the Court recognizes that the relationship between the '517 and '942 patents is so immediate in that the subject matter claimed in the '942 patent is totally subsumed within

81

the claims in the '517 patent, then to effect a true remedy for Bayer's inequitable conduct the Court must find that the '942 patent is also unenforceable.

## CONCLUSION

Based on the foregoing Reddy respectfully asks the Court to:

1.    FIND claims 1, 2, 8, 9 and 11 of United States Patent 4,990,517 patent invalid for obviousness under 35 U.S.C. § 103.

2.    FIND claims 1, 2, 3, 4, 5 and 7 of United States Patent 5,607,942 invalid under *In re Schneller*, 397 F.2d 350 (C.C.P.A. 1968) for double patenting over claims 4 and 5 of United States Patent 4,990,517.

3.    FIND claims 1, 2, 3, 4, 5 and 7 of United States Patent 5,607,942 invalid for obviousness-type double patenting over claims 4 and 5 of United States Patent 4,990,517.

4.    FIND United States Patent 4,990,517 unenforceable for inequitable conduct.

5.    FIND United States Patent 5,607,942 unenforceable for inequitable conduct.

6.    PERMANENTLY ENJOIN Bayer AG, Bayer Healthcare AG, Bayer Pharmaceuticals Corporation, their successors, assigns and licensees from asserting either United States Patent 4,990,517 or United States Patent 5,607,942 in any action.

7.    DISMISS the Complaint (D.I. 1) with prejudice.

8.    AWARD Reddy its cost and such other relief as the Court deems just and proper.

Based on the Statement of Admitted Facts Requiring No Proof [JTX 1] Reddy respectfully asks the Court to FIND that:

9.     The Moxifloxacin Hydrochloride tablet product of Reddy's ANDA 76-938 (including modification to the formulation but not to the active ingredient thereof), does not infringe any of claims 3, 4, 5, 6, 7,or 10 of United States Patent 4,990,517 [JTX 1 at ¶34].

10.     The bulk active pharmaceutical ingredient of Reddy's DMF 16999 does not infringe any of claims 10, 12, or 14 of United States Patent 4,990,517 when manufactured, sold, imported, exported or used for use in a product for humans [JTX 1 at ¶35].

11.     The use of the Moxifloxacin Hydrochloride tablet product of Reddy's ANDA 76-938 (including modification to the formulation but not to the active ingredient thereof), when used in humans does not infringe any of claims 3, 4, 5, 6, 7, 10, 12, 13 or 14 of United States Patent 4,990,517 [JTX 1 at ¶36].

12.     The bulk active pharmaceutical ingredient of Reddy's DMF 16999 does not infringe any of claims 6 or 8 of the United States Patent 5,607,942 when manufactured, sold, imported, exported or used for use in a product for humans [JTX 1 at ¶37].

13.     The use of the Moxifloxacin Hydrochloride tablet product of Reddy's ANDA 76-938 (including modification to the formulation but not to the active ingredient thereof), when used in humans does not infringe any of claims 6 or 8 of United States Patent 5,607,942 [JTX 1 at ¶38].

14.    The bulk active pharmaceutical ingredient of Reddy's DMF 16999 does not infringe any of claims 3, 4, 5, 6, or 7 of United States Patent 4,990,517 [JTX 1 at ¶39].

Further, if Bayer maintains that Dr. Schenke did not read and understand the claims of the '434 application when he signed his Inventors Declaration, Reddy respectfully asks the Court to:

15    ORDER that, to the extent necessary, Reddy's Complaint (D.I. 6) is AMENDED to include the allegation that the execution and submission of a false Inventors Declaration by Dr. Schenke constitutes inequitable conduct that renders each of United States Patents 4,990,517 and 5,607,942 unenforceable.

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Louis H. Weinstein
David J. Novack
A. Michael Covino
Michael H. Imbacuan
BUDD LARNER, P.C.
150 John F. Kennedy Parkway CN1000
Short Hills, New Jersey 07078
Tel: (973) 379- 4800

By: */s/ David E. Moore*
       Richard L. Horwitz (#2246)
       David E. Moore (#3983)
       Hercules Plaza, 6th Floor
       1313 North Market Street
       Wilmington, Delaware 19801
       Tel: (302) 984-6000
       rhorwitz@potteranderson.com
       dmoore@potteranderson.com

Dated: October 6, 2006

*Attorneys for Defendants/Counterclaim Plaintiffs*
*Dr. Reddy's Laboratories, Ltd. and*
*Dr. Reddy's Laboratories, Inc.*

754467/27944

84

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on October 6, 2006, the attached document was

hand delivered to the following persons and was electronically filed with the Clerk of the Court

using CM/ECF which will send notification of such filing(s) to the following and the document

is available for viewing and downloading from CM/ECF.

Frederick L. Cottrell , III
Richards Layton & Finger
One Rodney Square
920 North King Street
Wilmington, Delaware  19801
Cottrell@RLF.com

I hereby certify that on October 6, 2006, I have Electronically Mailed the documents to

the following non-registered participants:

Bruce R. Genderson
Adam L. Perlman
Aaron P. Maurer
David I. Berl
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, DC  20005
bgenderson@wc.com
aperlman@wc.com
amaurer@wc.com
dberl@wc.com

> /s/ David E. Moore
> Richard L. Horwitz
> David E. Moore
> Potter Anderson & Corroon LLP
> Hercules Plaza – Sixth Floor
> 1313 North Market Street
> P.O. Box 951
> Wilmington, DE  19899-0951
> (302) 984-6000
> rhorwitz@potteranderson.com
> dmoore@potteranderson.com

677083