## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

BAYER AG, BAYER HEALTHCARE AG,  )
and BAYER PHARMACEUTICALS      )
CORPORATION,                   )
                               )
    Plaintiffs,          )
                               )
     v.              )  Civil Action No. 04-0179-SLR
                               )
DR. REDDY'S LABORATORIES, LTD. and )
DR. REDDY'S LABORATORIES, INC.,    )
                               )
    Defendants.         )

## PLAINTIFFS' POST-TRIAL BRIEF

*OF COUNSEL:*

Bruce R. Genderson
Adam L. Perlman
Aaron P. Maurer
David I. Berl
Dov P. Grossman
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000
(202) 434-5029 (Facsimile)

Frederick L. Cottrell, III (#2555)
*Cottrell@rlf.com*
Jeffrey L. Moyer (#3309)
*Moyer@rlf.com*
Anne Shea Gaza (#4093)
*Gaza@rlf.com*
Richards, Layton & Finger P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
(302) 651-7700
(302) 651-7701 (Facsimile)

*Attorneys for Plaintiffs Bayer AG,*
*Bayer HealthCare AG, and*
*Bayer Pharmaceuticals Corporation*

Dated: October 6, 2006

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ v

INTRODUCTION ............................................................................................................... 1

BRIEF TECHNICAL BACKGROUND ............................................................................. 4

THE PATENTS-IN-SUIT AND THEIR PROSECUTION HISTORIES ........................... 5

    A.    The '517 Patent, PTX 1. ................................................................................ 5

    B.    The '942 Patent, PTX 3. ................................................................................ 5

    C.    The Prosecution of the Patents-In-Suit. ........................................................ 6

        1.    The Prosecution History of the '517 Patent, PTX 2. .................... 7

            a.    The Restriction Requirement and Bayer's Election of Certain Active Ingredient Bicyclic Quinolone Compounds. ...................................................................... 7

            b.    The Notice of Allowance and Payment of the Issue Fee. ............... 8

            c.    Bayer's Receipt and Submission of the European Search Report. .................................................................. 8

            d.    Issuance of the '517 Patent and the PTO's Consideration of the EP Search Report. ......................... 9

        2.    The Prosecution History of the '942 Patent, PTX 4. ................... 10

ARGUMENT ..................................................................................................................... 10

I.    REDDY HAS NOT PROVEN INEQUITABLE CONDUCT. ........................................ 10

    A.    Introduction. ................................................................................................ 10

    B.    The Governing Legal Standards. ................................................................. 13

    C.    There Was No Inequitable Conduct with Respect to the Liebig's Reference. ................................................................................................... 15

        1.    Liebig's Was Not Material to the Claims of the '517 Patent as Issued. ................................................................................... 15

        2.    Liebig's Was Not Intentionally Withheld. ................................... 18

            a.    Bayer's Le A 26 686 Application Does Not Show That Liebig's Was Intentionally Withheld. ........................... 20

                1)    Dr. Schenke, the Lead Inventor of Le A 26 686. .............. 20

                2)    Dr. Petersen. ..................................................................... 21

                3)    Mr. Horn and Dr. Bailly. ................................................... 22

            b.    Dr. Schenke Did Not Submit a False Inventors' Declaration. ............................................................... 22

D.    There Was No Inequitable Conduct Relating to the References
Disclosed in the EP Search Report. ........................................................ 24

    1.    Sankyo, Dainippon, and Egawa Were Not Material to the
Claims of the '517 Patent as Issued. ......................................... 25

        a.    The EP Search Report References Are Less Relevant
Than, and at Most Cumulative Of, References Before
the Examiner. ................................................................. 25

        b.    The EP Search Report References Were Not Material to
the Claims as Issued. ..................................................... 27

        c.    Bayer Did Not Admit the Materiality of the EP Search
Report References to the Claims as Issued. ................... 28

    2.    The References Disclosed in the EP Search Report Were Not
Withheld – They Were Submitted to the PTO. .......................... 30

    3.    There Was No Intent To Withhold the EP Search Report
References. ................................................................................. 31

        a.    The Submission of the EP Search Report to the PTO Is
Not Evidence of an Intent To Withhold the EP Search
Report. ........................................................................... 32

            1)    The Submission in the Parent Case ('517
Patent). .............................................................. 32

            2)    The Submission in the Divisional Case. ............. 34

        b.    Drs. Petersen and Schenke Did Not Intentionally
Include Compounds from the Prior Art in Their Initial
Application and Did Not Intentionally Withhold the EP
Search Report References. .............................................. 35

            1)    The Unintentional Overlap in Drafting of the
Originally-Filed Generic Claim. ........................ 37

            2)    Minutes of Meetings Months Earlier
Mentioning Sankyo, DTX 1 and 2. .................... 39

            3)    DTX 5: A Note from Months Earlier
Mentioning Dainippon and Egawa. ................... 41

        c.    The Prosecution of Le A 25 727 Does Not Evidence
Intent To Withhold Sankyo. ........................................... 42

