"an absolute plague," *Burlington Indus., Inc. v. Dayco Corp.*, 849 F.2d 1418, 1422 (Fed. Cir. 1988), by clear and convincing evidence. *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1178 (Fed. Cir. 1995).

Reddy's principal allegation is that Bayer withheld from the PTO the fact that a few compounds which anticipated certain claims of the '434 application as originally filed were in the prior art. In addition, on the second-to-last day of trial, after the evidence squarely refuted its intentional withholding case, Reddy sought to raise for the first time the claim that Dr. Schenke, one of the inventors of the '517 patent, filed a false inventors' declaration when the '434 application was filed in the United States. Both Reddy's actually-pled and newly-hatched theories suffer from the same infirmity – neither is remotely sustainable.

Before diving into the minutiae of Reddy's allegations, three points greatly simplify the Court's task. First, none of the allegedly withheld references was material to the issued '517 patent claims. That ends Reddy's inequitable conduct case as a matter of law. Second, the allegedly "withheld" art was before the examiner. That too ends Reddy's case. Third, the fact that Bayer's originally-filed claims overlapped with a handful of prior art compounds was an unintentional oversight. The individuals who Reddy accuses of intentional misconduct are honest people who tried to disclose relevant references as soon as they recognized a potential relationship to their patent application. Indeed, in a misguided effort to criticize Bayer's counsel for some perceived discovery slight, even Reddy's counsel, in a moment of unintended candor, commented that if he had asked Dr. Petersen for a particular document rather than Bayer's counsel, he "would have gotten it earlier." Tr. 485:3-8 (Petersen).[3]

---

[3] Another telling point – upon his retirement, well before this litigation, Dr. Petersen took home boxes of his documents that otherwise would have been destroyed pursuant to corporate policy. Tr. 389:9-15. These boxes that Dr. Petersen saved from routine destruction included many of the

Reddy has combed through and closely analyzed hundreds of thousands of pages produced by Bayer, plucked a few out of obscurity which have nothing to do with the drafting or prosecution of the '517 patent, and then speculated that the people involved must have remembered, many months later, all of the details of each of the references mentioned in these documents. Reddy also speculates that these individuals had in their minds simultaneously all of the thousands of prior art compounds and the millions of possible compounds that fell within the scope of the originally-filed claims – an impossible task obviously – and, that they must therefore have recognized that their original claims embraced some particular compounds from the prior art, yet decided to claim them anyway.

That is nonsense. Drs. Petersen and Schenke's primary jobs were synthesizing and inventing new compounds, not memorizing patent applications or references, and Dr. Bailly and Mr. Horn were each overseeing very large dockets of cases. They could not have perfect recollection of every compound in every reference they had ever seen, had cited to them, or heard of, or immediate recognition of every possible compound within their original claims. Yet that is what the Court has to assume in order to give any credence to Reddy's case. Without this premise, Reddy's theory of intentional withholding crumbles.

The Court need not take our word that the level of omniscience which Reddy attributes to Bayer's witnesses is pure fantasy. The evidence provided numerous examples of Reddy's counsel and its expert misstating or misremembering the content of documents, despite spending hours studying these particular documents. For example, Dr. LaVoie testified that all 13 of the most preferred compounds in Reddy's key Sankyo reference had a certain substituent in the 1-position when in fact, this was not true. Tr. 992:15-996:4 (LaVoie). Slide LaVoie # 6,

documents that Reddy relies on for its inequitable conduct case—certainly not the actions of a man who orchestrated a grand scheme to withhold relevant material from the examiner.

12

reflecting this error, was prepared by Reddy's counsel and reviewed by Dr. LaVoie. Tr. 994:1-4 (LaVoie). Reddy's counsel also prompted Dr. Schenke to incorrectly testify that all compounds on certain pages in the '517 patent used a particular 7-position substituent, only to have Bayer's counsel on re-direct point out that several on each page did not. Tr. 147:14-148:6, 230:17-232:5 (Schenke). Everyone at trial knew that these errors were inadvertent. Yet Reddy uses far more understandable oversights to accuse Bayer's witnesses of intent to mislead.

At the end of the day, Reddy's intentional withholding case makes no sense. There is no reason that any of the people involved would intentionally have included within their claims compounds that they knew were in the prior art. Any resulting claim would be useless, as it could never be enforced. Indeed, for that reason, it was Dr. Petersen's and Dr. Schenke's practice to modify generic claims in their applications to avoid prior art whenever they realized an overlap. And in this case, the notion that someone would, or did, intentionally claim the overlapping prior art compounds is unsupported by evidence or logic.

**B.    The Governing Legal Standards.**

To prove inequitable conduct, Reddy must prove "affirmative misrepresentations of a material fact, failure to disclose material information, or submission of false material information, coupled with an intent to deceive." *Purdue Pharma L.P. v. Boehringer Ingelheim GmbH*, 237 F.3d 1359, 1366 (Fed. Cir. 2001) (*quoting Baxter Int'l, Inc. v. McGaw, Inc.*, 149 F.3d 1321, 1327 (Fed. Cir. 1988)). Thus, Reddy must establish by clear and convincing evidence that: (1) the allegedly omitted information was material; (2) a person with a duty of disclosure knew of the existence and materiality of the information; and (3) that person intended to deceive the PTO. *Molins*, 48 F.3d at 1178. "In a case involving an omission of a material reference to the PTO, there must be clear and convincing evidence that the applicant made a deliberate decision to withhold a known material reference." *Baxter*, 149 F.3d at 1329 (emphasis

added); *Digital Control, Inc. v. Charles Mach. Works*, 437 F.3d 1309, 1318 (Fed. Cir. 2006). To prove inequitable conduct based on the filing of a false oath, Reddy must prove that the oath was false and that it was made with knowledge of the falsity and with intent to deceive. *Juicy Whip, Inc. v. Orange Bang, Inc.*, 292 F.3d 728, 744-45 (Fed. Cir. 2002); *Hebert v. Lisle Corp.*, 99 F.3d 1109, 1116 (Fed. Cir. 1996).

