In September 1990, a divisional case was filed to claim the non-elected subject matter that was restricted out of the '434 application. Tr. 541:8-542:1 (Bailly); PTX 11 at 36486-88. On February 14, 1991, prior to any action by the PTO in the divisional case, Bayer filed an IDS disclosing the EP Search Report. PTX 11 at 36501-08; Tr. 545:10-20 (Bailly). Unlike the IDS in the parent case, which was submitted as quickly as possible without substantive comment, Tr. 535:15-536:7 (Bailly), Bayer in this IDS had the time to review and distinguish the references referred to in the search report (which collectively were hundreds of pages long). PTX 11 at 36501-02; Tr. 546:2-20 (Bailly); 851:22-852:5 (Briscoe).

Reddy again speculates without any basis that Mr. Horn deliberately waited to submit this IDS until after the '517 patent issued, on the theory that by withholding the references in the divisional case the examiner somehow would not consider them in the parent '434 case. There is no evidence to support this allegation, which in any event makes no sense. Bayer and Mr. Horn had already submitted the EP Search Report references in the parent '434 case to the same examiner, who considered them. Furthermore, the undisputed record establishes that the issuance of the '517 patent and the date of submission of the EP Search Report in the divisional case "weren't linked together at all." Tr. 546:21-547:3 (Bailly). There was nothing unusual about the timing of the submission of the IDS in the divisional case – indeed, the only atypical timing was how fast the IDS was submitted in the parent. Tr. 843:2-21, 852:21-853:5 (Briscoe); 608:24-610:6 (Bailly).

      **b.**    **Drs. Petersen and Schenke Did Not Intentionally Include Compounds from the Prior Art in Their Initial Application and Did Not Intentionally Withhold the EP Search Report References.**

Reddy also asserts that Bayer knew that its originally-filed claims overlapped with compounds in Sankyo, Dainippon, and Egawa and intentionally withheld these references

35

from the PTO. However, Reddy has no evidence that anyone was aware of this overlap. Instead, it has pulled from the hundreds of thousands of pages Bayer produced a few insignificant documents mentioning these references months before the Le A 26 108 application was drafted and filed. Reddy then attempts to elevate both the documents and the references to a high level of importance which they never remotely had, asserting without a basis in evidence or logic that Bayer's inventors would have remembered these documents months later when the German application was filed or well over a year later when the corresponding U.S. application was filed. Listening to Reddy's presentation at trial, one would assume that Sankyo, Dainippon, and Egawa were especially significant and unforgettable references to the inventors and to the art.

Nothing could be further from the truth. Although these references received much attention at trial, none of them were important at the time, as will be discussed below. They were no different or more important than the hundreds of other references that may have been noticed or mentioned during the same time period but which made no lasting impression.

Not only has Reddy failed to meet its burden of proving intent by clear and convincing evidence, but the overwhelming evidence at trial established that Drs. Petersen and Schenke did not intentionally include compounds from the prior art in their initially-filed claims. Bayer had never made any of the compounds which anticipated their broad genus claim and they had no interest in pursuing any of them. None of the compounds were particularly interesting, and there is no reason anyone would have remembered them. In fact, Bayer previously had synthesized compounds sharing the monocyclic 7-position substituents of these compounds and found them either to have poor antibacterial activity, PTX 170; Tr. 115:9-119:1 (Schenke); 330:19-331:12 (Petersen), or to be toxic, PTX 167; Tr. 121:21-126:19 (Schenke); 333:18-25 (Petersen). And although 7-position monocyclic compounds were claimed in Le A 26 108, that

is simply because they were thought to be new and Bayer sought to describe and claim what it had made. *E.g.*, Tr. 323:9-18, 333:9-14 (Petersen). By the time the Le A 26 108 application was drafted, the focus of Bayer's work was bicyclic 7-position quinolones, Tr. 98:24-99:9 (Schenke); 324:4-8 (Petersen). The suggestion that Bayer intentionally included these poor-performing monocyclic compounds in its generic claim makes no sense and is contrary to the evidence.

### 1) The Unintentional Overlap in Drafting of the Originally-Filed Generic Claim.

The evidence is clear that Bayer did not intentionally claim the prior art. The generic formula in Le A 26 108 as filed spans three full pages and includes a tremendous number of compounds. PTX 2 at 834-36. No scientist, no matter how talented, could have parsed this formula, immediately recognized every compound within its scope, and realized that he may have seen or heard reference to one of those compounds many months earlier. As both Dr. Schenke and Dr. Petersen testified, this complex formula was constructed in an effort to include the substituents and compounds that Bayer had conceived of or synthesized. Tr. 104:20-105:14 (Schenke); 323:9-324:3, 329:9-17 (Petersen). The introduction of one substituent into the generic formula could add "thousands" of compounds to the scope of the generic claim. *Id.* Thus, for instance, Sankyo compound 1-144 was inadvertently covered by the generic claim because Dr. Petersen drafted the generic claim to cover compounds previously synthesized by Bayer having the same 7-position substituent (but different 8-position substituents), as well as a compound with the same 8-position methoxy substituent as Sankyo (but a different 7-position substituent). In so doing, he covered numerous other compounds, unknowingly including Sankyo compound 1-144. Tr. 329:4-17, 334:5-18 (Petersen). The evidence is unequivocal that neither Dr. Petersen nor Dr. Schenke ever focused on the fact that this specific compound with a 3-amino-4-methoxy pyrrolidine 7-position and a methoxy in the 8-position was one of the

37

millions of compounds in their generic formula, and they made no connection between their Le A 26 108 application and any of the EP Search Report references. In fact, the only evidence on this point is that while drafting the application, the inventors did not recognize that they had inadvertently covered compounds from the prior art, and did not intentionally include them within the originally-filed genus claim. Tr. 119:2-9, 127:13-128:4 (Schenke); 324:17-23, 329:4-17, 331:13-23, 334:19-335:3, 339:24-340:5 (Petersen).

Dr. Petersen also testified that it was his normal practice to modify generic claims to avoid prior art whenever he realized that there was an overlap, and gave specific examples. Tr. 324:25-326:6.[14] He never intentionally included compounds from the prior art. Tr. 324:17-23. Nor was he aware of any overlap between the initial claims and the prior art, "otherwise, [he] would have taken steps to amend" the claims (as he did with Liebig's). Tr. 339:24-340:5.

