membered monocycle that was known to confer favorable characteristics. Tr. 1480:23-1481:19 (Taylor). This would not have resulted in a compound within the scope of the '517 patent. *Id.*

Assuming instead that the POOS was motivated to make a new substituent, never before used in the quinolone field (something a POOS would not do, but which Reddy needs to assume to arrive at one of the Bayer compounds), the POOS would have used a new substituent within the conventional wisdom, *i.e.*, a new substituent with a 5- or 6-membered ring. This encompasses hundreds and hundreds of possibilities. Tr. 1481:20-1482:8 (Taylor). Drs. LaVoie and Remmel assert that a POOS would not want to continue working in the area of 7-position monocycles because so many scientists in the field were following the conventional wisdom that the field was "well-plowed." That is plain legal error. *See* II.C above. It also is wrong in fact. Dr. Taylor testified that there were an enormous number of structures left to try within the area of 7-position 5- and 6-membered substituents. Tr. 1436:12-20, 1437:1-10; PTX 2124. And, in fact, scientists working in field continued to explore 5- and 6-membered rings well into the 1990's. Tr. 260:12-19 (Petersen); 1436:21-25 (Taylor).

Even assuming further that for some reason a POOS wanted to retain the 3-amino-4-methyl pyrrolidine 7-position structure of Sankyo 1-130 and AT-3295, there are still hundreds of possible monocycles within the conventional wisdom. Tr. 1482:9-1483:10 (Taylor); PTX 2128. None of these would have led to compounds within the scope of the '517 patent. Tr. 1483:18-22.

Reddy's theory ignores all of this. Reddy requires a POOS to start with a 3-amino-4-methyl pyrrolidine monocycle, add a carbon to that structure, and then "close the ring" in order to form the Bayer 5/5 bicycle. Dr. Taylor testified "I don't believe there's a single suggestion there to carry out that ring closing theory, particularly when you have to add another

carbon atom to the system in order to do it." Tr. 1388:11-1389:9 (Taylor). It is undisputed that the compounds cannot actually be synthesized this way. Tr. 913:20-25 (LaVoie); 1406:18-1407:3 (Taylor). And the evidence showed that the POOS who considered Reddy's theory would have believed that each of these modifications would <u>reduce</u> activity.

First, it is undisputed that the art – even the art Reddy relies on – taught that adding a carbon to an amino group reduces activity. Sankyo teaches that compound 1-130 ("most preferred") is superior to compound 1-131 (not even preferred). Compound 1-131 is the same as compound 1-130 except for a carbon atom added to the amino group. DTX 28, PTX 2156; Tr. 1407:7-1408:13 (Taylor). Examples 1 and 2 of the Culberson patent teach the same thing, PTX 2402; Tr. 1409:2-19, 1570:15-1571:17 (Taylor), as do other examples in the quinolone literature. *E.g.*, DTX 259; Tr. 1409:20-23, 1570:15-1571:17, 1572:11-1575:5 (Taylor). The POOS thus would have believed that this first step of Reddy's ring closing theory would be going in the wrong direction. Tr. 1409:24-1410:6, 1574:19-1575:5 (Taylor).

Furthermore, making a bicycle from a monocycle destroys the very functionality that characterizes the 5-membered ring with an 3-amino substituent. Dr. Taylor testified at length about the fundamental differences between monocycle and bicycle substituents, using a binder clip as a demonstrative. Tr. 1398:12-1406:6. His testimony stands unrebutted that the POOS would consider this change to be significant, resulting in changes in the nature of the amino group, changes in hydrogen bonding, changes in conformational or rotational flexibility, differences in basicity, and the addition of carbon and deletion of hydrogen atoms. *See generally id.*, Tr. 1448:6-1449:12 (Taylor). The POOS would have expected each of these changes to impact a compound's activity, and because they are such different compounds, "there's no way of making, with any confidence at all, any kind of prediction about biological activity" of a

63

bicycle from the activity of a monocycle. *E.g.*, Tr. 1405:20-1406:6 (Taylor). Indeed, during prosecution of both the '434 application and the second divisional case, two PTO examiners concluded that monocycles and bicycles were not obvious variants. PTX 2 at 854-55; PTX 12 at 38428-30; Tr. 566:14-568:16 (Bailly). The POOS would be left with only the conventional wisdom that a monocycle would be more active than a bicycle. And given this expectation, the POOS would not be motivated to make a bicycle. *See, e.g.*, Tr. 1052:8-17, 1055:3-16 (LaVoie).

### c.    The Three Bicyclic References Relied on By Reddy Do Not Provide a Motivation To Combine.

Reddy relies on three references disclosing compounds with 7-position bicycles to support its view that a POOS would have been motivated to add a carbon to compound AT-3295 and Sankyo 1-130 and "close the ring." (The references are the Tone patent, DTX 260; Culbertson patent, DTX 256; and Hokuriku abstract, DTX 299. *See* PTX 2407 for bicycle structures.) None of these references disclose a bicycle used in Bayer's compounds – Reddy relies on them solely because they disclose bicycles at the 7-position. The evidence established that these references would have taught the POOS that compounds with 7-position bicycles would be <u>less</u> active than with monocycles, completely consistent with the conventional wisdom, and eviscerating any alleged motivation to use bicycles.

### 1)    Tone (PTX 41, DTX 260) Does Not Provide Motivation.

There is only one bicyclic 7-position substituent in Tone, and both sides' experts agree that it is very different from the Bayer bicycle. Tr. 1455:19-1459:12 (Taylor); 1036:11-24, 1030:2-13 (LaVoie); PTX 2057. Dr. Taylor discussed these differences at length at 1456:11-1458:25. A POOS would not have had any expectation of the properties of a compound with Bayer's bicycle based on the very different bicycle of Tone. Tr. 1458:10-1460:20 (Taylor).

Nor does Tone teach that bicyclic 7-position substituents are desirable in the

64

general sense, despite Reddy's suggestion. There are two Tone references. The more complete version is EP Application 0181521 (PTX 41) ("Tone EP"). Although Dr. LaVoie was aware of Tone EP, his testimony on direct ignored it completely, and focused solely on the less informative U.S. counterpart, U.S. Patent No. 6,684,648 (DTX 260). Tr. 908:2-910:18. Similarly, Dr. Remmel focused on Tone US, mentioning Tone EP only as something he had seen, but which did not change his opinion. Tr. 1639:8-1640:4.

There is good reason why Reddy's witnesses essentially ignored Tone EP – it includes all of the data in Tone US and also <u>additional data</u> teaching that the monocycles in Tone are more active than the bicycles. Tr. 1040:20-1042:3 (LaVoie); 1659:13-1662:18 (Remmel). There are five head-to-head *in vitro* comparisons in Tone EP as compared to only one in Tone US. Tr. 1041:12-18 (LaVoie).[25] The data overall shows that the monocycles are superior to the bicycles. PTX 77; Tr. 1459:17-24 (Taylor); 1199:17-1204:2 (Zhanel). And regarding compounds with the preferred 8-position fluorine (*see* III.A.1.a below), Dr. Remmel opined that the monocyclic compound is "significantly better," Tr. 1669:18-23, and Dr. LaVoie agrees that the bicyclic compound is "substantially less active." Tr. 1046:23-1047:2.

