## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

BAYER AG, BAYER HEALTHCARE AG,    )
and BAYER PHARMACEUTICALS          )
CORPORATION,                       )
                                   )
                  Plaintiffs,      )
                                   )
            v.                     )   Civil Action No. 04-0179-SLR
                                   )
DR. REDDY'S LABORATORIES, LTD. and )
DR. REDDY'S LABORATORIES, INC.,    )
                                   )
                  Defendants.      )

## PLAINTIFFS' RESPONSIVE POST-TRIAL BRIEF

*OF COUNSEL:*

Bruce R. Genderson
Adam L. Perlman
Aaron P. Maurer
David I. Berl
Dov P. Grossman
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000
(202) 434-5029 (Facsimile)

Frederick L. Cottrell, III (#2555)
*Cottrell@rlf.com*
Jeffrey L. Moyer (#3309)
*Moyer@rlf.com*
Anne Shea Gaza (#4093)
*Gaza@rlf.com*
Richards, Layton & Finger P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
(302) 651-7700
(302) 651-7701 (Facsimile)

*Attorneys for Plaintiffs Bayer AG,*
*Bayer HealthCare AG, and*
*Bayer Pharmaceuticals Corporation*

Dated: November 8, 2006

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iii

INTRODUCTION .............................................................................................................. 1

ARGUMENT ...................................................................................................................... 2

I.     THE CLAIMS OF THE '517 PATENT ARE NOT OBVIOUS. ............................... 2

     A.    Reddy Has Failed To Prove that the Asserted Claims of the '517
          Patent Are *Prima Facie* Obvious. ............................................................... 2

          1.     Neither AT-3295 Nor Sankyo 1-130 Would Have Been a Lead
                  Compound for the POOS in 1988. ................................................ 3

          2.     Reddy Ignores the Teachings of the Art as a Whole that
                  Monocyclic Substituents Were Regarded as Superior and the
                  Substantial Differences Between the Claimed Invention and the
                  Prior Art. ...................................................................................... 5

          3.     The Reference on which Reddy Now Relies Would Not Have
                  Motivated the POOS To Make Bicyclic Substituents. ................... 6

          4.     Even if DTX 161 Motivated a POOS To Synthesize Bicycles,
                  It Does Not Suggest the Use of Bayer's 5/5 Bicycle as a
                  Quinolone Substituent. .................................................................. 8

          5.     Reddy Has Not Proven Any Expectation of Success as to
                  Dependent Claims 8, 9, and 11. ................................................... 10

          6.     Bayer's Systematic Variation of Quinolone Substituents Does
                  Not Render All Resulting Inventions Obvious. ............................. 11

     B.    Bayer's Undisputed Evidence Concerning Unexpected Properties
          Disposes of Reddy's Obviousness Challenge. ............................................ 13

II.    REDDY HAS NOT PROVEN DOUBLE PATENTING. .......................................... 15

     A.    Reddy's *Schneller* Defense Fails. ............................................................. 15

     B.    Reddy Has Failed To Establish that Claims of the '942 Patent Are
          Invalid for Obviousness-Type Double Patenting. ....................................... 16

     C.    Reddy's Has Not Proven Expectation of Success for the Dependent
          Claims of the '942 Patent. ......................................................................... 18

III.   THERE WAS NO INEQUITABLE CONDUCT. ..................................................... 19

     A.    The Liebig's Reference. ............................................................................. 21

          1.     Liebig's Is Not Material to the Claims of the '517 Patent. ........... 21

          2.     There Was No Intent To Withhold the Liebig's Reference. .......... 24

                a.     The Liebig's Reference Was Disclosed to the PTO
                      When Bayer First Recognized It Could Be Pertinent to
                      Le A 26 108. .................................................................... 24

|   | b. | No One Realized that Original Claim 19 Covered a Compound in Liebig's Before Dr. Petersen Reviewed the Le A 26 108 Divisional Application. | 26 |

| | 3. | Dr. Schenke's Inventor's Declaration Provides No Support to Reddy. | 29 |

| B. | | The EP Search Report References. | 34 |

| | 1. | The EP Search Report References Are Not Material to the Claims as Issued. | 34 |

| | 2. | No One Realized Prior To Receipt of the EP Search Report that Bayer's Originally-Filed Generic Claims Overlapped with Any Compounds of the Prior Art. | 37 |

| | 3. | There Was No Inequitable Conduct in Submitting The EP Search Report References to the PTO. | 40 |

| C. | | The '942 Patent Is Not Unenforceable. | 44 |

CONCLUSION ........................................................................................... 45

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Baxter Int'l, Inc. v. McGaw, Inc.*, 149 F.3d 1321 (Fed. Cir. 1998) .................................................44

*Bayer AG v. Carlsbad Tech., Inc*, 298 F.3d 1377 (Fed. Cir. 2002) ................................................20

*In re Beattie*, 974 F.2d 1309 (Fed. Cir. 1992) .....................................................................................5

*Brasseler, U.S.A. I, L.P. v. Stryker Sales Corp.*, 267 F.3d 1370 (Fed. Cir. 2001) .........................17

*Consolidated Aluminum Corp. v. Foseco International Ltd.*,
      910 F.2d 804 (Fed. Cir. 1990) .....................................................................................................44

*Critikon v. Becton Dickinson Vascular Access, Inc.*, 120 F.3d 1253 (Fed. Cir. 1997) ...................22

*In re De Blauwe*, 736 F.2d 699 (Fed. Cir. 1984) ..............................................................................13

*Digital Control Inc. v. Charles Machine Works*, 437 F.3d 1309 (Fed. Cir. 2006) ..........................22

*In re Dillon*, 919 F.2d 688 (Fed. Cir. 1990) ................................................................................4, 36

*Dystar Textilfarben GmbH & Co Deutschland KG v. C.H. Patrick Co.*,
      464 F.3d 1356 (Fed. Cir. 2006) .................................................................................................5, 7

*E.I. Du Pont de Nemours & Co. v. Phillips Petrol. Co.*,
      656 F. Supp. 1343 (D. Del. 1987) ........................................................................................13, 14

*Eli Lilly & Co. v. Zenith Goldline Pharms., Inc.*,
      364 F. Supp. 2d 820 (S.D. Ind. 2005) ...................................................................................4, 18

*In re Emert*, 124 F.3d 1458 (Fed. Cir. 1997) ...................................................................................18

*FMC Corp. v. Hennessy Indus., Inc.*, 836 F.2d 521 (Fed. Cir. 1987) ..............................................25

*Geneva Pharm., Inc. v. GlaxoSmithKline PLC*, 349 F.3d 1373 (Fed. Cir. 2003) .....................17, 18

*GFI, Inc. v. Franklin Corp.*, 265 F.3d 1268 (Fed. Cir. 2001) ..........................................................25

*Graham v. John Deere Co.*, 383 U.S. 1 (1966) .............................................................................5, 17

*In re Greenfield*, 571 F.2d 1185 (C.C.P.A. 1978) ............................................................................13

*In re Harris*, 409 F.3d 1339 (Fed. Cir. 2005) ..................................................................................13

*Hebert v. Lisle Corp.*, 99 F.3d 1109, 1116 (Fed. Cir. 1996) ...........................................................31

iii

*Janssen Pharmaceutica N.V. v. Mylan Pharms., Inc.*,  2006 WL 2947531,
  2:03-cv-06220-JCL (D.N.J. Oct. 13, 2006) ........................................................3, 4

*In re Kahn*, 441 F.3d 977 (Fed. Cir. 2006) ................................................................6

*Karsten Mfg. Corp. v. Cleveland Golf Co.*, 242 F.3d 1376 (Fed. Cir. 2001) ......................8

*Kimberly-Clark Corp. v. Johnson & Johnson*, 745 F.2d 1437 (Fed. Cir. 1984) ......................21, 25

*In re Kollman*, 595 F.2d 48 (C.C.P.A. 1979).........................................................13, 14, 15

*In re Kotzab*, 217 F.3d 1365 (Fed. Cir. 2000).........................................................6

*Life Techs., Inc. v. Clontech Labs. Inc.*, 224 F.3d 1320 (Fed. Cir. 2000)......................4, 12

*In re Longi*, 759 F.2d 887 (Fed. Cir. 1985).........................................................18

*Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157 (Fed. Cir. 2006) ......................11

*In re Merchant*, 575 F.2d 865 (C.C.P.A. 1978) .........................................................13

*Molins PLC v. Textron, Inc.*, 48 F.3d 1172 (Fed. Cir. 1995)......................35

*Novo Nordisk Pharmaceuticals, Inc. v. Bio-Tech. Gen. Corp.*,
  424 F.3d 1347 (Fed. Cir. 2005)......................................................................25

*Ortho Diagnostic Sys., Inc. v. Miles, Inc.*, 865 F. Supp. 1073 (S.D.N.Y. 1994) ......................42

*Pharmacia Corp. v. Par Pharm., Inc.*, 417 F.3d 1369 (Fed. Cir. 2005)......................45

*In re Schneller*, 397 F.2d 350 (C.C.P.A. 1968) .........................................................15, 16

*Standard Oil v. Am. Cyanamid Co.*, 774 F.2d 448 (Fed. Cir. 1985)......................6

*Takeda Chem. Indus., Ltd. v. Mylan Labs., Inc.*, 417 F. Supp. 2d 341 (S.D.N.Y. 2006) ......................4

*In re Tiffin*, 448 F.2d 791 (C.C.P.A. 1971).........................................................13

*Truth Hardware Corp. v. Ashland Prods., Inc.*, No. 02-1541,
  2003 WL 22005839 (D. Del. 2003) ......................................................................45

*Yamanouchi Pharm. Co. v. Danbury Pharmacal, Inc.*,
  231 F.3d 1339 (Fed. Cir. 2000).........................................................................3, 4

## FEDERAL STATUTES AND RULES

35 U.S.C. § 103 (2000) ................................................................................................12, 36

37 C.F.R. 1.56(a).......................................................................................................22

## INTRODUCTION

Reddy's Opening Post-Trial Brief reads as if the trial of this matter never occurred. Reddy never meaningfully engages the trial record, largely repeating the unsupported allegations of its opening statement or, worse still, relying on newly-hatched theories it never previously articulated and which its own experts never discussed. Reddy makes sweeping proclamations unsupported by any evidence, as if it believes that inflammatory adjectives are an appropriate substitute for clear and convincing proof of invalidity or inequitable conduct.

When Reddy does discuss the trial evidence, it takes isolated snippets of testimony out of context, ignoring the plain import of the witnesses' testimony when read in its entirety. Reddy then asks the Court to draw inferences that, in addition to being illogical and unsupported, are contradicted by the very context and testimony which Reddy disregards. Reddy also cites to exhibits in the record but completely disregards the undisputed testimony about the import of those documents – testimony which refutes the point Reddy is attempting to establish.

In several instances, Reddy actually attempts to shift the burden of proof to Bayer by simply tossing out a series of unsupported theories and overheated accusations, and then suggesting that it is up to Bayer to prove that Reddy's speculations are not correct. That, of course, is exactly backwards, but the evidence here is so overwhelming that Bayer would prevail even if Reddy did not have the burden of proof. As Bayer demonstrated in its Opening Post-Trial Brief and as set forth below, the evidence at trial resoundingly refutes each of Reddy's theories of invalidity and inequitable conduct, both those which were actually tried and those which have been newly-minted in Reddy's Opening Brief.

1

## ARGUMENT

### I.    THE CLAIMS OF THE '517 PATENT ARE NOT OBVIOUS.

#### A.    Reddy Has Failed To Prove that the Asserted Claims of the '517 Patent Are *Prima Facie* Obvious.

Ignoring both controlling legal authority and the discredited obviousness case it presented at trial, Reddy seeks to render the claims of the '517 patent obvious based on a theory even its own experts were unwilling to propound. At trial, Dr. LaVoie asserted that the person of ordinary skill in the art ("POOS"), motivated by the teachings of Tone, Culbertson, and Hokuriku (DTX 260, DTX 256, and DTX 299), would have converted the monocyclic 3-amino-4-methyl pyrrolidine substituents of the prior art into the particular Bayer 5/5 bicyclic substituent never used before in the quinolone field. Reddy now largely jettisons this theory, substituting a theory based on another Bayer patent application (DTX 161), about which it presented not a single word of expert testimony. As Bayer discussed in its Opening Brief and as set forth below, both Reddy's new theory and its old theory are fatally flawed for numerous independent reasons:

1. Dr. LaVoie's testimony, and Reddy's case, is premised on a fundamental misunderstanding of the POOS as one who would be "creative," "think outside the box," and work outside the conventional wisdom. Bayer Br. 47-48.

2. Reddy's theory assumes that the POOS would start with compound AT-3295 or Sankyo 1-130, even though the record was undisputed that the POOS would not have used either as a lead compound in July 1988, the relevant priority date. *Id.* at 55-59.