E.    There Is No "Infectious Unenforceability" in This Case. ...................... 43

II.    REDDY HAS NOT PROVEN THAT THE CLAIMS OF THE '517 PATENT
ARE INVALID FOR OBVIOUSNESS. ............................................................. 45

A.    Reddy Bears a High Burden to Prove Invalidity. .................................. 46

B.    The Basic Law of Obviousness. ............................................................. 46

ii

C.    The Hypothetical POOS Is Not Inventive – Reddy's Obviousness Case Fails Because It Assumes the Contrary. .............................................. 47

D.    The Qualifications of and Factual Predicates for the Experts' Opinions............. 48

E.    The Qualifications of the Person of Ordinary Skill in the Art. ............................ 50

F.    The Conventional Wisdom at the 7-Position Was To Use 5- or 6-Membered Monocycles........................................................................... 51

G.    Reddy Has Not Proven the Prima-Facie Obviousness of Bayer's Claims – Reddy's "Ring-Closure" Theory Is Impermissible Hindsight............... 53

    1.    The POOS Would Not Have Been Motivated To Select AT-3295 or Sankyo 1-130 as a Lead Compound. ........................................... 55

        a.    The Lead Compound the POOS Would Have Chosen. ................. 56

        b.    The POOS Would Not Have Started with AT-3295..................... 57

        c.    The POOS Would Not Have Started with Sankyo 1-130................................................................................ 58

    2.    The POOS Would Not Have Been Motivated To Replace a Monocyclic 7-Position Substituent with the Bayer Bicycle. ................... 59

        a.    The Testimony of Reddy's Experts Is Insufficient. ...................... 59

        b.    The POOS Would Have Used a Monocycle at the 7-Position. ...................................................................................... 61

        c.    The Three Bicyclic References Relied on By Reddy Do Not Provide a Motivation To Combine. ....................................... 64

            1)    Tone (PTX 41, DTX 260) Does Not Provide Motivation........................................................................... 64

            2)    Culbertson (DTX 256), the Closest Prior Art, Does Not Provide Motivation. ........................................... 66

            3)    Hokuriku (DTX 299) Does Not Provide Motivation........................................................................... 67

        d.    A POOS Would Not Have Been Motivated To Make Bayer's Bicycles. ............................................................. 68

    3.    Reddy Has Not Proven a Reasonable Expectation of Success. ................. 69

H.    Reddy's Obviousness Challenge Fails in Light of Bayer's Rebuttal Evidence........................................................................................... 71

    1.    The Unexpected Properties of Compounds Within the Scope of Claims 1 and 2 of the '517 Patent Support Their Validity. ..................... 72

    2.    Objective Indicia of Nonobviousness Further Refute Reddy's Defense. ............................................................................... 73

III.    REDDY HAS NOT PROVEN THAT THE CLAIMS OF THE '942 PATENT
        ARE INVALID FOR DOUBLE PATENTING. ................................................ 74

        A.    The Claims of the '942 Patent Are Not Invalid For Obviousness-Type
              Double Patenting. ............................................................................... 74

              1.    Reddy Has Failed To Establish a *Prima Facie* Case of
                    Obviousness-Type Double Patenting. ............................................ 75

                    a.    In July 1988, Methoxy Was Outside the Conventional
                          Wisdom for 8-Position Substituents. .................................... 76

                    b.    8-Methoxy Possesses Very Different and Less
                          Desirable Chemical and Structural Features Than 8-
                          Chlorine and 8-Fluorine. ..................................................... 77

                    c.    Sankyo Did Not Change the Conventional Wisdom
                          Regarding 8-Methoxy. ......................................................... 78

                    d.    The Person of Ordinary Skill in July 1988 Would Not
                          Have Been Motivated to Replace the 8-Position
                          Substituents of '517 Patent Claims 4 and 5 with a
                          Methoxy Group. ................................................................... 79

              2.    Even If Reddy Could Establish *Prima Facie* Double Patenting,
                    Its Stipulations Concerning Moxifloxacin's Unexpected
                    Properties Resolve the Issue in Bayer's Favor. ............................ 80

        B.    The Court Should Reject Reddy's "*Schneller*-Type" Double Patenting
              Defense. .............................................................................................. 82

              1.    There Is No Such Thing as "*Schneller*-Type" Double
                    Patenting. ..................................................................................... 83

              2.    Even If There Does Exist a Doctrine of "*Schneller*-Type"
                    Double Patenting, It Is Factually Inapplicable. ........................... 85

              3.    Even If *Schneller* Applies to This Case, the Validity of the '942
                    Claims Is Supported by Evidence of Unexpected Properties. ....... 87

              4.    Bayer's Statements During Prosecution of the '942 Patent Do
                    Nothing to Support Reddy's Claim. ............................................. 88

IV.     RELIEF REQUESTED ................................................................................. 88

CONCLUSION ................................................................................................... 90

## TABLE OF AUTHORITIES

### FEDERAL CASES

*ATD Corp. v. Lydall, Inc.*,
159 F.3d 534 (Fed. Cir. 1998)...................................................................................................60

*American Hoist & Derrick Co. v. Sowa & Sons, Inc.*,
725 F.2d 1350 (Fed. Cir. 1984)..................................................................................................46