"Intent to deceive can not be inferred solely from the fact that information was not disclosed . . . ." *Hebert*, 99 F.3d at 1116. Rather, the non-disclosure must be "made with the specific intent to mislead," not due to "carelessness," *Speedplay, Inc. v. Bebop, Inc.*, 211 F.3d 1245, 1259 (Fed. Cir. 2000), "[w]holly inadvertent errors or honest mistakes," or oversight. *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 166 (Fed. Cir. 1985). "[T]he involved conduct, viewed in light of all the evidence, including evidence indicative of good faith, must indicate sufficient culpability to require a finding of intent to deceive." *Kingsdown Med. Consultants, Ltd. v. Hollister, Inc.*, 863 F.2d 867, 876 (Fed. Cir. 1988) (en banc).

Materiality is a question of fact that must be proven by clear and convincing evidence. *Purdue Pharma*, 237 F.3d at 1366. The Federal Circuit has discussed several different standards for materiality, the broadest being the "reasonable examiner" test, *i.e.*, whether "a reasonable examiner would have considered such prior art important in deciding whether to allow the parent application." *Digital Control,* 437 F.3d at 1314-16; *see also Purdue Pharma L.P. v. Endo Pharms., Inc.*, 438 F.3d 1123, 1128-29 (Fed. Cir. 2006) ("[T]he less material the information, the greater the proof [of intent] must be.").

Finally, even if materiality and intent have been established by clear and convincing evidence, a court then must weigh those factors "in light of all of the circumstances to determine whether the applicant's conduct is so culpable that the patent should be

unenforceable." *Juicy Whip*, 292 F.3d at 744.

####    C.    There Was No Inequitable Conduct with Respect to the Liebig's Reference.

Reddy alleges that Bayer intentionally withheld an article from *Justus Liebig's,*

*Annalen der Chemie*, Vol. 677 ("Liebig's"), DTX 218B. This claim fails as a matter of law.

The allegedly withheld pages of the Liebig's reference disclose the following

bicyclic compound:

This compound is not a quinolone, Tr. 938:25-939:1 (LaVoie), and it had never been used in

quinolones prior to the Bayer invention at issue here. Tr. 937:20-25 (LaVoie). Nor does the

Liebig's reference have anything to do with quinolone compounds – it is simply one reference in

the vast chemical literature. Tr. 938:25-939:18 (LaVoie). Dr. Taylor explained that the literature

included "thousands and thousands of bicycles, none of which had ever been used in quinolone

chemistry, and . . . there was no suggestion for taking [the Bayer bicycle] out of the literature."

Tr. 1388:5-10. The Liebig's compound is relevant to this case only because Bayer, without

knowledge of Liebig's, used a compound of the same structure as an intermediate in synthesizing

novel quinolones and included this intermediate in one of its original claims.

####    1.    Liebig's Was Not Material to the Claims of the '517 Patent as Issued.

The Federal Circuit has made clear that for a patent to be held unenforceable due

to failure to submit a reference, that reference must have been material to the claims of the patent

as issued. In language directly pertinent here, the court held in *Kimberly-Clark v. Johnson &*

*Johnson,* 745 F.2d 1437 (Fed. Cir 1984), that failure to submit a reference that was material to

the claims of a patent application as originally filed, but not as issued, is insufficient as a matter

of law to sustain a claim of inequitable conduct:

> In a case such as this, involving an issued patent attacked for
> breach of the duty of candor only on the basis of nonfeasance
> consisting of a failure to disclose known prior art, <u>the key issues of
> materiality and intent should be decided with reference to the
> claims of the patent.</u>  What we see here, however, is an <u>attempt by
> defendants to build a case of "fraud" by reason of non-disclosure
> of prior art material only to abandoned claims long since cancelled</u>
> during prosecution after being rejected by the examiner as
> unpatentable for reasons not involving the uncited prior art.  <u>To
> base a conclusion of "fraud" on such grounds is to deal with a
> hypothetical situation, not with reality.</u>  Defendants and the trial
> judge have had little or nothing to say, in discussing the breach of
> duty to disclose issue, about the limited claims finally patented;
> they have not shown that non-disclosure of prior art would have
> had any effect on their allowance.  Therefore, defendants have not
> sustained their heavy burden.

*Id.* at 1457 (emphases added); *Scripps Clinic & Research Found. v. Genentech, Inc.*, 927 F.2d

1565, 1583 (Fed. Cir. 1991) ("A reference that is material only to withdrawn claims can not be

the basis of a holding of inequitable conduct.").  While the Federal Circuit has noted that a court

may "look beyond the final claims to their antecedents" for context in analyzing the materiality

of the allegedly withheld information to the claimed invention – just as it may look to other

claims and the specification – the ultimate materiality inquiry remains focused on the issued

claims. *See, e.g., Fox Indus., Inc. v. Structural Pres. Sys., Inc.*, 922 F.2d 801, 803-04 (Fed. Cir.

1990) (distinguishing *Kimberly-Clark* because the allegedly withheld art in *Fox* "discloses the

entirety of the structure set forth in most of the issued claims"); *Baxter*, 149 F.3d at 1331-32

(analyzing materiality based on issued claims and contrasting *Kimberly-Clark*, where "the non-

disclosed prior art was not material to the allowed claims," and *Fox*, where "the omitted

references were not only material to the claims that were cancelled, but were also material to the

issued claims").

Bayer's original claim to intermediate compounds, which included the compound in Liebig's, was removed from the case as a result of the restriction requirement before any substantive prosecution took place. *See* pp. 7-8. *Kimberly-Clark* and its progeny make clear that whether Liebig's was material to an originally-filed claim is not the relevant inquiry; Reddy must prove that Liebig's was material to the claims of the '517 patent <u>as issued</u>. It has not come close.