Dr. Petersen and Dr. Schenke, over the course of their daily work, had knowledge of hundreds of chemical references (if not more), disclosing millions of compounds. Dr. Petersen testified that he tried to review chemical literature "every day," Tr. 319:25-320:10, and he brought into court with him two file drawers full of abstracts that he had collected over the years in the course of his work, PTX 56A, 57A, which covered "millions of compounds." Tr. 318:14-321:24; *see also* Tr. 87:11-88:9 (Schenke). Indeed, just to keep track of the compounds he himself had made, Dr. Petersen was forced to create an elaborate table. PTX 85; Tr. 257:25-259:14 (Petersen). With the benefit of hindsight, Reddy has pulled out and focused on a small number of documents from Bayer's quinolone research project that mention the EP Search Report references, all of which are from months before the Le A 26 108 application was drafted and a year-and-a-half before it was filed in the U.S., and none of which have anything to do with

---

[14] Dr. Schenke testified similarly. *See* I.C.2.a.1 above.

Le A 26 108. They provide no evidence at all that Dr. Petersen or Dr. Schenke intentionally withheld these references.

### 2) Minutes of Meetings Months Earlier Mentioning Sankyo, DTX 1 and 2.

Reddy relies on minutes from two of the routine monthly meetings of the quinolone working group at Bayer where Sankyo was discussed for a few minutes at most, along with numerous other references and other matters on the team's agenda. Neither meeting had anything to do with Le A 26 108, which did not yet exist. Tr. 119:10-120:2 (Schenke); 331:24-333:17 (Petersen).

DTX 1 is minutes of a November 25, 1987 meeting, where Sankyo is the seventh reference listed under "New Literature." DTX 1 at 1287. But the only discussion of Sankyo was by Dr. Grohe, who identified a generalized structure that listed the 7-position merely as a "heterocycle," which is a ring that has at least one non-carbon atom. *Id.*; Tr. 106:10-109:7 (Schenke). As Dr. Schenke testified, "There exist millions of heterocycles in the literature." *Id.*

DTX 2 is minutes of a January 28, 1988 meeting. Dr. Schenke, who worked exclusively on 7-position substituents and not on quinolone molecules, made a presentation about his work in synthesizing certain precursor compounds used as substituents, and discussed new precursors found in the literature from several other companies. He drew two monocyclic structures disclosed in Sankyo that could be used as 7-position substituents in quinolones. DTX 2 at 1278. Dr. Schenke had independently synthesized these monocyclic intermediates prior to his knowledge of Sankyo, and accordingly he reported in the minutes that his work "directly concerned" these substituents. *Id.*; Tr. 120:7-14. But the fact that Sankyo had used the same 7-position substituent in one of its compounds would not have impacted Bayer's own compounds, which had different substituents in the 8-position – it was common in the art to use substituents

from known compounds in novel combinations to make new compounds. Tr. 274:11-275:12 (Petersen); 1387:11-14 (Taylor). While Dr. Schenke was "a bit disappointed" when he learned that Sankyo disclosed compounds with one of the same monocyclic substituents he had been working on, Tr. 120:24-121:14, when he helped prepare Le A 26 108 many months later, he "obviously did not notice" that there was an overlap between a compound of Sankyo and the claims as filed. Tr. 127:13-22. Had he noticed, he "would have informed Dr. Petersen and we together would have informed the Patent Department about it. We would have made changes to our claims to make sure that these compounds were excluded from all our claims," *id.*, as he did in Le A 26 686, *supra* I.C.2.a.1, and other prosecutions. Tr. 102:5-17, 99:13-101:22, 130:7-20.

Dr. Petersen testified that he had no recollection of the meeting or the discussion of Sankyo reflected in DTX 2, Tr. 332:5-19, but that nothing in the notes would have been of concern since Sankyo was described as having 8-methoxy substituents, and Bayer's compounds with the same 7-position substituent used 8-fluorine and 8-chlorine. Tr. 332:20-333:8. In addition, prior to preparing the Le A 26 108 application, Bayer tested its own compounds with a 3-amino-4-methoxy pyrrolidine substituent and found that they had good activity, but were toxic. PTX 167; Tr. 121:21-126:19 (Schenke); 333:18-25 (Petersen). Accordingly, these were not compounds of great significance to Dr. Petersen. Moreover, Dr. Petersen never made a connection between Sankyo and Le A 26 108. Tr. 334:19-335:3. This testimony was not challenged; Reddy never even asked Dr. Petersen about DTX 2.

There is simply no basis to conclude that Dr. Petersen or Dr. Schenke ever realized when drafting or prosecuting their Le A 26 108 application that, as initially filed, it overlapped with a 3-amino-4-methoxy pyrrolidine-containing compound in Sankyo.

3)   **DTX 5: A Note from Months Earlier Mentioning Dainippon and Egawa.**

DTX 5 is a note from Dr. Schenke to Dr. Petersen dated November 24, 1987.  It reports the results of a search requested by Dr. Schenke for information relating to synthetic work Dr. Schenke was undertaking.  Tr. 109:8-110:21 (Schenke).  It did not relate to Le A 26 108 (still many months from being prepared) or any patent application.  *Id.*  While the search – using generic search terms – was intended to find references relating to 3-amino-4-<u>methoxy</u> pyrrolidine, it in fact returned three references disclosing 3-amino-4-<u>hydroxy</u> pyrrolidine, which was not of interest by November 1987.  Tr. 109:8-115:15 (Schenke).  Earlier that year Bayer had tested its own compound with the same 3-amino-4-hydroxy pyrrolidine 7-position substituent, found it to have very poor activity, and decided not to make any other compounds with this substituent.   PTX 170; Tr. 115:9-119:1 (Schenke); 330:19-331:12 (Petersen).   Two of the references the search returned were Dainippon, DTX 87, and Egawa, DTX 4, both from the Dainippon company.  Neither Dr. Schenke nor Dr. Petersen recalled the search, DTX 5, or the references.  Tr. 110:2-8, 112:16-113:2, 114:10-16 (Schenke); 329:18-330:5 (Petersen).  It is easy to see why.  There are over 50 compounds depicted in Egawa, DTX 4, and the compound which anticipated Bayer's original claims, 45(a), is buried in a table under a generic structure with dozens of other compounds.  DTX 4 at 51685.  Dr. Schenke noted that compound 45(a) had quite poor activity, and that "Bayer had no interest in compounds with this level" of activity as shown in the article.  Tr. 114:3-9.  Dainippon is a two-page summary of a patent application listing by name (not structure) six compounds, one of which it is now known anticipates the Le A 26 108 claims as filed.  But it includes no data for any of the compounds.  *See* DTX 87.

Neither Dr. Schenke nor Dr. Petersen recalled months later that these references disclosed compounds that fell within the scope of Le A 26 108's original generic claims or made

41

any connection between Le A 26 108 and these references. Tr. 119:2-9 (Schenke); 331:19-23 (Petersen). There simply is no evidence of intent to withhold these references.