Tone EP, unlike Tone US, also includes a head-to-head pharmacokinetic comparison. Tr. 1041:19-25 (LaVoie). The monocyclic substituent in this test is unquestionably better. Tr. 1206:16-1208:14 (Zhanel); 1674:11-24 (Remmel). Furthermore, Tone EP includes data on *in vivo* efficacy tests not in Tone US, but only for monocycles. Dr. Zhanel testified that the POOS would conclude from other data in the reference that the bicyclic compounds had been tested, and that the absence of *in vivo* results for bicyclic compounds meant that the bicycles compared unfavorably to the monocycles. Tr. 1210:17-1211:20.

---

[25] Head-to-head comparisons – comparing identical structures except in one position – are preferable to non-head-to-head results. *E.g.*, Tr. 970:22-971:9 (LaVoie); 1199:2-16 (Zhanel).

Thus, the data in Tone is entirely consistent with the conventional wisdom that monocycles are best. Tr. 1459:25-1460:7 (Taylor). *See Bausch & Lomb, Inc. v. Barnes-Hind/Hydrocurve, Inc.,* 796 F.2d 443, 448 (Fed. Cir. 1986) ("It is impermissible within the framework of section 103 to pick and choose from any one reference only so much of it as will support a given position to the exclusion of other parts necessary to the full appreciation of what such reference fairly suggests to one skilled in the art.").

### 2) Culbertson (DTX 256), the Closest Prior Art, Does Not Provide Motivation.

Culbertson teaches that the fused bicycles disclosed in the reference are inferior to the monocycles, and that its bicycles are generally less active than its monocycles, thus teaching away from bicycles generally and from fused bicycles (such as the Bayer bicycles) specifically. Culbertson discloses three different types of 7-position substituents: monocycles, spirocycles (another type of bicycle), and fused bicycles. PTX 2164; Tr. 1444:5-1445:11 (Taylor). It lists monocycles and spirocycles as its "preferred" and "most preferred" substituents; fused bicycles are not even preferred. Tr. 1449:23-1450:23 (Taylor); DTX 256 at 43776-79. And it discloses data for monocycles and spirocycles but none for fused bicycles. Tr. 1451:11-16 (Taylor). This would lead a POOS to believe that the fused bicycles were of less interest than the other 7-position substituents. Tr. 1450:1-23, 1453:7-1454:3 (Taylor). Culbertson also allows head-to-head comparisons between monocycles and spirocycles that further confirmed the conventional wisdom that monocycles are superior to bicycles. Tr. 1450:24-1452:8, 1454:4-10 (Taylor); PTX 2121D, 2121E; Tr. 1024:17-1027:2 (LaVoie) (monocycle "significantly better" than spirocycle). Even Dr. LaVoie testified that the POOS would conclude that the fused bicycles of Culbertson would be less active than the monocycles or spirocycles. Tr. 1017:4-1018:2.

The evidence establishes that Culbertson is the closest prior art to the '517 patent.

Tr. 1446:12-1447:6 (Taylor); PTX 2056 (structures); DTX 256 at 43824-25 (Exs. 21(d) & 21(h)); Tr. at 287:22-288:9 (Petersen); *see also* note 8, *supra*. Reddy did not offer any testimony to the contrary. Although Culbertson was cited to and by the PTO – Bayer cited it in the first column of the '517 patent, PTX 1 at 2559, col. 1:11-15, and the examiner cited the U.S. counterpart of Culbertson in the first office action, PTX 2 at 857 – Bayer's application never was rejected over Culbertson.

This is not surprising, for although the fused bicyclic compounds of Culbertson are the closest prior art, they are still very different from the fused bicycles of the '517 patent. While both compounds have fused bicycles at the 7-position where the first ring is a 5-membered pyrrolidine ring, the nitrogens in the second rings are in different positions – a "drastic structural change." Tr. 1445:23-1446:11 (Taylor); PTX 2198; Tr. 1015:17-1016:2, 1016:11-25 (LaVoie).

### 3) Hokuriku (DTX 299) Does Not Provide Motivation.

The Hokuriku abstract has no data at all and is largely ignored by Dr. LaVoie. He relies on a general statement in the abstract that the compounds were useful and had high antibacterial activity. Tr. 1030:14-1031:16 (LaVoie). A POOS would not rely on such general statements. Tr. 1461:7-1462:9 (Taylor). There is nothing comparing the bicyclic compounds of the abstract with any monocycles. Even Dr. LaVoie agrees that there is no teaching in Hokuriku to start with a pyrrolidine (as is present in AT-3295 and Sankyo 1-130) and make a bicycle. Tr. 1031:17-20 (LaVoie). The POOS would not have paid attention to this publication, as it provides no relevant data or information. Tr. 1461:7-1462:9, 1463:15-19 (Taylor). The Hokuriku bicycle also is very different structurally from the Bayer bicycle. PTX 2165; Tr. 1030:6-13, 1034:25-1036:6 (LaVoie); 1462:10-16, 1456:11-1459:12 (Taylor).

*      *      *

In short, the POOS would not have been motivated by these three references to

ignore the conventional wisdom and synthesize new 7-position bicycles. To the contrary, these references confirmed the conventional wisdom that monocycles were preferred.

### d. A POOS Would Not Have Been Motivated To Make Bayer's Bicycles.

The POOS would not have been motivated to combine the Sankyo or AT-3295 references with Culbertson, Tone, or Hokuriku, Tr. 1483:23-1484:7 (Taylor), or, even if the POOS was so motivated, the POOS would have focused on the most active compounds of Tone or Culbertson (all 7-position <u>monocycles</u>), and would have substituted one of these <u>monocycles,</u> consistent with the conventional wisdom. Tr. 1484:8-1486:15; 1450:24-1452:8 (Taylor). But even assuming that these references had motivated a POOS starting with AT-3295 or Sankyo 1-130 to try bicycles, the POOS would have put the known bicyclic 7-position substituents from those references onto the starting compound (and not made some other bicycle). Tr. 1486:16-1487:8 (Taylor). The patents do not suggest any bicycles other than the ones they disclose, *id*, which would not result in compounds within the scope of the '517 patent. *Id*.

Moreover, even assuming instead that a POOS decided to make a new bicycle, there were a great many to choose from. Tr. 1487:9-16 (Taylor). And, rather than making a brand new and very different bicycle such as the bicycles of the '517 patent, the POOS would try to modify the bicycles from Culbertson, Tone, and Hokuriku "by adding substituents." Tr. 1487:9-1488:2 (Taylor). Dr. Remmel is in complete agreement – he testified that the POOS would be motivated by Tone to explore 7-position bicycles like those of Tone that start with a piperazine nucleus. Tr. 1656:19-1657:15 (Remmel). This encompasses thousands of compounds, Tr. 1657:16-20 (Remmel), but clearly does not lead to the '517 patent.

Even if this undisputed testimony of Dr. Taylor and Dr. Remmel is ignored, Reddy is still left only with a generalized motivation to make 7-position "diazabicycloalkanes," a

68

generic chemical name that encompasses any bicycle with two nitrogens and no double bonds, and which describes literally thousands of compounds (if not more).  Tr. 1441:17-1444:3, 1463:20-1464:6 (Taylor); PTX 2130, 2407.  Indeed, Dr. LaVoie testified that he could draw pages and pages of such compounds. Tr. 1011:18-1012:3.

*        *        *

In summary, Reddy relies on a tortured pathway going from lead compound to the compounds of the '517 patent.  At every point, the POOS would have to make a choice that was contrary to the conventional wisdom or do something the POOS would not have done.