3. Even if the POOS had begun with AT-3295 or Sankyo 1-130, the conventional wisdom – which Reddy ignores – was that 5- and 6-membered monocyclic substituents were preferred and that bicycles were outside the conventional wisdom. The POOS modifying the 7-position would have synthesized 5- and 6-membered monocycles. *Id.* at 51-53, 61-64.

4. None of the references on which Reddy relied at trial to supply a motivation to synthesize bicyclic substituents (Tone, Culbertson, and Hokuriku) taught that bicyclic substituents were superior to monocycles; in fact, they taught exactly the opposite. *Id.* at 64-68. As discussed below, there is no evidence that Reddy's new reference, DTX 161, is any different.

5. None of the references on which Reddy relies, even if combined, teach or suggest the use of Bayer's 5/5 bicycle as a quinolone substituent. *Id.* at 68-69.

6. The record is undisputed that the compounds of the '517 patent exhibit unexpected properties compared – as they must be – to the closest prior art. *Id.* at 71-73.

### 1.    Neither AT-3295 Nor Sankyo 1-130 Would Have Been a Lead Compound for the POOS in 1988.

At trial, Reddy asked Dr. LaVoie to <u>assume</u> that the POOS would start with Sankyo or the Dainippon reference showing AT-3295. Bayer Br. 55-56. But the evidence demonstrated that in July 1988, the POOS would not have started with a compound from either reference, including AT-3295 or Sankyo 1-130. Bayer Br. 55-59. Reddy's failure to "show sufficient motivation . . . to . . . select[]" its starting compound "as a lead compound" is fatal to its obviousness case. *Yamanouchi Pharm. Co. v. Danbury Pharmacal, Inc.*, 231 F.3d 1339, 1344-45 (Fed. Cir. 2000). Just recently, a federal court in New Jersey rejected another attempt by Reddy to prove obviousness while failing to prove a motivation to select its starting compound as a lead compound. *Janssen Pharmaceutica N.V. v. Mylan Pharms., Inc.*, No. 2:03-cv-06220-JCL, 2006 WL 2947531, at *26 (D.N.J. Oct. 13, 2006). There, Reddy argued that *Yamanouchi* does not "'mandate[] the identification of a lead compound as a predicate to an obviousness analysis,' and . . . that [Reddy] need not demonstrate why one of ordinary skill in the art [at the priority date] would start with" its starting compound. *Id.* at 26 n.9. The Court disagreed, holding that because Reddy "allege[d] that one of ordinary skill in the art . . . would

have started with" a particular compound, it had to prove "that the prior art teaches the motivation to do so." *Id.* (*citing Yamanouchi*, 231 F.3d at 1345; *In re Dillon*, 919 F.2d 688, 692 (Fed. Cir. 1990) (en banc)).[1]

Reddy seeks to mask its failure of proof by arguing that "[i]n 1985," AT-3295 was "an intriguing" and "important compound." Reddy Br. 13, 38. Reddy's argument fails. First, Reddy addresses the state of the art in <u>1985</u>, rather than the relevant 1988 priority date. And the POOS would have concluded based on the absence of any additional data for AT-3295 between 1985 and 1988 that the compound was "dead," "toxic," and "terminated." Tr. 1185:21-1186:14 (Zhanel); 1471:16-1472:18 (Taylor).[2]

Moreover, there is no dispute that by 1988 "other more active compounds would have been the obvious choices" as lead compounds, thus rendering Reddy's argument irrelevant. *Yamanouchi*, 231 F.3d at 1344-45; Bayer Br. 56-57. The question is not whether, as Reddy

---

[1] *See also Eli Lilly & Co. v. Zenith Goldline Pharms., Inc.*, 364 F. Supp. 2d 820, 904 (S.D. Ind. 2005) (challenger "must establish by clear and convincing evidence that one of ordinary skill in the art would have been motivated to select [the compound in question] as a lead compound"); *Takeda Chem. Indus., Ltd. v. Mylan Labs., Inc.*, 417 F. Supp. 2d 341, 372 (S.D.N.Y. 2006) (same).

[2] Reddy relies predominately on Dr. Petersen's testimony, which relates to what he believed about AT-3295 in <u>1985</u>, not 1988. Reddy Br. 38; Tr. 392:7-19. First, an inventor's thought process is irrelevant to the obviousness inquiry. *Life Techs., Inc. v. Clontech Labs., Inc.*, 224 F.3d 1320, 1325 (Fed. Cir. 2000). Furthermore, contrary to Reddy's assertion, Dr. Petersen did not say that AT-3295 would have been a lead compound if it had been Bayer's (he was trying to understand the question in the portion cited by Reddy); in fact, he said that "[i]t was not an interesting lead compound for Bayer at the time." Moreover, Reddy's suggestion makes no sense, since Bayer used prior art compounds and substituents in its own research, and synthesized and tested competitor compounds of interest, but never made AT-3295. Tr. 284:2-14; *see also* Tr. 464:18-465:10 (by 1988 there were many more interesting prior art compounds).

Reddy's reliance on Bayer's 1985 status report (DTX 13), Reddy Br. 38, is similarly flawed, since, by 1988, Bayer's status report (DTX 16) reflects a lack of interest in AT-3295 – not even including it among the 14 competitor compounds listed in separate headings – which is consistent with Dr. Petersen's repeated testimony that, in 1988, AT-3295 was "not of further interest" to Bayer. Tr. 280:2-22, 464:18-465:10, 466:22-467:12; Bayer Br. 58.

argues, AT-3295 had "excellent antimicrobial activity compared to ciprofloxacin,"[3] Reddy Br.

38, but whether it was a <u>lead compound</u> in 1988, when it had been surpassed by and would have

been considered far less active than, among others, clinafloxacin and its 8-fluoro analog. Tr.

1467:8-1469:12, 1473:6-1475:3 (Taylor); 1170:11-1175:1, 1191:7-1192:19 (Zhanel); 1683:14-19

(Remmel).

As to its other starting compound, Sankyo 1-130, Reddy simply makes the

irrelevant contention that it was "one of the most important compounds <u>disclosed in the Sankyo

'206 Application</u>."  Reddy Br. 13, 38-39 (emphasis added); *see also* Bayer Br. 58-59.

Reddy has no evidence proving that the POOS would have selected either AT-

3295 or Sankyo 1-130 as a lead compound, and the evidence to the contrary is overwhelming.

### 2.    Reddy Ignores the Teachings of the Art as a Whole that Monocyclic Substituents Were Regarded as Superior and the Substantial Differences Between the Claimed Invention and the Prior Art.

The Federal Circuit repeatedly has cautioned that courts must look to the "<u>prior

art as a whole</u>" to determine whether it "'suggest[s] the desirability, and thus the obviousness, of

making the combination.'"  *In re Beattie*, 974 F.2d 1309, 1311-12, (Fed. Cir. 1992) (emphasis

added) (*quoting Lindemann Maschinenfabrik GmbH v. Am. Hoist & Derrick Co.*, 730 F.2d 1452,

1462 (Fed. Cir. 1984)); *Dystar Textilfarben GmbH & Co Deutschland KG v. C.H. Patrick Co.*,

464 F.3d 1356, 1361 (Fed. Cir. 2006).  Although it pays lip service to *Graham v. John Deere

Co.*, 383 U.S. 1, 17-18 (1966), Reddy Br. 36, Reddy fails to discuss in any substantive manner

the four factors central to the obviousness inquiry under *Graham*.  Reddy ignores altogether the

undisputed facts that in 1988: (1) the substituents used in the '517 patent would have been

viewed by the POOS as outside the conventional wisdom, as they contain 8- and 9-membered

---

[3] It did not.  *See* Bayer Br. 57-58.

bicycles, rather than the 5- or 6-membered monocycles believed to be optimal; (2) the POOS

would have considered Bayer's bicyclic substituents very different from the monocycles of the

prior art on which Reddy relies; and (3) not a single bicycle (to say nothing of Bayer's particular

bicycles) was ever mentioned in the voluminous body of peer-reviewed prior art quinolone

literature. *See* Bayer Br. 51-53, 63-64. Reddy has not met its burden where its evidence ignores

the conventional wisdom, the art as a whole, and the differences between monocycles and

bicycles. *In re Kahn*, 441 F.3d 977, 986 (Fed. Cir. 2006); *Standard Oil v. Am. Cyanamid Co.*,

774 F.2d 448, 454 (Fed. Cir. 1985); *In re Kotzab*, 217 F.3d 1365, 1369-70 (Fed. Cir. 2000).

### 3.  The Reference on which Reddy Now Relies Would Not Have Motivated the POOS To Make Bicyclic Substituents.

At trial, Reddy's experts relied on three references to argue that a POOS would

have been motivated to synthesize a bicyclic substituent: Tone, Culbertson, and Hokuriku.

Reddy's brief ignores these references and instead creates a wholly different motivation theory.[4]

Reddy now argues that a different reference, DTX 161, which discloses

quinolones with certain bridged piperazine bicycles, would have motivated the POOS to

synthesize quinolones with bicyclic substituents.[5] In the absence of evidence regarding how the

POOS would have interpreted DTX 161, Reddy cites testimony from the Bayer inventors that

several of the compounds it discloses were as active or more active than ciprofloxacin, and

---

[4] Reddy cites these references only by exhibit number as part of a long string cite in the Statement of Facts at page 14 but discusses none of them.

[5] Reddy also cites Dr. Taylor's testimony that the POOS would be motivated to modify 7-position substituents of prior art compounds. Reddy Br. 40. That proves nothing; a great deal of the work on quinolones involved the 7-position. What Reddy ignores, and studiously avoided asking Dr. Taylor, is how researchers were modifying the 7-position; the testimony showed that scientists in the field were working almost exclusively with monocyclic substituents. Bayer Br. 51-53, 59-64. Dr. Taylor made clear that the motivation he was referring to was to make additional *monocycles* within the conventional wisdom. Tr. 1579:21-1580:10.

argues that this provided a motivation to make 7-position bicycles. Reddy Br. 40. Not only is

this testimony irrelevant to obviousness – indeed, Reddy's sought (and received) assurance from

the Court that "Dr. Petersen's testimony will not be relevant to what the person of ordinary skill

in the art would have understood," Tr. 301:6-10 – but the expert testimony was clear that the art

had surpassed the activity of ciprofloxacin by 1988. Tr. 1191:7-1192:1 (Zhanel); 1473:6-24

(Taylor). Moreover, there is no evidence that DTX 161 would have motivated the POOS to

make quinolones with 7-position bicycles, as Reddy purposefully avoided offering any expert

testimony about DTX 161.[6] Thus, there is no evidence concerning how the POOS would

evaluate the data in DTX 161, whether the POOS would have had any interest in these

compounds in 1988, or whether the POOS would have been motivated by this data to make any

substituents, let alone bicyclic substituents in contravention of the conventional wisdom. In the

absence of such testimony, there cannot be clear and convincing evidence of motivation.[7]

---

[6] DTX 161 first surfaced in a supplemental expert report by Dr. Remmel to which Bayer's experts had no opportunity to respond. Tr. 1057:2-1064:14. Reddy argued at trial that while its expert should be allowed to testify about this reference, Bayer's experts should not be allowed to rebut this testimony because they did not discuss it in their reports (although Dr. Taylor was deposed on the document). The Court ruled that Bayer's experts could testify if Bayer first made them available for deposition. After Bayer's counsel agreed to do so, Reddy announced that Dr. Remmel would not testify about DTX 161 and cancelled the deposition of Bayer's other expert, thereby avoiding the response by Bayer's experts on the very reference that is now the linchpin of its motivation argument. Tr. 1084:16-1085:8.

[7] Reddy misreads *Dystar*, cited at Reddy Br. 37, as creating a new standard for motivation. The court in *Dystar* merely reiterated a long line of unremarkable cases holding that motivation need not necessarily be explicit, but can come from the knowledge of the POOS, the problem to be solved or common sense, stressing that in any event, this motivation inquiry must be "filtered through the knowledge of one skilled in the art," *Dystar*, 464 F.3d at 1361, which Reddy's machinations regarding DTX 161 avoided altogether. The court also repeatedly emphasized that in order to prevent hindsight, there must be actual evidence of motivation for the particular combination based on the then accepted wisdom in the field and the prior art as a whole, including the prior art that teaches away from the claimed invention. *Id.* at 1364-70.

4.    **Even if DTX 161 Motivated a POOS To Synthesize Bicycles, It Does Not Suggest the Use of Bayer's 5/5 Bicycle as a Quinolone Substituent.**

Reddy must show both a motivation to combine references (utterly lacking here, as discussed above), and a motivation to "<u>combine them in the way that would produce the claimed invention</u>." *Karsten Mfg. Corp. v. Cleveland Golf Co.*, 242 F.3d 1376, 1385 (Fed. Cir. 2001) (emphasis added). In a vain attempt to meet this burden, Reddy argues that not only would DTX 161 have motivated a POOS to synthesize bicyclic "diazabicycloalkanes," but that the POOS would have been motivated to synthesize the particular 5/5 bicycle of the '517 patent because both DTX 161 and the Bayer 5/5 bicycle are "diazabicyclo octanes," and because Dr. LaVoie testified that the Bayer 5/5 bicycle is the simplest diazabicyclo derivative of 3-amino-4-methyl pyrrolidine which allows the 3-amino group and 4-methyl group to remain in approximately the same location in space. Reddy Br. 39. That argument is meritless.