*Arkie Lures, Inc. v. Gene Larew Tackle, Inc.*,
119 F.3d 953 (Fed. Cir. 1997)....................................................................................................61

*Arthrocare Corp. v. Smith & Nephew, Inc.*,
310 F. Supp. 2d 638 (D. Del. 2004)...........................................................................................44

*Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*,
776 F.2d 281 (Fed. Cir. 1985)..............................................................................................60, 71

*In re Baird*,
348 F.2d 974 (C.C.P.A. 1965) ....................................................................................................75

*Bausch & Lomb, Inc. v. Barnes-Hind/Hydrocurve, Inc.*,
796 F.2d 443 (Fed. Cir. 1986)....................................................................................................66

*Baxter International, Inc. v. McGaw, Inc.*,
149 F.3d 1321 (Fed. Cir. 1988)........................................................................................ *passim*

*In re Beattie*,
974 F.2d 1309 (Fed. Cir. 1992)..................................................................................................51

*In re Braat*,
937 F.2d 689 (Fed. Cir. 1991).....................................................................................................84

*Budde v. Harley-Davidson, Inc.*,
250 F.3d 1369 (Fed. Cir. 2001)..................................................................................................46

*Burlington Industrial, Inc. v. Dayco Corp.*,
849 F.2d 1418 (Fed. Cir. 1988)..................................................................................................11

*Consolidated Aluminum Corp. v. Foseco International Ltd.*,
910 F.2d 804 (Fed. Cir. 1990).............................................................................................44, 45

*Ex parte Davis*,
56 U.S.P.Q. 2d 1434 (Bd. Pat. Interferences 2000) ..............................................................84, 87

v

*In re De Blauwe*,
736 F.2d 699 (Fed. Cir. 1984)..........................................................................72

*In re Dembiczak*,
175 F.3d 994 (Fed. Cir. 1999).....................................................................46, 59

*Digital Control, Inc. v. Charles Machine Works*,
437 F.3d 1309 (Fed. Cir. 2006)..................................................................14, 25

*In re Dow Chemical Co.*,
837 F.2d 469 (Fed. Cir. 1988)..........................................................................47

*eBay Inc. v. MercExchange L.L.C.*,
126 S. Ct. 1837 (2006)......................................................................................89

*E.I. Du Pont de Nemours & Co. v. Phillips Petrol. Co.*,
656 F. Supp. 1343 (D. Del. 1987)....................................................................72

*Ecolochem, Inc. v. S. Cal. Edison Co.*,
227 F.3d 1361 (Fed. Cir. 2000)........................................................................46

*In re Eli Lilly & Co.*,
902 F.2d 943 (Fed. Cir. 1990)..........................................................................61

*Eli Lilly & Co. v. Barr Laboratories, Inc.*,
251 F.3d 955 (Fed. Cir. 2001).........................................................74, 75, 84, 85

*Eli Lilly & Co. v. Zenith Goldline Pharms.*,
364 F. Supp. 2d 820 (S.D. Ind. 2005) ...............................................55, 81, 84

*In re Emert*,
124 F.3d 1458 (Fed. Cir. 1997).........................................................................80

*FMC Corp. v. Hennessy Industries, Inc.*,
836 F.2d 521 (Fed. Cir. 1987)..........................................................................19

*FMC Corp. v. Manitowoc Co.*,
835 F.2d 1411 (Fed. Cir. 1987)........................................................................25

*Fiskars, Inc. v. Hunt Manufacturing Co.*,
221 F.3d 1318 (Fed. Cir. 2000)........................................................................30

*Fox Industrial, Inc. v. Structural Preservation System, Inc.*,
922 F.2d 801 (Fed. Cir. 1990)..........................................................................16

vi

*In re GPAC Inc.*,
57 F.3d 1573 (Fed. Cir. 1995)..................................................................................51

*In re Gartside*,
203 F.3d 1305 (Fed. Cir. 2000)................................................................................47

*General Foods Corp. v. Studiengesellschaft Kohle mbH*,
972 F.2d 1272 (Fed. Cir. 1992)...........................................................................83, 84

*Geneva Pharmaceuticals, Inc. v. GlaxoSmithKline PLC*,
349 F.3d 1373 (Fed. Cir. 2003)......................................................................80, 81, 82

*Gillette Co. v. S.C. Johnson & Son, Inc.*,
919 F.2d 720 (Fed. Cir. 1990)..................................................................................61

*Graham v. John Deere Co.*,
383 U.S. 1 (1966).....................................................................................................46

*Grain Processing Corp. v. America Maize-Products Co.*,
840 F.2d 902 (Fed. Cir. 1988)..................................................................................54

*Hebert v. Lisle Corp.*,
99 F.3d 1109 (Fed. Cir. 1996)............................................................................14, 23

*In re Hedges*,
783 F.2d 1038 (Fed. Cir. 1986)................................................................................61

*Honeywell International, Inc. v. Universal Avionics System Corp.*,
397 F. Supp. 2d 537 (D. Del. 2005)..........................................................................89