The uncontradicted testimony of every witness who testified on this subject was that Liebig's was not material to the issued '517 patent claims. Under questioning by Reddy's counsel, Dr. Schenke, one of the inventors, testified that "the intermediate, Liebig's bicycle . . . was not relevant for the final quinolones." Tr. 141:1-10. He continued, "The quinolones containing bicycles were relevant. The intermediates were not . . . ." Tr. 141:14-20. Not surprisingly, Reddy chose not to ask Dr. Petersen whether Liebig's was material to the claims of the '517 patent. Dr. Bailly testified without contradiction that Liebig's "was, in fact, not relevant" because Liebig's contains "a precursor compound, and we didn't prosecute any claim to a precursor compound in the parent application." Tr. 543:21-544:21. Mr. Briscoe similarly testified that Liebig's was not relevant. Tr. 855:2-25.

Moreover, the prosecution history of the '434 application itself demonstrates the immateriality of Liebig's to the issued claims. In imposing the restriction, the examiner explicitly stated that the intermediate compounds (one of which was the Liebig's compound) and "final product" quinolones were "mutually exclusive species" that were "patentably distinct," rather than "obvious variants" of each other. PTX 2 at 854-55; Tr. 856:1-6 (Briscoe).

Although its expert, Dr. LaVoie, was aware of Liebig's, Reddy offered no expert testimony that Liebig's was material to the claims as issued, Tr. 935:24-936:21, and the uncontroverted evidence was that the intermediate compounds, including Liebig's, were

immaterial to the patentability of the claims to final quinolones.  This lack of any evidence of materiality is dispositive as to Reddy's claim relating to the Liebig's reference.

### 2.    Liebig's Was Not Intentionally Withheld.

Intent is a question of fact that must be proven by clear and convincing evidence. *Purdue Pharma*, 237 F.3d at 1366.  Because it alleges the failure to submit references to the PTO, Reddy must prove "that the applicant made a <u>deliberate decision to withhold a known material reference</u>." *Baxter*, 149 F.3d at 1329 (emphasis added).  Reddy has failed to do so, and the uncontradicted evidence precludes any such finding.  It is undisputed that when Le A 26 108, including the claim which included the 5/5 bicycle shown in Liebig's, was originally filed in Germany in July 1988, neither Dr. Petersen nor Dr. Schenke was aware of the Liebig's reference. Tr. 128:23-131:7 (Schenke); 335:21-336:10 (Petersen).[4]

About a year later, the U.S. version of Le A 26 108 was filed at the PTO.  At that time, neither Dr. Petersen nor Dr. Schenke realized that one of the originally-filed claims covered a compound in the prior art.  Tr. 130:21-131:7 (Schenke); 336:7-19 (Petersen).  Neither inventor reviewed the U.S. application in any detail prior to its filing; both had reviewed a substantially identical German version the previous year and relied on that review rather than re-reading the same document in English, although Dr. Petersen also did a cursory review of the English text in 1989.  Tr. 98:11-17, 216:19-23 (Schenke); 401:20-402:10 (Petersen).

---

[4]  Dr. Petersen, the lead inventor, was primarily responsible for drafting the claims and specification. Tr. 88:13-21 (Schenke); 321:25-322:12 (Petersen).  Dr. Schenke, as co-inventor, drafted only the portion of the specification that related to the synthesis of the intermediates he had synthesized, which did not include the Liebig's compound, as that was the responsibility of another co-inventor, Dr. Krebs, who is now deceased.  Tr. 90:7-91:16, 131:8-11 (Schenke). There is no reason to think that Dr. Krebs was aware of Liebig's, as he synthesized his 5/5 bicycle using a different method.  Tr. 131:2-11 (Schenke).  Indeed, there is no evidence that anyone at Bayer was aware of Liebig's before Dr. Schenke discovered the reference when drafting the Le A 26 686 application many months later. *See infra* I.C.2.a.

It was not until after the claim containing the Liebig's compound had been restricted out of the '434 application and a divisional application was prepared to pursue the non-elected subject matter that Dr. Petersen first noticed the overlap with Liebig's.  Tr. 336:11-19, 338:8-339:23 (Petersen); PTX 2 at 852-57; PTX 11; Tr. 541:8-19 (Bailly).  What happened next is conclusive evidence that there was no intent to deceive here.  Dr. Petersen took steps to ensure – via Dr. Bailly and Mr. Horn – that Liebig's was brought to the PTO's attention and the pertinent claim amended.  *Id.*; Tr. 429:6-432:3 (Petersen).  On October 1, 1990, Bayer filed a preliminary amendment in the divisional case, before any office action.  Tr. 542:10-21 (Bailly); PTX 11 at 36492.  The amendment informed the examiner – the same one examining the '434 application – that: "Claim 19 has been amended to delete therefrom the compound shown in Liebig's . . . .  A copy is submitted herewith."  PTX 11 at 36493; Tr. 541:20-542:14 (Bailly). There is no evidence that anyone even contemplated citing Liebig's in the parent case – it was not relevant there because the claims to intermediates already had been removed and it is undisputed that no one considered Liebig's relevant to the then-pending final product claims. *See* pp. 7-8; Tr. 855:5-25 (Briscoe).  Certainly no one was trying to hide it from the same examiner in the parent case to whom the reference and its significance was just disclosed in the divisional case.  Tr. 544:10-21 (Bailly).