> **c.     The Prosecution of Le A 25 727 Does Not Evidence Intent To Withhold Sankyo.**

Reddy also points to the prosecution of an application in another Bayer patent family, Le A 25 727 (PTX 14), to argue that Dr. Petersen, Dr. Bailly, and Mr. Horn knew about Sankyo. However, the evidence was clear that while these people did look at Sankyo in connection with Le A 25 727, their focus was on a totally different part of the reference than is relevant here. The prosecution of Le A 25 727 concerned quinolones with special 7-position substituents containing a carbon atom connected to four non-hydrogen atoms (called a "quaternary carbon" atom). PTX 2005; Tr. 547:18-25; 548:8-11 (Bailly). The examiner in Le A 25 727 cited Sankyo's disclosure of quinolones with quaternary carbon atoms in the 7-position substituent; there is no evidence that anyone studied the nearly 200 pages of Sankyo looking for other types of compounds, much less that they noticed compound 1-144, which does not have a quaternary carbon and was irrelevant to Le A 25 727. Nor is there any evidence that anyone believed Sankyo was material to Le A 26 108 and withheld the reference.

The examiner of Le A 25 727 first noted Sankyo during an interview in January 1990 (long after Le A 26 108 was filed in Germany and the U.S.), and on April 23, 1990 issued a rejection citing Sankyo and particularly a generic formula, a long table of compounds, and one example – example 79, containing a 7-position quartenary carbon atom. PTX 14 at 40604, 40677-78 (referring to Sankyo as "Iwata," Tr. 550:15-22 (Bailly)). Bayer performed comparative tests of some of its quaternary carbon compounds against Sankyo's example 79, and submitted to the PTO a declaration by Dr. Bremm discussing these results. PTX 14 at 40868-75.

To do this comparison, Bayer had to synthesize the quaternary compound of

Sankyo, perform microbiological comparison tests, and prepare and submit the declaration to the PTO. Tr. 555:16-556:5 (Bailly). This of course resulted in privileged communications between Dr. Bailly, Dr. Petersen, Dr. Bremm and Mr. Horn. Tr. 556:10-22 (Bailly). Reddy examined Bayer's witnesses about these communications (mentioned on Bayer's privilege log) and speculates without any basis that, as a result of these communications, Bayer was aware of – and worried about – Sankyo in relation to Le A 26 108. That speculation is contradicted by the evidence. Dr. Bailly testified that he did not look at Sankyo other than for its disclosure of quaternary compounds, Tr. 552:15-553:1, and that he saw no connection between Sankyo and Le A 26 108 prior to the receipt of the EP Search Report, which he then promptly submitted to the PTO. Tr. 553:2-10, 556:23-557:6, 559:14-20. Dr. Petersen likewise testified that his involvement was limited to synthesizing example 79, which "was the only compound I was interested in . . . ," Tr. 311:25-312:14, and that he did not consider Sankyo in connection with Le A 26 108. Tr. 313:3-11. There is no reason why anyone looking at the Sankyo quaternary carbon compounds would notice in the 187-page document compound 1-144 with a completely different and, for purposes of Le A 25 727, irrelevant structure.[15]

### E.    There Is No "Infectious Unenforceability" in This Case.

Reddy does not allege any inequitable conduct during the prosecution of the '942

---

[15] Reddy also points out that Dr. Petersen, after synthesizing example 79, used an intermediate common to that process to synthesize moxifloxacin for the first time in July 1990. Tr. 312:15-24, 459:20-462:4 (Petersen). As Dr. Petersen testified, "we tried all new intermediates to combine them with our most interesting bicyclic compounds," the most interesting being the 5/6 bicycle found in moxifloxacin. Tr. 463:11-464:1. Thus, once Dr. Petersen had made this intermediate, he naturally then combined it with his most interesting bicyclic 7-position substituent. This had nothing to do with the conception of moxifloxacin, as it is undisputed that moxifloxacin already had been conceived approximately two years earlier when it had been specifically depicted in the Le A 26 108 priority documents. PTX 2 at 750. In any event, Dr. Petersen knew of this precursor from its prior publication by Kyorin, Tr. 378:20-379:2; seeing the same thing in Sankyo was hardly the revelation that Reddy suggests.

patent. Indeed, all of the art that Reddy claims was withheld in the '517 patent's prosecution was submitted at the beginning of the '942 prosecution. Tr. 562:16-565:5 (Bailly). Instead, Reddy seeks to render the '942 patent unenforceable based on inequitable conduct that allegedly occurred during the '517 patent's prosecution – so-called "infectious unenforceability." As an initial matter, that claim fails because there was no inequitable conduct in the parent case.

"Charges of infectious inequitable conduct are disfavored even more than charges of inequitable conduct." *Arthrocare Corp. v. Smith & Nephew, Inc.*, 310 F. Supp. 2d 638, 675 (D. Del. 2004), *rev'd on other grounds*, 406 F.3d 1365 (Fed. Cir. 2005). Infectious unenforceability requires "more than mere relatedness of subject matter" between two patents. *Consol. Aluminum Corp. v. Foseco Int'l Ltd.*, 910 F.2d 804, 810 (Fed. Cir. 1990). The inquiry is whether the "inequitable conduct in prosecuting the [parent] patent had 'immediate and necessary relation' to the . . . enforcement of the [child] patents." *Id.* at 810-11 (citations omitted). There is no immediate and necessary relation between any alleged inequitable conduct in the '517 patent prosecution and enforcement of the '942 patent. The '942 patent's claims to moxifloxacin are completely divorced from the alleged inequitable conduct discussed above; moxifloxacin has a 5/6 bicycle in the 7-position and the claims of inequitable conduct all relate either to 7-position monocycles or to the Liebig's 5/5 bicycle. This ends Reddy's case. "[W]here the claims are subsequently separated from those tainted by inequitable conduct through a divisional application, and where the issued claims have no relation to the omitted prior art, the patent issued from the divisional application will not also be unenforceable due to inequitable conduct committed in the parent application." *Baxter*, 149 F.3d at 1332.[16]

---

[16] Rather than attempting to meet the legally relevant standard, Reddy's relies on the legal truism that the '942 patent relied on the filing date of the '517 patent, and thus avoided intervening art. Reddy's argument would render unenforceable all patents claiming priority to the same

## II.    REDDY HAS NOT PROVEN THAT THE CLAIMS OF THE '517 PATENT ARE INVALID FOR OBVIOUSNESS.

Nine scientists at Bayer invented the compounds of the '517 patent after years of synthesizing and testing thousands of compounds.  Reddy now alleges that two compounds within the entire scope of this invention are obvious.  Unlike the usual obviousness case, this is not a case of combining known substituents in a field in a different combination to make a new chemical compound.  Rather, it is undisputed that the allegedly obvious compounds of the '517 patent use a 7-position substituent that is <u>completely new</u> to the quinolone field.  What Reddy claims was obvious is a multi-step modification of the prior art to <u>create</u> a new substituent.