### 3.    Reddy Has Not Proven a Reasonable Expectation of Success.

To succeed with its obviousness argument, Reddy must also prove a reasonable expectation of success.  In *Yamanouchi*, which was also an ANDA case, the Federal Circuit characterized the reasonable expectation of success as something more than a reasonable expectation that the compound would achieve some baseline level of activity.  "Rather, the success was finding a compound that had high activity, few side effects, and lacked toxicity." *Yamanouchi*, 231 F.3d at 1345.

Claims 8, 9 and 11 of Bayer's patent similarly require activity and toxicity going beyond a baseline level.  Claims 8 and 9 of the '517 patent recite "an antibacterial composition comprising an antibacterially effective amount" of a compound within the scope of claim 1. Claim 11 recites "a method of combating bacteria in a patient" by administering an effective amount of a compound within genus claim 1.  Dr. Taylor testified as to the meaning of those limitations: "that means that you should have a compound which is potent and which has the right pharmacokinetic properties, and which is tolerable." Tr. 1495:11-1496:11. Reddy has not proven a reasonable expectation of arriving at any of these inventions.

As Dr. Taylor testified, quinolones are notoriously unpredictable.  "You can't

69

predict pharmacokinetic properties, particularly toxicity, when you change structure and you have a new compound." Tr. 1496:12-19. Structural changes to quinolones, especially drastic changes such as changing the 7-position ring system, lead to unpredictable consequences both with regard to activity and the biological properties of the compound. Tr. 1394:15-1396:12 (Taylor). Dr. Zhanel testified as to the many hurdles that have to be overcome to show clinical usefulness. Tr. 1164:5-16. He also testified that quinolones are infamous in medicinal chemistry for toxicity. Tr. 1164:17-1165:15. Accordingly, drug discovery was, and remains, a trial and error process. Tr. 1396:2-12 (Taylor). *See also, e.g., Ortho Pharm. Corp. v. Smith*, 959 F.2d 936, 943 (Fed. Cir. 1992) (affirming finding of nonobviousness; "when these compounds were being developed, one could not predict the effect of small structural changes on the biological activity."). The activity of the compounds of the '517 patent, before they were made, was completely unpredictable. Tr. 1493:16-1494:5 (Taylor). From the size and bicyclic nature of the 7-position, a POOS would have expected them to have suboptimal activity, but that is the extent of any expectation – the POOS would have no expectation about pharmacokinetics or toxicity. Tr. 1396:2-12, 1417:7-21, 1433:20-1434:11, 1495:17-1496:19 (Taylor). Accordingly, a POOS could have no expectation as to the antibacterial usefulness of the compounds of claim 1, and no expectation of success with respect to claims 8, 9, and 11. Tr. 1495:17-1496:19 (Taylor).

Yet again, Dr. LaVoie's testimony was conclusory at best, opining generally that determining an optimum dosage of a particular quinolone was within the knowledge of one skilled in the art and that the POOS would have known that a use for quinolones was to treat bacterial infections. Tr. 917:5-918:21, 920:4-921:10. But that does not answer the relevant question – Dr. LaVoie never addressed whether the POOS would have a reasonable expectation that the compounds of the '517 patent would have the combination of potency, pharmacokinetic,

and tolerability properties in animals and humans required by claims 8, 9, and 11.[26] Nor did Dr. Remmel. He simply opined that quinolones with a bicycle at the 7-position would have useful antibacterial properties – he never addressed the specific Bayer quinolones. Tr. 1635:21-1636:4.

### H. Reddy's Obviousness Challenge Fails in Light of Bayer's Rebuttal Evidence.

Even if Reddy were able to prove a *prima facie* case of obviousness, its defense fails in light of the uncontroverted rebuttal evidence of objective indicia of nonobviousness and the unexpected properties of the inventive compounds. *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1359 (Fed. Cir. 1999). Objective indicia serve as "useful control[s] upon hindsight evaluation of obviousness," *In re Johnston*, 435 F.3d 1381, 1385 (Fed. Cir. 2006), and always must be considered prior to reaching a conclusion of obviousness. *Ashland Oil*, 776 F.2d at 306. Recognized objective indicia of nonobviousness include commercial success, long-felt but unmet need, failure of others, and licenses of the patented invention to third parties. *In re Rouffet*, 149 F.3d at 1355.

Bayer also may rebut a *prima facie* case by making a showing of "unexpected results," *i.e.*, that the claimed invention exhibits some superior property or advantage that a POOS would have found surprising or unexpected. *In re Soni*, 54 F.3d 746, 750 (Fed. Cir. 1995). "The basic principle behind this rule is straightforward – that which would have been surprising to a person of ordinary skill in a particular art would not have been obvious. The principle applies most often to the less predictable fields, such as chemistry, where minor

---

[26] Dr. LaVoie's testimony regarding expectation of *in vitro* activity based on Sankyo, Tr. 1052:18-1054:3, is both wrong and insufficient. First, it ignores the conventional wisdom and significant differences between monocycles and bicycles described by Dr. Taylor above, and is inconsistent with Dr. Lavoie's own deposition testimony that "one would say that [the Bayer compounds] would have activity. One would not be able to speculate whether it would be better or inferior to [Sankyo 1-130]" until you made the compound. Tr. 1053:10-17. Moreover, *in vitro* activity, which is all that Sankyo shows, tells you nothing about whether the compound will work in animals and humans or will be tolerated at required doses. Tr. 1476:16-19 (Taylor).

71

changes in a product or process may yield substantially different results." *Id.* When unexpected results are used as evidence of nonobviousness, the results must be shown to be unexpected compared with the closest prior art. *In re De Blauwe*, 736 F.2d 699, 705 (Fed. Cir. 1984).

The unexpected properties of "a broader claimed range" – for example, the genus covered by '517 patent claims 1 or 2 – can "be proven by a narrower range of data." *In re Kollman*, 595 F.2d 48, 56 (C.C.P.A. 1979). Put differently, "one having ordinary skill in the art may be able to ascertain a trend in the exemplified data which would allow him to reasonably extend the probative value thereof" to rebut a *prima facie* case of obviousness. *Id.*; *see also E.I. Du Pont de Nemours & Co. v. Phillips Petrol. Co.*, 656 F. Supp. 1343, 1368 (D. Del. 1987) (in assessing unexpected properties, "any gap may be effectively covered by *trends* discernible by a worker skilled in the art from a large quantity of existing data"), *vacated on other grounds*, 849 F.2d 1430 (Fed. Cir. 1988).

1.    **The Unexpected Properties of Compounds Within the Scope of Claims 1 and 2 of the '517 Patent Support Their Validity.**

As discussed at II.G.2.c.2) above, the Culbertson quinolones with 5/5 and 5/6 fused bicycles were the closest prior art to the '517 patent. The uncontroverted testimony of Dr. Zhanel was that, based on his exhaustive review of voluminous data relating to activity, pharmacokinetics, and toxicity, the compounds within claims 1 and 2 possess unexpected, desirable properties compared to Culbertson. Tr. 1216:4-1218:20, 1220:23-1237:10; PTX 162, 181, 2056, 2107-A, 2107-F, 2109-A, 2109-B, 2110, 2111, 2112-A, 2112-C, 2113-A, 2113-B. Dr. Zhanel reviewed data for all of the available head-to-head comparisons (eight total) between compounds within the scope of claims 1 and 2 of the '517 patent with a 5/5 or 5/6 bicycle and the corresponding 5/5 and 5/6 bicycles that are within the scope of claim 1 of Culbertson.[27] Tr.