DTX 161 discloses compounds with "bridged" piperazine 7-position substituents such as the compound on the left, which, Dr. Schenke explained, are "completely different" from the 5/5 pyrrolidine bicycles (on the right) in the '517 patent:



Tr. 202:11-24, 226:20-227:19 (Schenke). Dr. Petersen likewise testified that the various types of bicycles shown in PTX 2071-B (including bridged piperazines and fused pyrrolidines) are "quite different classes of compounds," and that bridged piperazines are very different from fused bicycles (such as those in the '517 patent). Tr. 261:24-263:22. In addition, the bridged piperazines of DTX 161 were toxic. Tr. 294:16-295:17 (Petersen).[8]

---

[8] Dr. Taylor's explanation of how the Tone bicycle differed from the Bayer bicycle, Tr. 1455:15-

Moreover, the record is undisputed that if the POOS were motivated by a bicycle reference to make quinolones with bicycles, the POOS would have used bicycles <u>from that</u> <u>reference</u> or variations thereof. *See* Bayer Br. 68; Tr. 1486:15-1487:4 (Taylor). Substituting bridged piperazines in the 7-position of AT-3295 or Sankyo 1-130 would not result in the Bayer compounds.

Reddy's theory is based on the fact that both DTX 161 and the '517 patent have "diazabicyclo octanes" at the 7-position. Diazabicyclo octane simply refers to a carbon-based two-ring structure with eight atoms, two of which are nitrogens. Reddy seizes on this nomenclature as if it had some substantive significance, but ignores the undisputed testimony that the bridged piperazines of DTX 161 and the fused pyrrolidines of the '517 patent are very different in their structures. Tr. 202:11-203:2; *see also* Tr. 197:4-9 ("What is relevant here is the structure and not the name;" the name "does not say they have anything in common."). "Diazabicyclo octane" is no more a class that suggests commonality than the phrase "8 letter words with two n's" suggests a relevant similarity between the words "clinging" and "northern."

Finally, Reddy relies on what it characterizes as a "stunning admission" from Dr. Taylor that faced with a series of assumptions which Reddy imposed, the POOS would have made the Bayer 5/5 bicycle. Reddy Br. 41; Tr. 1546:10-17. Given the erroneous assumptions in the question, Dr. Taylor's answer is meaningless. Reddy's question assumed that:

- The POOS would start with AT-3295 or Sankyo 1-130;

- The POOS would have been motivated to make a bicycle;

- The POOS motivated to make a bicycle would "derive" a bicycle from the AT-3295 monocycle; and

---

1459:12, with which Dr. LaVoie agreed, Tr. 1030:2-13, 1036:11-24, also applies here, as the bridged piperazine bicycle shares many of the characteristics discussed regarding Tone's fused piperazine bicycle, in addition to the fundamental difference that it is bridged, not fused.

- The POOS would be motivated to make an 8-membered "diazabicyclo octane" bicycle in particular.

All of these assumptions are false. Bayer Br. 55-69; Tr. 1576:5-13 (Taylor).

Moreover, the entirety of Dr. Taylor's testimony makes clear his opinion that assuming, contrary to his view, that the POOS was motivated to make bicyclic quinolones that were "derived" from 3-amino-4-methyl pyrrolidine, they would not have made the Bayer 5/5 bicycle. When not artificially restricted to diazabicyclo octanes, he testified that such a POOS could have thought of numerous bicycles, such as those shown in PTX 2195-A. Tr. 1489:2-13. From among these, the POOS would have selected one of the compounds on PTX 2195-C (none of which is a diazabicyclo octane), as these "really retain the amino group and the methyl group" as substituents (as opposed to using them to form the ring), rather than the Bayer bicycles highlighted in PTX 2195-B which do not. Tr. 1489:14-18, 1490:6-1492:14, 1576:5-16 (Taylor). That is because the POOS would have understood that adding a carbon to the 3-amino and creating a bicycle destroys the very functionality of the 3-amino substituent and would be expected to reduce activity. Id.; Tr. 1573:10-1576:4; Bayer Br. 63-64. And he clarified that, for the same reasons, the answer to Reddy's question (which required making a diazabicyclo octane) is actually the compound on PTX 2195-D, which likewise retained the integrity of the 3-amino and 4-methyl substituents, not the Bayer 5/5 bicycle. Tr. 1576:21-1579:20.[9]

## 5. Reddy Has Not Proven Any Expectation of Success as to Dependent Claims 8, 9, and 11.

Dependent claims 8, 9, and 11 of the '517 patent are not obvious because the claims from which they depend are not obvious. In addition, Reddy cannot establish that the

---

[9] Although Reddy objected to this testimony as outside Dr. Taylor's report, the Court overruled the objection as Reddy had opened the door with its question to Dr. Taylor. Tr. 1578:17-24. Reddy has done the same by relying on this testimony from Dr. Taylor in its Opening Brief.

POOS would have a reasonable expectation of success in arriving at the claimed invention of these dependent claims. *See, e.g., Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1165-66 (Fed. Cir. 2006). Dr. Taylor testified without contradiction that the language of claims 8, 9, and 11 of the '517 patent require "a compound which is potent and which has the right pharmacokinetic properties, and which is tolerable." Tr. 1495:11-1496:11; *see also* Bayer Br. 69-71. Dr. Taylor likewise offered the unrebutted opinion that the POOS would have had no expectation that quinolones using the Bayer 5/5 bicycle would possess those properties in July 1988. Bayer Br. 69-71. Reddy contends that the dependent claims of the '517 patent are obvious because the additional limitations in these claims – *i.e.*, "an antibacterial composition comprising an antibacterially effective amount" of a given compound, and "a method of combating bacteria in a patient in need thereof which comprises administering to such patient an antibacterially effective amount of" a given compound – were "described in the prior art" for different compounds. Reddy Br. 15-16. That is irrelevant. The question is not whether these limitations were "described in the prior art," but whether the POOS would have had a reasonable expectation that the particular compounds Reddy claims are obvious would possess the properties required by the claims. The undisputed answer is no. Bayer Br. 69-71.

### 6.    Bayer's Systematic Variation of Quinolone Substituents Does Not Render All Resulting Inventions Obvious.

Finally, Reddy points to a poster which stated that the 5/6 bicycle of the compound in claim 5 of the '517 patent (the same bicycle used in moxifloxacin) was made by "systematic variation" of the 7-position substituents. DTX 223A at 5237. Reddy asserts that because: (1) there is no testimony that such variation "was beyond the ability of" the POOS and (2) "the patent laws do not allow the patenting of subject matter which is merely the work of a skilled mechanic," Bayer's invention is obvious. Reddy Br. 41.

This argument is legally incorrect and logically flawed. First, it is legally irrelevant how the inventors discovered their invention; the issue is whether it would have been obvious to the POOS. *Life Techs.*, 224 F.3d at 1325; *see also* 35 U.S.C. § 103 (2000) ("Patentability shall not be negatived by the manner in which the invention was made."). Second, there is no relationship between Bayer's "systematic variation" and "the work of a skilled mechanic." The '517 patent inventors are five highly skilled Ph.D. chemists and four Ph.D. microbiologists who worked for years on Bayer's quinolone project, relying on their experience, training, and interpretation of data; they departed from the conventional wisdom to synthesize the compounds of the '517 patent, which contained novel 7-position substituents never before been used in the quinolone art and were among the most effective antibacterial agents ever made. Reddy would have the Court believe that any invention resulting from this project was obvious because Bayer's approach was "systematic," presumably as distinguished from haphazard, random, and disorganized. That Bayer's approach was systematic does not mean that it was not also inventive. Third, Reddy's suggestion that a lack of testimony regarding whether "systematic variation" is beyond the ability of the POOS somehow proves Reddy's affirmative case is simply an example of Reddy adducing no evidence on a subject, and then suggesting that Bayer should have the burden of disproving an issue not even raised at trial. That approach is simply wrong – Reddy, not Bayer, bears the burden of proof by clear and convincing evidence. Finally, not even Reddy finds its argument persuasive, as it does not even allege that the very compound mentioned in the poster (BAY Y3118, which has a 5/6 bicycle) is obvious. At bottom, the poster is simply a red herring designed to divert attention from Reddy's lack of proof of obviousness.

**B.      Bayer's Undisputed Evidence Concerning Unexpected Properties Disposes of Reddy's Obviousness Challenge.**

Reddy's brief reveals a critical flaw in its obviousness case: Reddy presented absolutely no evidence to challenge Bayer's showing of unexpected properties. Having no factual response, Reddy is left to argue that Bayer's rebuttal evidence is legally insufficient. That argument is without merit.

Reddy's primary contention is that the only relevant comparison to rebut its *prima facie* case is an assessment of the properties of Sankyo 1-130 and AT-3295 compared to their purported "bicyclic analogs." Reddy Br. 42-43. However, the law is clear that when unexpected properties are used as evidence of nonobviousness, the results must be demonstrated to be unexpected compared to the closest prior art. *See, e.g., In re De Blauwe*, 736 F.2d 699, 705 (Fed. Cir. 1984); *In re Merchant*, 575 F.2d 865, 869 (C.C.P.A. 1978); *In re Harris*, 409 F.3d 1339, 1344 (Fed. Cir. 2005). As explained in Bayer's Opening Brief, the evidence is uncontroverted that the Culbertson quinolones with 5/5 and 5/6 bicycles are the closest prior art to the '517 patent; that is why Dr. Zhanel's analysis included head-to-head data comparisons for the Bayer compounds versus the Culbertson compounds. Bayer Br. 26, 66-67, 72-73.

Reddy agrees that unexpected properties only need to "rebut the *prima facie* case for the subject matter that is *prima facie* obvious." Reddy Br. 42 (*citing In re Tiffin*, 448 F.2d 791, 792 (C.C.P.A. 1971)).[10] Here, Reddy's contention that the 5/5 "bicyclic analogs" of Sankyo

---

[10] In the very same paragraph, Reddy also contends that Bayer must provide evidence "commensurate with the scope with the claims" alleged to be invalid. *See* Reddy Br. 42 (*quoting In re Greenfield*, 571 F.2d 1185, 1189 (C.C.P.A. 1978)). Reddy's does not contend that this standard requires the demonstration of unexpected properties for subject matter not alleged to be obvious, though the evidence adduced at trial is sufficient to meet that standard as well, since Dr. Zhanel testified to a "clear and consistent trend" revealing that, as a whole, Bayer's compounds of claims 1 and 2 of the '517 patent exhibited superior pharmacokinetic properties compared to the closest prior art (Culbertson). *See* Bayer Br. 72-73; *In re Kollman*, 595 F.2d 48, 56 (C.C.P.A. 1979); *E.I. Du Pont de Nemours & Co. v. Phillips Petrol. Co.*, 656 F. Supp. 1343, 1368 (D. Del.

13

1-130 and AT-3295 are obvious is, in essence, an allegation that the quinolones with a 5/5

bicycle within claims 1 and 2 are obvious.[11] To rebut that charge, Dr. Zhanel analyzed both *in*

*vitro* and pharmacokinetic data comparisons for compounds with the 5/5 bicycle, including

comparisons to the undisputed closest prior art, Culbertson. *See* Bayer Br. 72-73; PTX 162, 181,

182. He concluded that compounds with a 5/5 bicycle exhibit a trend of unexpected properties

relative to that art – testimony that was unrebutted. *Id.*; PTX 2107-F. Such a trend is sufficient

evidence to rebut a *prima facie* case of obviousness. *Kollman*, 595 F.2d at 56; *Du Pont*, 656 F.

Supp. at 1368.

      Reddy criticizes Dr. Zhanel's testimony by claiming that he "admitted" that "it

would be necessary to actually run a head-to-head comparison in order to give a 'reasoned

opinion' that one compound has unexpected properties compared to another." Reddy Br. 43

(*citing* Tr. 1258:25-1259:4). This is another example of Reddy quoting snippets of testimony

completely out of context. Dr. Zhanel's actual testimony was as follows:

> Q.     But to give a reasoned opinion to a reasonable degree of
> scientific certainty, you would need to run the test; correct?
> Because it is an unpredictable science?
>
> A.     Always, you're correct. You want to run the test if you
> have it. However, I want to make something very clear. I've
> looked at a lot of evidence here, a lot of information in the
> pharmacokinetic studies and in the head-to-head comparisons and

---

1987), *aff'd in part, rev'd in part, vacated in part by* 849 F.2d 1430 (Fed. Cir. 1988).