*Impax Laboratories, Inc. v. Aventis Pharms., Inc.*,
235 F. Supp. 2d 390 (D. Del. 2002)..........................................................................89

*Interconnect Planning Corp. v. Feil*,
774 F.2d 1132 (Fed. Cir. 1985)................................................................................59

*Johnson v. Trueblood*,
629 F.2d 287 (3d Cir. 1980)......................................................................................23

*In re Johnston*,
435 F.3d 1381 (Fed. Cir. 2006)................................................................................71

*In re Jones*,
958 F.2d 347 (Fed. Cir. 1992)..................................................................................77

vii

*Juicy Whip, Inc. v. Orange Bang, Inc.*,
292 F.3d 728 (Fed. Cir. 2002)...................................................................................14, 15

*In re Kaplan*,
789 F.2d 1574 (Fed. Cir. 1986)...................................................................75, 83, 84, 85

*Karsten Manufacturing Corp. v. Cleveland Golf Co.*,
242 F.3d 1376 (Fed. Cir. 2001).........................................................................................55

*Kimberly-Clark v. Johnson & Johnson*,
745 F.2d 1437 (Fed. Cir 1984).................................................................................. *passim*

*Kingsdown Medical Consultants, Ltd. v. Hollister, Inc.*,
863 F.2d 867 (Fed. Cir. 1988)...........................................................................................14

*In re Kollman*,
595 F.2d 48 (C.C.P.A. 1979) .............................................................................................72

*In re Kotzab*,
217 F.3d 1365 (Fed. Cir. 2000)...................................................................................46, 47

*In re Lalu*,
747 F.2d 703 (Fed. Cir. 1984)...........................................................................................80

*Life Techs., Inc. v. Clontech Laboratories, Inc.*,
224 F.3d 1320 (Fed. Cir. 2000).........................................................................................47

*Litton Industrial Products, Inc. v. Solid State System Corp.*,
755 F.2d 158 (Fed. Cir. 1985)...........................................................................................14

*Litton System v. Honeywell, Inc.*,
87 F.3d 1559 (Fed. Cir. 1996)...........................................................................................31

*In re Longi*,
759 F.2d 887 (Fed. Cir. 1985).................................................................................74, 75, 80, 83

*Medichem, S.A. v. Rolabo, S.L.*,
437 F.3d 1157 (Fed. Cir. 2006).........................................................................................47

*Molins PLC v. Textron, Inc.*,
48 F.3d 1172 (Fed. Cir. 1995).................................................................................. *passim*

*Newell Cos. v. Kenney Manufacturing Co.*,
864 F.2d 757 (Fed. Cir. 1988).........................................................................................82

*In re O'Farrell,*
853 F.2d 894 (Fed. Cir. 1988)..................................................................................61

*Ortho Pharm. Corp. v. Smith,*
959 F.2d 936 (Fed. Cir. 1992)............................................................................70, 75

*Orthopedic Equip. Co. v. All Orthopedic Appliances, Inc.,*
707 F.2d 1376 (Fed. Cir. 1983)................................................................................31

*In re Papesch,*
315 F.2d 381 (C.C.P.A. 1963) ..........................................................................80, 82

*In re Paulsen,*
30 F.3d 1475 (Fed. Cir. 1994)..................................................................................81

*Pfizer, Inc. v. Synthon Holdings BV,*
2006 WL 2553370 (M.D.N.C. Aug. 31, 2006)........................................................81

*Pfizer, Inc. v. Teva Pharms. USA, Inc.,*
429 F.3d 1364 (Fed. Cir. 2005)................................................................................89

*Pharmacia Corp. v. Par Pharm., Inc.,*
417 F.3d 1369 (Fed. Cir. 2005)................................................................................45

*Purdue Pharma L.P. v. Boehringer Ingelheim GmbH,*
237 F.3d 1359 (Fed. Cir. 2001)..............................................................13, 14, 18

*Purdue Pharma L.P. v. Endo Pharms., Inc.,*
438 F.3d 1123 (Fed. Cir. 2006)................................................................................14

*In re Rouffet,*
149 F.3d 1350 (Fed. Cir. 1998)................................................................................71

*Ruiz v. A.B. Chance Co.,*
234 F.3d 654 (Fed. Cir. 2000)..................................................................................50

*In re Schneller,*
397 F.2d 350 (C.C.P.A. 1968) ........................................................................ *passim*

*Scripps Clinic & Research Foundation v. Genentech, Inc.,*
927 F.2d 1565 (Fed. Cir. 1991)....................................................................16, 25, 31

*SmithKline Beecham Corp. v. Teva Pharms. USA, Inc.,*
No. 02-3779 (JWB) (D.N.J. Jan. 13, 2005) ............................................................82

ix

*In re Soni*,
54 F.3d 746 (Fed. Cir. 1995)...................................................................................71, 72

*Speedplay, Inc. v. Bebop, Inc.*,
211 F.3d 1245 (Fed. Cir. 2000)..............................................................................14, 31

*Standard Oil Co. v. American Cyanamid Co.*,
774 F.2d 448 (Fed. Cir. 1985)................................................................................47, 51