This chronology alone refutes any suggestion of intent to mislead by Drs. Petersen, Schenke or Bailly, or by Mr. Horn.  Indeed, ruling in a case where an allegedly withheld prior art reference was submitted to the same examiner in a related, co-pending application, the Federal Circuit held that the art was not concealed from the examiner, who "[m]ost certainly . . . was not 'affirmatively misled.'"  *Kimberly-Clark*, 745 F.2d at 1456.  As explained in *FMC Corp. v. Hennessy Industries, Inc.*, 836 F.2d 521, 526 (Fed. Cir. 1987), the

disclosure of a reference in a co-pending application negates "even a threshold level of intent" and precludes a finding of inequitable conduct. As a matter of law and fact, there was no intent to deceive here.

### a.    Bayer's Le A 26 686 Application Does Not Show That Liebig's Was Intentionally Withheld.

Reddy relied at trial on the prosecution of another Bayer application from a different patent family, Le A 26 686, to suggest that Liebig's was intentionally withheld. This application related to a method for synthesizing bicyclic compounds for use as starting materials for quinolones. PTX 15. Reddy argues that Drs. Schenke, Petersen and Bailly, and Mr. Horn knew from their work on this different application that Liebig's disclosed a compound within an original claim of the '434 application and deliberately withheld that information from the PTO. To the contrary, Le A 26 686 provides no evidence of intent to deceive.

### 1)    Dr. Schenke, the Lead Inventor of Le A 26 686.

While drafting the specification for Le A 26 686 in March 1989, Dr. Schenke discovered that a 1964 reference – Liebig's – disclosed a method of synthesizing the 5/5 bicycle. Tr. 128:23-129:1, 130:2-6 (Schenke). Consistent with his usual practice to disclose and avoid claiming relevant prior art, which he learned from Dr. Petersen, Tr. 102:5-20; 99:13-102:20, Dr. Schenke disclosed Liebig's on the first page of the application and ensured that the claims of the Le A 26 686 application excluded it. PTX 15 at 42556; Tr. 130:7-20.

The unrebutted evidence demonstrates that Dr. Schenke did not realize when drafting Le A 26 686 that the same compound disclosed in Liebig's had been claimed in Le A 26 108. Dr. Schenke had reviewed the Le A 26 108 German application many months earlier, in June 1988. Tr. 94:9-12. Although he reviewed the entire application, he focused on the part that he had written and the generic structure. Tr. 94:13-16. Dr. Schenke did not specifically

remember, almost 20 years later, if he reviewed the application's claims in June 1988 – but it was his normal practice to read them. Tr. 134:11-17, 134:25-135:8 (Schenke). However, even if Dr. Schenke had carefully reviewed the Le A 26 108 claims in June 1988, he would not have recognized an overlap with Liebig's because he did not learn about Liebig's until many months later. Tr. 128:23-129:1, 130:21-131:1, 216:1-7. Moreover, this particular compound would not have had any significance to him in reviewing Le A 26 108 (even assuming he did focus on it) as it was not an intermediate which he used in his work. There is no reason why this particular intermediate – described only by chemical name in a list with 10 other compounds – would somehow have been seared in his memory such that when, months later, he saw the same compound in Liebig's, he would have recalled that it was also claimed in a part of Le A 26 108 that was prepared by others. And Dr. Schenke testified, without contradiction, that he had no such recollection and made no connection between Le A 26 108 and Le A 26 686 when the '434 application was filed. *Id.*; Tr. 135:21-136:7, 163:13-21, 215:4-12.

### 2)    Dr. Petersen.

Dr. Petersen was co-inventor of the Le A 26 686 application. He was not responsible for drafting the specification or for the prosecution of the application; Dr. Schenke was. Tr. 365:13-14 (Petersen). Dr. Petersen testified that he "thinks" that Dr. Schenke might have shown him a draft before the German application in Le A 26 686 was filed, but he is not sure. Tr. 359:16-20. Dr. Petersen is sure, however, that he never realized that the Liebig's compound overlapped with one of intermediates originally claimed in Le A 26 108 until he reviewed the claims in the first divisional case in Le A 26 108, which was filed in September 1990. Tr. 338:8-340:5, 358:20-359:15. And then Dr. Petersen promptly had it brought to the PTO's attention. This was consistent with his general practice. Tr. 324:25-326:6.

21

### 3)    Mr. Horn and Dr. Bailly.

In its opening statement, Reddy accused the now-deceased Mr. Horn of intentionally withholding the Liebig's reference. The sum total of Reddy's evidence against Mr. Horn is the fact that he, on behalf of Bayer, filed both Le A 26 108 and Le A 26 686 in the U.S. But that is no evidence at all of intent to deceive, particularly given Mr. Briscoe's unrebutted testimony that Mr. Horn had literally hundreds of applications pending for Bayer at any one time in addition to his work for his other clients, that he did minimal work on Bayer applications (placing the claims into proper U.S. form but not doing any substantive review), and that he spent at most a half an hour on any given Bayer application before filing it. Tr. 808:19-813:21 (Briscoe). There is no evidence that Mr. Horn ever substantively reviewed the claim to intermediate compounds in the original '434 application. Indeed, the only evidence was that it would have been contrary to his usual practice in prosecuting Bayer applications to have substantively reviewed the claims. Tr. 501:24-502:24 (Bailly); 812:19-813:13 (Briscoe). There also is no evidence that he made any connection between the prosecution of Le A 26 686 and the '434 application, and given his caseload and usual practice in filing applications, it is inconceivable that Mr. Horn ever realized that the Liebig's compound discussed in Le A 26 686 was the same compound as in one of Bayer's original Le A 26 108 claims.

There likewise is no evidence that Dr. Bailly knew that an originally-filed claim in Le A 26 108 overlapped with Liebig's prior to the divisional case, let alone that he intentionally kept this information from the PTO.