Reddy's obviousness theory has numerous fatal flaws.  Reddy relies on a hindsight-distorted selective view of the art, the legally incorrect view that a POOS was inventive, and a "ring-closing" theory that would have scientists disregard the conventional wisdom in the field to make compounds which would be expected to be less active.  The references key to Reddy's obviousness case were available to the quinolone research community at least two years before the priority date of the '517 patent.[17]  Yet there is no evidence that any one of the hundreds of scientists working at fifty companies active in the field at the time did what Reddy alleges was obvious.  Tr. 1413:24-1416:11 (Taylor).  The reason is simple – Bayer's invention was not obvious.

---

application whenever one of them is procured by inequitable conduct – a proposition that the Federal Circuit squarely has rejected.  *See, e.g.*, *Pharmacia Corp. v. Par Pharm., Inc.*, 417 F.3d 1369, 1374-75 (Fed. Cir. 2005) ("[T]his court's inequitable conduct cases do not extend inequitable conduct in one patent to another patent that was not acquired through culpable conduct."); *Baxter*, 149 F.3d at 1332; *Consol. Aluminum*, 910 F.2d at 809-11.

[17] All of the quinolone bicycle references and compound AT-3295, which Reddy relies on for the 7-position 3-amino-4-methyl pyrrolidine substituent, were available by May 1986.  PTX 2026B; Tr. 1413:24-1416:11 (Taylor).

A.      **Reddy Bears a High Burden to Prove Invalidity.**

Each claim of the '517 patent is presumed valid, 35 U.S.C. § 282, and "any facts supporting a holding of invalidity must be proved by clear and convincing evidence." *Budde v. Harley-Davidson, Inc.*, 250 F.3d 1369, 1376 (Fed. Cir. 2001). Proving invalidity is especially difficult when the prior art was before the PTO examiner during prosecution of the application, as Reddy has "the added burden of overcoming the deference that is due to a qualified government agency presumed to have properly done its job . . . ." *Am. Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1359 (Fed. Cir. 1984).

B.      **The Basic Law of Obviousness.**

Obviousness is a legal determination based on several underlying issues of fact: (1) the scope and content of the prior art; (2) the level of skill of a POOS; (3) the differences between the claimed invention and the teachings of the prior art; and (4) any objective indicia of nonobviousness. *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966); 35 U.S.C. § 103. The *Graham* factors "serve to 'guard against slipping into use of hindsight' and to resist the temptation to read into the prior art the teachings of the invention in issue." 383 U.S. at 36 (citation omitted). Likewise, the Federal Circuit has warned against using "the inventor's disclosure as a blueprint for piecing together the prior art to defeat patentability – the essence of hindsight." *In re Dembiczak*, 175 F.3d 994, 999 (Fed. Cir. 1999); *see also Ecolochem, Inc. v. S. Cal. Edison Co.*, 227 F.3d 1361, 1371-72 (Fed. Cir. 2000). "A critical step in analyzing the patentability of claims pursuant to section 103(a) is casting the mind back to the time of invention, to consider the thinking of one of ordinary skill in the art, guided only by the prior art references and the then-accepted wisdom in the field." *In re Kotzab*, 217 F.3d 1365, 1369 (Fed. Cir. 2000).

To establish *prima facie* obviousness, Reddy must show that a POOS would have

had a <u>motivation to combine</u> the prior art to arrive at the claimed invention and that the POOS would have had a <u>reasonable expectation of success</u> in doing so. *See, e.g.*, *In re Dow Chem. Co.*, 837 F.2d 469, 473 (Fed. Cir. 1988). This analysis "stands as a critical safeguard against hindsight analysis and rote application of the legal test for obviousness." *Yamanouchi Pharm. Co., Ltd. v. Danbury Pharmacal, Inc.*, 231 F.3d 1339, 1343 (Fed. Cir. 2000) (*quoting In re Rouffet*, 149 F.3d 1350, 1357-58 (Fed. Cir. 1998)). "The presence or absence of a motivation to combine references in an obviousness determination is a pure question of fact," *In re Gartside*, 203 F.3d 1305, 1316 (Fed. Cir. 2000), as is the presence or absence of a "reasonable expectation of success." *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1165 (Fed. Cir. 2006).

### C.     The Hypothetical POOS Is Not Inventive – Reddy's Obviousness Case Fails Because It Assumes the Contrary.

Reddy's obviousness case rests almost exclusively on the testimony of its chemistry expert Dr. LaVoie. Dr. LaVoie's testimony is fundamentally flawed – he erroneously assumes that the hypothetical POOS is motivated to "think outside the box" and ignore the conventional wisdom. Tr. 1001:7-1004:6. This assumption renders his obviousness opinions of no probative value and ends Reddy's obviousness case.

The Federal Circuit has been clear that a POOS is <u>not</u> inventive:

> A person of ordinary skill in the art is . . . <u>presumed to be one who thinks along the line of conventional wisdom in the art and is not one who undertakes to innovate</u>, whether by patient, and often expensive, systematic research or by extraordinary insights, it makes no difference which.

*Standard Oil Co. v. American Cyanamid Co.*, 774 F.2d 448, 454 (Fed. Cir. 1985) (emphasis added); *see also Life Techs., Inc. v. Clontech Labs, Inc.*, 224 F.3d 1320, 1325 (Fed. Cir. 2000) (POOS "is an objective legal construct <u>presumed to think along conventional lines</u> . . . ." (emphasis added)); *Kotzab*, 217 F.3d at 1369 (POOS in obviousness analysis is "guided only by

the prior art references and <u>the then-accepted wisdom in the field</u>." (emphasis added).

Dr. LaVoie based his obviousness opinion on an understanding of a POOS that is completely to the contrary. His POOS is "[o]ne would want to get away from the – the conventional wisdom, possibly as much as possible," Tr. 1009:16-1010:9, and "certainly would want to push themselves out of the envelope" of what others were doing. Tr. 1003:4-12. The POOS on whom Dr. LaVoie bases his opinion "would try to stretch," Tr. 1010:4-9, would "think outside the box," "be creative," and "would be looking forward." Tr. 1003:13-20. Dr. LaVoie's POOS would not follow the conventional wisdom here, as he views the conventional wisdom as "ground that has been extensively plowed, . . . mines that have been extensively mined, and that's not how you advance research or draw discovery." Tr. 1002:1-18.[18]

Dr. LaVoie testified that he was "not surprised" that scientists actually working in the field after the priority date continued to work within the conventional wisdom, because, "[a] lot of times we have individuals that – that make compounds, but in many cases don't put thought, much thought in terms of which compounds they're making and why they're making them. . . . They'll do a lot of things that really would be not considered terribly inventive." Tr. 1010:10-24. To Dr. LaVoie, people working in the field following the conventional wisdom are not inventive and, therefore, are not persons of ordinary skill. Dr. LaVoie has it backwards. Dr. LaVoie's opinion, predicated on this legally infirm ground, is of no value.