---

[27] Mr. Martin Glenschek-Sieberth, after reviewing all of the quinolone data at the relevant

1216:4-18; PTX 162. Those comparisons demonstrate that the Bayer compounds are superior to

the Culbertson compounds in multiple ways. Specifically, the Bayer compounds possess:

> (1) greater *in vitro* activity against a range of gram-positive and
> gram-negative bacteria, Tr. 1222:11-1224:22 (Zhanel); PTX 162,
> 2107-A, 2107-F;
>
> (2) higher efficacy against different bacteria strains, including
> *Pseudomonas aeruginosa*, Tr. 1225:9-1228:4 (Zhanel); PTX 2109-
> A, 2109-B, 2110;
>
> (3) lower toxicity, Tr. 1228:12-1229:10 (Zhanel); PTX 2111; and
>
> (4) better pharmacokinetics in serum and in tissue, Tr. 1229:15-
> 1234:17 (Zhanel); PTX 2112-A, 2112-C, 2113-A, 2113-B.

Dr. Zhanel also reviewed data for all of the compounds within '517 patent claims 1 and 2 that

were synthesized by Bayer and for which Bayer conducted its standard serum pharmacokinetics

test (40 total),[28] and concluded that the compounds exhibit surprising, desirable pharmacokinetic

properties compared both to Culbertson and to then industry standards (ciprofloxacin and

clinafloxacin), both of which had very good pharmacokinetic properties compared to the art as a

whole. Tr. 1216:23-1217:25, 1235:2-1237:10; PTX 181, 182.

## 2. Objective Indicia of Nonobviousness Further Refute Reddy's Defense.

The evidence of objective indicia of nonobviousness further supports the

patentability of the asserted claims of the '517 patent. Bayer has licensed the '517 patent –

including claims 1 and 2 – to third parties. JTX 1 at ¶ 52. In addition, moxifloxacin, which is

---

institute at Bayer, confirmed (based on criteria provided to him by Bayer's counsel) that Dr.
Zhanel reviewed data for all of the available head-to-head comparisons. Tr. 1588:1-23, 1590:12-
1595:10, 1601:12-1067:13, 1615:6-9; PTX 162, 1170. As Dr. Zhanel explained, experts
routinely rely on lab technicians like Mr. Glenschek-Sieberth to retrieve relevant data. Tr.
1220:3-22.

[28] Mr. Glenschek-Sieberth also confirmed that Bayer had conducted its standard serum
pharmacokinetics test for 40 compounds within the scope of '517 patent claims 1 and 2. Tr.
1614:9-1616:13; *see also* PTX 181, 1170.

within the scope of these claims, is and has been a commercial success as a result of its properties and fulfilled a long-felt but unmet need that existed in the art as of July 1988. *Id.* at ¶¶ 49-51.

### III.    REDDY HAS NOT PROVEN THAT THE CLAIMS OF THE '942 PATENT ARE INVALID FOR DOUBLE PATENTING.

Reddy's final defense is that the '942 patent is invalid under two theories of double patenting: (1) obviousness-type double patenting over claims 4 and 5 of the '517 patent (PTX 2058) in view of Sankyo (DTX 28), and (2) what it refers to as "*Schneller*-type" double patenting, an argument premised on the Court of Customs and Patent Appeals decision *In re Schneller*, 397 F.2d 350 (C.C.P.A. 1968). Reddy, however, utterly failed to meet its "heavy and unshifting" burden of proving double patenting by clear and convincing evidence. *Symbol Techs., Inc. v. Opticon, Inc.*, 935 F.2d 1568, 1580 (Fed. Cir. 1991).[29]

#### A.    The Claims of the '942 Patent Are Not Invalid For Obviousness-Type Double Patenting.

"Non-statutory" or "obviousness-type" double patenting applies when "claims in a later patent . . . are not patentably distinct from claims in a commonly owned earlier patent." *Eli Lilly & Co. v. Barr Labs., Inc.*, 251 F.3d 955, 967 (Fed. Cir. 2001); *In re Longi*, 759 F.2d 887, 892 (Fed. Cir. 1985). In the double patenting context, "[a] later patent claim is not patentably distinct from an earlier patent claim if the later claim is obvious over, or anticipated by, the earlier claim." *Eli Lilly*, 251 F.3d at 968. Reddy's allegations concern the obviousness aspect of double patenting (as opposed to double patenting due to anticipation by an earlier-issued claim). Accordingly, the same underlying factual inquiries relevant to an obviousness

---

[29] As discussed above, Reddy's burden is more difficult to meet because the art it relies on was before the PTO. *See* PTX 3 at 2617 (listing Sankyo '206); *Ultra-Tex Surfaces, Inc. v. Hill Bros. Chem. Co.*, 204 F.3d 1360, 1367 (Fed. Cir. 2000).

determination under 35 U.S.C. § 103 are applicable. *See, e.g., Longi*, 759 F.2d at 892 n.4 ("a double patenting of the obviousness type rejection is 'analogous to [a failure to meet] the nonobviousness requirement of 35 U.S.C. § 103'") (alteration in original); *Studiengesellschaft Kohle mbH v. N. Petrochem. Co.*, 784 F.2d 351, 355 (Fed. Cir. 1986). The obviousness-type double patenting inquiry includes a review of, *inter alia*, (1) the differences between the earlier- and later-filed claims, *Eli Lilly*, 251 F.2d at 968; (2) whether such differences constitute a mere obvious variation of the earlier invention to the POOS, *In re Kaplan*, 789 F.2d 1574, 1580 (Fed. Cir. 1986); and (3) whether there was a motivation or suggestion to modify the earlier claim. *See, e.g., Ortho Pharm.*, 959 F.2d at 943; *In re Baird*, 348 F.2d 974, 979 (C.C.P.A. 1965).

### 1. Reddy Has Failed To Establish a *Prima Facie* Case of Obviousness-Type Double Patenting.

As an initial matter, Reddy's *prima facie* case fails as a matter of law for the same reason that its obviousness case against the '517 patent fails: the testimony of Dr. LaVoie was premised on the legally incorrect view that the person of ordinary skill would be "creative and inventive" and "think outside the box." *See* II.C above. That is legally dispositive.

The substance of Dr. LaVoie's testimony, limited to a handful of lines over three transcript pages, was that if the POOS applied Sankyo to claims 4 and 5 of the '517 patent, the POOS would be motivated to replace the 8-fluorine and 8-chlorine substituents (both of which are halogens) with an 8-methoxy group to arrive at the compounds claimed in the '942 patent. Tr. 922:18-923:15, 925:4-10. Wholly absent from Dr. LaVoie's opinion was any discussion of: (1) the conventional wisdom regarding 8-position substituents in July 1988; (2) the differences between 8-halogen substituents like fluorine and chlorine and 8-methoxy; (3) whether there existed a teaching or suggestion to combine Sankyo with claims 4 and 5 in the first place and whether the POOS would do so; or (4) whether and why the POOS would be motivated to make

75

Dr. LaVoie's suggested modification. The evidence at trial demonstrates why – none of those inquiries support Reddy's position.

a.    **In July 1988, Methoxy Was Outside the Conventional Wisdom for 8-Position Substituents.**

The conventional wisdom in July 1988 was that the 8-fluorine and 8-chlorine substituents of '517 patent claims 4 and 5 were the most active substituents at the 8-position, followed by ring nitrogen (referred to as "naphthyridine") and hydrogen. Tr. 1497:11-18, 1506:7-1507:23 (Taylor); PTX 33 at 1.[30] Indeed, it was undisputed that fluorine and chlorine were regarded as the optimal 8-position substituents. Tr. 1497:11-18, 1507:6-23 (Taylor); 963:18-964:5 (LaVoie); 1195:7-16 (Zhanel); 251:1-5 (Petersen).