[11] Reddy's obviousness defense centers around the structure of the 7-position substituent of
Sankyo 1-130 and AT-3295. *See, e.g.,* Reddy Br. 39. If the POOS would in fact be motivated to
substitute 5/5 bicycles at the 7-position of Sankyo 1-130 and AT-3295, then there is no reason
why the POOS would not be motivated to make other quinolones with a 5/5 bicycle in the 7-
position – including, for example, ones with preferred substituents such as 8-fluorine or 8-
chlorine. *See, e.g.,* Bayer Br. 76-77. Reddy cannot limit the allegedly "obvious" portion of the
'517 patent to two of the numerous 5/5 bicycles claimed in order to avoid evidence of
unexpected properties. Bayer's rebuttal evidence therefore is properly directed toward 5/5
bicycles generally, not just the two "bicyclic analogs" as Reddy suggests.

> you never have all of the evidence. Scientists always want more data, but we never have all the evidence.
>
> However, am I confident what I'm seeing here is a clear, consistent favored trend for the Bayer bicycle? Yes. What would my expectation be without having run the test? I would guide the company to say this is what I think would happen. I would think this unexpected trend would continue.

Tr. 1258:25-1259:4. In other words, all Dr. Zhanel "admitted" was that, while scientists seldom have perfectly complete data, the data that existed here was sufficient to conclude that the observed trend would extend to other compounds for which there was not data. That is all the law requires. *See Kollman*, 595 F.2d at 56.[12]

## II.    REDDY HAS NOT PROVEN DOUBLE PATENTING.

### A.    Reddy's *Schneller* Defense Fails.

Bayer's Opening Brief showed that Reddy's interpretation of *In re Schneller*, 397 F.2d 350 (C.C.P.A. 1968), is incorrect and that *Schneller* is inapplicable here. Bayer Br. 83-87. Faced with these insurmountable legal and factual hurdles, Reddy trumpets a purported admission Bayer made during prosecution of the '942 patent that *Schneller* "governs" and that Bayer was not "taking issue" with it. *See, e.g.*, Reddy Br. 46-47. However, as Bayer discussed

---

[12] Reddy argues that the absence of any head-to-head data comparisons between the Bayer compounds and AT-3295 and Sankyo 1-130 warrants an inference that "Bayer was either too afraid to let its testifying expert run the experiment, or that Bayer arranged to have the experiment run by a non-testifying expert and Bayer is withholding the results under a claim of work-product immunity." Reddy Br. 43. This is nothing more than speculation of a party unable to rely on actual evidence. It is also false; undersigned counsel represent that no such experiments ever were run. And if Reddy thought additional experiments were important, it could have done so itself. The explanation for why there is no data to make a head-to-head comparison is simple: the data Dr. Zhanel relied on was historical data from Bayer's quinolone project, not experiments he personally conducted. *See, e.g.*, Tr. 1231:1-22; PTX 162, 181, 182. As Dr. Petersen explained, Bayer did not make AT-3295 or Sankyo 1-130 because it only synthesized competitor compounds when it believed they were of interest. Tr. 284:5-14. And as discussed above, the existing data was more than sufficient to prove unexpected properties, so no additional experiments were needed.

in its Opening Brief, Mr. Briscoe explained that there was no point arguing that *Schneller* was inapplicable because, at the time, *Schneller* was a basis for rejection in the MPEP – which the examiner was required to follow – and Bayer believed its claims were patentable anyway. Bayer Br. 88. Moreover, the reason Bayer stated that it did not "tak[e] issue" with *Schneller* is because the decision only required Bayer to "establish[] the independent and distinct character of the" claims at issue, something Bayer had already done with data showing unexpected properties. Tr. 789:8-25; 793:15-795:5, 820:6-821:3 (Briscoe); PTX 4 at 2175-76; Bayer Br. 84, 86-88.[13]

Reddy next cites the MPEP to assert that *Schneller* is still "legal[ly] viab[le]" because the PTO continues to recognize it as a valid basis for double patenting rejections. Reddy Br. 47. But the very next paragraph of the MPEP, after the language Reddy quotes, states: "The decision in *In re Schneller* did not establish a rule of general application and thus is limited to the particular set of facts set forth in that decision." PTX 64 at 1108. In any event, the MPEP does not have the force of law, nor can it overrule governing Federal Circuit law on double patenting. PTX 63 at 1079 ("This Manual does not have the force of law"); *see also* JTX 5 at ¶ 2.

Finally, Reddy posits that unexpected properties somehow are irrelevant if *Schneller* applies. Reddy Br. 47-48. That is incorrect. Bayer overcame the PTO's *Schneller*-based rejection with a showing of unexpected properties. *See* Bayer Br. 87. Thus, while Reddy's argument is based on the fact that the PTO once applied *Schneller*, it selectively ignores PTO practice that (when it was applying *Schneller*) unexpected properties were relevant.

## B.    Reddy Has Failed To Establish that Claims of the '942 Patent Are Invalid for Obviousness-Type Double Patenting.

The sole evidentiary support for Reddy's obviousness-type double patenting

---

[13] Bayer made the same showing at trial through a stipulation that moxifloxacin possesses unexpected properties. JTX 3 ¶¶ 1-4.

defense is a few lines of conclusory testimony from Dr. LaVoie, based on his legally impermissible view of the POOS, Bayer Br. 47-48, 75, that Sankyo would motivate the POOS to replace the 8-halogens of claims 4 and 5 of the '517 patent with an 8-methoxy because "[a]ll of the 'most preferred' compounds" in Sankyo "have methoxy at the 8-position." Reddy Br. 49. Wholly absent from Reddy's brief is any discussion of important factual issues under *Graham*, including: (1) the conventional wisdom concerning 8-position substituents as of July 1988 that halogens were preferred and that methoxy was suboptimal; (2) the chemical and structural differences between 8-halogens and 8-methoxy – differences that render the '942 patent claims patentably distinct from '517 patent claims 4 and 5; or (3) what the data in Sankyo (or lack thereof) actually taught the POOS about 8-methoxy. *See* Bayer Br. 75-78. In short, Reddy does not come close to meeting its clear-and-convincing burden.

Instead, Reddy yet again relies on an "admission" that in context admits nothing, and on erroneous legal arguments. Reddy asserts that Dr. Taylor admitted on cross-examination that Sankyo "speaks to the 'worthwhileness' of methoxy at the 8-position," and that Sankyo therefore teaches that 8-methoxy is worthwhile. Reddy Br. 49. To the contrary, Dr. Taylor merely answered yes to the question "[t]he Sankyo '206 application does say *something* about the worthwhileness of methoxy at the 8 position?" Tr. 1519:25-1520:2 (emphasis added). Reddy was careful not to ask Dr. Taylor exactly what that "something" was, as Dr. Taylor had just testified at length that nothing in Sankyo would have changed the conventional wisdom that 8-methoxy was not a "worthwhile" substituent (to use Reddy's language). Tr. 1509:9-1515:4; Bayer Br. 78-79. Reddy also ignores Dr. LaVoie's testimony that the POOS could not have concluded from Sankyo that 8-methoxy was as good as 8-halogen. Tr. 990:23-991:12.

Reddy next incorrectly contends that footnote 1 of *Geneva Pharmaceuticals, Inc.*

17

*v. GlaxoSmithKline PLC*, 349 F.3d 1373 (Fed. Cir. 2003), is the Federal Circuit's "only pronouncement on the issue to date" of whether unexpected properties can rebut a *prima facie* case of obviousness-type double patenting.[14]  Reddy Br. 50-51.  As discussed in Bayer's Opening Brief at 80-82, the Federal Circuit decided long before *Geneva* that unexpected properties are relevant to obviousness-type (as opposed to anticipation-based) double patenting. *In re Emert*, 124 F.3d 1458, 1462 (Fed. Cir. 1997); *In re Longi*, 759 F.2d 887, 896-97 (Fed. Cir. 1985).  Indeed, the Southern District of Indiana in *Eli Lilly & Co. v. Zenith Goldline Pharms., Inc.*, 364 F. Supp. 2d 820 (S.D. Ind. 2005), cited both *Emert* and *Longi* in rejecting the same argument Reddy presents here. *Id.* at 911-12.

Finally, Reddy all but concedes that its legal position is unpersuasive by asserting that "the burden is on Bayer to show that unexpected properties are relevant to the issue of obviousness-type double patenting."  Reddy Br. 51.  That is baseless.  Bayer does not have any burden to prove what the law is.  And according to multiple Federal Circuit and district cases, the law is that unexpected properties <u>are</u> legally relevant.  Bayer Br. 80-82.  Reddy's defense therefore fails because it has stipulated that if the unexpected properties of the '942 patent claims are relevant to determining obviousness-type double patenting, the '942 patent claims are not invalid under that doctrine.  JTX 1 at ¶ 47.

## C. Reddy's Has Not Proven Expectation of Success for the Dependent Claims of the '942 Patent.

Reddy contends that dependent claims 3, 4, 5, and 7 of the '942 patent are obvious for the same reason as the dependent claims of the '517 patent – that they add only limitations that were disclosed in the prior art with regard to different compounds.  Reddy Br. 18-19.  For the reasons

---

[14] In its opening statement, Reddy took a different position, arguing that the decision in *Geneva* was not "controlling precedent" as to whether "secondary considerations and the unexpected properties come in" and that the issue was "hotly contested." Tr. 32:7-11.

discussed in section I.A.5 above, Reddy's argument and the record evidence does not establish

the requisite expectation of success for the dependent claims of the '942 patent.

## III.    THERE WAS NO INEQUITABLE CONDUCT.

Reddy's inequitable conduct case is based on supposition and speculation, wholly

divorced from the record evidence. Before addressing the minutiae of the allegations in Reddy's

Brief, however, it is useful to step back and understand what Reddy's claim is really all about. It

is undisputed that the most important compounds in the Le A 26 108 patent application were

certain quinolones with 5/6 bicycles at the 7-position. These compounds included Bayer's early

development compounds (claimed in claims 4 and 5) and also the compound which was later

called moxifloxacin. None of Reddy's inequitable conduct allegations have anything to do with

these compounds or any other compound with a 5/6 bicycle.

Instead, Reddy's case is that Bayer intentionally included within the scope of

generic claims prior art compounds with monocycles at the 7-position which were not of interest

to Bayer and an intermediate compound which in and of itself was unimportant and, when

attached to a quinolone nucleus, formed compounds with a 5/5 bicycle at the 7-position –

compounds that were much less important to the inventors. Then, the story continues, Bayer

knowingly withheld references containing these compounds. In fact, the compounds were of

such little significance that in response to the examiner's restriction requirement, all were

removed from the case. As a result, none of these allegedly withheld compounds were relevant

to the claims of the '517 patent as issued – they were only relevant to claims that were removed

from the case before any substantive prosecution occurred. Moreover, Bayer in fact submitted

all of the references containing them to the examiner who was handling the Le A 26 108

application. As a matter of law and fact, there cannot be inequitable conduct here.

Bayer challenged Reddy in its opening statement to provide some motive for why

19

anyone would have jeopardized claims to important compounds by intentionally including uninteresting compounds from the prior art. Tr. 46:10-47:4. In response, Reddy now speculates without any evidentiary basis that these references were withheld because Bayer was "desperate to preserve its profit flow" in the face of "substantial generic competition" that would occur when "its ciprofloxacin patents expired," and thus "Bayer needed to develop – and obtain patent protection for – a next generation quinolone product." Reddy Br. 11. This is fantasy. In 1988, the ink had barely dried on the U.S. patent on ciprofloxacin, U.S. Patent No. 4,670,444, which issued only a year earlier and would not expire until years into the next century. *See Bayer AG v. Carlsbad Tech., Inc.*, 298 F.3d 1377, 1378-79 (Fed. Cir. 2002). Indeed, in 1988, ciprofloxacin had just entered the market in the U.S., certainly not the time when there would have been "desperate" efforts to get a patent on some successor. *See* PTX 220 at 853 (1988 *Annual Report in Medicinal Chemistry*, noting that "[Cipro] is now approved in the United States . . . ").

In addition to being factually wrong, Reddy's purported "greed" motive makes no sense. Intentionally including within originally-filed generic claims compounds that were in the prior art could not have helped Bayer obtain claims covering its development compounds; it could only jeopardize Bayer's claims covering these compounds. Reddy's theory thus devolves into the suggestion that, contrary to its own interests, Bayer engaged in a "pattern of deception and inequitable conduct" to obtain claims covering compounds that no one cared about and that, because they were disclosed in the prior art, Bayer could never use.

As the Court will see, much of Reddy's "evidence" is simply taking illogical liberties with the concept of "knowledge." Reddy's position is that if someone came across a reference in any context, that person then had "knowledge" of the reference and all that it contains in perpetuity. Building from this premise, Reddy extrapolates that if a patent claim

overlapped with a compound in that reference, it must have been done intentionally, because after all, the people involved had "knowledge" of the reference and because, according to Reddy, the inventors also must have "known" every compound within the scope of their claims (even though there were millions). Of course, that is incorrect – the overwhelming evidence showed that Bayer's inventors and counsel did not recall what turned out to be the relevant portions of the prior art references and made no connection between them and their patent application.