*Studiengesellschaft Kohle mbH v. N. Petrochem. Co.*,
784 F.2d 351 (Fed. Cir. 1986).....................................................................................75

*Symbol Techs., Inc. v. Opticon, Inc.*,
935 F.2d 1568 (Fed. Cir. 1991)...................................................................................74

*Takeda Chemical Industrial, Ltd. v. Mylan Laboratories, Inc.*,
417 F. Supp. 2d 341 (S.D.N.Y. 2006)...........................................................................55

*Tap Pharm. Prods., Inc. v. Owl Pharms., L.L.C.*,
419 F.3d 1346 (Fed. Cir. 2005).....................................................................................31

*TiVo Inc. v. EchoStar Committees Corp.*,
2006 WL 2398681 (E.D. Tex. Aug. 17, 2006) ..............................................................89

*Ultra-Tex Surfaces, Inc. v. Hill Brothers Chemical Co.*,
204 F.3d 1360 (Fed. Cir. 2000)....................................................................................74

*Uniroyal, Inc. v. Rudkin-Wiley Corp.*,
837 F.2d 1044 (Fed. Cir. 1988).....................................................................................51

*Upjohn Co. v. MOVA Pharm. Corp.*,
225 F.3d 1306 (Fed. Cir. 2000)................................................................................25, 60

*In re Vogel*,
422 F.2d 438 (C.C.P.A. 1970) ...............................................................................83, 84

*WMS Gaming, Inc. v. International Game Tech.*,
184 F.3d 1339 (Fed. Cir. 1999)....................................................................................71

*Yamanouchi Pharm. Co., Ltd. v. Danbury Pharmacal, Inc.*,
231 F.3d 1339 (Fed. Cir. 2000)..............................................................47, 54, 55, 69

## FEDERAL STATUTES AND RULES

35 U.S.C. § 103  ................................................................................................... *passim*

35 U.S.C. § 271...............................................................................................................88, 89

35 U.S.C. § 282......................................................................................................................46

Fed. R. Civ. P. 54(d)(1)..........................................................................................................89

xi

**INTRODUCTION**

This is a case arises out of the filing by Dr. Reddy's Laboratories, Ltd. and Dr. Reddy's Laboratories, Inc. (collectively, "Reddy") of an Abbreviated New Drug Application ("ANDA") to market a generic version of AVELOX®, a highly-effective and commercially successful antibacterial drug sold by Bayer.    The active ingredient in AVELOX® is moxifloxacin hydrochloride, which is protected, *inter alia*, by the two patents-in-suit, U.S. Patent No. 4,990,517 (the "'517 patent") and U.S. Patent No. 5,607,942 (the "'942 patent").   Faced with Reddy's ANDA, Plaintiffs Bayer AG, Bayer HealthCare AG, and Bayer Pharmaceuticals Corporation (collectively, "Bayer") brought this suit for infringement of the '517 patent and the '942 patent.

Reddy has conceded that its proposed generic moxifloxacin product infringes both of Bayer's patents.   Thus, the only issues addressed during the seven-day bench trial of this matter were Reddy's defenses and counterclaims of invalidity and inequitable conduct.

The evidence was overwhelming.  Reddy did not approach establishing by clear and convincing evidence that the '517 patent is invalid for obviousness, the '942 patent is invalid for double patenting, or that any inequitable conduct occurred.   Indeed, the evidence revealed Reddy's case for what it is – ill-reasoned hindsight and baseless *post hoc* criticism of Bayer scientists and attorneys.  Reddy's defenses fail as a matter of law in light of controlling case law foreclosing them, and as a matter of fact based on the evidence resoundingly refuting them.

Inequitable Conduct

Reddy alleges the intentional withholding of prior art.   The uncontradicted evidence, however, was that the compounds allegedly withheld from the PTO were immaterial to the issued claims of the patents, the references supposedly "withheld" actually were submitted to the PTO, and there was no intent to deceive.  For these and other reasons, Reddy's claim fails.

1

Reddy's case is based on the fact that Bayer's originally-filed patent application included genus claims covering millions of chemical compounds and a claim to certain intermediates (materials used to make final compounds) which inadvertently covered a small number of compounds in the prior art. Not only was the evidence clear that the inclusion of these prior art compounds was unintentional, but the evidence established that no one ever believed that the allegedly withheld references containing them were material to the prosecution of the '517 patent, and they were in fact not material. Moreover, as soon as any person with a duty of disclosure had any inkling that these references could possibly be pertinent, they submitted the references to the U.S. Patent and Trademark Office ("PTO"), which considered them. These facts refute any suggestion of an intent to deceive.

Reddy also seeks to render the '942 patent "infectiously" unenforceable because of this same conduct. But the '942 patent claims have no relationship to this alleged inequitable conduct, and thus as a matter of law, Reddy's infectious unenforceability defense must fail.

<u>Invalidity</u>

Reddy's invalidity arguments are also meritless. Reddy contends that the asserted claims of the '517 patent are invalid for obviousness and that the asserted claims of the '942 patent are invalid based on two theories of double patenting: obviousness-type double patenting and what Reddy calls "Schneller-type" double patenting. All of these arguments fail.