### b.    Dr. Schenke Did Not Submit a False Inventors' Declaration.

Having failed to prove that Dr. Schenke ever realized that an originally-filed claim of the '434 application contained the compound shown in Liebig's, Reddy resorted to claiming, based on a hypertechnical misreading of the inventors' declaration filed with the '434

22

application, that Dr. Schenke submitted a false declaration.[5]

       Reddy's theory is baseless. "A holding of unenforceability based on the filing of a false oath requires that the oath was false, and made with knowledge of the falsity." *Hebert*, 99 F.3d at 1116. Here, Dr. Schenke's declaration was not false, he did not believe it to be false, and he did not submit it with intent to deceive.

       The inventors' declaration in the '434 application states that "I hereby state that I have reviewed and understand the contents of the above identified specification, including the claims, . . . ." PTX 2 at 529. It does not say, as Reddy erroneously asserts, that the declarant had read, studied, and memorized every last detail of the application, including every one of the millions of compounds claimed, on the day he signed the oath. The form only requires that the applicant state that he had reviewed and understood the application before submitting it. The record is clear that Dr. Schenke had in fact reviewed and understood the application before it was filed. That does not mean that he had to read it in June 1989, as Reddy suggests. To the contrary, Dr. Schenke relied, quite reasonably, on his review the previous year (before he had learned of Liebig's) of the Le A 26 108 priority application in German – his native language – and his understanding that the 26 108 priority application and '434 application essentially were the same, just in different languages. Tr. 132:7-18, 141:21-142:13, 215:13-216:23.[6] Indeed, Dr. Schenke testified that, in signing the declaration, "I relied on our German, on the German version, which I had read the year before, and my understanding was that the foreign

---

[5] Reddy waited until the second-to-last day of trial, several days after Dr. Schenke had returned to Germany, to raise this allegation in a motion to conform the pleadings to the evidence. Tr. 1307:17-1313:16. Reddy's eleventh-hour attempt to insert a brand new accusation prejudices Bayer and should be denied. *See Johnson v. Trueblood*, 629 F.2d 287, 294-95 (3d Cir. 1980).

[6] And, in fact, Reddy does not dispute that the Le A 26 108 German and U.S. applications were essentially the same, except for the addition of a few examples with corresponding claim amendments.

applications were just the same as the [German] version, which we had drafted a year before then." Tr. 98:11-17.  That the German and foreign applications were the same was, to Dr. Schenke's understanding, "normally the case and I relied on that.  That was the case.  That was only a translation.  Nothing substantially was changed in the translation." Tr. 216:19-23.[7] Further, Dr. Schenke testified "I had read the German version and I understood what we had invented . . . it was my understanding that I fulfilled my duty in signing the oath." Tr. 137:1-3.

The suggestion that Dr. Schenke must have lied when he said he reviewed and understood the <u>claims</u> of his application is also false.  While Dr. Schenke candidly admits not specifically recalling almost 20 years later reviewing the German application's claims in this particular case, he testified that it was his normal practice to do so.  Tr. 134:11-136:11.  And he further testified repeatedly that he "understood when I signed the oath that what we had synthesized was what we had invented and that was what we claimed." Tr. 136:13-16; 135:4:8; 135:21-136:7.

Dr. Schenke's declaration was true – he had in fact reviewed and believed he understood the application and claims before he signed the oath; he believed that the oath was true; and there was no intent to deceive whatsoever.

**D.    There Was No Inequitable Conduct Relating to the References Disclosed in the EP Search Report.**

Reddy alleges the withholding of three other references:  Sankyo EP 0 241 206 ("Sankyo," DTX 28); Dainippon Chemical Abstract JP-A-60 126 284 ("Dainippon," DTX 87); and an article authored by Egawa in the Journal of Medicinal Chemistry ("Egawa," DTX 4)

---

[7] *See also* Tr. 217:6-8 ("When I signed, my opinion was that both applications are essentially the same, the German version and the English version."); Tr. 218:24-219:5 ("[M]y understanding was that the English version, the English document was the same as the Le A 26 108, which we filed a year before."); Tr. 219:23 ("normally the case"); Tr. 220:16 ("usually the case").

(collectively, the "EP Search Report references"). Each of these three references was listed in the EP Search Report that Bayer received in November 1990 and promptly submitted to the PTO. This alone refutes Reddy's claim. In any event, as in the case of the Liebig's reference, the EP Search Report references were not material to the claims as issued, were not believed to be material by the inventors or attorneys, and were not withheld, much less withheld with the specific intent to deceive the PTO.

1.    **Sankyo, Dainippon, and Egawa Were Not Material to the Claims of the '517 Patent as Issued.**

As discussed above, in order to prove inequitable conduct based on alleged withholding of references, Reddy must prove that the references were material to the claims of the '517 patent as issued, as non-disclosure of a "reference that is material only to withdrawn claims can not be the basis of a holding of inequitable conduct." *Scripps*, 927 F.2d at 1583. *See also* I.C.1 above; *Kimberly-Clark*, 745 F.2d at 1437; *Baxter*, 149 F.3d at 1331-32. While Sankyo, Dainippon, and Egawa anticipated, and were thus material to, originally-filed genus claims in the '434 application, that subject matter was withdrawn before any substantive prosecution took place. The references were not material to the '517 patent claims as issued.

a.    **The EP Search Report References Are Less Relevant Than, and at Most Cumulative Of, References Before the Examiner.**

It is well-settled that an allegedly withheld prior art reference is not material and need not be disclosed if it "is not as pertinent as that considered by the examiner, or is merely cumulative to that considered by the examiner." *Molins*, 48 F.3d at 1179; *see also Digital Control*, 437 F.3d at 1319; *Upjohn Co. v. MOVA Pharm. Corp.*, 225 F.3d 1306, 1312 (Fed. Cir. 2000); *Baxter*, 149 F.3d at 1328; *Scripps*, 927 F.2d at 1582; *FMC Corp. v. Manitowoc Co.*, 835 F.2d 1411, 1415 (Fed. Cir. 1987). The EP Search Report references were not material for this reason alone.