**D.    The Qualifications of and Factual Predicates for the Experts' Opinions.**

The probative value of Dr. LaVoie's testimony also is severely undercut by the process by which he formed his opinions. Before being retained in the case, Dr. LaVoie neither worked nor researched in the area of quinolone antibacterials, nor had he read review articles or

---

[18] Dr. Remmel's opinion was similarly based on the flawed premise that monocyclic substituents were "well plowed." Tr. 1656:7-14.

patents on quinolone antibacterials. His only knowledge of this literature was based on general texts that gave "overviews" of quinolone antibacterials. Tr. 939:19-940:25, 941:12-14. Nevertheless, Dr. LaVoie formed his initial opinion as to the obviousness of Bayer's compounds – which took a team of experienced scientists years to invent – in, at most, ten hours of work. Tr. 941:4-17. And those ten hours were spent reviewing only documents provided to Dr. LaVoie by Reddy. Indeed, every document he relied upon in his initial expert report was provided to him by Reddy's counsel. Tr. 941:23-943:9. The patent references cherry-picked by Reddy and given to Dr. LaVoie grossly overemphasized quinolones with a bicyclic 7-position. They also failed to discuss the state of the art regarding structure-activity-relationships in quinolone antibacterials. Tellingly, although Dr. LaVoie agrees that a POOS would have read structure-activity-relationship review articles and other relevant literature such as annual reviews of developments in the field, and even agrees that a POOS would have used this literature as a guide in his or her work, Dr. LaVoie admits that he had not read any of this literature when he formed his opinion. Tr. 943:13-947:9, 949:4-25.[19]

The contrast to Bayer's experts is extraordinary. Dr. Taylor, the A. Barton Hepburn Professor of Organic Chemistry Emeritus and Senior Research Scientist at Princeton University, is the recipient of many prestigious awards, including the 2005 Thomas Edison Award for invention of the anti-cancer drug Alimta®. Tr. 1381:6-1383:20; PTX 8 (Taylor CV). He is the editor of the 77-volume series *The Chemistry of Heterocylic Compounds*, commonly referred to as the "bible of heterocycles." (The compounds in this case are heterocycles.) Tr. 1384:22-1386:1. He was familiar with quinolone chemistry before his retention in this case. Tr.

---

[19] Dr. Remmel similarly has never done research on quinolone antibacterials or been involved in a drug discovery program relating to quinolone antibacterials. Tr. 1676:14-22. Dr. Remmel's limited testimony did nothing to ameliorate the deficiencies of Dr. LaVoie's analysis.

1384:22-1386:8. He has extensive experience in drug design and development, and has been consulting with research chemists at pharmaceutical companies for 55 years. Tr. 1383:21-1384:21. Dr. Zhanel is Professor of Medical Microbiology, Infectious Diseases at the University of Manitoba. Tr. 1142:12-23; PTX 10 (Zhanel CV). He has over 20 years of experience in quinolone antibacterials. Tr. 1142:24-1143:23. He has authored approximately 190-200 publications on quinolones. Tr. 1144:6-8. And he has consulted with pharmaceutical companies and clinicians on quinolone antibacterials since 1987. Tr. 1145:10-1147:3.

Despite this experience, both Dr. Taylor and Dr. Zhanel spent hours familiarizing and re-familiarizing themselves with the literature relevant to the key issues here. They conducted their own independent research and came to their conclusions based on the breadth of the art as a whole. Tr. 1417:22-1418:15, 1559:17-22 (Taylor); 1148:25-1149:15 (Zhanel).

**E.    The Qualifications of the Person of Ordinary Skill in the Art.**

"The determination of the level of ordinary skill in the art is an integral part of the *Graham* analysis." *Ruiz v. A.B. Chance Co.*, 234 F.3d 654, 666 (Fed. Cir. 2000). Both sides' experts essentially agree on the educational qualifications and experience of the hypothetical POOS. Dr. LaVoie defines the POOS as having either a Ph.D. in organic or medicinal chemistry and one year post-doctoral or industrial experience, or a masters degree with additional experience. Tr. 881:3-20. Dr. LaVoie also agreed that the POOS would have a general understanding of pharmacokinetics, Tr. 1048:21-1049:1, and that the POOS would be familiar with articles discussing structure-activity relationships of quinolone antibacterials, yearly reviews, and other relevant literature in the field. Tr. 949:4-25. Dr. Taylor agreed with these qualifications, but also added additional qualifications that are not really disputed, including

50

experience in drug discovery and complete familiarity with quinolone literature.[20] Tr. 1391:20-1393:15. Furthermore, Dr. Taylor opined that the POOS would have to be capable of reading and understanding microbiological data. *Id.*

    **F.**    **The Conventional Wisdom at the 7-Position Was To Use 5- or 6-Membered Monocycles.**

    A claimed invention must be viewed "'in the state of the art that existed at the time' . . . the invention was made." *Uniroyal, Inc. v. Rudkin-Wiley Corp.*, 837 F.2d 1044, 1050-51 (Fed. Cir. 1988) (*quoting Interconnect Planning Corp. v. Feil*, 774 F.2d 1132, 1138 (Fed. Cir. 1985)). "When determining the patentability of a claimed invention which combines two known elements, 'the question is whether there is something in the prior art as a whole to suggest the desirability, and thus the obviousness, of making the combination.'" *In re Beattie*, 974 F.2d 1309, 1311-12, (Fed. Cir. 1992) (emphasis added) (*quoting Lindemann Maschinenfabrik GmbH v. Am. Hoist & Derrick Co.*, 730 F.2d 1452, 1462 (Fed. Cir. 1984)).

    As discussed above, consideration of the prior art must address the conventional wisdom in the field, an important factor in preventing forbidden hindsight analysis. A POOS "think[s] along the lines of conventional wisdom in the art." *Standard Oil*, 774 F.2d at 454.[21] At the priority date, with respect to the 7-position, the "conventional wisdom, which was the summation of, really, of all the experience of people in the field for a long period of time was that 5- and 6-membered rings were optimal." Tr. 1417:7-21 (Taylor) (emphasis added). Linear substituents or rings with fewer than 5 or 6 members were suboptimal, as were rings with more

---

[20] The POOS is legally "presumed to know the relevant prior art," *In re GPAC Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995).