By contrast, the skilled artisan in 1988 regarded methoxy as outside the conventional wisdom for 8-position substituents and as less active than the preferred substituents. The 8-methoxy substituent was known at least since 1977, when the seminal Albrecht article stated that "[t]he effect of this compound can be reduced still further by means of a substitution, e.g. by an 8-methoxy group . . . ." PTX 1158 at 30412; Tr. 298: 8-12 (Petersen). The substituent also was included generically in an early Bayer quinolone patent, PTX 35; Tr. 302:19-303:15 (Petersen), and disclosed in a Kyorin patent. Tr. 378:20-379:2 (Petersen). Nonetheless, publications in the field during the mid- to late-1980's either ignored 8-methoxy completely, focusing on the preferred halogen, ring nitrogen, and hydrogen substituents, Tr. 962:11-22 (LaVoie); 1497:19-1498:13 (Taylor); *see also* PTX 215, 220, 221, 245 (1985-88 ACS annual reports), or disclosed data teaching away from the use of 8-methoxy. For example, Culbertson disclosed that the replacement of fluorine and hydrogen in the 8-positon

---

[30] That understanding was reinforced by the introduction of clinafloxacin (which has a chlorine in the 8-position) and its 8-fluoro analog, which were viewed as among the most active quinolones ever known. Tr. 1171:15-1175:1, 1176:13-1177:3 (Zhanel); PTX 42 at 5.

with a methoxy group decreases activity. PTX 2121-A; PTX 2121-C; Tr. 1504:8-1506:6 (Taylor); 299:10-300:12, 301:18-302:15 (Petersen); *see also* DTX 256 at 43803-05, 43830-33. Not surprisingly, as of July 1988, Dr. Petersen was not interested in 8-methoxy and had not made compounds using it as a quinolone substituent. Tr. 250:5-252:9, esp. 251:12-18 (Petersen).

> **b.    8-Methoxy Possesses Very Different and Less Desirable Chemical and Structural Features Than 8-Chlorine and 8-Fluorine.**

The POOS would also have understood that the preferred 8-position substituents shared particular structural and chemical features which are different from those of methoxy. These differences further support the nonobviousness of the '942 patent claims. For example, the quinolone literature suggested that 8-position substituents should be electron withdrawing (or "electronegative"), a property of both chlorine and fluorine. Tr. 1506:22-1508:7 (Taylor); *see also* PTX 33 at 1. It further taught that preferred 8-position substituents needed to be small, a feature common to fluorine and chlorine. Tr. 1508:14-23 (Taylor); *see also* PTX 33 at 1. Methoxy, however, is fundamentally different. Tr. 1508:24-1509:4 (Taylor). Unlike fluorine and chlorine, methoxy is electron donating (or "electropositive"). Tr. 965:3-18 (LaVoie); 1508:8-13 (Taylor). Methoxy also is a larger substituent than either fluorine or chlorine. Tr. 965:19-24 (LaVoie); 1508:14-23 (Taylor). It also was uncontroverted that unlike chlorine and fluorine, methoxy is a flexible group. Tr. 965:25-966:3 (LaVoie). These differences have two consequences. First, as a factual matter, they would have caused the POOS to believe that methoxy would be less desirable than fluorine or chlorine. Tr. 1506:7-1509:4 (Taylor). Second, legally, the structural dissimilarity of methoxy from the halogens indicates that they are not obvious variants of one another, and therefore moxifloxacin was not an obvious variant of claims 4 and 5 of the '517 patent. *See, e.g., In re Jones*, 958 F.2d 347, 350 (Fed. Cir. 1992) (finding nonobviousness based on structural dissimilarity).

c.    **Sankyo Did Not Change the Conventional Wisdom Regarding 8-Methoxy.**

The Sankyo EP '206 application – the centerpiece of Dr. LaVoie's testimony – did nothing to change the conventional wisdom that 8-methoxy was suboptimal. Tr. 1509:9-1511:4 (Taylor). It does not even mention 8-position fluorine or chlorine substituents, let alone discuss their merits relative to methoxy. Tr. 1509:12-20 (Taylor). In fact, the limited data in Sankyo – with no head-to-head comparisons – showed that the 8-methoxy compounds possessed similar activity against key gram-negative bacteria as norfloxacin, a quinolone known in July 1988 to be on average ten times less active than ciprofloxacin, the benchmark against which new quinolones usually were compared. Tr. 1194:10-1195:6 (Zhanel); 1511:7-18 (Taylor). Data that did not compare favorably even to norfloxacin for several important bacteria certainly would not change the conventional wisdom that 8-methoxy was suboptimal. There were several head-to-head comparisons the Sankyo inventors could have made, but did not, to show the relative activity of 8-methoxy and 8-halogen. Tr. 1511:19-1514:21 (Taylor); PTX 2140-E; *see also* Tr. 987:23-989:12 (LaVoie). In any event, Sankyo does not present any data comparing methoxy to fluorine or chlorine. PTX 2018-B; Tr. 1195:7-21 (Zhanel); 1511:5-18 (Taylor). Certainly the POOS could not have concluded from Sankyo that 8-methoxy was an interesting substituent or as active as fluorine or chlorine. Tr. 1514:22-1515:4 (Taylor); 977:11-22, 990:23-991:12 (LaVoie).

Dr. LaVoie opined on cross-examination that Sankyo was a "landmark" publication in the field based on "the comments of the inventors about the surprising activity associated with this 8-methoxy substituent." Tr. 953:12-23 (LaVoie). Dr. LaVoie was wrong. First, the POOS would not have relied on such a general statement, as the POOS would know that inventors regularly boast about their inventions using similar terms. Tr. 1195:22-1197:3

78

(Zhanel); 1461:7-1462:9 (Taylor).    Second, as discussed above, Sankyo was hardly a

"landmark." *See also* Tr. 1193:2-9 (Zhanel); 1414:12-15 (Taylor).    Third, it is not surprising that

Dr. LaVoie thought Sankyo was a landmark – he had little knowledge of quinolone antibacterials

prior to this case and never researched whether 8-methoxy was discussed elsewhere in the

literature. Tr. 939:19-941:3, 953:6-23; 957:2-14 (LaVoie); *see also* II.D above.

> ### d.    The Person of Ordinary Skill in July 1988 Would Not Have Been Motivated to Replace the 8-Position Substituents of '517 Patent Claims 4 and 5 with a Methoxy Group.