### A.    The Liebig's Reference.

#### 1.    Liebig's Is Not Material to the Claims of the '517 Patent.

Reddy repeatedly argues that the Liebig's reference is "highly material" because (1) Liebig's anticipated a portion of originally-filed claim 19, and (2) "issued claim 7 claims a compound with the Bayer 5/5 Bicycle at the 7-position," Reddy Br. 20, and issued claim 1 includes that compound as well. *Id.* at 21. Reddy's first point, that Liebig's anticipated one of Bayer's intermediate claims <u>as filed</u>, is irrelevant to materiality because the materiality of a reference is judged with respect to the <u>issued</u> claims of the patent. Bayer Br. 15-16; *Kimberly-Clark Corp. v. Johnson & Johnson*, 745 F.2d 1437, 1457 (Fed. Cir. 1984) ("[T]he key issues of materiality and intent should be decided with reference to the claims of the patent.").

Reddy's second point is simply counsel's argument. There is no evidence whatsoever that Liebig's was material to any issued claim; to the contrary, the evidence from every witness who addressed the issue was that it was not. Bayer Br. 17. Moreover, although Dr. LaVoie testified that he was aware of Liebig's, Reddy <u>did not even ask</u> either of its experts whether Liebig's was material. *Id.* Rather, Reddy studiously avoided advancing this theory at trial, thereby precluding the rebuttal it no doubt feared from Bayer's experts. Attorney arguments cannot substitute for Reddy's complete lack of evidence.

With no evidence supporting the materiality of Liebig's to the issued claims,

Reddy is left to speculate that " [a] reasonable examiner <u>could have</u> issued a rejection of issued claim 7 of the '517 patent over a combination of the Liebig's Reference . . . and DTX 341." Reddy Br. 20 (emphasis added); *see also id.* at 6, 55. But the testimony Reddy cites merely stands for the unremarkable proposition that claim 7 has at its 7-position the same 5/5 bicycle disclosed in Liebig's. Because Liebig's is not a quinolone reference and there is no evidence at all of any teaching, suggestion, or motivation to combine Liebig's with any quinolone reference, this fact is irrelevant to materiality.[15] Moreover, under the objective "reasonable examiner" standard that both parties agree should apply, the test is whether there was a "<u>substantial</u> <u>likelihood</u> that a reasonable examiner <u>would</u> consider [the art] important in deciding to allow the application to issue as a patent." 37 C.F.R. 1.56(a); *see also* Bayer Br. 14; Reddy Br. 51; *Digital Control Inc. v. Charles Machine Works*, 437 F.3d 1309, 1315 (Fed. Cir. 2006). Without any expert testimony that the POOS would have considered Liebig's relevant to the obviousness of the issued claims, there is no basis to conclude that a reasonable examiner <u>would have</u> considered Liebig's to be important to the patentability of the claims of the '517 patent.[16]

---

[15] A variation of this theme is Reddy's argument that Liebig's was material because example 26 of the '517 patent used the 5/5 bicycle to make the compound of claim 7. Reddy Br. 21. Example 26 simply shows a method of making the compound in claim 7 for purposes of enablement. That the 5/5 bicycle is used in synthesizing the compound of claim 7 says nothing whatsoever about its relevance to the obviousness inquiry for claim 7. Tr. 141:1-10 (Schenke).

[16] Reddy's reliance on *Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.*, 120 F.3d 1253, 1258 (Fed. Cir. 1997), Reddy Br. 56, in place of testimony or other evidence, is unavailing. In *Critikon*, the patent examiner "specifically relied on" an aspect of the invention shown by the withheld art, which was "the most relevant art" to that limitation. Here, the '517 patent claims are novel because they claim quinolones that use substituents at the 7-position never before used in the quinolone field. No reference discloses this novel aspect of the invention, and Liebig's – far from being "the most relevant art" – is so irrelevant to the patentability of the '517 claims that not even Reddy's asserts the reference as a basis for invalidity. Indeed, unlike *Critikon* where the reference at issue was in the relevant art, here Liebig's has nothing to do with quinolones. And it is undisputed that the "most relevant art" to the "limitation" of using Bayer's fused pyrrolidine 7-position substituents was Culbertson, which the inventors cited in the specification and disclosed. Bayer Br. 66-67.

The only evidence on this point proves the contrary. The examiner's first action during prosecution of the '517 patent was to impose a restriction requirement in which he distinguished the intermediates from Bayer's final quinolone compounds as "mutually exclusive species" that were "patentably distinct" and not "obvious variants" of one another. PTX 2 at 854-55; Bayer Br. 7-8, 17. Thus, like every trial witness who addressed this issue, the examiner also considered the intermediates immaterial to the patentability of the quinolone compounds.

Reddy also argues that by including the 5/5 bicycle in original claim 19, Bayer "explicitly represent[ed] to the Examiner" that this bicycle was novel, and that "[r]elying on this representation and assuming the Bayer bicycle to be patentable, the Examiner would certainly conclude that any compound incorporating the Bayer 5/5 Bicycle was also patentable." Reddy Br. 55. Again, this is baseless speculation. First, there is no evidence that the examiner considered claim 19 in assessing the patentability of claims to quinolone compounds, and claim 19 was out of the case before any substantive prosecution took place. Bayer Br. 7-8. Nor is there any evidence that the examiner considered the novelty of the 5/5 bicycle to be relevant, and if he did, he would not have simply "assumed" the 5/5 bicycle intermediate to be patentable; rather, his job was to examine the claims. Finally, Reddy's notion that the examiner's conclusion that quinolones with the 5/5 bicycle were patentable was dependent on Bayer's "representation" in claim 19 that the bicycle itself was novel ignores the fact that one of the 5 generic 7-position bicycle substituents in the quinolones within the scope of '517 patent claim 1 was not in the original claims to intermediates and the quinolones containing it were found patentable in the absence of any "representation" regarding the bicycle itself. Tr. 1496:20-1497:7 (Taylor). In short, there is no basis for Reddy's speculation that the examiner relied on claim 19 in determining the patentability of the 5/5 bicycle.

### 2.    There Was No Intent To Withhold the Liebig's Reference.

#### a.    The Liebig's Reference Was Disclosed to the PTO When Bayer First Recognized It Could Be Pertinent to Le A 26 108.

The linchpin of Reddy's intentional withholding case as to Liebig's is its assertion that Liebig's "was <u>never</u> disclosed to, or considered by, the Examiner." Reddy Br. 5 (emphasis in original). But Bayer submitted Liebig's to the examiner at the very beginning of prosecution of the first divisional case in Le A 26 108. Original claim 19 was then pending in this divisional application, having been restricted out and withdrawn from consideration in the parent. As soon as Dr. Petersen made a connection between Liebig's and the Le A 26 108 family, he took steps, together with Dr. Bailly and Mr. Horn, to ensure that it was submitted to the PTO in the divisional application where it was relevant. Bayer Br. 19; Tr. 338:8-340:5; 429:6-432:6 (Petersen); PTX 11 at 36492-93.

Reddy argues that "[i]ncredibly," "when Mr. Horn submitted the Liebig's reference in the prosecution of the [divisional] application[,] he did not direct it to the attention of the Examiner of the parent application," terming this "stunning." Reddy Br. 25. Reddy ignores, however, its complete failure to prove that Liebig's was material to the parent case (as shown above), or that Horn (or anyone else) believed it was (*see* discussion below). *See also* Bayer Br. 17, 19. More importantly, Reddy omits that the <u>same examiner</u> was responsible for both the parent and divisional cases. Tr. 541:8-542:1 (Bailly); PTX 11 at 36491-93. As Mr. Briscoe testified, the usual PTO procedure in 1990 (and today) is that a divisional case is assigned to the same examiner handling the parent, and Mr. Horn would have expected the divisional to be handled by the same examiner. Tr. 849:17-850:8. The suggestion that Mr. Horn intended to withhold Liebig's from the examiner of the parent case by submitting it to the same person in the divisional while the parent was pending is as illogical as it is unsupported. Not

24

surprisingly, it is also inconsistent with controlling case law, which recognizes that the submission of a reference to the same examiner in a co-pending application is fundamentally inconsistent with an intent to deceive. *See FMC Corp. v. Hennessy Indus., Inc.*, 836 F.2d 521, 526 (Fed. Cir. 1987); *Kimberly-Clark*, 745 F.2d at 1456.

Reddy next asserts that Mr. Horn, in citing Liebig's to the examiner in the divisional case, was obligated "to check whether the Bayer 5/5 Bicycle was material to any of the allowed claims" of the '517 patent, that he either failed to do so or in fact determined that Liebig's was highly material, and either way, he had intent to deceive. Reddy Br. 63-64. These assertions are equally baseless. First, the cases that Reddy cites do not support any such investigation obligation.[17] More importantly, the notion that Mr. Horn determined that Liebig's

---

[17] Reddy's cases are entirely inapposite. *Brasseler, U.S.A. #I., L.P. v. Stryker Sales Corp.*, 267 F.3d 1370 (Fed. Cir. 2001), a willful blindness case, stated that inequitable conduct could be found where the attorney prosecuting the application was informed on multiple occasions that a potentially barring sales event had taken place and therefore was "on notice of the likelihood that specific, relevant, material information exist[ed] and should be disclosed," yet, "in an effort to avoid complying with their duty to disclose," chooses not to investigate. *Id.* at 1382-83. Mr. Horn, on the other hand, had no "notice" that Liebig's was material to the claims of the '517 patent (the evidence uniformly shows it was not and that he would not have thought it was), and there certainly is no evidence that he deliberately chose not to investigate in an intentional effort to avoid complying with his duty of disclosure. Indeed, the fact that Mr. Horn disclosed Liebig's in the divisional where it was relevant completely distinguishes *Brasseler*.

Reddy also relies on *Novo Nordisk Pharmaceuticals, Inc. v. Bio-Technology General Corp.*, 424 F.3d 1347 (Fed. Cir. 2005), for the proposition that Drs. Petersen, Schenke, and Bailly and Mr. Horn "knew or should have known" of the materiality of the allegedly withheld references. Reddy Br. 53. The comparison strains credulity. *Novo Nordisk* was a case in which the inventors disclosed in their priority application that they had "purified" and prepared the claimed invention, even though they knew that they "had not successfully prepared" it and their efforts to do so failed repeatedly. *Novo Nordisk*, 424 F.3d at 1357. Moreover, the inventors were on notice that their knowing misrepresentation was "critical to the prosecution," as the examiner specifically inquired during an interview (attended by the inventors) as to where in the priority application "enablement is present," upon which Novo "pointed to" that very misleading example to overcome the examiner's rejection. *Id.* at 1358-59. And the inventors never disclosed the falsity of their example to the PTO. *Id* at 1360. Likewise, *GFI, Inc. v. Franklin Corp.*, 265 F.3d 1268, 1274 (Fed. Cir. 2001), is not remotely applicable. In *GFI*, the applicants

was material in the parent case or deliberately put his head in the sand to avoid gaining such

knowledge is a figment of Reddy's imagination. Moreover, the uncontradicted evidence at trial

was that Liebig's was <u>not</u> material to the claims of the parent application, that Mr. Horn would

<u>not</u> have thought that it was, and that he would have understood the examiner to have indicated

when making the restriction requirement that the intermediates were <u>not</u> relevant to the final

quinolone compound claims then pending. *See supra* section III.A.1; Tr. 855:5-857:9 (Briscoe).

In fact, the only one ever to suggest that Liebig's was material to the '434 application is Reddy's

counsel, who makes this unsupported allegation having made the calculated choice to avoid

asking its experts to provide a basis for it.[18] And there is no evidence that Mr. Horn deliberately

put his head in the sand. Indeed, even Reddy admits that it has no proof that he did so: "Mr.

Horn is deceased and cannot tell us whether or not he satisfied this duty." Reddy Br. 64. Given

the burden of proof, that is fatal to Reddy's claim.

### b. No One Realized that Original Claim 19 Covered a Compound in Liebig's Before Dr. Petersen Reviewed the Le A 26 108 Divisional Application.

As Bayer discussed in its Opening Brief, the evidence at trial overwhelmingly

refutes any suggestion that Liebig's was intentionally withheld or that there was an intent to

deceive. Bayer Br. 18-22. The evidence on this point was straightforward: when the

intermediate claim including the 5/5 bicycle was first filed in Germany in 1988, no one was

---

had knowledge of information material to then-pending claims –a potentially interfering patent
application – but never disclosed it to the PTO. To the contrary, they <u>distinguished</u> art before the
examiner on the basis that it lacked limitations the applicants knew were present in the
potentially interfering application. Here, by contrast, the evidence at trial demonstrated that
every reference Reddy contends was "withheld" was in fact <u>disclosed</u> to the PTO as soon as a
connection was made between the reference and Le A 26 108. Bayer Br. 9, 19, 31.