Although they are addressed to different patents, Reddy's obviousness attack on the '517 patent and obviousness-type double-patenting attack on the '942 patent suffer similar fatal flaws. It is undisputed that Bayer's patents claim quinolone antibacterials with bicycles at the 7-position which had never before been used in the quinolone field. The evidence showed that the conventional wisdom at the priority date of the patents (July 1988) was that monocycles

2

at the 7-position were optimal, and that using a bicycle would reduce activity. Likewise, the evidence showed that an 8-methoxy substituent (as used in moxifloxacin) was considered by persons of ordinary skill in the art at the priority date to be outside the conventional wisdom and inferior to the more commonly-used and accepted fluorine and chlorine 8-position substituents. And it was undisputed at trial that moxifloxacin and the compounds of Bayer's '517 and '942 patent claims have unexpected properties as compared to the closest prior art.

Bayer's experts, Drs. Ted Taylor and George Zhanel, both experienced scientists with decades of relevant practical experience, performed a thorough analysis of the field as it existed at the priority date before forming their opinions in this case, and testified at length about the teachings of the quinolone art and the deficiencies of Reddy's theories. The testimony of Reddy's experts, on the other hand, highlights the shortcomings in its case. Dr. LaVoie, Reddy's chemistry expert, reached his opinion as to the obviousness of Bayer's compounds based on his view that the person of ordinary skill in the art ("POOS") would "push themselves out of the envelope" of the conventional wisdom and "try to think outside the box" – an assumption which is contrary to controlling law and which renders his opinions of no probative value. Tr. 1003:4-1004:6, 1009:16-1010:9 (LaVoie). Dr. LaVoie's testimony was entirely conclusory, and his opinions are further undercut by the fact that, having virtually no relevant background knowledge of the area, he formed his initial opinions based solely on a limited number of references provided to him by Reddy's counsel which he studied for no more than ten hours. Tr. 941:9-943:1 (LaVoie). Similarly, Dr. Remmel, Reddy's microbiology expert, based his testimony regarding the use of bicycles on one prior art patent, and at most opined that a POOS would find it obvious to try bicycles at the 7-position which are very different from those in Bayer's compounds. Tr. 1656:19-1658:20 (Remmel). Reddy utterly failed to provide clear and

convincing evidence of obviousness or obviousness-type double patenting.

Finally, Reddy's "Schneller-type" double patenting attack on the '942 patent is baseless. Reddy asserts that the non-binding 1968 decision of the Court of Customs and Patent Appeals, *In re Schneller*, 397 F.2d 350 (C.C.P.A. 1968), created a new doctrine of double patenting, but no court in the 38 years since has ever agreed. This Court should not be the first, as Reddy's theory is inconsistent with a long line of subsequent Federal Circuit decisions.

## BRIEF TECHNICAL BACKGROUND

This case involves "quinolones," which are a class of antibacterial compounds that share certain features in common, namely their core chemical structure:



This core structure has various positions at which atoms or chemical groups (called "substituents") may be attached. Those positions are numbered 1 – 8 in the figure above. *See also* PTX 2071-A . The substituent attached to position 1 on the quinolone core, for example, is called the "1-position substituent." The 7- and 8-position substituents are the focus of this case.

Much of the evidence in this case focuses on "monocycles" and "bicycles" at the 7-position. Examples of particular monocycles and bicycles are shown on PTX 2071-B. Simply put, a monocycle is a substituent with one ring (which may have other substituents attached to it at various places). A bicycle, by contrast, is a substituent with two rings (with other substituents potentially attached at various points). The evidence at trial demonstrated that monocycles and bicycles are very different structures from one another, Tr. 1397:5-1406:6 (esp., 1397:9-21) (Taylor), and that the various types of bicycles – of which there are a great many – are likewise

4

very different from one another.  Tr. 1440:1-1441:16 (Taylor).

## THE PATENTS-IN-SUIT AND THEIR PROSECUTION HISTORIES

### A.    The '517 Patent, PTX 1.

Claims 1 and 2 of the '517 patent generically claim millions of quinolone compounds, expressed through a generic formula with multiple variables.  Each of the quinolone compounds encompassed by these generic formulas has an important feature in common – a 7-position bicyclic substituent in which the first ring (the one attached to the quinolone core) is a five-membered ring with one nitrogen (a "pyrrolidine") that is fused to another 5-membered or 6-membered ring as depicted in PTX 2070.  Tr. 90:11-17 (Schenke).  At trial these substituents were referred to as "5/5" or "5/6" bicycles, depending on the number of atoms in the second ring.  Claims 1, 2, 8, 9 and 11 of the '517 patent are asserted in this action and are admittedly infringed by Reddy.  JTX 1, Statement of Admitted Facts ("SAF") ¶¶ 27-30.  The parties also agree that the claims of the patents-in-suit are enabled and described by the specification of the '517 patent, and that the priority date for both patents is July 15, 1988.  JTX 1, SAF ¶¶ 8-10, 14-18, 41.