25

As Bayer's chemistry expert, Dr. Taylor, testified, the closest prior art to the claims of the '517 patent is a Culbertson patent, EP 0106489, DTX 256 ("Culbertson"). Tr. 1446:12-1447:6. Culbertson discloses antibacterial quinolones with bicyclic 7-position substituents, and in particular discloses fused bicycles where the first ring is a 5-membered pyrrolidine ring (just as in the 7-position substituents of the '517 patent). *Id.*; PTX 2164, 2198. The compounds of the EP Search Report references – Sankyo, Dainippon, and Egawa – all have monocycles at the 7-position. A POOS would have considered bicyclic 7-position and monocyclic 7-position substituents to be fundamentally different. Indeed, comparing the Bayer 5/5 bicycle with the monocycles Reddy relies on in its obviousness case, Dr. Taylor testified at length about these differences, Tr. 1397:4-1406:6; PTX 2142, noting that the monocycle and bicycle have "completely different" "structural features" and are "fundamentally different." Tr. 1398:12-17, 1405:3-4, 12-13. *See* II.G.2 below. Dr. Taylor's testimony that the "Culbertson bicycle is, without question, the closest prior art" is uncontested. Tr. 1446:12-1447:6. Bayer cited Culbertson in the first column of the '517 patent's specification, PTX 1 at 2559, col. 1:11-15, and the examiner cited the U.S. counterpart of Culbertson, PTX 40, in the first Office Action. PTX 2 at 859. Accordingly, the undisputed evidence demonstrates that the EP Search Report references are both not as pertinent as, and at most cumulative of, art that was before the examiner. They are thus not material as a matter of law.[8] *Molins*, 48 F.3d at 1179.

---

[8] Indeed, to the extent references disclosing quinolones with monocycles at the 7-position were relevant at all, the POOS still would consider Culbertson to be the closest prior art. While no monocycles are close in structure to bicycles, the closest monocycle would be found in the Culbertson U.S. patent, which has a compound that requires no additional carbon atom in order to close the ring and form a bicycle under Dr. LaVoie's theory, and which was cited by the examiner. Tr. 1410:7-1413:5 (Taylor); PTX 40 at 89, PTX 2132.

b.    **The EP Search Report References Were Not Material to the Claims as Issued.**

In addition to being at most cumulative, Sankyo was not material to the claims as issued. It is true, as Reddy asserts, that compound 1-144 of Sankyo fell within the generic claims of the '434 application as originally filed. This explains the citation of Sankyo in the EP Search Report, as the claims in Europe (unlike those in the U.S.) had not been restricted and thus still contained monocycles at the 7-position. Tr. 533:9-14 (Bailly). But Reddy does not even allege that Sankyo compound 1-144 is relevant to the claims of the '517 patent as issued. Nor is there any evidence that it was relevant.

There is another compound disclosed in Sankyo with a different 7-position substituent – compound 1-130 – that Reddy relies on in its obviousness case. PTX 2055. But as discussed in the preceding section and in section II.G.1.c below regarding obviousness, the Sankyo monocycle was not material to the consideration of the Bayer 5/5 bicycle. Tr. 1410:7-1413:5 (Taylor). Moreover, compound 1-130 cannot possibly be a basis for Reddy's claim that Bayer intentionally withheld the Sankyo reference because there is no evidence that anyone at Bayer ever was aware of this compound. Tr. 283:18-24 (Petersen).

Similarly, neither Dainippon nor Egawa were material to the claims as issued. Both of these references are from the same research group, and they contain the same 7-position substituent. *E.g.*, PTX 2141. Similar to Sankyo 1-144, they were relevant to the originally-filed '434 application claims because the generic claims of the application as filed inadvertently covered compounds contained in these references. As with Sankyo compound 1-144, Reddy does not allege that either of these references are relevant to the claims of the '517 patent as issued, and there is no evidence suggesting otherwise.

27

    **c.**    **Bayer Did Not Admit the Materiality of the EP Search Report References to the Claims as Issued.**

Having provided no testimony that the references which anticipated Bayer's originally-filed claim were material to the '517 patent claims as issued, Reddy misreads the prosecution history to argue that Bayer admitted the materiality of these references to the claims as issued. Bayer did no such thing.

As discussed in detail at pp. 7-8 above, on April 4, 1990, the PTO issued an office action that set forth a restriction requirement. The restriction requirement split into four groups the active ingredient quinolone compounds claimed in the '434 application as filed. PTX 2 at 853. Bayer elected Group IV, claiming quinolones with certain bicycles at the 7-position, and prosecuted that subject matter in the '434 application. *Id.* at 855. Among the subject matter not elected were the quinolones containing monocycles at the 7-position. *Id.* at 853. The compounds in the EP Search Report references which anticipated the originally-filed genus claims of the '434 application were monocycles.

The examiner included the following boilerplate paragraph in the office action:

> Should applicant traverse <u>on the ground that the species are not patentably distinct</u>, applicant should <u>submit evidence</u> or identify such evidence now of record showing the <u>species to be obvious variants</u>, or <u>clearly admit on the record</u> that this is the case. In either instance, if the examiner finds one of the inventions anticipated by the prior art, the evidence of admission may be used in a rejection under 35 U.S.C. § 103 of the other invention.

PTX 2 at 855 (emphases added); Tr. 826:11-24 (Briscoe) ("standard form paragraph"). Ignoring the plain language of this paragraph, Reddy asserts that this form language states that

> "<u>if you [Bayer] traverse</u> my [the examiner's] restriction requirement and <u>give me a reason</u> why everything should be kept together, if I, the examiner, find something that anticipates one of the groups that you don't elect, I reserve the right to use it to reject the other group as being obvious."

Tr. 18:14-19 (Opening) (emphasis added).[9]  Bayer did traverse, and Reddy argues that Bayer's traversal was an admission that the references that anticipate the non-elected subject matter – Sankyo, Dainippon and Egawa – were material to the elected subject matter.  Tr. 19:10-13 (Opening).