[21] Dr. Taylor testified that this legal construct reflects how drug discovery actually works – the POOS would have taken advantage of the experience of others, working in areas known to be fruitful and avoiding areas thought to be unproductive. Tr. 1418:16-1419:5.

than 5 or 6 members. *Id.* The POOS was focused on monocycles, and only those with a certain number of atoms in the ring.

One of the primary references synthesizing and reflecting the then-conventional wisdom about the 7-position substituent was a 1986 article by Dr. Domagala, PTX 34 (the "Domagala article"); Tr. 1426:10-15 (Taylor). Dr. Domagala is one of the inventors of the Culbertson reference relied on by Reddy in its obviousness case, a reference that also is the closest prior art in this case. *See* II.G.2.c.2) below; Tr. 1426:20-22 (Taylor). As Dr. Taylor testified, the Domagala article describes that at the 7-position, the conventional wisdom was that "five- or six-membered rings by themselves or with small substituents have very good gyrase-DNA complex binding and have good to excellent MICs as well." PTX 34 at 400, Tr. 1426:10-1432:8. Dr. Domagala's opinion stayed the same through 1988, as evidenced by two of his later articles that again indicate the desirability of 5- and 6-membered rings at the 7-position. Tr. 1438:3-1439:9 (Taylor); PTX 33, 50.

Numerous references in the field reflect the conventional wisdom that 5- and 6-membered monocycles were optimal. The patent literature Dr. Taylor reviewed showed that through 1988, the art's focus at the 7-position was on 6-membered piperazine rings and 5-membered 3-amino-pyrrolidine rings. Tr. 1419:18-22. (The structures of piperazine and 3-amino-pyrrolidine are shown on PTX 2071-B.) The journal articles he reviewed reflected that scientists working in the field were focusing on 5- or 6-membered rings. Tr. 1419:13-1421:2 (Taylor). Moreover, the Annual Reviews of the American Chemical Society, summarizing the major developments in the field each year, also focused on 5- and 6-membered rings. Tr. 1421:3-1426:9 (Taylor); PTX 245, 215, 221, 220. And the quinolone antibacterial compounds on the market in 1988 had 6-membered piperazine monocycles in the 7-position. Tr. 1419:6-12.

52

Compounds with bicyclic 7-position substituents were outside the conventional wisdom and were believed to have poor activity compared to the 5- and 6-membered monocycles. In 1988, 5/5 bicycles and 5/6 bicycles, such as in Bayer's compounds, would unquestionably have been viewed by the POOS as "suboptimal" substituents, as they are not 5- or 6-membered rings; they are cyclic octanes (8-membered) and nonanes (9-membered). Tr. 1432:14-1434:13 (Taylor). Indeed, Dr. LaVoie admitted that, although "there was certainly a lot of monocyclic substituents at the 7-position that were associated with good antibacterial activity," he was unaware of any prior art journal articles or review articles that even mention a 7-position bicycle. Tr. 1004:14-1006:16.[22] Dr. Remmel likewise agreed that the reviews of quinolone structure-activity relationships in the mid- to late-1980s focused on monocyclic compounds, Tr. 1655:16-19, and that he also was not aware of any prior art review article mentioning a compound with a bicycle at the 7-position. Tr. 1655:20-24.

### G.    Reddy Has Not Proven the Prima-Facie Obviousness of Bayer's Claims – Reddy's "Ring-Closure" Theory Is Impermissible Hindsight.

Reddy's theory of obviousness is far-fetched. Based on impermissible hindsight and a legally irrelevant POOS, Dr. LaVoie testified that a POOS would take compounds from within the conventional wisdom, modify them to be outside of the conventional wisdom, and have a reasonable expectation of success that these never-before-synthesized compounds with a 7-position substituent new to the quinolone field would be effective antibacterial agents. Far from providing clear and convincing proof of this theory, the evidence actually refutes it.

Where the creation of a chemical compound requires several steps of manipulating the prior art, the patent challenger must show that the POOS would have been

---

[22] Dr. LaVoie was not only unaware of the Domagala article, he was not sure he read it by trial (even though Dr. Taylor relied on it). Tr. 1021:12-19 (LaVoie).

motivated to take <u>each</u> of those steps. *Yamanouchi*, 231 F.3d at 1344-45. "Care must be taken to avoid hindsight reconstruction by using 'the patent in suit as a guide through the maze of prior art references, combining the right references in the right way so as to achieve the result of the claims in suit.'" *Grain Processing Corp. v. Am. Maize-Prods. Co.*, 840 F.2d 902, 907 (Fed. Cir. 1988) (*quoting Orthopedic Equip. Co. v. U.S.*, 702 F.2d 1005, 1012 (Fed. Cir. 1983)).

Reddy alleges that a POOS would start with one of two prior art compounds, Sankyo Compound 1-130 or AT-3295 (which are identical except for the 8-position)[23]:



**AT-3295**                                                **Sankyo 1-130**

PTX 2075. The POOS would <u>not</u> have started with either of these compounds in July 1988. The only reason that Reddy did is hindsight – without starting with one of these compounds, it would not obtain a compound within the scope of Bayer's claims.

Reddy further alleges that the "prior art would have suggested adding a carbon, closing the ring, and making" a compound with Bayer's 5/5 bicycle. Tr. 26:13-19 (Opening). In fact, the art taught just the opposite. The POOS would have expected that adding a carbon would reduce activity, would not have proceeded contrary to the conventional wisdom and

---

[23] Both compounds have a "3-amino-4-methyl pyrrolidine" 7-position substituent. Pyrrolidine refers to the 5-membered ring, 3-amino refers to the attachment of an amino ("$H_2N$" above) substituent to the pyrrolidine at its 3-position, and 4-methyl refers to the attachment of a methyl ("$H_3C$" above) substituent to the pyrrolidine at its 4-position.

closed the ring to make a bicycle, and would not have had any expectation about that compound other than that activity would be worse. Reddy simply cannot show that a POOS would have "follow[ed] the precise steps" needed to reach the claimed invention. *Yamanouchi*, 231 F.3d at 1345.