Taking these factors together – the conventional wisdom, the differences between

8-methoxy and 8-halogens, and the Sankyo disclosure – it is clear that there was no motivation to

make Dr. LaVoie's proposed modification.    First, as discussed above, there is no evidence that

the POOS would have been motivated to combine Sankyo with claims 4 and 5, and persuasive

testimony by Drs. Taylor and Zhanel to the contrary.    Moreover, while Dr. LaVoie initially

testified that the POOS, applying Sankyo, would replace the 8-halogens with a methoxy group,

he later conceded that nothing in Sankyo suggested that methoxy would be as good as fluorine or

chlorine. Tr. 977:11-22, 990:23-991:12.    He further admitted that the POOS would not make a

compound without expecting that it would be at least as active as the lead compound, and

certainly would not make it if the expectation was that it would be inferior.    Tr. 1049:3-16;

1052:8-17.    That testimony merely reinforces Dr. Taylor's opinion that the POOS would not

have been motivated to replace fluorine or chlorine with methoxy, because the expectation would

have been that the new compounds would possess reduced activity.    Tr. 1515:12-1516:12,

1517:9-19. Fundamentally, the fluorine and chlorine 8-position substituents of the compounds of

claims 4 and 5 were considered to be optimal.    The POOS in 1988 would not have wanted to

modify the 8-position.    And even if the POOS had wanted to, there was no reason to focus on 8-

methoxy, as there were numerous other 8-position substituents both inside and outside of the

conventional wisdom that could have been utilized.  Tr. 1516:13-1517:8 (Taylor).

> **2.    Even If Reddy Could Establish *Prima Facie* Double Patenting, Its Stipulations Concerning Moxifloxacin's Unexpected Properties Resolve the Issue in Bayer's Favor.**

Reddy's obviousness-type double patenting defense also fails in light of its stipulation that moxifloxacin possesses unexpected desirable properties compared to the compounds of '517 patent claims 4 and 5.  *See* JTX 1 at ¶ 45.  Reddy has stipulated that if such properties are relevant to determining obviousness-type double patenting, then the '942 patent claims are <u>not invalid</u> under that doctrine.  *Id.* at ¶ 47.  That ends the inquiry in Bayer's favor.

As discussed previously, the Federal Circuit has long held that the underlying factual inquiries for an obviousness determination are equally relevant to the consideration of obviousness-type double patenting.  *See* III.A above.  The Federal Circuit has stated repeatedly that the obviousness-type double patenting analysis includes a consideration of unexpected properties.  *See, e.g., In re Emert*, 124 F.3d 1458, 1462 (Fed. Cir. 1997) (looking for "some indication of unexpected properties" in assessing whether the claimed invention was invalid for non-statutory double patenting); *Longi*, 759 F.2d at 896 (examining a declaration concerning unexpected results to assess non-statutory double patenting).  Those decisions are consistent with the longstanding principle that the properties of a claimed compound must be considered in assessing obviousness (and therefore obviousness-type double patenting) because "[f]rom the standpoint of patent law, a compound and all of its properties are inseparable."  *In re Papesch*, 315 F.2d 381, 391 (C.C.P.A. 1963); *see also In re Lalu*, 747 F.2d 703, 707 (Fed. Cir. 1984) ("[A] relevant property of a compound cannot be ignored in the determination of nonobviousness.").

Despite this well-established precedent, Reddy suggests that a single footnote in *Geneva Pharmaceuticals, Inc. v. GlaxoSmithKline PLC*, 349 F.3d 1373 (Fed. Cir. 2003), overturned *sub silencio* decades of well-settled, controlling authority and eliminated unexpected

properties from the obviousness-type double patenting inquiry. Reddy is wrong. Footnote 1 of

*Geneva* states in pertinent part:

> The distinctions between obviousness under 35 U.S.C. § 103 and nonstatutory double patenting include:
>
> \*    \*    \*
>
> 3.    Obviousness requires inquiry into objective criteria suggesting nonobviousness; nonstatutory double patenting does not.

*Id.* at 1378 n.1. Reddy misreads this unremarkable footnote. *Geneva* was "a case involving

nonstatutory double patenting based upon <u>anticipation</u> under § 102 rather than obviousness under

§ 103." *Eli Lilly & Co.*, 364 F. Supp. 2d at 911 (emphasis added); *Pfizer, Inc. v. Synthon*

*Holdings BV*, 2006 WL 2553370, at \*21 (M.D.N.C. Aug. 31, 2006) ("the *Geneva* case dealt with

§ 102 defense of anticipation, and not § 103 obviousness").[31] The district courts in *Eli Lilly* and

*Pfizer* accordingly refused to extend this footnote to a case such as this where non-statutory

double patenting was alleged based on obviousness, finding that its language was merely an

imprecise reference to the anticipation aspect of double patenting that does not apply to a case

involving the obviousness aspect. *Eli Lilly*, 364 F. Supp. 2d at 911-12; *Pfizer*, 2006 WL

2553370, at \*21.

Notably, Reddy (although it was a party to *Eli Lilly*, represented by the same firm

as here) fails to mention *Eli Lilly* in its section of the Pretrial Order relating to *Geneva*. Instead,

Reddy contends that its reading of *Geneva* is correct because "at least three district courts have

followed [*Geneva*] fully and without question." Pretrial Order (D.I. 108) at Ex. 5, pp. 16-17.

---

[31] *Geneva*'s exclusion of objective evidence of nonobviousness "makes sense in view of the law of anticipation, which does not require" such an analysis. *Eli Lilly*, 364 F. Supp. 2d at 911; *see also In re Paulsen*, 30 F.3d 1475, 1482 n.11 (Fed. Cir. 1994) (evidence of nonobviousness irrelevant to an anticipation inquiry).

But the cases Reddy relies on did no such thing. While each court perfunctorily recited the language from the *Geneva* footnote, none actually applied it to invalidate a claim, for in none of the cases did the alleged infringer make out a *prima facie* case of invalidity.

The only decision Bayer is aware of in which the *Geneva* footnote factored into the court's analysis allowed the patentee to introduce evidence of unexpected properties. In *SmithKline Beecham Corp. v. Teva Pharms. USA, Inc.*, No. 02-3779 (JWB) (D.N.J. Jan. 13, 2005) (slip op. attached hereto as Exhibit A), the ANDA applicant sought to preclude the patentee from relying on evidence of objective indicia of nonobviousness to rebut a charge of double patenting. *Id.* at 3. The district court, which issued its opinion prior to the extensive analysis set forth in *Eli Lilly*, held that, "without commenting" on whether unexpected properties are properly characterized as an objective indication of nonobviousness, it would allow the patentee to introduce evidence of the unexpected properties of the patented invention because "a compound and its properties are inseparable" for purposes of determining nonobviousness. *Id.* at 8 (*citing Papesch*, 315 F.2d at 391).

Reddy's reading of *Geneva* is plainly wrong. The Federal Circuit did not use a footnote to make a sweeping change to established patent law that unexpected properties are relevant to obviousness-type double patenting determinations, especially where the issue was not even presented in *Geneva*. Not only would the court not have buried such an important matter in a footnote, but a panel of the court cannot overturn circuit precedent. *See, e.g., Newell Cos. v. Kenney Mfg. Co.*, 864 F.2d 757, 765 (Fed. Cir. 1988). Accordingly, Reddy's stipulation means that the '942 patent claims are not invalid for obviousness-type double patenting. JTX 1 at ¶ 47.

**B.    The Court Should Reject Reddy's "*Schneller*-Type" Double Patenting Defense.**

Reddy asks this Court to be the first judicial body to hold that *In re Schneller*, 397

F.2d 350 (C.C.P.A. 1968), created a third kind of double patenting, which it calls nonobviousness-type "*Schneller*-type" double patenting.   The Court should decline that invitation.