[18] The issue was not raised in Reddy's expert reports (which cited Liebig's but did not assert it
was material to the issued '517 patent claims or raise any obviousness theory based upon it), and
Bayer's experts therefore had no reason to address the issue.

aware of the Liebig's reference. Eight months later, while drafting a different application relating to intermediate compounds (Le A 26 686), Dr. Schenke discovered the Liebig's reference and, consistent with his normal practice, disclosed it in that application and avoided any claims to the 5/5 bicycle. The uncontradicted testimony is that, at that point, neither he nor Dr. Petersen realized that this compound in Liebig's was one of 11 intermediate compounds listed by chemical name (not drawn out structure) in 11 pages of claims in the original German Le A 26 108 application filed the previous year. Months later, when the U.S. version of Le A 26 108 was filed, no one realized that the corresponding claim 19 included a compound from the prior art, as neither inventor reviewed the U.S. application in any detail, reasonably relying on their review of the substantially identical German version in their native language the previous year. *Id.* Finally, as discussed above, when Dr. Petersen was reviewing claims for the first Le A 26 108 divisional application and noticed the overlap with Liebig's, he, Dr. Bailly, and Mr. Horn took steps to point out the overlap to the PTO and amend the claim in the divisional to avoid it. The evidence showed that this was the first time anyone realized that original claim 19 overlapped with Liebig's, and when they did, they promptly and voluntarily brought it to the examiner's attention in the prosecution where it was actually relevant.

Reddy's response is simply to say, over and over, in different ways and with increasingly shrill adjectives, that Drs. Schenke and Petersen in fact knew they were claiming a compound disclosed in Liebig's in Le A 26 108, that they intentionally decided to do so, and that they are lying when they say that they did not recognize the overlap. But the evidence they cite proves no such thing, and Bayer's evidence discussed above proves the opposite.

For example, Reddy argues that Dr. Schenke's disclosure of Liebig's in Le A 26 686 "is a proverbial smoking gun" that proves that "Drs. Schenke and Petersen were well aware

of the Liebig's Reference and its importance to their work in the Bayer quinolone project, including work that was related to the subject matter of the '517 patent" because the two applications are related. Reddy Br. 22. First, this proves exactly the opposite – when Dr. Schenke became aware of Liebig's relevance to a particular patent application, he disclosed it and avoided claiming it, just as Dr. Petersen later did. Second, Reddy's unstated assumption that the inventors must have remembered that the compound had also been in a different patent application eight months earlier, which they reviewed at a time when they had no knowledge of Liebig's disclosure or reason to focus on this particular compound, has no basis in fact and is inconsistent with the inventors' testimony. Third, simply because Liebig's is cited in Le A 26 686 – which is directed to new methods of synthesizing intermediates of the same general type as the compound in Liebig's – does not mean that the Liebig's compound was important to Drs. Schenke and Petersen's work in the quinolone project. Reddy is confusing the fact that it might have been relevant in drafting Le A 26 686 to avoid overlapping with Liebig's (once they knew Liebig's existed) with the reference being important to the overall quinolone project. As Drs. Schenke and Petersen testified, they sometimes in the course of their work came across prior art which overlapped with claims they were drafting. When this happened, they drafted around the art to avoid the overlap. Bayer Br. 38. Doing so in Le A 26 686 would hardly have been the life-altering event for Dr. Schenke that Reddy's argument presupposes.[19]

Reddy's claim that "Dr. Petersen withheld the Liebig's Reference with intent to deceive," Reddy Br. 62-63, consists almost exclusively of attorney argument that is contradicted

---

[19] Reddy relies on a section of a December 1988 quinolone project team report to suggest that Dr. Schenke focused on the 5/5 bicycle. Reddy Br. 22, 57; DTX 76 at 1127. Reddy ignores two critical points. First, this document is from months before Dr. Schenke first learned of Liebig's. Second, all the document shows is that Dr. Schenke was aware that quinolones with the 5/5 bicycle at the 7-position were disclosed in Le A 26 108. But that has nothing to do with whether Bayer had a specific claim to the intermediate compound shown in Liebig's.

by the evidence. Indeed, the only citation to trial testimony in the entire section about Dr.

Petersen is to <u>Dr. Schenke's</u> testimony which Reddy cites to assert that Dr. Petersen "knew

shortly before signing the Inventors Declaration that the Bayer 5/5 Bicycle was in the prior art

(Tr. 165:17-21)." Reddy Br. 62. Again taking testimony completely out of context, Reddy

excludes from its citation the second half of Dr. Schenke's answer which is consistent with Dr.

Petersen's own testimony discussed above and which eviscerates the very point Reddy is trying

to make. As Dr. Schenke continued ". . . but he [Dr. Petersen] also made no connection between

the intermediate claims [in Le A 26 108] and our Le A 26 686." Tr. 165:17-23. Finally, and

more importantly, Reddy completely ignores the fact that when Dr. Petersen reviewed the claims

in the divisional application and made this connection between the intermediate claims and

Liebig's, he took steps to submit Liebig's to the PTO in the divisional application in which it

actually was relevant. Dr. Petersen's conduct throughout this prosecution was consistent with an

intent to disclose, not to withhold.[20]

### 3.    Dr. Schenke's Inventor's Declaration Provides No Support to Reddy.

Concocting a new inequitable conduct theory when the trial was virtually over,

Reddy now relies heavily on Dr. Schenke's inventor's declaration which was filed with the '434

application. Reddy suggests that either (1) Dr. Schenke reviewed and understood the application

and claims and therefore knew that the 5/5 bicycle was claimed and that Liebig's was material to

the original claims or (2) Dr. Schenke did not review the application and claims and he lied when

he swore that he did.[21] That is a false dilemma, as there is no conflict between Dr. Schenke's

---

[20] Indeed, Dr. Petersen disclosed in Le A 26 108's specification the Culberson reference that he believed was the closest prior art to the quinolone compounds of the '517 patent and that the evidence established was the most material reference to those compounds. Bayer Br. 66-67.

[21] As Bayer discussed in its Opening Brief, Reddy's request to amend the pleadings to add a new theory of inequitable conduct first raised on the second to last day of trial after Dr. Schenke had

oath being true and his understandable failure to recognize that originally filed claim 19 overlapped with Liebig's. A simple example from the trial demonstrates the point.

Dr. LaVoie testified under oath that he had read Sankyo carefully "several times" and reviewed its 13 most preferred compounds. Tr. 992:15-994:4. He also testified that each of these compounds had a cyclopropyl at the 1-position, referring to an exhibit prepared by Reddy's counsel and "reviewed" by Dr. LaVoie. *Id.* In fact, all 13 compounds do not have this substituent. Tr. 994:5-996:4. Using Reddy's logic, either Dr. LaVoie committed perjury by reviewing Sankyo and then testifying that all 13 compounds had 1-cyclopropyl when he knew that they did not, or he committed perjury when he testified that he had reviewed Sankyo (because if he had, he would have known that all 13 compounds did not have a 1-cyclopropyl).

Of course, this is sophistry; Dr. LaVoie did not commit perjury. Dr. LaVoie reviewed the 13 examples in Sankyo, and either never noticed that one of them did not contain cyclopropyl, or noticed but soon forgot. And Dr. LaVoie's testimony clearly illustrates that even when someone is reviewing a few pages from a document with great care knowing he will be cross-examined about it a few days later, it is still easy to miss an example. Here, Dr. Schenke testified that he reviewed the substantially identical German version of the application a year earlier, was not aware of Liebig's at the time, and thus had no reason to take special note of the 5/5 bicycle claimed in the application. As a result, when he signed the oath a year later, he did not – and would have had no reason to – recall that the 5/5 bicycle had been claimed or to focus on Liebig's at all, much less realize that it was material to the '434 application as filed.

In addition, the evidence at trial shows that the declaration is correct and that Dr. Schenke believed it to be correct. Reddy has not proven that Dr. Schenke's "oath was false and

---

already left the country should be denied. Bayer Br. 23 n.5.

that it was made with knowledge of the falsity" and submitted with intent to deceive. *Hebert v. Lisle Corp.*, 99 F.3d 1109, 1116 (Fed. Cir. 1996). Reddy misreads the inventors' declaration, which states, in relevant part, "I hereby state that I have reviewed and understand the contents of the above identified specification, including the claims, . . . ." PTX 2 at 529. The oath does not say that the inventor has studied and memorized everything in his application and claims, or even read them word for word. As Dr. LaVoie demonstrated, it is easy to review and believe you understand a document but either miss completely or not recall some detail that later turns out to be important. The oath simply requires that the inventor has reviewed and understood the contents of the application. Dr. Schenke had "reviewed and underst[ood]" the contents of the application before signing his oath, having reviewed it in German (his native language) prior to its filing in the German Patent Office, and he believed (correctly) the U.S. version to be essentially the same. Bayer Br. 23-24. Dr. Schenke "understood when I signed the oath that what we had synthesized was what we had invented and that was what we claimed." Tr. 136:13-16. This is explained in Bayer's Opening Brief at pages 22-24 and is more than sufficient to satisfy his obligation. Moreover, there is no evidence that in signing the declaration Dr. Schenke had any intent to deceive the PTO.

To further support its claim, Reddy points to purported "admissions" by Dr. Schenke which are no such thing. First, Reddy emphasizes Dr. Schenke's testimony that if he had reviewed claim 19 "<u>when it was filed in the United States</u>" (a qualification Reddy's brief ignores) "he would have understood that the application claimed the Bayer 5/5 Bicycle (Tr. 135:9-19)." Reddy Br. 57. But as Dr. Schenke explained in his answer, this is beside the point because he had reviewed the application a year earlier at a time when he was unaware of Liebig's, and he therefore made no connection to the Liebig's reference at the time. Tr. 134:25-

31

136:7; Bayer Br. 23-24. Moreover, there is no reason to think that even if he had repeated the mind-numbing task of re-reviewing the lengthy application again in 1989 (at a time when he was aware of Liebig's), without the benefit of hindsight, he would have made a connection between the application and Liebig's. Certainly Dr. LaVoie's example suggests that this would have been unlikely.

Similarly, Reddy states that "Dr. Schenke testified that he knew 'exactly' what the invention was about (Tr. 135:4-6)," that therefore he would have known that it was about the Bayer 5/5 bicycle and that when he signed the declaration, he was focused on the bicycles, including the Bayer 5/5 bicycle. Reddy Br. 58. Reddy then implies that Dr. Schenke focused on the bicycle intermediate and must have made a connection with Liebig's. Again Reddy takes testimony out of context. Dr. Schenke never purported to have memorized "exactly" every detail of the application, and his testimony made clear that his focus was on the quinolones with 7-position bicycles, not the bicycle intermediates standing alone. Tr. 140:12-141:20.[22] Moreover, the testimony which Reddy cites, when read in its entirety, simply demonstrates that Dr. Schenke had a good faith basis to sign the oath and believed it to be true: "I was not responsible for making the claims. I knew exactly what was synthesized and what the invention was about and my understanding when signing the oath was that that is what we claimed and so I signed the document and my understanding was that I fulfilled my duty with that." Tr. 135:4-8.

Finally, the absurdity of Reddy's attack on Dr. Schenke's credibility is plain from the face of Reddy's brief. Reddy suggests that "perhaps Dr. Schenke changed his testimony"

---

[22] The testimony at Tr. 140:16 is a transcription error, as is clear from the context. Dr. Schenke testified that "It was an application concerning quinolones . . .," not "wasn't." Because the German speaking witnesses testified in English, the original record had a number of transcription errors. The court reporter requested the parties to submit an agreed errata sheet, and the parties submitted a lengthy list correcting mostly substantively irrelevant errors. Attached as Exhibit A is an errata sheet with additional transcription errors about which Reddy would not agree.

regarding whether he reviewed the claims of Le A 26 108 "because he was confronted on cross

examination with the pointed accusation that he lied in his declaration when he stated that he

understood the claims." Reddy Br. 58. But simply looking at Reddy's transcript cites (at 58)

demonstrates that once again, Reddy's speculation is baseless – the "confrontation" took place

<u>after</u> Reddy claims Dr. Schenke changed his testimony. And in fact, there was no change in

testimony at all. On direct, Dr. Schenke testified in response to the question of whether he

"<u>focused</u> on the claims" that he "didn't review the claims. It was Dr. Petersen's task . . . ." Tr.

96:23-97:2. The clear import of this testimony is that Dr. Schenke did not closely focus on the

claims, which in fact was true. And were there any doubt about what he meant because, in

testifying in a foreign language, he answered using a different verb than in the question, Dr.