At the time the application that led to the '517 patent was drafted and filed, moxifloxacin was only a compound listed in a long table in the application – it had not yet been synthesized.  *See* PTX 1 at 2570[1], Table 1, cols. 23-24 (fourth compound).  It was not a development compound for Bayer.  Tr. 313:12-315:12 (Petersen).  Moxifloxacin is not specifically claimed in the '517 patent, although it is covered by genus claims 1 and 2.

### B.    The '942 Patent, PTX 3.

The claims of the '942 patent, by contrast, are directed specifically to a single chemical structure and its four stereoisomers (one of which is moxifloxacin).  PTX 3 at 2667-68.

---

[1] All page number references are to Bates numbers without prefix, unless otherwise specified.

Moxifloxacin's structure is shown in claim 1 and in PTX 2071-A. The filing of the '942 patent followed moxifloxacin's unexpectedly becoming a development compound after toxicity arose during human clinical trials of Bayer's prior development compound in 1993. Tr. 315:13-316:3 (Petersen); DTX 34 at 47237-38. Claims 1-5 and 7 of the '942 patent are asserted in this action and are admittedly infringed by Reddy. JTX 1, SAF ¶¶ 31-33.

**C.    The Prosecution of the Patents-In-Suit.**

The patents-in-suit are part of the same patent family, called "Le A 26 108." *See* PTX 2073 (summary of patent families). The Le A 26 108 patent family includes the priority applications filed in the German Patent Office, the patents-in-suit, and other U.S. and foreign patents and applications claiming the same priority. Tr. 496:4-11, 500:8-24 (Bailly).

The first-named inventor of Le A 26 108 is Dr. Uwe Petersen. As lead inventor, he was primarily responsible for drafting the two German applications to which the patents-in-suit claim priority. Tr. 321:25-322:12 (Petersen); 88:13-25 (Schenke). He received from his co-inventors draft sections pertaining to the work they had done. *Id.* He also was responsible for working with the Bayer patent department during prosecution of Le A 26 108. *Id.*

As was Bayer's usual practice, the Le A 26 108 application was first filed in the German Patent Office. Some months later, the application was translated into various languages and prepared for filing around the world by a specialized department at Bayer known as the "Foreign Filing Group." Tr. 500:25-501:11, 657:17-24 (Bailly). The applications then were filed and prosecuted in numerous countries by local patent counsel. *Id.* These outside counsel were responsible for dealing with issues of local law and practice, while Bayer's internal patent department controlled the substance of the patent prosecution. Tr. 501:24-502:24 (Bailly). The U.S. law firm responsible for prosecution of the Le A 26 108 family in the PTO was Sprung, Horn, Kramer & Woods, most particularly Leonard Horn (now deceased) and Kurt Briscoe. *Id.*

6

1.      **The Prosecution History of the '517 Patent, PTX 2.**

The U.S. patent application that led to the '517 patent, Application No. 07/375,434 (the "'434 application"), was filed in the PTO on June 30, 1989.  PTX 2 at 332, 338. The application was 190 pages long, with 14 pages of claims.  The first several claims in the application were genus claims, covering literally millions of quinolone compounds.  Several different generic 7-position substituents were included within these claims' original scope, most of which were bicycles, but one of which included a variety of monocycles.  *Id.* at 514.

a.      **The Restriction Requirement and Bayer's Election of Certain Active Ingredient Bicyclic Quinolone Compounds.**

The first action by the PTO drastically cut back on the scope of the claims in the '434 application.  On March 23, 1990, the examiner spoke with Mr. Horn, Bayer's U.S. counsel, by phone regarding a restriction requirement the examiner was imposing.  PTX 2 at 855.  The examiner believed that there were nine patentably distinct inventions, or "groups," in the original claims and required Bayer to select one group to prosecute.  Tr. 515:20-520:8 (Bailly).

These nine groups are described in an April 4, 1990 office action.  PTX 2 at 852-857.  The first four related to Bayer's claims to "active ingredient" quinolone antibacterial compounds, *id.* at 853, three of which had bicycles at the 7-position and one of which had monocycles at the 7-position.  Tr. 518:1-519:23 (Bailly).  The remainder of the nine groups, Groups V-IX, contained "intermediate" compounds used to make the active ingredient quinolones.  PTX 2 at 853-854; Tr. 516:17-21 (Bailly).  The examiner distinguished each of these nine groups as separate patentably distinct inventions.  PTX 2 at 854-55.

During the March 23, 1990 call, Bayer elected to prosecute one of the active ingredient quinolone groups with bicycles at the 7-position ("Group IV," which includes the bicyclic 7-position substituents of the '517 patent depicted in PTX 2070).  *Id.* at 855.  This

7

occurred before the examiner had done any searching and allowed him to limit the scope of his

subsequent search.   Tr. 823:10-824:2 (Briscoe); PTX 2 at 335, 855.   After this election,

prosecution of the '434 application focused <u>solely</u> on the quinolones in Group IV.[2]  The non-

elected subject matter was "out of the case," and it was Mr. Horn's practice to consider it as

such.  Tr. 825:8-15 (Briscoe).  Dr. Bailly had the same understanding.  Tr. 522:19-523:2, 530:12-

531:2.  Indeed, the only further mention of the non-elected quinolones (the other bicycles and the

monocycles) and the intermediates is when the claims were later amended to formally remove

them (though effectively they were long since gone).  Tr. 529:6-531:2 (Bailly).