That argument is specious.  First, Reddy has misread the PTO's form paragraph. The paragraph's plain language provides that it applies "[s]hould applicant traverse <u>on the ground that the species are not patentably distinct</u>."  Bayer did <u>not</u> traverse on this ground. Second, Bayer never took any of the actions the form language requires to traverse on this basis – it did not submit or identify any evidence that the species of its claims were obvious variants of one another; nor did it make an admission, clear or otherwise, that they were.  Tr. 527:5-528:15 (Bailly).  This boilerplate paragraph, therefore, is not relevant to the case.

In its July 19, 1990 response to the PTO's office action, in accordance with its normal practice, Bayer affirmed its election of Group IV in writing and traversed on the ground that the active ingredient compounds "share a great deal of common structure and utility," and that they further have certain common features in the 7-position and are "not really so remote structurally."  PTX 2 at 893; Tr. 520:25-521:7 (Bailly); 827:3-828:7 (Briscoe).[10]  Mr. Briscoe explained without contradiction that these are "code words to the examiner that what is being argued here is unity of invention," Tr. 830:1-3, which allows an applicant to prosecute disparate

---

[9] A traversal is a disagreement with the restriction requirement made by an examiner.

[10] The traversal did not concern the restriction of claims to remove the intermediate compounds in Groups V-IX; Bayer traversed only as to the final quinolones of Groups I-IV.  Tr. 525:17-22 (Bailly).   Bayer regularly received restriction requirements in the prosecution of U.S. applications, because Bayer filed essentially the same broad claims throughout the world, and the breadth of claims allowed in a single application in the U.S. was narrower than in other jurisdictions.  Tr. 520:9-24 (Bailly).  Bayer routinely attempted to traverse in protest against having to pay the additional fees for multiple applications.  Tr. 833:9-834:5 (Briscoe).

subject matter in the same application "even though the species <u>were patentably distinct</u>, if they shared a common structural core which had been disclosed as being essential to a common utility . . . ." Tr. 827:3-828:7, 829:3-831:3 (emphasis added). Thus, Bayer did <u>not</u> traverse on the ground that the compounds were not patentably distinct, *id.*, but rather on the distinct basis that the antibacterial quinolone compounds of Groups I-IV were "alike enough that they should be permitted in the same patent." Tr. 527:22-528:3, 525:10-16 (Bailly). Mr. Briscoe further testified that "unity of invention" was a common argument made by Mr. Horn and his firm in response to restrictions, and that no examiner had ever taken it as an admission that species were not patentably distinct or that they were obvious variants of each other. Tr. 831:4-832:17. Nor would Mr. Horn have believed his statement to be any such admission. *Id.* Dr. Bailly likewise did not believe this traversal to be an admission that the species were obvious variants, nor did Bayer submit or identify any evidence that they were. Tr. 528:5-15. Moreover, as happened in the vast majority of cases in which Bayer made such an argument, the examiner maintained the restriction, which he could not have done if Bayer made the admission that Reddy suggests. Tr. 525:23-25 (Bailly); 832:5-17 (Briscoe).

### 2. The References Disclosed in the EP Search Report Were Not Withheld – They Were Submitted to the PTO.

A reference cited to the PTO cannot form the basis for a finding that the reference was intentionally withheld, for "[a]n applicant can not be guilty of inequitable conduct if the reference was cited to the examiner, whether or not it was a ground of rejection by the examiner." *Fiskars, Inc. v. Hunt Mfg. Co.*, 221 F.3d 1318, 1327 (Fed. Cir. 2000). Indeed, so long as a reference was before the examiner, it does not matter who cited it or when it was cited: "When a reference was before the examiner, whether through the examiner's search or the applicant's disclosure, it cannot be deemed to have been withheld from the examiner." *Molins*,

48 F.3d at 1185; *Litton Sys. v. Honeywell, Inc.*, 87 F.3d 1559, 1571 (Fed. Cir. 1996) *vacated on other grounds*, 520 U.S. 1111 (1997); *Scripps*, 927 F.2d at 1582; *Orthopedic Equip. Co. v. All Orthopedic Appliances, Inc.*, 707 F.2d 1376, 1383 (Fed. Cir. 1983).

Accordingly, Reddy's claims with regard to Sankyo, Dainippon, and Egawa fail for another, independent reason:  the references were not withheld, but were submitted to the PTO. The facts are undisputed. Within one week of receiving the EP Search Report for Le A 26 108, Bayer submitted it and all of the cited references to the PTO. *See* pp. 8-9 above; PTX 2 at 1221, 1230-34. This is dispositive as a matter of law.[11]

### 3.    There Was No Intent To Withhold the EP Search Report References.

The fact that the EP Search Report references were disclosed to the PTO by Bayer also answers Reddy's charge that Bayer's inventors or attorneys acted "with the specific intent to mislead" the PTO. *Speedplay*, 211 F.3d at 1259; *see also Tap Pharm. Prods., Inc. v. Owl Pharms., L.L.C.*, 419 F.3d 1346, 1352 (Fed. Cir. 2005) (allegedly tardy submission of a European Search Report after the notice of allowance was not inequitable conduct, in part because the applicant "submitted the European search report to the examiner within a month after receiving it"). The submission of these references is absolutely inconsistent with any "deliberate decision to withhold a known material reference." *Baxter*, 149 F.3d at 1329.

---

[11] While not relevant to the duty of disclosure issue, it is also clear that the submitted references were considered by the examiner, who initialed the Form 1449 listing them.  PTX 2 at 1563. Although Reddy argues that the references were not considered until after the patent issued, and therefore should not be deemed to have been considered, the PTO disagreed, issuing Bayer a Certificate of Correction placing these references on the face of the patent after being provided the relevant documentation showing the timing of the submission and consideration of the references. PTX 2 at 1571-75; Tr. 539:22-540:19 (Bailly). *See generally*, pp. 9-10.