1.     **The POOS Would Not Have Been Motivated To Select AT-3295 or Sankyo 1-130 as a Lead Compound.**

Reddy must show a motivation to select the compounds on which its case is premised. "[T]here must be some suggestion, motivation, or teaching in the prior art that would have led a person of ordinary skill in the art to select the references" for combination. *Karsten Mfg. Corp. v. Cleveland Golf Co.*, 242 F.3d 1376, 1385 (Fed. Cir. 2001). Reddy must also show that the POOS would have selected these compounds as lead compounds. The Federal Circuit in *Yamanouchi* held that the defendant failed to show a pharmaceutical compound was obvious in part because it "did not show sufficient motivation for one of ordinary skill in the art at the time of invention to . . . select[] example 44 as a lead compound" over other compounds in the art. *Yamanouchi*, 231 F.3d at 1344-45. "[O]ther more active compounds would have been the obvious choices . . . ." *Id.*; *see also Takeda Chem. Indus., Ltd. v. Mylan Labs., Inc.*, 417 F. Supp. 2d 341, 372 (S.D.N.Y. 2006) ("[T]he evidence is overwhelming that one skilled in the art would not have, based on the prior art, chosen compound (b) as a lead compound."); *Eli Lilly & Co. v. Zenith Goldline Pharms.*, 364 F. Supp. 2d 820, 904 (S.D. Ind. 2005) (challenger "must establish by clear and convincing evidence that one of ordinary skill in the art would have been motivated to select [the compound in question] as a lead compound").

A critical hole in Reddy's case is that neither Dr. LaVoie nor Dr. Remmel testified that a POOS would be motivated to choose either Sankyo 1-130 or AT-3295 as a lead compound from the relevant prior art as a whole. *See, e.g.*, Tr. 898:9-899:22 (question regarding

lead compound to Dr. LaVoie withdrawn and not answered). Dr. LaVoie testified only that a POOS, starting with AT-3295 or 1-130 in hand, would have been motivated to make modifications to those compounds. Tr. 899:18-22. Dr. Remmel likewise never opined that a POOS would be motivated to select AT-3295 as a lead compound and never discussed Sankyo 1-130. Bayer's compounds could only result from Reddy's obviousness theory if the POOS began with one of these two compounds. As there is no evidence a POOS would have done so (and affirmative evidence that the POOS would not), Reddy's case fails from the start.

### a.    The Lead Compound the POOS Would Have Chosen.

The only evidence addressing what compound in the prior art as a whole would have been a "lead compound" in July 1988 was the testimony of Bayer's experts. Dr. Taylor testified that the POOS would have selected as a lead compound a marketed compound about which the POOS would have substantial information besides activity (e.g., toxicity and tolerability, pharmacokinetics) – ciprofloxacin, PTX 2143, was the only candidate. Alternatively, the POOS would have selected a compound among those with the best known activity – at the priority date the compound known as clinafloxacin or its 8-fluoro analog. Tr. 1467:8-1469:12 (Taylor); PTX 42 at A-17 (reporting data on clinafloxacin and analog); Tr. 1170:11-1171:22, 1172:7-1175:1 (Zhanel); PTX 2022 (clinafloxacin structure).[24] Dr. Taylor testified that these compounds were actually being used as lead compounds in 1988 by people working in the field. Tr. 1467:20-1469:12. Dr. Zhanel, based on his own personal knowledge at the priority date, testified to the same effect, naming Bayer, Warner-Lambert, and Kyorin as among the companies working on clinafloxacin. Tr. 1170:11-1171:22, 1184:11-15. And Dr. Petersen confirmed that Bayer and many other companies used clinafloxacin as a lead structure.

---

[24] See also DTX 257 (clinafloxacin patent); Tr. 1179:8-1184:10 (Zhanel) (discussing superiority of clinafloxacin).

Tr. 256:8-257:24.

A third possibility would have been to start with a less active compound which had good pharmacokinetic properties; Dr. Taylor identified two such compounds – NY-198 and AM-833. Tr. 1469:13-1470:10 (Taylor); PTX 222 at 835.

There is no evidence that, starting with any of the lead compounds identified by Drs. Taylor and Zhanel, it would have been obvious to make any compound within the scope of the '517 patent; the only evidence was to the contrary. Tr. 1470:11-14 (Taylor).

### b. The POOS Would Not Have Started with AT-3295.

Reddy bases its case regarding AT-3295 on a set of monographs from a conference in Kyoto, Japan in 1985, DTX 115, three years before to the relevant date. But the critical issue is not how AT-3295 would have been viewed in 1985. Rather, it is how the POOS would have viewed AT-3295 in July 1988; Reddy did not introduce any evidence that AT-3295 would have been a lead compound in the context of the art as a whole in 1988. In fact, the evidence is clear that by 1988, AT-3295 was not a candidate to be a lead compound.

The 1985 Kyoto conference was the first and last time that information about AT-3295 was reported (other than subsequent publications merely citing back to publications from the conference but providing no additional information or data). By 1988, years had passed without new data or information being published about AT-3295. As Dr. Taylor testified, the POOS would have presumed from that lack of information that something "was found that was deleterious, perhaps toxicity." Tr. 1471:16-1472:18. Dr. Zhanel, who was aware of the Kyoto conference at the time, testified that scientists often see information at a meeting about a compound, but then nothing else follows, leading them to conclude that the compound has failed: "It's dead. It's caused toxicity in *in vitro* tests or toxicity in an animal model and it has been terminated." Tr. 1185:21-1186:14.

57

By 1988, a POOS would not have viewed the data for AT-3295 in DTX 115 as showing overall improvement over ciprofloxacin, and there was no pharmacokinetic or toxicity data in these monographs. Tr. 1185:14-20 (Zhanel); 1554:21-1555:1 (Taylor); PTX 222 at 834-35 (1988 Fernandes article stating that several compounds including AT-3295 "do not have a significant potency advantage over" ciprofloxacin). Dr. Zhanel further testified that by 1988, a POOS would have known that clinafloxacin and other compounds had far surpassed AT-3295, that AT-3295 likely was toxic, and that there was no reason that a POOS would use AT-3295 as a starting compound. Tr. 1191:7-1192:19. Even Dr. Remmel agreed that there were compounds reported after 1985 and before 1988 that had better activity than AT-3295. Tr. 1683:14-19; *see also*; PTX 221 at 1428; PTX 22 at 835-35; Tr. 1473:6-1475:3 (Taylor).

Reddy also relies on a 1988 Bayer report mentioning AT-3295 to assert it was an appropriate lead compound. In contrast to previous yearly reports, DTX 13 (1985) at 100320, DTX 14 (1986) at 100298, and DTX 15 (1987) at 100258, the 1988 report does not contain a separate heading for AT-3295 and states only that, "AT-3295 is possibly in pre-clinical tests," DTX 16 at 100126, exactly what DTX 115 showed in 1985. Dr. Petersen testified consistent with that understanding, stating that in 1988 AT-3295 was "not of further interest" to Bayer, in part because there was no further data reported after 1985. Tr. 280:2-22, 282:6-25.