> **1.      There Is No Such Thing as "*Schneller*-Type" Double Patenting.**

Both the Federal Circuit and its predecessor court have made clear that there are two – and only two – types of double patenting.   The first, "statutory double patenting" (often termed "same invention double patenting") provides that a later-issued patent cannot claim the identical subject matter claimed in an earlier-issued one with the same assignee. *See Longi*, 759 F.2d at 892-93.   The second is the judicially-created doctrine of non-statutory or obviousness-type double patenting discussed above.   If a later-issued claim (1) does not claim the identical invention as an earlier-issued claim, and (2) is not rendered obvious or anticipated by an earlier-issued claim, <u>then there is no double patenting</u>.   As Judge Rich – the author of *Schneller* – explained in a subsequent Federal Circuit opinion, in language equally applicable here:

> Clearly the two patents do not claim the *same* invention, and this is not argued.   Under an obviousness-type double patenting analysis, neither *claimed* process is a mere obvious variation of the other. <u>No other kind of "double patenting" is recognized, so there is no double patenting</u>.   That concludes the case so far as this appeal is concerned.

*Gen. Foods Corp. v. Studiengesellschaft Kohle mbH*, 972 F.2d 1272, 1278 (Fed. Cir. 1992) (final emphasis added).   Likewise, in *In re Vogel*, 422 F.2d 438, 441-42 (C.C.P.A. 1970), a case decided after *Schneller* which is regarded as the CCPA's "restatement of the law of double patenting," *Kaplan*, 789 F.2d at 1579, the court held that a double patenting challenge involves an assessment of two issues: (1) "Is the same invention being claimed twice?"; and (2) "Does any claim in the application define merely an obvious variation of an invention disclosed and claimed in the patent?" *Vogel*, 422 F.2d at 441.   If the answer to both of these questions is no,

"there is no double patenting involved." *Id.* at 442.

In light of this unequivocal precedent, it is no coincidence that neither the Federal Circuit nor any district court in the 38 years since the *Schneller* decision has ever suggested that it set forth an additional test for double patenting. Moreover, the PTO Board of Patent Appeals and Interferences explicitly has rejected the idea. In *Ex parte Davis*, 56 U.S.P.Q.2d 1434, 1438 n.5 (Bd. Pat. Interferences 2000), the PTO Board held, "[I]t is our view that *Schneller* does not set forth another test for determining 'obviousness-type' double patenting," and that "*Schneller* did not establish a rule of general application and thus is limited to the particular set of facts set forth in that decision." *Davis*, 56 U.S.P.Q.2d at 1436 (emphasis added).

In addition, *Schneller* itself is not controlling authority. CCPA decisions are only binding precedent if a majority of the Court joined in the opinion. *Kaplan*, 789 F.2d at 1578. In *Schneller*, however, only two of the five judges joined in the opinion of the Court. The PTO Board concluded that *Schneller* "is of doubtful controlling precedent" for this very reason. *Davis*, 56 U.S.P.Q.2d at 1438 n.5.

Further, *Schneller* itself does not create a brand new doctrine of double patenting (as Judge Rich's subsequent *Gen. Foods* decision makes clear). The principal question *Schneller* addressed was whether the claims in the later-filed application were of an "independent and distinct character" from the claims of the earlier-issued patent. 397 F.2d at 354. Because the CCPA determined that the claims were not independent and distinct, it concluded that any extension of the patent right would be "unjustified." *Id.* But if a later claim is not obvious over, or anticipated by, the earlier claim, then the claims are patentably distinct and the extension of patent protection is not unjustified. *See In re Braat*, 937 F.2d 689, 594-95 (Fed. Cir. 1991) (Rich, J.); *Eli Lilly*, 251 F.3d at 968; *Eli Lilly*, 364 F. Supp. 2d at 909-10.

84

Finally, there are at least two additional aspects of Reddy's proffered test for "*Schneller*-type" double patenting that are fundamentally inconsistent with Federal Circuit precedent. First, Reddy suggests that it is relevant whether the invention of the second patent (here a species) is covered by the claims of the first patent (here a genus). However, the Federal Circuit has made plain that such a factual posture, known as "domination," is a "commonplace situation" that "is not, per se, double patenting." *Kaplan*, 789 F.2d at 1577-78. Instead, the test remains whether the later-filed claims are anticipated by or obvious over the earlier-issued ones. *See id.* at 1580); *Eli Lilly*, 251 F.3d at 968. Second, Reddy contends that a relevant inquiry is whether the invention of the second patent is disclosed in the first patent, relying on the '517 patent specification's example of moxifloxacin. However, the Federal Circuit has prohibited using the patent specification in such a fashion, as double patenting focuses solely on the claims of the first patent. *Kaplan*, 789 F.2d at 1577, 1580.

> ## 2.      Even If There Does Exist a Doctrine of "*Schneller*-Type" Double Patenting, It Is Factually Inapplicable.

Even if *Schneller* did create an additional basis for double patenting, it would be inapplicable here. The facts of *Schneller* demonstrate that the applicant was improperly trying to manipulate the system by artfully drafting claims to cover one embodiment in two separate patents with claims of practically identical scope. *Schneller*, 397 F.2d at 354-55. As such, the court held that there was "no valid excuse or mitigating circumstances making it either reasonable or equitable to make an exception" to the rule against double patenting. *Id.* at 355.

The facts of *Schneller* stand in stark contrast to the facts of this case. First, the claims of the '517 and '942 patents that cover moxifloxacin are vastly different in scope. Claims 1 and 2 of the '517 patent claim are genus claims, encompassing a multitude of compounds of which moxifloxacin is just one. PTX 1 at 2609-10, col. 102:7-103:45; *see also* Tr. 323:19-24

85

(Petersen). Claim 1 of the '942 patent is a species claim for moxifloxacin which Reddy admits (1) is not an obvious variant of '517 patent claims 1 and 2, and (2) possesses unexpected properties compared to those claims. JTX 1 at ¶¶ 44, 48; *see also* PTX 3 at 2667-68, col. 98:52-99:2. Moreover, moxifloxacin is just one of over 200 examples disclosed in the '517 patent. PTX 1 at 2570-86, 2598-609. That hardly constitutes an attempt to claim twice a single preferred embodiment using minor nuances in claim scope, as was the case in *Schneller*.

Second, the evidence shows that Bayer was not trying to manipulate the system by claiming moxifloxacin in the '942 patent, because Bayer did not have a reason to claim moxifloxacin until long after the '517 patent issued. Tr. 315:1-12 (Petersen). At the time the '517 patent issued, the compounds of particular interest to Bayer, including its development candidate BAY Y3118 (nicknamed "Rambofloxacin"), had bicycles in the 7-position and halogen substituents in the 8-position. Bayer claimed those compounds in claims 4 and 5 of the '517 patent. Tr. 314:2-25 (Petersen). Moxifloxacin, however, was not even synthesized until after both the German and U.S. applications were filed, *compare* PTX 1 at 2558 (first German application filed July 15, 1988; U.S. application filed June 30, 1989) *with* Tr. 312:25-313:2 (Petersen) (first moxifloxacin synthesis in July 1990), and the results of the initial testing on moxifloxacin were disappointing, Tr. 313:12-315:9 (Petersen); PTX 163. It was not until long after the issuance of the '517 patent, and after the failure of BAY Y3118 in 1993, that Bayer became aware of moxifloxacin's unexpected desirable properties. Tr. 315:10-316:3 (Petersen).