Schenke made clear later in his testimony (before Reddy's vaunted "confrontation") that while

he does not specifically recall almost 20 years later reviewing the claims, it was his normal

practice to do so. Tr. 134:11-136:16.[23]

       As to Reddy's "confrontation" of Dr. Schenke itself, Reddy conveniently omits

Dr. Schenke's vehement denial of its accusation (Tr. 135:21-136:7):

> Q. It was a lie when you signed DTX-74 and said that you
> understood the claims of Le A 26 108; correct?
>
> A. No. That was not a lie. When I signed the oath, my
> understanding was that what was in the claim is what we had
> invented and what we had described. I read the -- the German
> version. Perhaps I read the claims. I can't remember that. But at
> the time, when I read the German version, that was in 1988, I had
> no knowledge about the Liebig's reference at the time and when
> we signed the oath in 1989, I made no connection to the Liebig's

---

[23] Dr. Schenke's belief that he understood what was claimed is further supported by his review of
the application's generic formula, which was the basis for all of the quinolone claims in the
application, to ensure that Bayer's most important compounds were included. Tr. 94:9-96:21.
Moreover, because he was unaware of Liebig's at the time he reviewed the application, whether
or not he read the claims would have made no difference.

reference at that time and so I did not know that a compound was
already disclosed in prior-art literature.

In short, Dr. Schenke's declaration was not false, he did not believe it to be false,
and there was no intent to deceive. *See* Bayer Br. 22-24.

**B.      The EP Search Report References.**

Reddy's claim that Bayer intended to withhold from the PTO the references in the
EP Search Report is refuted by the fact that Bayer actually <u>submitted</u> the EP Search Report and
the references it cited to the PTO during the prosecution of the '517 patent as soon as there was
any suggestion that they were relevant. That fact alone is dispositive. Bayer Br. 8-9. Faced with
the inconvenient fact that the references were not withheld, Reddy concocts a grand conspiracy
theory that the references were "submitted with the intent to deceive." Reddy Br. 64. That is
absurd. There is no evidence whatsoever that Bayer intended to deceive the PTO about the
references by submitting them, or that anyone believed that the manner of submission was
improper. That Reddy maintains this theory in the face of all the evidence at trial refuting it
speaks volumes about the strength of Reddy's case. Even Reddy admits that it lacks clear and
convincing evidence against Drs. Petersen, Schenke, and Bailly, noting that it only "<u>might be
sufficient</u> to support an inference of intent to deceive." Reddy Br. 69-70 (emphasis added).
Thus Reddy focuses most of its attention on the now-deceased Mr. Horn, a respected member of
the bar, charging him with inequitable conduct without citation to any testimony, without regard
to the evidence at trial, and without any basis whatsoever.

**1.      The EP Search Report References Are Not Material to the Claims as
         Issued.**

Reddy makes two arguments regarding materiality of the EP Search Report
references to the claims as issued. Reddy primarily relies on an assertion that there was an
admission of materiality of the references in the prosecution of the '434 application. And almost

34

as a throw-away, Reddy states that the content of the references is material. Reddy Br. 27, 29. Both of these arguments are without merit.

As to the content of the references, as discussed in detail in Bayer's Opening Brief, the evidence established that the EP Search Report references were not material to the claims of the '517 patent as issued and at most are cumulative. *See* Bayer Br. 25-27. Reddy argues that Sankyo was material because Sankyo compound 1-130 (which did not anticipate the claims as filed) "supports Reddy's obviousness defense in this case." Reddy Br. 29.[24] It is Reddy's burden to show materiality by clear and convincing evidence, *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1178 (Fed. Cir. 1995), and Reddy's conclusory allegations fail to meet that burden. There is no evidence (thus the lack of citations in Reddy's brief) that any examiner would have thought of Reddy's closing the ring theory or otherwise considered Sankyo material to the claims as issued, much less that anyone at Bayer ever considered it to be material. *See* Bayer Br. 25-27. Indeed, there is no evidence that anyone at Bayer ever was aware of compound 1-130 from Sankyo. And the evidence at trial proved that Sankyo was not material. *See* Bayer Br. 27; Tr. 1410:7-1413:5 (Taylor).

Likewise, Reddy's contention that the EP Search Report references were material because they were designated as "X" references by the EPO, Reddy Br. 28-29, is incorrect. The claims in Europe had not been restricted as they had been in the U.S.; the European claims still contained quinolones with monocycles at the 7-position. Bayer Br. 8-9, 27. The "X" references were only relevant to portions of the European claims that had long since been removed from the U.S. claims. They were not material to the U.S. claims as issued. *Id.*

Nor was there any admission of materiality. Reddy relies on a boilerplate

---

[24] Reddy does not suggest that the content of the Dainippon abstract or the Egawa article are material to the claims as issued, and there is no evidence that they were.

recitation in the prosecution history, and misquotes and mischaracterizes Bayer's response, to claim that Bayer's traverse of the examiner's restriction requirement was a legally-binding "crucial admission." Reddy Br. 67. Reddy again makes an argument that was disproved at trial by overwhelming evidence, which it simply ignores.

First, Reddy does not even address the plain language of the examiner's boilerplate recitation: (1) it only applies if there is a traverse "on the ground that the species <u>are not patentably distinct</u>," and, (2) the only consequence of so traversing is that if Bayer "submit[s] evidence" or "clearly admit[s]" "the species to be obvious variants," such evidence may be used against Bayer in a future rejection under 35 U.S.C. § 103. PTX 2 at 855; Bayer Br. 28-30.

As Mr. Briscoe explained, Bayer did not traverse on the ground that the species were "not patentably distinct," but instead on grounds of unity of invention. PTX 2 at 893; Bayer Br. 29-30. The form language thus does not even come into play. And Bayer did not "clearly admit" that its quinolones were "obvious variants" of one another, or "submit evidence" showing this to be the case. *Id.* Bayer simply asked that, under recognized grounds of unity of invention, the compounds remain in the same patent application as they shared "common structure and utility" and were "not really so remote structurally." *Id.*; Tr. 527:22-528:3, 525:10-16 (Bailly); 827:3-832:22 (Briscoe). This is not a "clear admission" that Bayer's compounds are obvious variants.

Second, misquoting the evidence, Reddy's states that "Mr. Horn admitted that all of the quinolones in the original patent application were '<u>close in structure</u>' . . . ." Reddy Br. 67 (emphasis added). Mr. Horn never made such an admission, and the words Reddy quotes are nowhere to be found in the record. *In re Dillon*, 919 F.2d 688, 692 (Fed. Cir. 1990), cited at Reddy Br. 67-68, is thus inapposite – there was no admission (or evidence) of structural

similarity of Bayer's monocycle and bicycle quinolone compounds. Indeed, the examiner in the '434 application, and a later examiner, both explicitly stated that the monocycle and bicycle groups of Bayer's quinolone compounds were not obvious variants of each other. PTX 2 at 854-55; PTX 12 at 38428-30; Tr. 566:14-568:16 (Bailly), and Dr. Taylor's testimony established that the monocycles were structurally very different from bicycles. Bayer Br. 63-64.

### 2.    No One Realized Prior To Receipt of the EP Search Report that Bayer's Originally-Filed Generic Claims Overlapped with Any Compounds of the Prior Art.

Bayer's originally-filed claims had several broad generic structures covering a tremendous number of compounds. *See* Bayer Br. 5, 37-39. Reddy has identified a few prior art compounds that inadvertently were included within the scope of the broad generic claims as filed. *See* Bayer Br. 37-39. None of these anticipatory compounds were included as examples in the patent, or were described other than in a generic sense. These compounds were monocyclic 7-position quinolones that Bayer had not even made and were of no interest to Bayer as antibacterials at the time the application was filed. *Id.* And in response to the restriction requirement at the outset of prosecution, Bayer eliminated the portions of the claims that were inadvertently anticipated by these compounds by electing to prosecute only quinolones with certain 7-position bicycles. *See* Bayer Br. 7-8.

The references containing these few prior art compounds were identified in the EP Search Report. Prior to the receipt by Bayer of the EP Search Report on November 9, 1990, there is no evidence that anyone ever made a connection between the EP Search Report references and Le A 26 108. In the normal course of their work, Dr. Petersen and Dr. Schenke had come across the references relied on by Reddy months before the Le A 26 108 application even existed. *See* Bayer Br. 39-42. Contrary to Reddy's assertion that the references were "importan[t] to Bayer's work," Reddy Br. 29, the Egawa article and Danippon abstract related to

37

compounds that Bayer believed to be poor-performing. *See* Bayer Br. 41. There certainly was nothing so notable about these references that Drs. Schenke or Petersen would have remembered them months later when they started drafting the German priority applications for Le A 26 108, much less realized that two compounds among the millions within the scope of Bayer's generic claims had been disclosed in the references.[25]

Likewise, although the 187-page Sankyo reference was mentioned – with many other references – in the normal course of the quinolone project at Bayer prior to the drafting of Le A 26 108, the evidence uniformly showed that no one at Bayer recognized months later that the generic formula of Le A 26 108 unintentionally included within its scope a compound from the Sankyo reference.[26] Bayer Br. 39-40. Reddy's allegations that the importance of Sankyo is shown by its citation in another Bayer patent prosecution, Le A 25 727 (referred to by Reddy as the "'459 application"), also fall flat. Reddy Br. 31-32, 68-69. The focus of Le A 25 727 was quinolone compounds with unique "quaternary" carbon atoms at the 7-position (Le A 26 108 did not include any such compounds). Bayer Br. 42-43. Sankyo was relevant in Le A 25 727 because the examiner there explicitly called out one quaternary compound from Sankyo (example 79), and Bayer's prosecution focused on distinguishing its compounds from this example by synthesizing the compound of Sankyo and running comparative tests. Bayer Br. 42-43. No one focused on the other compounds listed in Sankyo's 187 pages, much less noticed the

---

[25] Reddy suggests that highlighting on Dr. Petersen's Dainippon abstract (DTX 600) was done during the 1980s, and that it showed the Dainippon abstract was important. The testimony actually was that there were "many reasons" why Dr. Petersen may have highlighted the card, and it could have been done at any time during his research, from when the DTX 600 abstract was first published in 1985 (long before it would have had any significance in Le A 26 108), until his retirement in 2002 (11 years after the '517 patent issued). Tr. 385:10-21, 239:9-10.

[26] Reddy unintentionally acknowledges as much when it states that the inventors were aware of these X references "well prior to filing the ['434] application." Reddy Br. 66.

single example that Reddy has identified as anticipating Bayer's generic claims as filed. *Id.*

Reddy trumpets as an "admission" Dr. Schenke's testimony that Dr. Petersen had been made aware of the EP Search Report references and "should have" caused them to be submitted to the PTO. Reddy Br. 29-30, 65. This is yet another example of Reddy taking testimony out of context to suggest an inference that the testimony explicitly contradicts. Dr. Schenke testified on cross-examination that if Dr. Petersen "had remembered" the Dainippon abstract "he would have" submitted it. Tr. 188:6-12. Reddy then attempted to "impeach" Dr. Schenke with a portion of his deposition, and when he tried to explain that at his deposition he had given the same explanation he had provided at trial, Reddy cut him off. Tr. 190:17-22. On re-direct, it was made clear that Dr. Schenke testified at his deposition, "If [Dr. Petersen] didn't make any connection," between the Dainippon abstract and Le A 26 108, "then he certainly would not have notified the patent department about [the reference]." Tr. 229:8-19.[27]

Reddy makes much of the fact that Dr. Petersen later (after the anticipatory subject matter had been eliminated from the prosecution of the '434 application) used some of the precursors that he synthesized in connection with the comparative tests in Le A 25 727 to make moxifloxacin. Reddy Br. 31-32, 69. But this was completely consistent with Dr. Petersen's normal practice of using precursors available to him to synthesize new compounds with his favored 5/6 bicycle: "we tried all new intermediates to combine them with our most interesting bicyclic compounds." Tr. 463:11-464:1; Bayer Br. 43 n.15. There is no doubt that

---

[27] Reddy's reliance on Dr. Schenke's testimony that he was "a bit disappointed" when he discovered that one of the monocycles he made was also used in Sankyo does nothing to advance Reddy's case and was fully addressed in Bayer's Opening Brief at 39-40. Likewise, Reddy's argument that Dr. Schenke failed to determine whether Dr. Petersen had submitted the Dainippon abstract and the Egawa article to the patent department ignores Dr. Schenke's testimony that he had forgotten about these references by the time the Le A 26 108 application was prepared and that if he had remembered them he would have made sure that they were disclosed. Tr. 119:2-9.