> **b.**  **The Notice of Allowance and Payment of the Issue Fee.**

Following Bayer's formal affirmance in writing of its election in a July 19, 1990

response (and a minor change to the claims not pertinent here), the PTO issued a "Notice of

Allowance and Issue Fee Due" on August 27, 1990.  PTX 2 at 1213.  Shortly thereafter, Bayer

filed a divisional application directed to the subject matter which had been restricted out of the

'434 application.  PTX 11.  On October 31, 1990, Bayer paid the issue fee for the '434

application.  PTX 2 at 1219.

> **c.**  **Bayer's Receipt and Submission of the European Search Report.**

While the '434 application was pending, a corresponding application was pending

in the European Patent Office ("EPO").  The first event in an EPO prosecution is the issuance of

a "European Search Report" (the "EP Search Report"), which reports the results of a computer-

assisted search done by the EPO.  Tr. 532:23-533:6 (Bailly).  The European claims were still in

their original form, still including 7-position monocycles, as they had not been restricted as in the

---

[2]  The examiner "withdr[ew] from further consideration" claims directed solely to non-elected
subject matter; claims covering both elected and non-elected inventions, like the genus claims,
remained pending <u>only</u> insofar as they concerned <u>elected</u> subject matter.  PTX 2 at 855-56.

8

U.S. prosecution. Tr. 533:9-14 (Bailly).

The EP Search Report for the Le A 26 108 application issued on November 7, 1990. PTX 2 at 1230. It was received in the Bayer mailroom on Friday, November 9, 1990. Tr. 533:15-19 (Bailly). Dr. Bailly had his secretary transmit it to the Sprung, Horn firm, which she did on Monday, November 12, 1990. He did so as a matter of "plain routine," without determining whether the references were material. Tr. 534:19-22, 535:25-536:7. He expected Sprung, Horn to send the report and references to the PTO. Tr. 534:23-535:2.

The Sprung, Horn firm received the EP Search Report and the references it cited from Bayer on Wednesday, November 14, 1990. Tr. 837:24-838:23 (Briscoe); PTX 66. Two days later, on November 16, 1990, Mr. Horn sent the report and references to the PTO in an "Information Disclosure Statement" ("IDS"), and also included with the IDS a "Form 1449," listing the references. PTX 2 at 1221. The IDS informed the examiner that:

> The enclosed references were cited in the search report of the European Patent Office in the corresponding European application. A copy of such search report is also enclosed.

*Id.* Incredibly, Reddy accuses Bayer of withholding three of the references Bayer submitted.

### d.    Issuance of the '517 Patent and the PTO's Consideration of the EP Search Report.

The '434 application issued as the '517 patent on February 5, 1991. On February 11, 1991, the PTO mailed a communication responding to the IDS that Bayer submitted with the EP Search Report in November. The examiner included a copy of the Form 1449 Bayer had submitted, which was initialed next to each reference in the EP Search Report (indicating that he had considered the references). The Form 1449 was signed and dated February 8, 1991 in the box "Date Considered." PTX 2 at 1562-63. The examiner stated that he had considered the EP Search Report and the references cited,  and that "All the claims being allowable,

9

PROSECUTION ON THE MERITS REMAINS CLOSED in this application." *Id.* at 1562.

Some years later, Bayer sought a Certificate of Correction putting the references in the EP Search Report on the title page of the '517 patent, as they were considered by the examiner. Bayer submitted with its request a copy of the signed PTO Form 1449 and the February 11, 1991 communication. PTX 2 at 1571-75. The PTO approved the request and issued the Certificate of Correction. Tr. 539:22-540:19 (Bailly); PTX 2 at 1571.

### 2.    The Prosecution History of the '942 Patent, PTX 4.

The '942 patent issued from U.S. Patent Application No. 08/406,448 (the "'448 application"), which was filed March 20, 1995. The '448 application is in the same patent family as the '517 patent and claims priority, through the '434 application, back to the same priority applications. When it filed the '448 application, Bayer, as a matter of normal practice, also filed copies of every IDS filed in previous U.S. applications in the Le A 26 108 family, including the IDS relating to the EP Search Report and its cited references. PTX 4 at 2031; Tr. 562:16-563:19 (Bailly). The PTO examiner considered these references. *Id.* As with the '517 patent, the PTO never rejected the claims of the '942 patent based on these references.

During prosecution, the claims of the '942 patent were rejected on grounds of double patenting over the '517 patent. Bayer, however, overcame the double patenting rejections and the claims of the '942 patent issued.

### ARGUMENT

### I.    REDDY HAS NOT PROVEN INEQUITABLE CONDUCT.

#### A.    Introduction.

Reddy alleges that Bayer's patents are unenforceable because of inequitable conduct which allegedly occurred during the prosecution of the '517 patent. Reddy bears the high burden of proving an inequitable conduct defense, characterized by the Federal Circuit as

10