      **a.**      **The Submission of the EP Search Report to the PTO Is Not Evidence of an Intent To Withhold the EP Search Report.**

      **1)**      **The Submission in the Parent Case ('517 Patent).**

Reddy alleges that Leonard Horn's <u>submission</u> of the EP Search Report and its cited references is itself evidence of intent to deceive. Focusing on certain procedures in the Manual of Patent Examining Procedure ("MPEP") relating to the submission of art in certain circumstances after the issue fee has been paid, Reddy argues that (1) these procedures were "requirements" which (2) Mr. Horn did not follow, and therefore (3) he intentionally submitted the references in a way calculated to prevent the PTO from considering them.

Reddy's theory makes no sense and is not supported by any evidence. Mr. Horn's firm received the EP Search Report on November 14, 1990; two days later it was en route to the PTO. *See supra* pp. 8-9. As Mr. Briscoe testified without contradiction, this turnaround was unusually fast given the backlog of paper in Mr. Horn's office – indicating that Mr. Horn and/or others at his firm realized that the issue fee had been paid and that there was some urgency. Tr. 843:2-21. Mr. Briscoe also explained that Mr. Horn's practice was not even to determine whether the references cited in a European Search Report were relevant; rather, he simply forwarded them to the PTO. Tr. 731:14-18; 732:4-9. And contrary to Reddy's unsupported speculation, Mr. Briscoe explained that Mr. Horn's goal would have been to have the references considered in order to strengthen Bayer's patent. Tr. 843:22-844:6. Indeed, the examiner here did consider them. *See supra* pp. 9-10. The notion that Mr. Horn devised a scheme to intentionally withhold these references by submitting them extraordinarily promptly defies the evidence – and logic.[12]

---

[12] Moreover, the undisputed testimony at trial was that Mr. Horn's practice was to handle issues informally with examiners, typically by discussing them over the telephone,. Tr. 840:13-841:8, 842:16-843:1 (Briscoe). As Mr. Briscoe explained, Mr. Horn's practice in out-of-the-ordinary

In its opening, Reddy speculated without foundation that Mr. Horn was concerned that his traversal of the examiner's restriction was an admission that the EP Search Report references were material, and therefore he concocted an elaborate scheme to hide them by disclosing them. Mr. Horn did not make an admission, *see* I.D.1.c above, and the only evidence is that he would not have had the least concern that he had made an admission. Tr. 832:5-22 (Briscoe). Reddy's entire theory unravels from there.

Furthermore, the MPEP section Reddy relies on, § 609, DTX 97, did not set forth "requirements" for submitting art after the issue fee was paid. The MPEP itself makes clear that its provisions "do not have the force of law." PTX 60 at 42170; JTX 5 at ¶ 1. And as Mr. Briscoe testified, § 609 itself repeatedly makes clear that its provisions are only "guidelines." Tr. 750:11-13.

Moreover, to follow MPEP § 609, required:

(c) A statement . . . that, in the judgment of the person making the statement, the information cited:

(1) raises a serious question as to the patentability of the claimed subject matter, or

(2) is closer than that of record, or

(3) is material to the examination of the application . . . .

DTX 97 at 41777. There are additional procedures after the issue fee has been paid. *Id.*

The allegation that Mr. Horn "chose" not to file such a statement, with the intent to deceive the PTO, is absurd. There is no evidence that Mr. Horn was even aware of this

---

situations such as this was to call the examiner, and find out how the examiner wished to proceed. *Id.* While Mr. Horn cannot testify, all of the facts of record are entirely consistent with his having followed his usual practice, as the examiner did in fact consider the references Mr. Horn submitted. Certainly there is no clear and convincing evidence to the contrary.

33

provision of the MPEP. The only evidence at trial was to the contrary. As Mr. Briscoe testified, "Certainly, [Mr. Horn] was familiar with the MPEP, but what you have to understand is the MPEP is hundreds of pages. On each page there are tens of details. He did not know everything in the MPEP to the last detail." Tr. 723:3-9. When asked whether Mr. Horn was aware of the provisions of MPEP § 609 that Reddy relies on, Mr. Briscoe testified that "I don't have any specific knowledge that he was, but I doubt it." Tr. 749:4-7; *see also* Tr. 747:25-748:4 ("The MPEP is a voluminous text." "[N]o patent attorney" would be "familiar with every last detail in the MPEP").[13] In addition, the undisputed evidence was that Mr. Horn's practice for submitting references at any time was to submit them on an IDS, whether the issue fee had been paid or not. Tr. 841:25-842:15 (Briscoe). That is precisely what he did here.

Finally, the portion of § 609 on which Reddy relies could not have been followed. There is no evidence that Mr. Horn believed these references to be "material," "closer than that of record," or "to raise a serious question of patentability." The evidence demonstrated that any such representation would have been false as to the then pending claims. *See* discussion of obviousness below. At bottom, Reddy's counter-intuitive "concealment by disclosure" theory lacks any factual support.

### 2) The Submission in the Divisional Case.

Reddy also alleges that Bayer's disclosure of the EP Search Report in an IDS in the first divisional case – to the same examiner – is further evidence of intent to withhold. Yet again, this argument makes no sense and is not supported by the evidence.

---

[13] Moreover, the MPEP itself is not a model of clarity on the submission of art after payment of the Issue Fee, even if a practitioner had decided to consult it (which there is no evidence Mr. Horn did or would have done). In an entirely different chapter, Chapter 2000 entitled in part "Duty of Disclosure," the MPEP also discusses the submission of art late in prosecution, but makes no mention of any of the procedures Reddy relies upon, and does not even cross-reference § 609. DTX 188 at 41640-41 (§§ 2002.03, 2002.03(a)); JTX 5 at ¶ 12.

34