### c.    The POOS Would Not Have Started with Sankyo 1-130.

There is no evidence that a POOS would have chosen Sankyo 1-130 as a lead compound from the art as a whole – Reddy simply assumed that a POOS would start with this compound. *Cf.* Tr. 899:18-22, 912:18-913:3 (LaVoie) ("Q. Starting with Sankyo Compound 1-130 . . . "). To the contrary, the evidence was that the POOS would not have started with Sankyo. Dr. Zhanel had never heard of the Sankyo reference in his twenty years of practice in the field. Tr. 1192:20-1193:9. And Dr. LaVoie, whose knowledge of Sankyo came from Reddy,

58

had no knowledge that anyone actually used compound 1-130 as a lead compound. Tr. 998:20-999:5. Furthermore, the data in Sankyo showed that compound 1-130 had uninteresting activity – the compounds of Sankyo were compared only to norfloxacin (a compound long since surpassed by ciprofloxacin and clinafloxacin) and were only marginally better in activity against important gram-negative bacteria. PTX 2118-B. Dr. Zhanel's testimony that the POOS would not have been interested in any of the Sankyo compounds in 1988 was unrebutted. Tr. 1194:2-1195:6, 1196:1-1197:3, 1268:6-1269:12, 1370:3-13. Dr. Taylor testified similarly. Tr. 1475:15-1476:19.

> **2.    The POOS Would Not Have Been Motivated To Replace a Monocyclic 7-Position Substituent with the Bayer Bicycle.**

Reddy also must prove that the POOS would have been motivated to modify the Sankyo and AT-3295 references to produce the claimed Bayer compounds. *Karsten*, 242 F.3d at 1385 ("In holding an invention obvious in view of a combination of references, there must be some suggestion, motivation, or teaching in the prior art that would have led a person of ordinary skill in the art to select the references and combine them in the way that would produce the claimed invention." (emphasis added)). The Federal Circuit has stressed that "rigorous application of the requirement for a showing of the teaching or motivation to combine prior art references" is the best defense against a hindsight-based obviousness analysis. *Dembiczak*, 175 F.3d at 999; *see also Interconnect Planning*, 774 F.2d at 1143 ("When prior art references require selective combination by the court to render obvious a subsequent invention, there must be some reason for the combination other than the hindsight gleaned from the invention itself.").

> **a.    The Testimony of Reddy's Experts Is Insufficient.**

Reddy alleges that a POOS starting with the 3-amino-4-methyl pyrrolidine 7-position substituent of either Sankyo 1-130 or AT-3295 would have been motivated to add a

carbon atom and "close the ring," yielding a compound with the Bayer 5/5 bicycle. But Reddy's evidence was far from clear and convincing.

Dr. LaVoie's testimony on this issue, conclusory to put it charitably, amounts to a single page of trial testimony. Tr. 912:18-913:19. He simply stated that 7-position bicyclic compounds were known in the quinolone art and that the POOS starting with Sankyo 1-130 or AT-3295 would somehow "envision" the Bayer 7-position bicyclic substituent. *Id.* This is classic hindsight, and as a matter of law cannot support a finding of obviousness. *ATD Corp. v. Lydall, Inc.*, 159 F.3d 534, 546 (Fed. Cir. 1998) ("the conclusory opinion of [an] expert witness" was insufficient proof of obviousness); *see also Upjohn*, 225 F.3d at 1311 ("At this critical point in the determination of obviousness, there must be factual support for an expert's conclusory opinion."); *Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*, 776 F.2d 281, 294 (Fed. Cir. 1985) ("Lack of factual support for expert opinion going to factual determinations, however, may render the testimony of little probative value in a validity determination.").

Dr. Remmel's testimony similarly fails to show a motivation to make the Bayer compounds. He testified, on the basis of one 7-position bicyclic reference in the art (the Tone patent discussed below), that the POOS would have "the reasonable expectation that if you were to use a bicyclic at the 7-position, that you'd have a compound that would have useful antibacterial activity." Tr. 1637:23-1638:4. Even according to Dr. Remmel, this would not suggest to the POOS to make the Bayer 7-position bicycle in particular, but rather any one of "thousands" of bicyclic compounds containing two nitrogen atoms. Tr. 1656:19-1658:10. Indeed, he admitted that at most the POOS would be motivated by Tone to explore similar bicycles starting with a piperazine, Tr. 1657:6-15, which would not result in the Bayer bicycle (which starts with a pyrrolidine). He further agreed that the prior art he relied on merely would

60

have suggested "that <u>further investigation might be done</u>" and "might <u>pique a [POOS]'s interest</u> <u>and curiosity</u> as to additional bicyclic compounds in the 7-position." Tr. 1654:23-1655:15 (emphases added).

      Dr. Remmel's testimony is, at best, that 7-position bicycles unrelated to Bayer's bicycles were "obvious-to-try," which is not sufficient under § 103. *Gillette Co. v. S.C. Johnson & Son, Inc.*, 919 F.2d 720, 725 (Fed. Cir. 1990). "An 'obvious-to-try' situation exists when a general disclosure may <u>pique the scientist's curiosity</u>, such that <u>further investigation might be</u> <u>done</u> as a result of the disclosure, but the disclosure itself does not contain a sufficient teaching of how to obtain the desired result, or that the claimed result would be obtained if certain directions were pursued." *In re Eli Lilly & Co.*, 902 F.2d 943, 945 (Fed. Cir. 1990) (emphases added); *In re O'Farrell*, 853 F.2d 894, 903 (Fed. Cir. 1988). Prior art that suggested to a POOS "to explore a new technology or general approach that seemed to be a promising field of experimentation, where the prior art gave only general guidance as to the particular form of the claimed invention or how to achieve it," simply is insufficient. *O'Farrell*, 853 F.2d at 903.

### b.    The POOS Would Have Used a Monocycle at the 7-Position.

      Reddy's ring closing theory requires the POOS to ignore the conventional wisdom and to make choices at every decision point that the POOS would not make. That does not prove obviousness; in fact, it proves the opposite. "[C]onventional wisdom that a combination should not be made is evidence of unobviousness." *Arkie Lures, Inc. v. Gene Larew Tackle, Inc.*, 119 F.3d 953, 958 (Fed. Cir. 1997); *see also In re Hedges*, 783 F.2d 1038, 1041 (Fed. Cir. 1986) (proceeding against accepted wisdom is evidence of nonobviousness).

      Here, even assuming the POOS started with AT-3295 or Sankyo 1-130, they would not have made a bicycle. Rather, the POOS would, in accordance with the conventional wisdom, have replaced the 7-position monocycle of those compounds with another 5- or 6-