Third, unlike in *Schneller* where there was no evidence that the inventions of the earlier- and later-filed claims were independent and distinct, 397 F.2d at 354 ("appellant has clearly not established the independent and distinct character of the inventions of the appealed claims"), Reddy has <u>stipulated</u> that moxifloxacin is not an obvious variant of claims 1 and 2 of

86

the '517 patent, meaning that the inventions are independent and distinct. JTX 1 at ¶ 48.

> **3.    Even If *Schneller* Applies to This Case, the Validity of the '942 Claims Is Supported by Evidence of Unexpected Properties.**

During prosecution of the application that matured into the '942 patent, the examiner issued a double patenting rejection that was premised on *Schneller*.[32]  PTX 4 at 2070-72. Mr. Horn responded that the rejection was improper, because Bayer had submitted evidence of unexpected properties and thereby established the "independent and distinct character of the invention[]" as required under *Schneller*, 397 F.2d at 354. PTX 4 at 2174-76; Tr. 793:15-795:5, 818:23-819:9, 870:5-871:19 (Briscoe); *see also* PTX 4 at 1937-51 (declarations discussing the unexpected properties of moxifloxacin). Shortly thereafter, the examiner conducted an in-person interview with Mark Russell of Sprung, Horn, after which the examiner decided to allow all claims, commenting "Showing of unexpected results overcomes the obviousness-type rejection." PTX 4 at 2171; *see also* Tr. 793:15-794:2, 819:14-820:5, 863:20-864:14 (Briscoe). Because there was no pending obviousness-type double patenting rejection at that time (distinct from the so-called *Schneller* rejection), the examiner's comments must refer to the *Schneller* rejection. This means either that: (1) the "independent and distinct" analysis in *Schneller* is, in fact, no different than the traditional test for obviousness-type double patenting, or (2) even under the PTO's now-abandoned view of *Schneller*, it is overcome by a showing of unexpected properties. This is dispositive of Reddy's *Schneller* defense given Reddy's stipulation to the unexpected properties of moxifloxacin over claims 1 and 2 of the '517 patent. JTX 1 at ¶ 44.

---

[32] This rejection was made pursuant to the version of MPEP § 804 in force at the time. DTX 242 at 41932; JTX 5 at ¶ 8. The PTO has since essentially disavowed this view of the law, as the current version of the MPEP contains the language from *Davis* that *Schneller* does not set forth a rule of general application and is limited to its particular facts. *See* PTX 64 at 1108; JTX 5 at ¶ 10; *see also Davis*, 56 U.S.P.Q.2d at 1436.

4.    **Bayer's Statements During Prosecution of the '942 Patent Do Nothing to Support Reddy's Claim.**

Reddy contends that statements Bayer made during prosecution of the '942 patent are probative of the existence of *Schneller*-type double patenting. Tr. 28:24-29:3 (Reddy Opening). That is wrong. First, the only relevant question is what the law is, not what Sprung Horn said about it ten years ago. Second, Bayer's statements are fully consistent with the validity of the '942 patent claims. In response to the examiner's *Schneller* rejection, Mr. Horn stated that "[a]pplicants in no way are taking issue with that case" because *Schneller* merely inquired into "the independent and distinct character of the inventions," something Bayer had proven with data showing unexpected properties. Tr. 789:8-25, 793:15-795:5, 820:6-821:3 (Briscoe). It was on that precise basis that Mr. Horn told the PTO, "Indeed, the law of Schneller governs, but it supports rather than negates patentability." PTX 4 at 2176. And, as Mr. Briscoe explained, because *Schneller* was in the MPEP, there was no point arguing that the examiner should ignore it, particularly where the evidence demonstrated that the claims were patentable anyway. Tr. 820:11-821:3 (Briscoe). In short, the only thing Bayer "admitted" during prosecution of the '942 patent is that the pending claims were independent, distinct, and fully patentable over the claims of the '517 patent. And that is in fact the case.

## IV.    RELIEF REQUESTED

Title 35 provides that upon finding in Bayer's favor, the Court "shall order the effective date of any approval of" Reddy's ANDA "to be a date which is not earlier than the date of the expiration of the patent which has been infringed," which here is March 4, 2014, the later of the expiration dates of the '517 and '942 patents. 35 U.S.C. § 271(e)(4)(A); PTX 3 at 2617; PTX 1 at 2558.

88

In addition, pursuant to 35 U.S.C. § 271(e)(4)(B), Bayer requests that the Court enjoin Reddy (and related individuals and entities) from engaging in the commercial manufacture, use, offer for sale, or sale within the United States, or importation into the United States, of moxifloxacin hydrochloride or any drug product containing moxifloxacin hydrochloride or any compound or drug product within the scope of claim 1 or 2 of the '942 patent on or before March 4, 2014.    The Hatch-Waxman statutory scheme makes clear that (unlike monetary relief) injunctive relief is warranted even where there has been no commercial launch. *Compare* 35 U.S.C. § 271(e)(4)(B), *with* 35 U.S.C. § 271(e)(4)(C).    Moreover, the four factors set forth in *eBay Inc. v. MercExchange L.L.C.*, 126 S. Ct. 1837, 1839 (2006), for assessing the propriety of issuing a permanent injunction support doing so here.[33]

Finally, Bayer requests that it be awarded its costs. Fed. R. Civ. P. 54(d)(1); D. Del. L.R. 54(a)(1).

---

[33] With regard to irreparable injury and the inadequacy of monetary damages, the principal value of patents is their statutory right to exclude, and any loss of Bayer's market share or customers constitutes an irreparable injury that cannot be recouped through a monetary award. *See Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp.*, 397 F. Supp. 2d 537, 546-47 (D. Del. 2005); *TiVo Inc. v. EchoStar Comms. Corp.*, 2006 WL 2398681, at *3-*4, *6 (E.D. Tex. Aug. 17, 2006); *see also Pfizer, Inc. v. Teva Pharms. USA, Inc.*, 429 F.3d 1364, 1381 (Fed. Cir. 2005) (infringement of valid patent results in presumption of irreparable harm).    The balance of hardships tips in favor of an injunction as Bayer has prevailed and therefore is entitled to exclude Reddy during the term of Bayer's patents, while the entry of an injunction simply maintains the status quo for Reddy. *See Impax Labs., Inc. v. Aventis Pharms., Inc.*, 235 F. Supp. 2d 390, 396 (D. Del. 2002).    Finally, the public interest is served when courts enforce valid patents. *Id.*

## CONCLUSION

For the foregoing reasons, judgment should be entered in favor of Bayer and the

remedies Bayer seeks should be ordered. A proposed Order is attached as Exhibit B.


*OF COUNSEL:*

Bruce R. Genderson
Adam L. Perlman
Aaron P. Maurer
David I. Berl
Dov P. Grossman
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000
(202) 434-5029 (Facsimile)

*Anne Shea Gaza*

Frederick L. Cottrell, III (#2555)
*Cottrell@rlf.com*
Jeffrey L. Moyer (#3309)
*Moyer@rlf.com*
Anne Shea Gaza (#4093)
*Gaza@rlf.com*
Richards, Layton & Finger P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
(302) 651-7700
(302) 651-7701 (Facsimile)

*Attorneys for Plaintiffs Bayer AG,*
*Bayer HealthCare AG, and*
*Bayer Pharmaceuticals Corporation*


Dated: October 6, 2006