Dr. Petersen had conceived of moxifloxacin long before he synthesized it in July 1990 – he had identified it in Table I in the Le A 26 108 application two years earlier. Bayer Br. 43 n.15.[28]

Reddy all but admits that these facts do not carry its burden, characterizing them as facts that merely "might be sufficient to support an inference of intent to deceive." Reddy Br. 69-70 (emphasis added). Reddy is thus left only with its discredited argument, discussed below, that Mr. Horn intentionally disclosed the EP Search Report references in a deceptive manner.[29]

### 3. There Was No Inequitable Conduct in Submitting The EP Search Report References to the PTO.

Reddy asserts that Mr. Horn's submission of the EP Search Report references to the PTO within days of Bayer's receipt of the report "can only be explained as a part of a calculated effort to make sure that the [EP Search Report references] would not be considered" and that the "circumstantial evidence speaks loudly." Reddy Br. 72-73. The evidence, however, shows that very promptly after receiving the report and references from Bayer, Mr. Horn followed his normal practice of submitting all references received from the client without analyzing them. Bayer Br. 32-34.[30] In addition, the evidence showed that Mr. Horn's practice

---

[28] Reddy's allegation that this synthesis occurred "on July 26, 1990 . . . during the time period in which Bayer was sorting out its response to the Examiner Dentz's restriction requirement," Reddy Br. 69, is incorrect. Bayer told Examiner Dentz on March 23, 1990 what group it was electing, a fact confirmed by the April 4, 1990 PTO office action. Bayer Br. 7-8. Indeed, Reddy conceded in its opening that during the March 23, 1990 telephone call between Mr. Horn and the examiner, the non-elected subject matter was withdrawn. Tr. 16:7-10.

[29] Reddy also argues that the testimony of Drs. Petersen and Schenke cited in this section was evidence that the inventors believed that the references were material. Reddy Br. 65. But all of this testimony was in the context of the claims as originally filed (about which materiality is not in dispute), and says nothing about the claims as issued.

[30] Bayer submitted the references in the parent case without inquiring as to whether they were relevant to the claims in that application. *See* Bayer Br. 34-35. And, in fact, the references were not relevant to this U.S. prosecution, as Bayer later determined and described in the submission of the EP Search Report references in due course in the first Le A 26 108 divisional case. *Id.*

was to deal with these types of matters through informal contacts with the examiner, and in any

event, the references actually were considered by the examiner, and listed on the face of the

patent. Bayer Br. 9-10; Tr. 841:25-843:1 (Briscoe).[31]  That is not circumstantial evidence that

Mr. Horn intentionally deceived the PTO.  It is <u>direct</u> evidence that he acted properly.[32]

In order to argue that Mr. Horn hid these references by submitting them, Reddy

spins a fantastic tale and asks the Court to draw inferences that are both implausible and contrary

to the evidence, which Reddy again either quotes out of context or ignores.  For example, Reddy

argues that Mr. Horn "was certainly familiar with the MPEP (Tr. 723:5)" and that he "would

follow the MPEP if he knew that a section was relevant. (Tr. 724:21-22)."  Reddy Br. 71.  This,

Reddy claims, proves that Mr. Horn intentionally decided not to follow MPEP § 609.  But the

sentence Reddy quotes from page 723 actually states:

> Q.    And, of course, Mr. Horn was familiar with the MPEP?

---

[31] Reddy asserts that the references were not considered by the examiner until after the patent issued, but this is irrelevant.  First, the PTO determined that the references were properly considered by issuing the certificate of correction, a discretionary decision by the PTO that Bayer was correct in asserting that the references were considered.  Bayer Br. 9-10; PTX 68 at 92 (§ 1485); JTX 5 at ¶ 11.  More importantly, the issue here is Mr. Horn's intent.  The references were submitted by Mr. Horn months before the patent issued, and that the examiner happened to consider them three days after the patent issued (rather than, say, three days before) does not change the facts that Mr. Horn wanted the references to be considered, that they were considered, and that the examiner did not find them to be material.

[32] Reddy's argument that Mr. Horn "chose to bury his head in the sand in order to avoid learning whether the X References were material to the allowed '434 application," Reddy Br. 74-75, is baseless and, as discussed above in note 17, the case on which Reddy relies, *Brasseler*, is not remotely applicable.  *Brasseler* involved a situation where information material to pending claims was <u>not</u> disclosed to the PTO, and the Federal Circuit held that one could not avoid a finding of intent when he was on notice that the material information existed but deliberately chose not to look for it so as to avoid learning information that he would be obligated to disclose.  Here, Mr. Horn promptly <u>disclosed</u> the references and the EP Search Report showing why the EPO thought them relevant.  There is thus no issue of Mr. Horn deliberately cultivating ignorance so as to avoid having to disclose something which he in fact disclosed, and no evidence of intentionally "burying his head in the sand" in any event.  Reddy's suggestion that after submitting the Search Report and the references there remained some further "duty to investigate" is meritless.

> A.   Certainly, he was familiar with the MPEP, but what you have
> to understand is the MPEP is hundreds of pages. On each page
> there are tens of details. He did not know everything in the MPEP
> to the last detail.

Tr. 723:3-9 (Briscoe).  And Reddy ignores Mr. Briscoe's answer, when asked by Reddy whether

Mr. Horn was aware of the provisions of MPEP § 609 that Reddy relies on, that: "I don't have

any specific knowledge that he was, but I doubt it."  Tr. 749:4-7; *see also* Tr. 747:25-748:4.

Moreover, Reddy disregards the fact that Mr. Horn could not have followed § 609 even if he

knew about it, as none of its conditions were applicable to the non-material EP Search Report

references. *See* Bayer Br. 33-34.[33]

The linchpin for Reddy's entire argument is its unfounded speculation that a

"problem" arose when the EP Search Report was received because Mr. Horn was worried about

his "admission" of materiality in traversing the restriction requirement.  Reddy Br. 67-68, 72.  As

explained above, this imaginary "problem" never existed—there was no admission, and Mr.

Horn would not have viewed his routine "unity of invention" traversal as an admission.  Tr.

832:5-22 (Briscoe).  This eviscerates Reddy's alleged motive.  Other than the speed with which

the references were submitted in the parent case, everything regarding Mr. Horn's receipt and

submission of the EP Search report containing "X References" (which the evidence showed were

of no special concern) was pure routine.  Tr. 836:22-837:23.  Mr. Horn simply had no reason <u>not</u>

---

[33] Reddy cites *Ortho Diagnostic Systems, Inc. v. Miles, Inc.*, 865 F. Supp. 1073, 1082 (S.D.N.Y. 1994) for the proposition that Mr. Horn "knew or should have known that in these circumstances the additional art would not be considered."  Reddy Br. 73.  But whatever a hypothetical experienced attorney "should have" known, *Ortho* is readily distinguishable on several grounds, including the facts that the evidence established that Mr. Horn in fact likely did not know of § 609 and that the procedures of § 609 were inapplicable here in any event.  Moreover, there is no evidence that Mr. Horn intended to deceive the examiner; to the contrary, the only evidence was that his intent was to have the references considered and that he was successful. Bayer Br. 32.

to submit the references to the PTO, and he in fact submitted them promptly. Bayer Br. 32-34.[34]

Finally, Reddy argues that Bayer's submission of the EP Search Report in the first divisional case, after Bayer's expedited submission in the parent case, also is evidence of an intent to deceive. Reddy Br. 72-73. Reddy states that "Mr. Horn made the deliberate choice to delay his submission of the [references] in the '906 division application" until after the '517 patent issued. *Id.* at 73. There is no citation for this baseless and implausible assertion. The IDS in the divisional case included substantive discussion of the references and an explanation of their relevance to the then pending claims, and the evidence showed that this filing occurred prior to the first office action in that case and within the normal timeframe for such submissions by Bayer. Bayer Br. 34-35. The same references had already been cited to the examiner in the parent case with a copy of the EP Search Report showing the "X" designations, and had the same examiner also read the IDS in the divisional case before the '517 patent issued, it would only have reinforced the view (which he apparently came to independently) that the cited references were irrelevant as they all related to quinolones with monocycles.

Finally, no adverse inferences can be drawn from routine correspondence (reflected on Bayer's privilege log) between Mr. Horn and his client leading up to the filing in the divisional case in which the references were distinguished (on a basis which also renders them immaterial to the parent case) after they were already submitted in the parent case. Furthermore, the evidence established that there was no relationship between the submission of the EP Search Report in the divisional case and issuance of the '517 patent, Bayer Br. 35, and

---

[34] Reddy also asserts that Mr. Horn was "already familiar" with Sankyo because of its citation by the examiner in Le A 25 727. Reddy Br. 72. Reddy ignores the uncontradicted testimony that Mr. Horn had in excess of a thousand applications pending at any given time and that he had no system for cross-referencing amongst unrelated applications. Tr. 808:23-809:2, 813:22-814:16 (Briscoe). In addition, if Mr. Horn recalled anything about Sankyo, it was that it disclosed 7-position substituents with quaternary carbon atoms, which are irrelevant to Le A 26 108.

that Mr. Horn would not even have known when the patent would issue. Tr. 847:20-849:10

(Briscoe). Indeed, Reddy admits that the timing could have been "coincidence." Reddy Br. 73.

### C.    The '942 Patent Is Not Unenforceable.

Reddy's sole charge relating to the enforceability of the '942 patent is "infectious

unenforceability." Reddy Br. 80-83. As there is no inequitable conduct that renders the '517

patent unenforceable, the '942 patent remains enforceable as well.

However, even were Reddy to prevail on its allegations regarding the '517 patent,

the '942 patent would be unaffected. A later patent can only be rendered unenforceable by

inequitable conduct in an earlier application if the "inequitable conduct in prosecuting the

[parent] patent had 'immediate and necessary relation' to the . . . enforcement of the [child]

patents." *Consol. Aluminum Corp. v. Foseco Int'l Ltd.*, 910 F.2d 804, 810-11 (Fed. Cir. 1990)

(citation omitted). Reddy alleges that such an "immediate and necessary relation" exists because

the '517 and '942 patents share the same specification and priority date, and that "the relief

sought by Bayer in asserting the '942 patent is exactly the same as the relief it seeks in asserting

the '517 patent." Reddy Br. 81. But none of these allegations address the relevant inquiry. The

'942 patent is directed solely to specific quinolones with a 5/6 bicycle at the 7-position (i.e.,

moxifloxacin and related compounds), and Reddy does not contend that Liebig's or the EP

Search Report references were relevant to such compounds. *See* Bayer Br. 43-44. And the fact

that the patents share the same specification and claim the same priority is essentially always true

of patents in a parent-divisional relationship, and the Federal Circuit has rejected the proposition

that such a relationship is sufficient for there to be infectious unenforceability:

> [W]here the claims are subsequently separated from those tainted by
> inequitable conduct through a divisional application, and where the issued
> claims have no relation to the omitted prior art, the patent issued from the
> divisional application will not also be unenforceable due to inequitable
> conduct committed in the parent application.

*Baxter Int'l, Inc. v. McGaw, Inc.*, 149 F.3d 1321, 1332 (Fed. Cir. 1998); *see also Pharmacia Corp. v. Par Pharm., Inc.*, 417 F.3d 1369, 1374-75 (Fed. Cir. 2005) ("[T]his court's inequitable conduct cases do not extend inequitable conduct in one patent to another patent that was not acquired through culpable conduct.") For the same reason, the fact that Bayer seeks the identical relief from enforcement of its patents is insufficient for infectious unenforceability.

Reddy overstates the holding of *Truth Hardware Corp. v. Ashland Products, Inc.*, No. 02-1541, 2003 WL 22005839 (D. Del. 2003), Reddy Br. 80, which does not compel or suggest a different result. In *Truth Hardware*, the continuation patent included claims with a clear relationship to the art withheld during prosecution of the parent application, *Truth Hardware*, 2003 WL 22005839 at *2 n.2, and also contained within its specification the identical false statement made in the parent, *id.* at *3. Under those circumstances, the court held the continuation patent to be unenforceable. Those are a far cry from the facts of this case, where the art Reddy alleges was withheld during the '517 patent's prosecution is not even alleged to be related to the '942 patent or its prosecution and was disclosed at the very beginning of prosecution in any event. Bayer Br. 43-44.

## CONCLUSION

For the foregoing reasons, and for the reasons previously stated, judgment should be entered in favor of Bayer and the remedies Bayer seeks should be ordered.

*OF COUNSEL:*
Bruce R. Genderson
Adam L. Perlman
Aaron P. Maurer
David I. Berl
Dov P. Grossman
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000

Frederick L. Cottrell, III (#2555)
*Cottrell@rlf.com*
Jeffrey L. Moyer (#3309)
*Moyer@rlf.com*
Richards, Layton & Finger P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
(302) 651-7700
*Attorneys for Plaintiffs Bayer AG, Bayer HealthCare AG, and Bayer Pharmaceuticals Corporation*

45

## CERTIFICATE OF SERVICE

I hereby certify that on November 8, 2006, I caused to be served by hand delivery the foregoing document and electronically filed the same with the Clerk of Court using CM/ECF which will send notification of such filing(s) to the following:

> Richard L. Horwitz
> David E. Moore
> Potter Anderson & Corroon LLP
> Hercules Plaza, 6[th] Floor
> 1313 North Market Street
> Wilmington, DE   19801

I hereby certify that on November 8, 2006, I sent by Federal Express the foregoing document to the following non-registered participants:

> Louis H. Weinstein
> Frank D. Rodriguez
> David J. Novak
> A. Michael Covino
> Budd Larner, PC
> 150 John F. Kennedy Parkway
> Short Hills, NJ 07078-2703

_Anne Shea Gaza_

Anne Shea Gaza (#4093)
GAZA@rlf.com