# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

BAYER AG, BAYER HEALTHCARE AG,    )
and BAYER PHARMACEUTICALS    )
CORPORATION,    )
    )
    Plaintiffs,    )
    )
    v.    )
    )
DR. REDDY'S LABORATORIES, LTD. and    )
DR. REDDY'S LABORATORIES, INC.,    )
    )
    Defendants.    )    C. A. No. 04-179 (SLR)
    )
DR. REDDY'S LABORATORIES, LTD. and    )
DR. REDDY'S LABORATORIES, INC.,    )
    )
    Counterclaim Plaintiffs,    )
    )
    v.    )
    )
BAYER AG, BAYER HEALTHCARE AG,    )
and BAYER PHARMACEUTICALS    )
CORPORATION,    )
    )
    Counterclaim Defendants.    )

## REDDY'S RESPONSIVE POST TRIAL BRIEF
## AND REQUEST FOR CLOSING ARGUMENT

OF COUNSEL:

Louis H. Weinstein
David J. Novack
A. Michael Covino
Michael H. Imbacuan
BUDD LARNER, P.C.
150 John F. Kennedy Parkway CN1000
Short Hills, New Jersey 07078
Tel: (973) 379- 4800

Dated: November 8, 2006

Richard L. Horwitz (#2246)
David E. Moore (#3983)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 North Market Street
Wilmington, Delaware 19801
Tel: (302) 984-6000
srhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Defendants/Counterclaim Plaintiffs*
*Dr. Reddy's Laboratories, Ltd. and*
*Dr. Reddy's Laboratories, Inc.*

# TABLE OF CONTENTS

NATURE AND STAGE OF THE PROCEEDING................................................1

REQUEST FOR CLOSING ARGUMENT................................................1

INTRODUCTION TO REDDY'S RESPONSE................................................1

I.    THE '517 PATENT IS UNENFORCEABLE DUE TO
      INEQUITABLE CONDUCT................................................3

      A.    Reddy's inequitable conduct defense is not limited to the
            original claims................................................3

      B.    The Liebigs Reference was material and was withheld with
            intent to deceive................................................3

            1.    Bayer does not address the evidence which shows that
                  the Liebigs Reference was material to claims that
                  issued................................................3

            2.    The Liebigs Reference was withheld with intent to
                  deceive................................................6

                  a.    Liebigs was withheld with intent to deceive
                        when the application for the '517 patent was
                        filed................................................6

                        i.    Bayer's shifting position on whether Dr.
                              Schenke did or did not review his claims is
                              not credible................................................8

                        ii.   The fortuitous cancellation of the claim
                              anticipated by Liebigs did not cure the
                              inequitable conduct................................................10

                  b.    Liebigs was withheld with intent to deceive
                        after the '517 patent was allowed................................................12

            3.    The Liebigs Reference was not submitted to or
                  considered by the Examiner of the '517 patent before
                  the patent issued................................................13

      C.    The X References were material and were withheld with
            intent to deceive................................................15

i

1.  Mere submission of the X References does not
    preclude inequitable conduct ............................................................... 15

2.  Mr. Horn's failure to follow his usual practice shows
    that he was focused on the potential materiality of the
    X References ............................................................................................. 17

3.  Mr. Horn did not discuss the X References with the
    Examiner before the '517 patent issued .................................................. 17

4.  A "prompt" submission does not negate intent to
    deceive ...................................................................................................... 18

5.  There is no evidence that the X References were
    cumulative ................................................................................................. 19

D.  The Examiner could have used the admission in Mr. Horn's
    traverse to reject the allowed claims over the X References ..................... 21

E.  Mr. Horn knew or should have known about the MPEP's
    requirements for submitting references after payment of the
    issue fee ............................................................................................................ 23

F.  The record shows a pattern of misconduct ....................................................... 26

II.   THE '942 PATENT IS ALSO UNENFORCEABLE ........................................... 28

III.  THE ASSERTED CLAIMS OF THE '517 PATENT ARE
      OBVIOUS ............................................................................................................... 29

A.  Reddy does not need to show why its references would be
    selected .............................................................................................................. 29

B.  Reddy does not need to show why AT-3295 and Sankyo
    Compound 1-130 would have been selected as "lead
    compounds" ....................................................................................................... 30

C.  Reddy does not need to show that bicycles would have
    been preferred over monocycles ....................................................................... 32

D.  The so-called "conventional wisdom" does not remove
    Reddy's references from the prior art ................................................................ 32

E.  Bayer does not compare the two compounds asserted to be
    obvious to the two prior art compounds relied on by Reddy ............................ 33

F.    Bayer tries to make Dr. LaVoie the issue ................................................35

IV.    THE ASSERTED CLAIMS OF THE '942 PATENT ARE
        INVALID................................................................................................36

    A.    The asserted claims of the '942 patent are invalid for
            obviousness-type double patenting ..............................................36

        1.    The Sankyo '206 Application teaches methoxy at the
                8-position ...........................................................................36

        2.    Objective indicia of non-obviousness are not relevant
                to obviousness-type double patenting....................................38

    B.    The '942 patent is invalid under the holding of *In re
            Schneller* .....................................................................................40

        1.    Bayer mischaracterizes the holding of *In re Schneller* .....................40

        2.    *Schneller* is the law ..............................................................41

        3.    If *Schneller* is not the law it should be...................................41

        4.    Unexpected properties are not relevant to *Schneller*-
                type double patenting ...........................................................42

CONCLUSION.............................................................................................42

# TABLE OF AUTHORITIES

## Cases

*Application of Meinhardt*,
   392 F.2d 273  (C.C.P.A. 1968) ............................................................................33

*Baxter Int'l, Inc. v. McGaw, Inc.*,
   149 F.3d 1321 (Fed. Cir. 1998) ..............................................................10, 28, 29

*Brasseler, U.S.A. I, L.P. v. Stryker Sales Corp.*,
   267 F.3d 1370 (Fed. Cir. 2001) ...............................................................................6

*Calhoun v. Yamaha Motor Corp., U.S.A.*,
   350 F.3d 316 (3d Cir. 2003) ..................................................................................34

*Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.*,
   120 F.3d 1253 (Fed. Cir. 1997) ..............................................................19, 20, 24, 27

*Daubert v. Merrell Dow Pharms., Inc.*
   509 U.S. 579 (1993) ...............................................................................................34

*Dayco Prods., Inc. v. Total Containment, Inc.*,
   329 F.3d 1358 (Fed. Cir. 2003) ................................................................................3

*Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*,
   851 F.2d 1387 (Fed. Cir. 1988) .............................................................................39

*Driscoll v. Cebalo*,
   731 F.2d 878 (Fed. Cir. 1984) ...............................................................................11

*Dystar Textilfarben GmbH & Co. Deutschland KG v. C.H. Patrick Co.*,
   464 F.3d 1335 (Fed. Cir. 2006) .............................................................................37

*Eisai Co., Ltd. v. Dr. Reddy's Labs., Ltd.*,
   No. 03 Civ. 9053(GEL), 2006 WL 2872584 (S.D.N.Y. Oct. 6, 2006) ...............14, 24

*Eli Lilly & Co. v. Barr Labs., Inc.*,
   251 F.3d 955 (Fed. Cir. 2001) ...............................................................................41

*eSpeed, Inc. v. Brokertec USA, L.L.C.*,
   417 F. Supp. 2d 580 (D. Del. 2006) .........................................................................7

*Ferring B.V. v. Barr Labs., Inc.,*
  437 F.3d 1181, 1190 (Fed. Cir. 2006), *cert. denied,*
  75 U.S.L.W. 3121 (U.S. Oct. 30, 2006) ............................................................. 22, 27

*FMC Corp. v. Hennessey Indus., Inc.,*
  836 F.2d 521 (Fed. Cir. 1987) ..................................................................... 13, 25

*Fox Indus., Inc. v. Structural Pres. Sys., Inc.,*
  922 F.2d 801 (Fed. Cir. 1990) ...................................................................... 6, 11

*Geneva Pharms., Inc. v. GlaxoSmithKline PLC,*
  349 F.3d 1373 (Fed. Cir. 2003) ....................................................................... 39

*In re Dillon,*
  919 F.2d 688 (Fed. Cir. 1990) ......................................................................... 22

*In re Fulton,*
  391 F.3d 1195 (Fed. Cir. 2004) ....................................................................... 32

*In re Harnisch,*
  631 F.2d 716 (C.C.P.A. 1980) .................................................................... 21, 22

*In re Inland Steel Co.,*
  265 F.3d 1354 (Fed. Cir. 2001) ....................................................................... 37

*In re Keller,*
  642 F.2d 413 (C.C.P.A. 1981) ......................................................................... 30

*In re Lamberti,*
  545 F.2d 747 (C.C.P.A. 1976) ......................................................................... 37

*In re Longi,*
  759 F.2d 887 (Fed. Cir. 1985) ......................................................................... 38

*In re Merck & Co., Inc.,*
  800 F.2d 1091 (Fed. Cir. 1986) ................................................................... 30, 36

*In re Paulsen,*
  30 F.3d 1475 (Fed. Cir. 1994) ......................................................................... 39

*In re Schneller,*
  397 F.2d 350 (C.C.P.A. 1968) ........................................................... 2, 40, 41, 42

*In re Simon,*
  461 F.2d 1387 (C.C.P.A. 1972) ....................................................................... 30

*In re Van Ornum*,
   686 F.2d 937 (C.C.P.A. 1982) .................................................................................41

*In re Zickendraht*,
   319 F.2d 225 (C.C.P.A. 1963) .................................................................................38

*Karsten Mfg. Corp. v. Cleveland Golf Co.*,
   242 F.3d 1376 (Fed. Cir. 2001).............................................................................29

*Keystone Driller Co. v. General Excavator Co.*,
   290 U.S. 240 (1933)................................................................................................28

*Kimberly-Clark v. Johnson & Johnson*,
   745 F.2d 1437 (Fed. Cir. 1984)..............................................................................11

*LP Mathews LLC v. Bath & Body Works, Inc.*,
   C.A. No. 04-1507-SLR, 2006 WL 3000198 (D. Del. Oct. 19, 2006)....................39

*McKesson Info. Solutions Inc. v. Bridge Med., Inc.*,
   Civ. No. S-02-2669 FCD KJM, 2006 WL 1652518
   (E.D. Cal. June 13, 2006)................................................................................25, 26

*Merck & Co. v. Biocraft Labs., Inc.*,
   874 F.2d 804 (Fed. Cir. 1989)................................................................................37

*Merck & Co., Inc. v. Danbury Pharmacal, Inc.*,
   873 F.2d 1418 (Fed. Cir. 1989)..........................................................................5, 25

*MicroStrategy Inc. v. Business Objects, S.A.*,
   429 F.3d 1344 (Fed. Cir. 2005)..............................................................................34

*Novo Nordisk Pharm., Inc. v. Bio-Technology Gen. Corp.*,
   424 F.3d 1347 (Fed. Cir. 2005)................................................................................7

*Ortho Diagnostic Sys. Inc. v. Miles Inc.*,
   865 F. Supp. 1073 (S.D.N.Y. 1994)......................................................................24

*Rohm & Haas Co. v. Crystal Chem. Co.*,
   722 F.2d 1556 (Fed. Cir. 1983)..............................................................................10

*Semiconductor Energy Lab. Co. v. Samsung Elec. Co.*,
   204 F.3d 1368 (Fed. Cir. 2000)........................................................................15, 16

*Semiconductor Energy Lab. Co. v. Samsung Elec. Co.*,
   24 F. Supp. 2d 537 (E.D. Va. 1998), *aff'd on other grounds*,
   204 F.3d 1368 (Fed. Cir. 2000)..............................................................................11

*South Corp. v. United States*,
   690 F.2d 1368 (Fed. Cir. 1982) ........................................................................................ 41

*Tap Pharm Prods., Inc. v. Owl Pharms., L.L.C.*,
   419 F.3d 1346 (Fed. Cir 2005) ................................................................................. 18, 19

*Truth Hardware Corp. v. Ashland Prods., Inc.*,
   C.A. No. 02-1541-GMS, 2003 WL 22005839 (D. Del. Aug. 19, 2003) ........................ 29

*Yamanouchi Pharm. Co., Ltd v. Danbury Pharmacal, Inc.*,
   231 F.3d 1339 (Fed. Cir. 2000) ....................................................................................... 31

**Statutes**

35 U.S.C. § 102 ........................................................................................................................ 35

35 U.S.C. § 103 .................................................................................................................. 30, 39

35 U.S.C. § 121 ........................................................................................................................ 22

**Rules**

37 C.F.R § 1.2 (1990) ............................................................................................................. 18

37 C.F.R. § 10.18 (1990) ................................................................................................... 12, 23

Fed. R. Civ. P. 15(b) ................................................................................................................ 9

Fed. R. Evid. 702 .................................................................................................................... 34

**Other Authorities**

22 Wright & Graham, FEDERAL PRACTICE AND
   PROCEDURE, Evidence § 5166 ..................................................................................... 39

MPEP § 2001.06(b) ................................................................................................................. 14

MPEP § 2004 ........................................................................................................................... 23

MPEP § 609 ....................................................................................................................... 16, 24

## NATURE AND STAGE OF THE PROCEEDING

This Hatch Waxman Act case was initiated by plaintiffs Bayer AG, Bayer Healthcare AG, and Bayer Pharmaceuticals Corporation (collectively "Bayer") against defendants Dr. Reddy's Laboratories, Ltd. and Dr. Reddy's Laboratories, Inc. (collectively "Reddy") in March of 2004 and a bench trial was held August 7-15, 2006. The parties dispute the validity and enforceability of Bayer's two patents-in-suit, U.S. Patent 4,990,517 ("the '517 patent") and U.S. Patent 5,607,942 ("the '942 patent"). Reddy's Opening Post Trial Brief (D.I. 132) and Plaintiff's Post Trial Brief (D.I. 133) were filed concurrently on October 6, 2006.

Reddy's Opening Post Trial Brief (D.I. 132) is referred to herein as Reddy's "Opening Brief" and is cited: "Reddy Br. at __". Plaintiffs' Opening Post Trial Brief (D.I. 133) is referred to as Bayer's "Opening Brief" and is cited: "Bayer Br. at __". This Responsive Brief is being filed concurrently with Bayer's Responsive Brief.

No substantive replies are scheduled.

## REQUEST FOR CLOSING ARGUMENT

Reddy respectfully requests closing argument at the Court's convenience.

## INTRODUCTION TO REDDY'S RESPONSE

Through a combination of clever wordsmithing and frequent misconstruction of the factual evidence, Bayer has set forth in its Opening Brief a series of arguments calculated to direct the Court's attention away from the critical inequitable conduct issues in this case. A major effort of Reddy in this brief is to correct these misstatements and to bring into focus the real inequitable conduct issues:

- The withheld references were material to the claims of the '434 application as filed <u>and</u> they were material to claims of the '517 patent as issued.

- The inequitable conduct of Dr. Schenke and Dr. Petersen arising from their collective failure to cite the Liebigs Reference in the prosecution of the '434 application is not cured by the withdrawal of claim 19 during the prosecution.

- The evidence is irrefutable that Mr. Horn knew that the Liebigs Reference anticipated one of the original claims of the '434 application before it issued as the '517 patent.

- Submission of the Liebigs Reference to the Patent Office in the divisional application does not constitute disclosure of that reference to the Examiner in the parent application.

- Submission of the "X References" to the Patent Office in a manner calculated so that they would not ordinarily be considered is inconsistent with the duty of candor and disclosure owed to the Patent Office.

- The "X References" were submitted to the Patent Office with the intent that the Examiner be deceived; the fact that it was done promptly emphasizes rather than diminishes this intent.

- The fact that Bayer produced literally hundreds of thousands of documents in discovery does not diminish the significance of those documents which clearly and convincingly demonstrate the inequitable conduct of Dr. Schenke, Dr. Petersen, Dr. Bailly and Mr. Horn.

- *Schneller*-type double patenting is established in patent law jurisprudence and memorialized in the MPEP. Bayer's pronouncement of its demise is premature.

In each case, Bayer would have the Court believe the contrary. An examination of the facts and the law cited by Reddy will lead the Court to reject Bayer's position in each instance.

Reddy's other major effort in this brief is to set the record straight regarding the law which should be applied to the clear and convincing evidence of invalidity.

2

## I.    THE '517 PATENT IS UNENFORCEABLE
## DUE TO INEQUITABLE CONDUCT

### A.    Reddy's inequitable conduct defense
### is not limited to the original claims

It is not "Reddy's principal allegation" that Bayer withheld references that were
only material to "certain claims of the '434 application as originally filed." Bayer Br. at
11. Rather, as Bayer knows well, Reddy asserts that the Liebigs Reference, which was
never cited in the prosecution of the '517 patent, and the three X References, which were
only cited after the issue fee was paid, were highly material to claims that issued in the
'517 patent. Further, Reddy asserts that Liebigs and the three X References were not
before the Examiner of the '517 patent because they were actually or constructively
withheld. Reddy also asserts that persons with a duty of disclosure knew or should have
known that each of these references was material.

### B.    The Liebigs Reference was material
### and was withheld with intent to deceive

#### 1.    Bayer does not address the evidence which shows that
#### the Liebigs Reference was material to claims that issued

The Liebigs Reference was highly material because it could have been used to
reject an issued claim of the '517 patent. *See Dayco Prods., Inc. v. Total Containment,
Inc.*, 329 F.3d 1358, 1365 (Fed. Cir. 2003) (information was "highly material" because it
"could have conceivably served as the basis" for a rejection) (citation omitted). In
particular, and in addition to the fact that it anticipated one of the original claims, Reddy
asserts that the Liebigs Reference was highly material because it could have been used to
reject issued claim 7 of the '517 patent. Bayer, however, does not address, much less
refute, the evidence which shows that Liebigs was material to the issued claims.

As explained more fully in Reddy's Opening Brief, pp. 20-21, the following undisputed evidence shows that the Liebigs Reference was material to the issued claims:

- The Liebigs Reference disclosed the Bayer 5/5 Bicycle;

- Claims 1, 2 and 3 of the issued '517 patent all included compounds with the Bayer 5/5 Bicycle attached at the 7-position;

- Claim 7 of the issued '517 patent claimed a specific compound with the Bayer 5/5 Bicycle at the 7-position;

- If the Bayer 5/5 Bicycle is attached to the 7-position of a known prior art quinolone intermediate, the resulting compound is the exact compound claimed in claim 7 of the issued '517 patent;

- The '517 patent showed the use of the Bayer 5/5 Bicycle to make issued claim 7;

- By asserting in their Inventors Declaration that they were entitled to a claim to the Bayer 5/5 Bicycle, the inventors represented to the Examiner that the Bayer 5/5 Bicycle was not in the prior art; and

- When the Examiner allowed claim 7 of the '517 patent to issue, he had not been told that the Bayer 5/5 Bicycle was in the prior art.

On these undisputed facts, the Liebigs Reference was highly material to at least issued claims 1, 2, 3 and 7 of the '517 patent. As discussed at p. 55 of Reddy's Opening Brief, claim 7 claims a specific compound with the Bayer 5/5 Bicycle attached at the 7-position. DTX 510; Tr. 207:6-13. Clearly, if the Examiner had known that the Bayer 5/5 Bicycle was in the prior art, a fact which was indisputably known to Dr. Schenke, Dr. Petersen, Dr. Bailly, and Mr. Horn, the Examiner could have used the presence of the Bayer 5/5 Bicycle in the prior art to reject issued claim 7. Thus, when deciding whether to allow claim 7 to issue, and especially after the inventors represented to the Examiner that the Bayer 5/5 Bicycle was not in the prior art, a reasonable Examiner would have surely wanted to know that the Bayer 5/5 Bicycle was in the prior art.

4

That claim 7 might have issued over the Liebigs Reference would not defeat Reddy's clear and convincing evidence of high materiality to the issued claim. Materiality is not a "but for" test of whether the claim would have issued over the withheld reference. *Merck & Co., Inc. v. Danbury Pharmacal, Inc.* 873 F.2d 1418, 1421 (Fed. Cir. 1989) (rejecting patentee's argument which "presupposes a 'but for' standard of materiality"). Rather, the Liebigs Reference was highly material because it could have been used to reject issued claim 7.

In lieu of addressing Reddy's undisputed evidence regarding the materiality of the Liebigs Reference to at least issued claim 7, Bayer complains that "Reddy offered no expert testimony that Liebig's was material to the claims as issued. . . ." Bayer Br. at 17. However, it is not necessary for an expert to recite the magic words that a particular reference "was material". Nor would such testimony have even been proper given the Court's Standing Order regarding so-called "patent law experts". Manifestly, it is within the fact finding ability of the Court to determine on the undisputed record whether the Liebigs Reference was material. It is misleading for Bayer to suggest otherwise.

Further, Bayer's insinuation that Dr. LaVoie did not testify to the importance of the Liebigs Reference, Bayer Br. at 17, plainly misstates the record. In particular, Dr. LaVoie testified about the use of bicycles at the 7-position of prior art quinolones, *e.g.* Tr. 900:19-25, that the Bayer 5/5 Bicycle was a known bicycle, Tr. 938:9-10, and that the '517 patent claims the result of "reacting it with a known entity that's known to be a method for making quinolone antibiotics." Tr. 938:9-12. This testimony by Dr. LaVoie, which confirms the high materiality of the Bayer 5/5 Bicycle to issued claim 7, was neither disputed nor challenged at trial.

Thus, there is clear and convincing evidence that the Liebigs Reference was highly material to claims that issued in the '517 patent. In <u>addition</u>, there can be no dispute that the Liebigs Reference, because it actually anticipated one of the original claims, was of the highest materiality to the application as filed. *Fox Indus., Inc. v. Structural Pres. Sys., Inc.,* 922 F.2d 801, 804 (Fed. Cir. 1990) ("A finding that a withheld reference anticipates a claim in a patent satisfies the most stringent standard of materiality.").

### 2. The Liebigs Reference was withheld with intent to deceive

Bayer's sophistry does nothing to change the evidence which shows that the Liebigs Reference was withheld with intent to deceive.

#### a. Liebigs was withheld with intent to deceive when the application for the '517 patent was filed

As expected, Bayer relies on "circular finger pointing" to try to evade the clear and convincing evidence that Liebigs was withheld with intent to deceive at the time the application for the '517 patent was filed at the United States Patent Office. Bayer's circular logic is that the person who really knew about the Liebigs Reference, Dr. Schenke, didn't really know all that much about his application for the '517 patent and that the person who really knew about the application for the '517 patent, Dr. Petersen, didn't really know about the Liebigs Reference. Bayer Br. at 18 n.1. Bayer's "not me" defense runs afoul of Federal Circuit precedent that refuses to allow each individual with a duty of disclosure to avoid the consequences of their wrongful acts by shifting their responsibility to someone else. *Brasseler, U.S.A. I, L.P. v. Stryker Sales Corp.,* 267 F.3d 1370, 1380 (Fed. Cir. 2001) (applicants and attorneys cannot rely on "circular logic" of each asserting that the other failed to provide them with the requisite information such

6

that each is absolved of the duty of disclosure); *Novo Nordisk Pharm., Inc. v. Bio-Technology Gen. Corp.*, 424 F.3d 1347, 1362 (Fed. Cir. 2005).

Circular finger pointing notwithstanding, there is ample evidence that Dr. Schenke and Dr. Petersen were both aware that the Bayer 5/5 Bicycle was material to their application for the '517 patent at the time it was filed and that they both knew that the Bayer 5/5 Bicycle was disclosed in the Liebigs Reference.

First, Bayer cannot escape from the fact that both Dr. Schenke and Dr. Petersen signed an Inventors Declaration, DTX 74, where they explicitly stated under penalty of perjury that they had reviewed and that they understood the specification of their application, "including the claims". Any chemist with the training of Dr. Schenke or Dr. Petersen who reviewed and understood the application would have known that the Bayer 5/5 Bicycle was important to the application and the claims. *See* Reddy Br. at 20-21.

Second, Bayer admits that Dr. Petersen was "primarily responsible for drafting the claims and specification." Bayer Br. at 18 n.4. It "strains credulity" for Bayer to assert that Dr. Petersen did not know the importance of the Bayer 5/5 Bicycle to his own application and claims. *See eSpeed, Inc. v. Brokertec USA, L.L.C.*, 417 F. Supp. 2d 580, 594 (D. Del. 2006) (Jordan, J.) ("It strains credulity to the snapping point to claim that this earlier stage in their systems development simply slipped the applicants' minds.").

Third, Bayer does not dispute that before Dr. Schenke filed his application for the '517 patent at the United States Patent Office he told the members of the Bayer quinolone project, including Dr. Petersen, that the Bayer 5/5 Bicycle was one of the compounds that was important to the application that formed the basis for the '517 patent. DTX 76 at p. 5. Bayer does nothing whatsoever to address this "smoking gun" evidence which

unambiguously establishes that Dr. Schenke was fully cognizant of the fact that the Bayer 5/5 Bicycle was important to his application for the '517 patent.

Finally, Bayer does not dispute the fact that both Dr. Schenke and Dr. Petersen were aware that the Bayer 5/5 Bicycle had been published in the Liebigs Reference. Nor could they: Dr. Schenke and Dr. Petersen were the two co-inventors of a patent application which stated on its very first page that the Bayer 5/5 Bicycle was in the prior art precisely because it had been published in Liebigs. PTX 15 at DRLMOX 042737.

### i.    Bayer's shifting position on whether Dr. Schenke did or did not review his claims is not credible

Bayer finds itself between a rock and a hard place on the issue of whether Dr. Schenke did or did not review and understand the claims in his application for the '517 patent. On the one hand, if Dr. Schenke's declaration was true, as the Court should assume, then Dr. Schenke reviewed the claims of his application, he understood the claims of his application and he understood that the Bayer 5/5 Bicycle was material. Tr. 135:9-19. Being aware that the Bayer 5/5 Bicycle was material, Dr. Schenke would have had no excuse for not disclosing its prior publication in the Liebigs Reference.

On the other hand, if Dr. Schenke did not review and understand his claims, Dr. Schenke's declaration was false and Bayer would be subject to a finding of inequitable conduct based on the execution and filing of a false Inventors Declaration. Reddy Br. at 60-62.

Stuck on the horns of this dilemma, Bayer is forced to dance around the issue of whether or not Dr. Schenke reviewed and understood his claims before his application was filed. At trial, it was Bayer who called Dr. Schenke first and it was Bayer who elicited the dramatic testimony that Dr. Schenke did not review the claims of his

application. Tr. 96:25 ("No, I didn't review the claims."). Dr. Schenke justified his

flagrant breach of his duty of disclosure on the ground that it was Dr. Petersen's task to

review the claims. Tr. 96:25-97:2. Now, in its Opening Brief, Bayer takes the opposite

position and relies on Dr. Schenke's contrary testimony that it was in fact Dr. Schenke's

"normal practice" to review the claims. Bayer Br. at 24. Bayer and Dr. Schenke cannot

have it both ways.

Reddy's position is that the Court should rely on Dr. Schenke's Inventors

Declaration, DTX 74, and find that at the time the application was filed Dr. Schenke did

indeed review and understand his application, including his claims. Dr. Schenke's

declaration is clear and convincing evidence that he knew that the Bayer 5/5 Bicycle was

material. Adding this evidence to the smoking gun at page 5 of DTX 76, where Dr.

Schenke drew a picture of the Bayer 5/5 Bicycle and where he told his co-inventors of its

importance to the application for the '517 patent, the Court is compelled to conclude that

Dr. Schenke did, in fact, understand what he said he understood. Because there is clear

and convincing evidence that Dr. Schenke knew that the Bayer 5/5 Bicycle was material

and there is no dispute that Dr. Schenke knew that the Bayer 5/5 Bicycle was disclosed in

the Liebigs Reference, the only reason why Dr. Schenke withheld the Liebigs Reference

was to deceive the Examiner at the time the application for the '517 patent was filed.

As Bayer now appears to concede that Dr. Schenke really did review and really

did understand the claims of his application for the '517 patent, there is no need for

Reddy to amend its pleadings pursuant to Fed. R. Civ. P. 15(b). If, however, Bayer again

switches course and chooses to take the position that Dr. Schenke did not review and

understand the claims of his application, Reddy renews its motion that the pleadings

should be amended to allege that the execution and filing of a false Inventors Declaration

constitutes inequitable conduct that renders the '517 patent unenforceable. *See* Reddy Br.

at 60-62. Because the '942 patent relies on the very same Inventors Declaration, the

falsity of the declaration would render the '942 patent unenforceable as well.

> **ii.    The fortuitous cancellation of the claim
> anticipated by Liebigs did not cure the
> inequitable conduct**

Bayer would have the Court believe that Dr. Schenke and Dr. Petersen get a free

pass for their inequitable conduct with respect to the Liebigs Reference because the

original claim that was anticipated by the Liebigs Reference was "removed from the case

as a result of the restriction requirement before any substantive prosecution took place."

Bayer Br. at 17. Bayer is incorrect. Dr. Schenke and Dr. Petersen committed inequitable

conduct when they declared they were entitled to claim the Bayer 5/5 Bicycle although

they knew it was disclosed in the prior art. This misrepresentation could have been the

factor which induced the Examiner to allow the claims that covered compounds with the

Bayer 5/5 Bicycle attached at the 7-position. Because nothing was done in the

prosecution of the '517 patent to alert the Examiner to this misrepresentation, the

cancellation of the anticipated claim was not a cure. *Rohm & Haas Co. v. Crystal Chem.
Co.*, 722 F.2d 1556, 1573 (Fed. Cir. 1983) (any cure must enable the Examiner to

reconsider any decision that might have been affected by the misrepresentation).

Moreover, the Federal Circuit has flatly rejected the proposition, advanced by

Bayer here, that inequitable conduct with respect to an original claim of a patent

application is automatically excused if the claim to which the inequitable conduct was

directed is cancelled <u>after</u> the inequitable conduct was committed. *Baxter Int'l, Inc. v.*

*McGaw, Inc.*, 149 F.3d 1321, 1332 (Fed. Cir. 1998) ("*Fox* and *Driscoll* clearly stand for the proposition that cancellation or amendment of a claim 'tainted' by inequitable conduct will not excuse the patentee's intentional failure to disclose material references."); *Fox*, 922 F.2d at 804 (applicant's attorney "had an obligation to disclose the brochure to the PTO notwithstanding the fact that none of the claims issued in the form in which he drafted them"). "A fortuitous rejection does not cure a breach of the duty of candor. *Id.* (citing *Driscoll v. Cebalo*, 731 F.2d 878, 885 (Fed. Cir. 1984)). As noted by the Federal Circuit in *Fox,* the opinion in *Kimberly-Clark v. Johnson & Johnson,* 745 F.2d 1437 (Fed. Cir. 1984), a case relied on by Bayer, Bayer Br. at 15-17, does not hold that a fortuitous rejection effects a cure. *Fox*, 922 F.2d at 804.

Contrary to Bayer's argument, a cure of inequitable conduct already committed "cannot be achieved through manipulation of patent prosecution procedures, such as canceling or amending claims or filing continuation and divisional applications." *Semiconductor Energy Lab. Co. v. Samsung Elec. Co.*, 24 F. Supp. 2d 537, 545 (E.D. Va. 1998), *aff'd on other grounds,* 204 F.3d 1368 (Fed. Cir. 2000).

Simply put, the Liebigs Reference anticipated original claim 19 of the application for the '517 patent at the time it was filed and Dr. Schenke and Dr. Petersen, who were aware of its materiality, withheld that publication with intent to deceive. The fortuitous cancellation of the anticipated claim 19 after the restriction requirement did nothing to cure their inequitable conduct. *Fox*, 922 F.2d at 804. In addition, the Liebigs Reference remained highly material to the application for the '517 patent throughout its prosecution, yet it was never disclosed to the Patent Office in the context of that application.

b.    **Liebigs was withheld with intent to deceive**
**after the '517 patent was allowed**

Bayer would have the Court believe that "it is inconceivable that Mr. Horn ever

realized that" the Liebigs Reference anticipated one of the original claims of the '517

patent. Bayer Br. at 22. Bayer's statement is a brazen misstatement of the record. The

evidentiary record plainly shows that between the time that the claims of the '517 patent

were allowed and the time that Mr. Horn paid the issue fee, Mr. Horn absolutely knew

that original claim 19 of the application for the '517 patent was anticipated by the

disclosure of the Bayer 5/5 Bicycle in the Liebigs Reference. The indisputable evidence

comes in the form of a Preliminary Amendment signed and filed by Mr. Horn on October

1, 1990 in the division application to the '517 patent. DTX 98 at BL001-011201 ("Claim

19 has been amended to delete therefrom the compound shown in Liebig's Ann. der

Chemie, Vol. 677 (1964) page 155, formula VIII."). Mr. Horn clearly knew that the

Liebigs Reference disclosed the Bayer 5/5 Bicycle and that it anticipated original claim

19 because his signature on the amendment was a certification that he had in fact read the

amendment he was filing. 37 C.F.R. § 10.18 (1990). Although Mr. Horn did submit the

Liebigs Reference in the <u>division</u> of the '517 patent, he withheld the Liebigs Reference

from the prosecution of the '517 patent with intent to deceive.

Mr. Horn's failure to submit the Liebigs Reference in the prosecution of the '517

patent is a departure from his usual practice which confirms his awareness and his intent

to deceive. If Mr. Briscoe's testimony is to be believed, Mr. Horn would have submitted

the Liebigs Reference in the prosecution of the '517 patent without determining whether

or not it was material. Tr. 732:4-9. Knowing that it anticipated one of the original

claims, Mr. Horn's withholding of the Liebigs Reference from the prosecution of the
'517 patent was a deliberate choice. A choice that was motivated by intent to deceive.

###    3.    The Liebigs Reference was not submitted to or considered by the Examiner of the '517 patent before the patent issued

Bayer would have the Court believe that there can be no inequitable conduct with
respect to the Liebigs Reference because Mr. Horn's October 1, 1990 Preliminary
Amendment in the division to the '517 patent "informed the examiner" of the application
for the '517 patent that original claim 19 was anticipated by the Liebigs Reference.
Bayer Br. at 19. Bayer's assertion does not even rise to the level of a "half truth." Yes,
the amendment was submitted to the Patent Office in a division of the '517 patent. But
there is no evidence that Mr. Horn ever submitted a copy of the amendment in the
prosecution of the '517 patent; there is no evidence that the amendment was ever
considered in regard to the '517 patent; and there is no evidence that the Liebigs
Reference was considered in the division until after the '517 patent issued. Most
significantly, when Mr. Horn filed the amendment in the division application, he did not
direct it to the attention of the Examiner of the '517 patent. Rather, he left a blank space
in the spot reserved for the Examiner's name. DTX 98 at BL0001-011200.

Thus, when Mr. Horn submitted the Liebigs Reference in the division application,
the division was not before "the same examiner" as the application for the '517 patent. In
fact, the division was not yet before any examiner. Bayer asserts that disclosure of a
reference in a co-pending application negates "even a threshold level of intent" and
"precludes a finding of inequitable conduct." Bayer Br. at 19-20. However, this
principle only applies, if at all, if the applications were "pending before the same
examiner at the very same time." *FMC Corp. v. Hennessey Indus., Inc.*, 836 F.2d 521,

526 (Fed. Cir. 1987). That was not the case here. Here, the division application ended up being before "the same examiner" only <u>after</u> the '517 patent had safely issued.

Moreover, for all practical purposes, the applications were not really "co-pending" because prosecution on the merits of the '517 patent had already ended by the time Mr. Horn submitted the Liebigs Reference in the division. PTX 2 at BL020-001213. At the time the '517 patent issued, there is no evidence that any substantive prosecution had started in the division or that an Examiner had even been assigned to the division. Between the time that he submitted the Liebigs Reference in the division and the time the '517 patent issued, Mr. Horn had no basis to conclude that the Liebigs Reference was before the Examiner of the '517 patent and there is no evidence that it was.

Finally, even if Mr. Horn had actually known that the division would be handled by the same Examiner, any practitioner as experienced as Mr. Horn knew or should have known that he still had a duty to disclose the Liebigs Reference in the parent application because the MPEP informed practitioners that it is improper for an applicant to assume that an Examiner keeps in his mind all of the art cited to him in all of his applications. DTX 188 at DRLMOX 041639, MPEP § 2001.06(b) ("[W]e think it is unfair to the busy examiner, no matter how diligent and well informed he may be, to assume that he retains details of every pending file in his mind when he is reviewing a particular application . . . [T]he applicant has the burden of presenting the examiner with a complete and accurate record to support the allowance of letters patent."); *Eisai Co., Ltd v. Dr Reddy's Labs., Ltd*, No. 03 Civ. 9053(GEL), 2006 WL 2872584, at *11 n.26 (S.D.N.Y. Oct. 6, 2006) (rationale of the affirmative duty to disclose is "to place the onus of assembling material

14

information on the one seeking to benefit rather than on the already burdened examiner.").

Mr. Horn's deliberate decision not to submit the Liebigs Reference in the application for the '517 patent at the time he submitted a copy of it in the division application is culpable conduct which confirms that Mr. Horn withheld the Liebigs Reference from the prosecution of the '517 patent with intent to deceive.

### C.     The X References were material and were withheld with intent to deceive

#### 1.     Mere submission of the X References does not preclude inequitable conduct

Bayer would have the Court believe that there can be no inequitable conduct with respect to the three X References simply because Bayer "submitted" the X References to the Patent Office. Bayer Br. at 31. According to Bayer, submission of the X References to the Patent Office "is dispositive as a matter of law". *Id*. Bayer is incorrect. Even though the X References were transmitted to the Patent Office, Mr. Horn's failure to follow the MPEP's procedure for submission after payment of the issue fee was a constructive withholding which supports a finding of inequitable conduct.

The Federal Circuit's opinion in *Semiconductor Energy Lab. Co. v. Samsung Elec. Co.*, 204 F.3d 1368 (Fed. Cir. 2000), is instructive on the law of constructive withholding. In *Semiconductor*, a Japanese-speaking applicant submitted an entire Japanese reference and a partial English translation that focused on less material portions of the reference. *Id*. at 1377. Although the entire Japanese reference had been "submitted," the Federal Circuit nonetheless affirmed the district court's finding of

15

inequitable conduct because the applicant "constructively withheld the reference from the PTO". *Id.*

Similar to what Bayer argues before this Court, Bayer Br. at 31, the applicant in *Semiconductor* argued that because "it submitted" the Japanese reference to the Patent Office "it cannot be deemed to have withheld the reference from the examiner". *Semiconductor*, 204 F.3d at 1377. The Federal Circuit flatly rejected the argument that mere submission is enough. Rather, in affirming the lower court's finding of inequitable conduct the Federal Circuit concluded that the manner in which the applicant submitted the reference "hardly satisfies the duty of candor required of every applicant before the PTO." *Id.*

Here, Mr. Horn's late submission of the X References was also a constructive withholding which failed to satisfy his duty of disclosure. Mr. Horn knew of the potential materiality of the X References because they had been cited as "X" references in the European Search Report and Mr. Horn was a chemical engineer, DTX 333 at p. 2090B, with immense experience in prosecuting patents. It can also be concluded that Mr. Horn knew that submitting the X References improperly would decrease the probability that they would be considered by the Examiner down to the point that they would "not ordinarily be considered". MPEP § 609 (DTX 97 at 600-66). The result here should be the same as the result in *Semiconductor*. The Court should find that Mr. Horn "consciously decided" to submit the X References with the deceptive intent that in the ordinary course they would not be considered. *See Semiconductor*, 204 F.3d at 1376.

16

### 2.    Mr. Horn's failure to follow his usual practice shows that he was focused on the potential materiality of the X References

Bayer asserts that there was "nothing unusual" about Mr. Horn's submission of the X References. Bayer Br. at 35. Again Bayer is misstating the record. At trial, the undisputed evidence was that Mr. Horn's usual practice would have been to submit the X References "as soon as possible" in the division application, Tr. 731:14-18, without making any determination as to their materiality, Tr. 732:4-9. However, it is clear that Mr. Horn did not follow his usual practice in the division. In particular, when he received the X References from Bayer he did not submit them "as soon as possible." Instead, he waited about three months. Tr. 777:14-778:4. Moreover, instead of not giving a second thought to the materiality of the X References, Mr. Horn submitted an explanation of why the X References were not important, but only in regards to the division. Tr. 851:22-852:5. Finally, Bayer's Privilege Log confirms that Mr. Horn and his clients at Bayer were quite concerned about the materiality of X References to the allowed application that was set to issue as the '517 patent. DTX 214 at 36, 39, and 41.

Thus, the Court should find that Mr. Horn knew of the potential materiality of the X References to the application for the '517 patent, that with intent to deceive he submitted them in a way calculated to ensure that in the ordinary course they would not be considered, and that with intent to deceive he allowed the claims of the '517 patent to issue knowing that the references had not been considered.

### 3.    Mr. Horn did not discuss the X References with the Examiner before the '517 patent issued

Bayer would have the Court believe that Mr. Horn acted in good faith with respect to the late-submitted references because he must have had a telephone

17

communication with the Examiner of the '517 patent about the X References before the patent issued. Bayer Br. at 32-33 n.12. There is, however, no record of any such communication either in Mr. Horn's files or the prosecution history of the '517 patent. Moreover, the Code of Federal Regulations mandated that "[t]he action of the Patent and Trademark Office will be based exclusively on the written record in the Office [and that] [n]o attention will be paid to any alleged oral promise, stipulation, or understanding in relation to which there is disagreement or doubt." 37 C.F.R § 1.2 (1990). This regulation, which is still in effect, makes good sense because it prevents practitioners and their clients from using the possibility that there was an undocumented informal telephone call to avoid a finding of deceptive intent when the written record shows that things were not done as they should have been.

### 4.    A "prompt" submission does not negate intent to deceive

Bayer would have the Court find that there can be no inequitable conduct regarding the submission of the three X References after the issue fee was paid simply because they were "promptly submitted to the PTO" after receipt of the European Search Report. Bayer Br. at 25. Bayer is incorrect. A submission made with intent to deceive can surely be the basis of inequitable conduct even if it was promptly made. The issue before the Court is whether Mr. Horn submitted the X References with the deceptive intent that in the ordinary course they would not be considered. The issue is not whether the X References were moved off of Mr. Horn's "backlogged" desk quickly. Bayer Br. at 32.

The Federal Circuit's opinion in *Tap Pharm Prods., Inc. v. Owl Pharms., L.L.C.*, 419 F.3d 1346 (Fed. Cir 2005), cited in Bayer's Opening Brief at 31, is readily

distinguishable. Unlike here, where the late-cited references were cited in the European

Search Report as highly material "X" references, in *Tap* the European Search Report

characterized the late-cited reference "as merely technological background and thus not

material to patentability." *Id.* at 1352. Also, unlike here, there is no indication in *Tap*

that the withheld reference anticipated any of the original claims. Moreover, unlike here,

the late-cited reference in *Tap* was clearly cumulative of the other art. *Id.* As discussed

below, the late-cited X References were not cumulative to the prior art that was actually

before the Examiner of the '517 patent.

### 5.    There is no evidence that the X References were cumulative

The X References were not "cumulative" to the art already before the Examiner.

Nonetheless, Bayer bases a "cumulative" argument on testimony by Dr. Taylor that the

Culbertson reference was "the closest prior art". Bayer Br. at 26. Thus, Bayer urges the

Court to hold erroneously that anything which is not the closest prior art is automatically

cumulative. However, this is not the law and Bayer cites no authority to support its

illogical premise. Rather, the MPEP clearly stated that the duty of disclosure "may still

require the submission of prior art or other information which is not as close as that of the

record." DTX 188 at DRLMOX 041642 (emphasis added). The rule proposed by Bayer,

that everything but the closest art is cumulative, would stand the law of materiality on its

head.

Consider for example a situation where a claim has 10 elements and the "closest"

art discloses an embodiment with elements 1 through 9. Clearly, if another "less close"

reference disclosed the missing element 10 there would be no argument that the reference

which disclosed the missing element was cumulative. *See Critikon, Inc. v. Becton*

*Dickinson Vascular Access, Inc.*, 120 F.3d 1253, 1257 (Fed. Cir. 1997) (withheld reference that disclosed point of novelty was material). Here, Dr. Taylor admitted that Example 1-130 of the Sankyo '206 Application, *i.e.*, one of the X References, disclosed the single element of the '517 patent that was missing from the Culbertson Reference.

In particular, Dr. Taylor testified that the difference between the Culbertson Reference and the '517 patent was the position of the nitrogen in the 7-position substituent. PTX 2198; Tr. 1446:5-7. Indeed, Dr. Taylor described alteration of the nitrogen's position as a "drastic structural change", Tr. 1446:5-7, and he admitted that "the position of the nitrogen is everything", Tr. 1535:21-1536:5. Following this admission, Dr. Taylor was shown DTX 527 and was asked whether Example 1-130 of the Sankyo '206 Application had the nitrogen in the correct position relative to the pyrrolidine ring.

At first Dr. Taylor refused to give a direct answer to this straightforward question. Instead he gave the evasive and illogical response that he considered the position of the nitrogen to be "irrelevant". Tr. 1536:11 ("I think that's irrelevant."). When pressed, however, Dr. Taylor reluctantly admitted that in Example 1-130 of the Sankyo '206 Application the nitrogen was in fact in the same position relative to the pyrrolidine ring as the nitrogen in the 7-position substituents of the '517 patent. Tr. 1536:14. Thus, the Sankyo '206 Application discloses the single missing element of the Culbertson Reference and the Culbertson Reference cannot cause the Sankyo '206 Application to be cumulative. *See Critikon,* 120 F.3d at 1258.

20

**D.     The Examiner could have used the admission in Mr. Horn's traverse to reject the allowed claims over the X References**

Mr. Horn's traverse of the restriction requirement issued by the Examiner in the Examiner's Action of April 4, 1990 made the three X References highly material because the admission made in support of the traverse could have been used to reject the elected subject matter over the three X References. Bayer, however, maintains that Mr. Horn only traversed on the ground of "unity of invention" and that Mr. Horn "did <u>not</u> traverse on the ground that the compounds were not patentably distinct." Bayer Br. at 30 (emphasis in the original). Bayer is incorrect. The Examiner's restriction requirement was explicitly based on the ground that "the inventions are deemed patentably distinct", PTX 2 at BL020-000855, and it makes no sense for Bayer to argue that Mr. Horn was not responding to this restriction.

Bayer is correct to the extent it is arguing that the Examiner's Action of April 4, 1990 also included a <u>rejection</u> of certain claims "for being drawn to an improper Markush [Group]". PTX 2 at BL020-000858. However, the evidence is clear that Mr. Horn's traverse was in response to the <u>restriction requirement</u> because the traverse was directed to a different set of claims compared to the claims that were subject to the Markush rejection. Specifically, the traverse of the restriction requirement was directed to claims 1 to 3, <u>7 to 10</u> and 12 to 18, PTX 2 at BL020-000893 ("Applicants affirm their election of Group IV, claims 1 to 3, 7 to 10 and 12 to 18") and the Markush rejection was not directed to claims <u>7 to 10</u>, PTX 2 at BL020-000858.

It is true that the rejection based on an improper Markush Group could have been traversed by arguing that there was "unity of invention". *In re Harnisch*, 631 F.2d 716,

722 (C.C.P.A. 1980). However, in *Harnisch* the court was careful to point out that the

"'unity of invention' concept is not to be confused with" restriction practice under 35

U.S.C. § 121. *Id.* Here, Mr. Horn responded to an Examiner's Action which clearly

included a restriction requirement under 35 U.S.C. § 121, PTX 2 at BL020-000853, <u>and</u> a

rejection for an improper Markush Group, *id.* at BL020-000858. If anyone knew the

difference between a 35 U.S.C. § 121 restriction requirement based on patentable

distinctness and a rejection based on an improper Markush Group it was Mr. Horn

because Mr. Horn was the very attorney who represented the applicant in the *Harnisch*

action where this distinction was drawn. *In re Harnisch*, 631 F.2d at 716.

Thus, Mr. Horn knew very well that he was traversing a restriction requirement

based on the Examiner's conclusion that "the inventions are deemed patentably distinct".

PTX 2 at BL020-000855. Mr. Horn also knew that the Examiner could construe his

admission of structural similarity as an admission that the non-elected and elected subject

matter were obvious variants. *See In re Dillon*, 919 F.2d 688, 692-93 (Fed. Cir. 1990)

(en banc) (structural similarity standing alone is enough to form the basis of a *prima facie*

obviousness rejection). Because the Examiner explicitly told Mr. Horn that following a

traverse of the restriction requirement any art that anticipated the non-elected subject

matter could be used to reject the elected subject matter, Mr. Horn was clearly on notice

that the Examiner would have wanted to know that each of the three X References

anticipated the non-elected subject matter from original claim 1. *See Ferring B.V. v. Barr*

*Labs., Inc.,* 437 F.3d 1181, 1190 (Fed. Cir. 2006) (affirming summary judgment of

inequitable conduct when the applicants were "on notice" that the Examiner wanted an

affidavit from a disinterested expert and they concealed declarant's ties to the applicant),

*cert denied*, 75 U.S.L.W. 3121 (U.S. Oct. 30, 2006).

    **E.**    **Mr. Horn knew or should have known about the MPEP's requirements for submitting references after payment of the issue fee**

In an effort to convince the Court that Mr. Horn lacked intent to deceive the

Patent Office, Bayer portrays this experienced and prominent patent attorney as a

practitioner who disregarded the governing regulations and the MPEP. For example:

Bayer states that Mr. Horn "did minimal work on Bayer applications," that he

would have spent "at most a half an hour on any given Bayer application before filing it"

and that it "would have been contrary to his usual practice in prosecuting Bayer

applications to have substantively reviewed the claims." Bayer Br. at 22. However,

during the 1990-91 time period, 37 C.F.R. § 10.18 provided that:

> (a) Every paper filed by a practitioner representing an applicant or party to a proceeding in the Office must bear the signature of, and be personally signed by, such practitioner except those papers which are required to be signed by the applicant or party. The signature of practitioner to a paper filed by him or her, constitutes a certificate that:
>
> (1) The paper has been read by the practitioner;
>
> . . .
>
> (3) To the best of his or her knowledge, information, and belief, there is good ground to support the paper . . . .

37 C.F.R. § 10.18 (1990) (emphasis added). Moreover, according to Chapter 2004 ¶ 7 of

the MPEP:

> It is particularly important for an attorney or agent to review, before filing, an application which was prepared by someone else, e.g., a foreign application. It is also important that an attorney or agent make sure that foreign clients, including foreign applicants, attorneys, and agents understand the requirements of the duty of disclosure, and that the U.S. attorney or agent review any information disclosure statements or citations to ensure that compliance with § 1.56 is present . . . .

23

DTX 188 at DRLMOX 041642. Bayer's argument that Mr. Horn was too busy and too distracted to do anything wrong is not a defense to inequitable conduct.

Citing testimony from Mr. Briscoe, Bayer also argues that there is no evidence that Mr. Horn "was even aware" or should have been aware of the provisions in MPEP § 609 concerning the submission of information after payment of the issue fee, as the "MPEP is a voluminous text" with which no patent practitioner could be expected to be completely familiar, and which, in any event, offers only "guidelines," not "requirements". Bayer Br. at 33-34 & n.13. To the contrary, the Federal Circuit has stated that, "[A]lthough [the MPEP] does not have the force of law, [it] is well known to those registered to practice in the PTO and reflects the presumptions under which the PTO operates." *Critikon,* 120 F.3d at 1253, 1257. Notably, in a recent decision from the Southern District of New York, Judge Lynch denied a patentee's motion for summary judgment of no inequitable conduct and observed that:

> [T]he MPEP serves as a common articulation of patenting norms,
> indicating what information is appropriately considered material and
> reflecting on the intentions of an applicant who does not follow it. Thus,
> while a violation of standards set forth in the MPEP does not *ipso facto*
> constitute sufficient proof of inequitable conduct, courts appropriately take
> note of it as evidence on these subjects.

*Eisai Co., Ltd. v. Dr. Reddy's Labs., Ltd.,* No. 03 Civ 0953(GEL), 2006 WL 2872584, at *10 n.22 (S.D.N.Y. Oct. 6, 2006); *see also Ortho Diagnostic Sys. Inc. v. Miles Inc.,* 865 F. Supp. 1073, 1082 (S.D.N.Y. 1994) (based on the then-current MPEP rule for submission of art after a notice of allowance, the court found that "applicants' experienced patent attorney knew or should have known that in these circumstances the

additional art would not be considered by the PTO"). Here, Mr. Horn's failure to follow the MPEP is evidence of his intent to deceive.

Bayer further argues that it should be applauded for its quick turnaround in submitting the X References "given the backlog of paper in Mr. Horn's office." Bayer Br. at 32. However, the fact that his office may have been backlogged is no excuse for Mr. Horn's failure to comply with his duty of disclosure. *See McKesson Info. Solutions Inc. v. Bridge Med., Inc.*, Civ. No. S-02-2669 FCD KJM, 2006 WL 1652518, at *21 (E.D. Cal. June 13, 2006) ("Attorneys cannot insulate themselves against charges of inequitable conduct by instituting policies that prevent them from complying with the law. . ."); *FMC Corp. v. Hennessy Indus., Inc.*, 836 F.2d 521, 526 n.6 (Fed. Cir. 1987) ("[O]ne should not be able to cultivate ignorance, or disregard numerous warnings that material information or prior art may exist, merely to avoid actual knowledge of that information or prior art.").

Mr. Horn was clearly on notice that his failure to follow the MPEP's procedures for citing art after the issue fee was paid would drastically reduce the probability that the X References would be considered. It is reasonable to infer that Mr. Horn intended the expected result of his improper submission and the Court should find that Mr. Horn intended to deceive the Examiner of the '517 patent concerning the X References. *See Merck,* 873 F.2d at 1422 (intent "is most often proven by 'a showing of acts the natural consequences of which are presumably intended by the actor.'" (citation omitted)).

Here, the natural consequence of Mr. Horn's conduct was that the X References would not ordinarily be considered and the Court should infer that this was Mr. Horn's intent.

**F.    The record shows a pattern of misconduct**

Bayer would have the Court believe that Reddy bases its inequitable conduct case on "a few insignificant documents" from "Bayer's voluminous production" which show a casual knowledge of the three X References. Bayer Brief at 36. Bayer's position is a smokescreen, a diversion and inaccurate to boot. These documents are not "insignificant". Rather, these documents show a pattern of nondisclosure with respect to the X References and support a finding of inequitable conduct. *See McKesson*, 2006 WL 1652518, at *24 ("A pattern of material nondisclosures, such as present here, weighs firmly in favor of unenforceability.").

The pattern evidenced by these so-called "insignificant documents" includes the following culpable conduct by Dr. Schenke, Dr. Petersen, Dr. Bailly and Mr. Horn:

- Dr. Petersen's failure to disclose the Egawa Article and the Dainippon Abstract to the United States Patent Office despite the fact that Dr. Schenke sent Dr. Petersen a memorandum about the importance of those references, DTX 5, and despite the fact that Dr. Schenke testified that Dr. Petersen should have disclosed those references, Tr. 189:15-192:7.

- Dr. Schenke's failure to disclose the "Ube/Sankyo" publication even though Dr. Schenke was disappointed that it anticipated some of his work for the Bayer quinolone project, Tr. 120:24-121:8.

- Dr. Petersen's failure to disclose the Sankyo '206 Application even though he used an intermediate that he knew to be disclosed in that reference to make moxifloxacin for the first time during the prosecution of the '517 patent, JTX 1 at ¶¶ 63-64; Tr. 445:10-446:2; PTX 1079 at BL008-012394.

- The failure of Dr. Petersen, Dr. Bailly and Mr. Horn to disclose the Sankyo '206 Application in the prosecution of the '517 patent even though they knew that Dr. Petersen's co-pending quinolone patent application had been rejected over the Sankyo '206 Application, Tr. 308:3-309:5; 551:6-552:3, 625:23-626:20, 627:3-18, 628:2-7.

These instances are not "insignificant" and they are too many for this Court to ignore. As the Federal Circuit has recognized:

> [A] patentee facing a high level of materiality and clear proof that it knew
> or should have known of that materiality, can expect to find it difficult to
> establish 'subjective good faith' sufficient to prevent the drawing of an
> inference of intent to mislead. A mere denial of intent to mislead (which
> would defeat every effort to establish inequitable conduct) will not suffice
> in such circumstances.

*Critikon*, 120 F.3d at 1257. Moreover, it is certainly appropriate for the Court to consider

Bayer's pattern of non-disclosure. *See Ferring*, 437 F.3d at 1194 (finding it important

that "there were multiple omissions over a long period of time – a fact that heightens the

seriousness of the conduct.").

The pattern of non-disclosure, including Dr. Schenke's and Dr. Petersen's

withholding of the Liebigs Reference when the application for the '517 patent was filed,

Mr. Horn's withholding of the Liebigs Reference before the '517 patent issued, Mr.

Horn's deceptive submission of the three X References after the issue fee for the '517

patent was paid, and the repeated non-disclosure over a long period of time as evidenced

by Bayer's "insignificant" documents, negates any possibility that Bayer's course of

conduct can be written off as a series of coincidences. Rather, Bayer's course of conduct

compels a finding of inequitable conduct.

In the final analysis, Bayer's legal argument against Reddy's claim of inequitable

conduct can be distilled into a single principle: "No harm, no foul." But this is not the

law of patent practice and must not be approved by this Court.

- The failure of Dr. Schenke and Dr. Petersen to submit the Liebigs Reference
  in the prosecution of the '434 application is not "cured" by the withdrawal of
  original claim 19.

- The failure of Dr. Schenke and Dr. Petersen to inform the Examiner that the
  Bayer 5/5 Bicycle was in the prior art was not "cured" by the later withdrawal
  of original claim 19 from the '434 application.

- The failure of Mr. Horn to submit the Liebigs Reference in the prosecution of
  the '517 patent was not "cured" when he submitted that reference in the

prosecution of the divisional application which ultimately had the same Examiner.

- The failure of Dr. Schenke, Dr. Petersen and Mr. Horn to timely submit the X References during the prosecution of the '434 application was not "cured" because they anticipated only the non-elected subject matter.

- The failure of Mr. Horn to follow the provisions of the MPEP when submitting the X References <u>after</u> the issue fee had been paid was not "cured" by the Examiner having indicated that the references were considered after the '517 patent issued.

In each instance, Bayer's culpable conduct is beyond question. Nevertheless, Bayer would have the Court countenance this wrong. However, this pattern of inequitable conduct is clear and should not be endorsed by the Court. When viewed in their entirety, these acts display a contumacious disregard for the rules of patent practice in the United States and constitute clear and convincing evidence of inequitable conduct on the part of Bayer.

## II.    THE '942 PATENT IS ALSO UNENFORCEABLE

Inequitable conduct in a first patent renders a second patent unenforceable when there is a sufficient relationship between the inequitable conduct in the first patent and the relief sought in the second patent. *Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 245-46 (1933). Because the relief sought by Bayer in asserting the '942 patent is exactly the same as the relief sought by Bayer in asserting the '517 patent, Reddy respectfully asks the Court to apply the rule of *Keystone Driller* and to find that the inequitable conduct in the '517 patent renders the '942 patent unenforceable.

Bayer, however, relies on an out-of-context quotation to assert that Reddy's case is "ended" by the Federal Circuit's decision in *Baxter*, 149 F.3d at 1332. Bayer Br. at 44. The Court should decline Bayer's invitation to apply *Baxter* because the facts of the

28

instant case are completely different from the facts that led the *Baxter* court to a finding of no infectious unenforceability.

In particular, in *Baxter* the claims of the second patent were restricted out of the first patent because they "were drawn to an entirely different invention that . . . should never have been included in the [application for the first patent] in the first place." *Baxter*, 149 F.3d at 1332. The exact opposite is true in the instant case. Here, the claims of the '942 patent are all covered by the claims of the '517 patent and there is no reason why the claims of the later patent could not have been obtained in the earlier one. On these facts, the holding in *Baxter* is inapposite to the question of whether the inequitable conduct in the '517 patent renders the '942 patent unenforceable.

Reddy respectfully asks the Court to follow the teaching of *Truth Hardware Corp. v. Ashland Prods., Inc.*, C.A. No. 02-1541-GMS, 2003 WL 22005839, at *1 (D. Del. Aug. 19, 2003). Bayer should not be allowed to use "a scheme of divisional and continuation applications" to "avoid the consequences" of its inequitable conduct. *Id.*

## III.  THE ASSERTED CLAIMS OF THE '517 PATENT ARE OBVIOUS

### A.  Reddy does not need to show why its references would be selected

Because it would be too absurd to argue that the primary references relied on by Reddy in its obviousness case are not from the quinolone art, Bayer resorts to a cropped quote from *Karsten Mfg. Corp. v. Cleveland Golf Co.*, 242 F.3d 1376, 1385 (Fed. Cir. 2001), in a misguided attempt to impose on Reddy the burden of showing why the person of ordinary skill would have been motivated to "select" the particular prior art references upon which Reddy relies. Bayer Br. at 55. There is no such burden. To the contrary, Bayer's piecemeal attack on Reddy's references goes against the established and

controlling precedent which holds that references cannot be challenged individually when the claim of obviousness is based on a combination of references. *In re Merck & Co., Inc.*, 800 F.2d 1091, 1097 (Fed. Cir. 1986) ("Non-obviousness cannot be established by attacking references individually where the rejection is based upon the teachings of a combination of references."), *citing In re Keller*, 642 F.2d 413, 425 (C.C.P.A. 1981).

Reddy is surely allowed to rely on the collective teaching of its references to prove obviousness because "the question in a section 103 case is not only what the references expressly teach, but what they would collectively suggest to one of ordinary skill in the art. . . ." *In re Simon*, 461 F.2d 1387, 1390 (C.C.P.A. 1972). Contrary to what Bayer urges here, the correct test "is whether the references, taken as a whole, would have suggested [the] invention to one of ordinary skill in the medicinal chemical arts at the time the invention was made." *In re Merck*, 800 F.2d at 1097, *citing In re Simon*, 461 F.2d at 1390.

Thus, the Court must consider what the prior art which discloses Dainippon Compound AT-3295 and Sankyo Compound 1-130 would have suggested to the person of ordinary skill in the art in view of the prior art which discloses the use of bicycles at the 7-position. *In re Keller*, 642 F.2d at 426 (test for obviousness is what would one reference "in view of" another reference "have suggested to one of ordinary skill in the art").

**B.    Reddy does not need to show why AT-3295 and Sankyo Compound 1-130 would have been selected as "lead compounds"**

Bayer also seeks to impose on Reddy the improper burden that Reddy must show why the person of ordinary skill in the art would have been "motivated to select" AT-3295 or Sankyo Compound 1-130 as a "Lead Compound". Bayer Br. at 55. Reddy has

no such burden. Contrary to what Bayer would have the Court believe about the Federal Circuit's opinion in *Yamanouchi Pharm. Co., Ltd. v. Danbury Pharmacal, Inc.*, 231 F.3d 1339 (Fed. Cir. 2000), that decision does not establish the rule that a party asserting obviousness must show that the prior art compounds upon which it relies would have been "lead" compounds. In that case, the party asserting obviousness argued that it would have been obvious for the person of ordinary skill to select one lead compound from one reference, another lead compound from another reference, and to combine a piece of the first compound with a piece of the second compound "through a series of manipulations" to make the patented compound. *Id.* at 1343. That is not what Reddy argues here.

First, here it is admitted by Bayer's expert, Dr. Taylor, that a person of ordinary skill was in fact motivated to modify the 7-position substituents of prior art compounds in the quinolone field. Tr. 1548:10-18.

Second, here the selection of the prior art compounds relied on by Reddy is simple and straightforward because it is undisputed that AT-3295 is the single most important compound disclosed in the Dainippon Abstract and Bayer's expert, Dr. Zhanel, admitted that Sankyo Compound 1-130 is one of the three most important compounds disclosed in the Sankyo '206 Application. Tr. 1273:1-20; PTX 2118-B.

Third, contrary to *Yamanouchi,* Reddy does not argue that a piece of one compound selected from the prior art should be replaced by a piece of another compound selected from the prior art. Rather, Reddy argues that combining the art which discloses AT-3295 or Sankyo Compound 1-130 with the art which suggests the use of bicycles at the 7-position would have led the person of ordinary skill as a matter of routine

31

experimentation to make two of the compounds covered by the asserted claims of the '517 patent. In this regard, Bayer's own expert, Dr. Taylor, made the stunning admission that a person of ordinary skill in the art "would have made the Bayer bicycle" if he were told to make the diazabicyclo octane derivative of either AT-3295 or Sankyo Compound 1-130. Tr. 1546:17.

### C.  Reddy does not need to show that bicycles would have been preferred over monocycles

Bayer seeks to impose on Reddy the burden of showing that the person of ordinary skill would have preferred bicycles to monocycles as 7-position substituents. Bayer Br. at 61 ("The person of ordinary skill would have used a monocycle at the 7-position."). Contrary to what Bayer would like the law to be, Reddy has no burden to show that bicycles would have been "preferred". As explained by the Federal Circuit in *In re Fulton*, the issue is whether the prior art suggests the *desirability* of the modification asserted to be obvious, and "not whether there is something in the prior art as a whole to suggest that the combination is the *most desirable* combination available." *In re Fulton*, 391 F.3d 1195, 1200 (Fed. Cir. 2004) (emphasis in original). "Thus, a finding that the prior art as a whole suggests the desirability of a particular combination need not be supported by a finding that the prior art suggests that the combination claimed by the patent applicant is the preferred, or most desirable, combination." *Id.*

### D.  The so-called "conventional wisdom" does not remove Reddy's references from the prior art

Bayer cannot and does not dispute that the prior art includes multiple references which show the use of bicycles at the 7-position. Instead, Bayer urges the Court to find that a person of ordinary skill would not have used bicycles because bicycles were

32

against the conventional wisdom. Bayer Br. at 61. Bayer is barking up the wrong tree. First, it is undisputed that some of the inventors of the '517 patent had already published a patent application, DTX 161, wherein every compound they compared against the ciprofloxacin "Gold Standard" had a diazabicyclo octane substituent at the 7-position. This reference included data which showed that these diazabicyclo octane compounds compared quite favorably to ciprofloxacin. Tr. 197:23-25, 419:25-422:6. Second, the so-called "conventional wisdom" does not remove references such as DTX 161 from the prior art. It is long settled that a reference "must be considered for what it fairly teaches one of ordinary skill in the art." *Application of Meinhardt*, 392 F.2d 273, 276 (C.C.P.A. 1968). No matter how inconvenient for Bayer, references such as DTX 161, DTX 256, DTX 260 and DTX 299 must be considered for all that they teach regarding the use of bicycles at the 7-position.

### E.    Bayer does not compare the two compounds asserted to be obvious to the two prior art compounds relied on by Reddy

Reddy asserts that two of the compounds covered by the asserted claims of the '517 patent (the Bicyclic Analog of AT-3295 and the Bicyclic Analog of Sankyo Compound 1-130) are obvious over their monocyclic analogs (AT-3295 and Sankyo Compound 1-130). *See* Reddy Br. at 13-15. Although Bayer compares some of the compounds covered by the asserted claims to some prior art compounds, Bayer Br. at 72-73, Bayer does not even attempt to argue in its Opening Brief that the two compounds asserted to be obvious exhibit any unexpected properties or any other objective indicia of non-obviousness over their prior art analogs. Therefore, all of the unexpected properties and other objective indicia of non-obviousness introduced by Bayer at trial are simply not relevant.

Moreover, any attempt by Bayer to introduce expert opinion comparing the properties of the compounds asserted to be obvious to their prior art analogs would be doomed to failure. Bayer's own expert, Dr. Zhanel, admitted on cross examination that because of the "unpredictable" nature of the technology at issue it would be necessary to actually run a head-to-head comparison in order to give a "reasoned opinion" that one compound had unexpected properties compared to another. Tr. 1258:25-1259:4. No head-to-head comparison between the particular compounds relied on by Reddy and the particular compounds asserted to be obvious was either presented at trial or relied on by Dr. Zhanel. In fact, Dr. Zhanel admitted he did not make a single comparison between a pair of compounds where the difference was that one of the compounds had the prior art 7-position substituent relied on by Reddy (3-amino-4-methyl pyrrolidine) and the other had the 7-position substituent asserted to be obvious (the Bayer 5/5 Bicycle). Tr. 1301:7-12.

Plainly, an expert's opinion cannot be based on speculation. Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharms., Inc.* 509 U.S. 579, 590 (1993); *Calhoun v. Yamaha Motor Corp., U.S.A.,* 350 F.3d 316, 321 (3d Cir. 2003). Given that it was Dr. Zhanel himself who admitted that he lacked the data needed to give a "reasoned opinion" that the Bicyclic Analog of Dainippon Compound AT-3295 or the Bicyclic Analog of Sankyo Compound 1-130 have unexpected properties over their prior art analogs, any testimony by Dr. Zhanel on this subject would be speculative. Because it would be speculative it cannot be relied on by Bayer. *MicroStrategy Inc. v. Business Objects, S.A.,* 429 F.3d 1344, 1355-56 (Fed. Cir. 2005) ("[T]he district court has the responsibility to exclude an

expert opinion that overlooks factors that render the testimony unreliable and/or speculative.").

### F.    Bayer tries to make Dr. LaVoie the issue

For all of Bayer's attempts to belittle and besmirch Dr. LaVoie and his work for Reddy on this case, the proof is in the pudding. Dr. LaVoie's testimony showed him to be a well qualified medicinal chemist and a credible witness. Just because certain references were given to Dr. LaVoie by Reddy's counsel does not change what those references teach to a person of ordinary skill. The fact that Reddy did not have to pay Dr. LaVoie many hundreds of thousands of dollars to render his opinions does not detract from his credibility. The fact that Bayer paid its experts much more than what Reddy paid to its experts does not add to the credibility of Bayer's experts.

Moreover, for all his lofty credentials, it was Bayer's witness, Dr. Taylor, who was evasive on the stand and who lacked credibility. For example, Dr. Taylor opened his direct examination with an attack on Dr. LaVoie based on the purported fact that "not a single one" of 50 pharmaceutical companies other than Bayer had "hit on [Dr. LaVoie's] ring closing theory" before the priority date of the application for the '517 patent. Tr. 1389:2-5. As demonstrated during cross examination, Dr. Taylor was just plain wrong on this issue. In particular, after being shown a patent application that was filed in Japan by one of Bayer's competitors about a year before the priority date of the '517 patent, Dr. Taylor reluctantly admitted that the ring closing theory espoused by Dr. LaVoie was in fact included in that Japanese application. Tr. 1532:12-1533:5.

Reddy does not assert that this Japanese reference was "prior art" under 35 U.S.C. § 102 and it was not relied on by Dr. LaVoie. However, it is undisputed evidence of

contemporaneous invention under *In re Merck & Co*, 800 F.2d 1091, 1098 (Fed. Cir. 1986), and it eviscerates Dr. Taylor's pejorative testimony that no other pharmaceutical company "hit on" Dr. LaVoie's ring closing theory before the priority date of the '517 patent.

Finally, Bayer makes much too much of Dr. LaVoie's testimony concerning the person of ordinary skill. Bayer Br. at 47. Bayer completely ignores the fact that Dr. LaVoie testified that he read Dr. Taylor's expert report and that none of Dr. LaVoie's opinions would change if he used Dr. Taylor's definition of the person of ordinary skill. Tr. 881:21-882:2. There is simply no basis for Bayer to urge the Court to dismiss all of Dr. LaVoie's testimony concerning the invalidity of the '517 patent.

## IV.    THE ASSERTED CLAIMS OF THE '942 PATENT ARE INVALID

### A.    The asserted claims of the '942 patent are invalid for obviousness-type double patenting

Bayer defends against Reddy's claim of obviousness-type double patenting on two fronts: a) Bayer tries to convince the Court that the Sankyo '206 Application doesn't really teach the use of a methoxy group at the 8-position; and b) by arguing that objective indicia of non-obviousness are relevant to obviousness-type double patenting. Bayer is incorrect on both counts.

#### 1.    The Sankyo '206 Application teaches methoxy at the 8-position

It makes no sense to argue that the Sankyo '206 Application, DTX 28, does not teach the use of a methoxy group at the 8-position. First, "methoxy" is a type of "alkoxy" and the authors of that reference report their discovery that the use of alkoxy substituents at the 8-position "leads to the production of compounds which have unexpectedly good antibacterial activities, in many cases far surpassing those of the prior

36

art compounds." DTX 28 at p. 3. <u>Second</u>, the 8-position substituent of the 'Sankyo '206 Application (called "R$^1$") can only be "alkoxy", <i>id.</i> at p. 4, and the reference explicitly teaches that out of all the alkoxy groups "the methoxy group is preferred", <i>id</i> at p. 11. <u>Third</u>, all of the compounds described as "most preferred" because of their "excellent activity" have a methoxy group at the 8-position. <i>Id</i> at p. 50 ("In particular, because of their excellent activity, the following compounds are most preferred.").

Faced with this clear and convincing evidence, Bayer resorts to arguing that the Sankyo '206 Application does not suggest the use of methoxy at the 8-position because it does not teach that methoxy is preferred to the fluorine and chlorine substituents that, according to Bayer, "were considered to be optimal". Bayer Br. at 79. Bayer's argument is contrary to controlling authority. In fact, the Federal Circuit rejects the argument that motivation is limited to the preferred teachings of the prior art. <i>Merck & Co. v. Biocraft Labs., Inc.</i>, 874 F.2d 804, 807 (Fed. Cir. 1989) ("'the fact that a specific [embodiment] is taught to be preferred is not controlling, since all disclosures of the prior art, including unpreferred embodiments, must be considered'") <i>quoting In re Lamberti,</i> 545 F.2d 747, 750 (C.C.P.A. 1976); <i>followed and quoted in In re Inland Steel Co.</i>, 265 F.3d 1354, 1361 (Fed. Cir. 2001).

Bayer's attempt to show that the Sankyo '206 Application teaches away from the use of methoxy at the 8-position, Bayer Br. at 78, is even more misguided. Just because the Sankyo '206 Application "does not present any data comparing methoxy to fluorine or chlorine", Bayer Br. at 78, does not mean that it teaches away from methoxy. <i>Dystar Textilfarben GmbH & Co. Deutschland KG v. C.H. Patrick Co.</i>, 464 F.3d 1356, 1364

(Fed. Cir. 2006) ("We will not read into a reference a teaching away from a process where no such language exists.").

### 2.    Objective indicia of non-obviousness are not relevant to obviousness-type double patenting

Obviousness-type double patenting "is a judicially created doctrine grounded in public policy. . . ." *In re Longi*, 759 F.2d 887, 892 (Fed. Cir. 1985). The fundamental basis of the doctrine is the policy that the public will know with certainty that it is able to practice anything which appears to be an obvious variant of an earlier patented invention on the day the earlier patent expires:

> Fundamental to this doctrine in the policy that: 'The public should . . . be able to act on the assumption that upon the *expiration* of the patent it will be free to use not only the invention claimed in the patent but also modifications or variants which would have been *obvious* to those of ordinary skill in the art at the time the invention was made, taking into account the skill of the art and prior art other than the invention claimed in the issued patent.'

*Id* at 892-93 *quoting In re Zickendraht*, 319 F.2d 225, 232 (C.C.P.A. 1963) (Rich, J., concurring) (emphasis in the original). Allowing the introduction of unexpected properties or other objective indicia of non-obviousness into the double patenting inquiry would defeat this public policy.

The policy of allowing the public to act would be defeated because, even though something might appear to be an obvious variant of an earlier patented invention, the public would not be able to act on this assumption because it would never know whether there were some "unexpected" properties hiding in the woodwork. Unexpected properties are, by definition, impossible to predict. If truly unexpected properties can be thrown into the double patenting mix, the public would never be free to act on its assumptions about an expiring patent.

As the party propounding the use of unexpected properties to defeat a *prima facie* showing of obviousness-type double patenting, the burden is on Bayer to show their admissibility. *See In re Paulsen,* 30 F.3d 1475, 1482 (Fed. Cir. 1994) (citing *Demaco Corporation v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988)); *see also* 22 Wright & Graham, FEDERAL PRACTICE AND PROCEDURE, Evidence § 5166, p. 69 n.20 (burden is always on the proponent of the evidence to establish that it is relevant).

Just because such evidence has been admitted and considered in previous obviousness-type double patenting decisions does not mean that the Federal Circuit or any of its predecessors has ever ruled on the precise question of whether such evidence is admissible. Reddy does not dispute that unexpected properties, when relevant to the challenged subject matter, are objective evidence of nonobviousness in a case brought for statutory obviousness under 35 U.S.C. § 103. *See LP Mathews LLC v. Bath & Body Works, Inc.*, C.A. No. 04-1507-SLR, 2006 WL 3000198, at *5 (D. Del. Oct. 19, 2006) ("This objective evidence includes. . . unexpected results. . . ."). On the other hand, and of particular relevance here, the Federal Circuit has remarked that obviousness-type double patenting differs from statutory obviousness, in part because obviousness-type double patenting does not require an inquiry into objective evidence of nonobviousness. *Geneva Pharms., Inc. v. GlaxoSmithKline PLC,* 349 F.3d 1373, 1378 n.1 (Fed. Cir. 2003).

Contrary to Bayer's spin on the issue, Reddy does not allege that the *Geneva* footnote "overturned *sub silencio* decades of well-settled, controlling authority." Bayer Br. at 80. Rather, this is a situation where, as far as Reddy can ascertain, there is no controlling authority.

39

As in the famous story about the emperor's new clothes, the fact that the people acted as if the emperor was wearing the most beautiful clothes did not change the fact that he was not wearing any clothes at all. Here, just because prior courts have acted as if objective indicia of non-obviousness have always been relevant to obviousness-type double patenting, that does not mean that this type of evidence will be found to be relevant when looked at by the Federal Circuit from a fresh and unbiased perspective.

### B.    The '942 patent is invalid under the holding of *In re Schneller*

#### 1.    Bayer mischaracterizes the holding of *In re Schneller*

Bayer is wrong when it argues that the "principal question" of *In re Schneller*, 397 F.2d 350 (C.C.P.A. 1968), was whether the claims in the later-filed application were independent and distinct from the claims of the earlier-issued patent. Bayer Br. at 84. In the *Schneller* opinion, the "controlling fact" was clearly stated to be whether allowing the second patent would extend the patent monopoly of subject matter which was fully disclosed in and covered by the earlier patent:

> The controlling fact is that patent protection for the clips, <u>fully disclosed in and covered by the claims of the patent, would be extended by allowance of the appealed claims</u>. Under the circumstances of the instant case, wherein we find no valid excuse or mitigating circumstance making it either reasonable or equitable to make an exception, and wherein there is no terminal disclaimer, the rule against 'double patenting' must be applied.

*Schneller*, 397 F.2d at 355 (emphasis added).

### 2.    *Schneller* is the law

Bayer wants the Court to believe there is no such thing as *Schneller*-type double patenting. Bayer Br. at 83. Bayer's position is understandable. Because the asserted claims of the '942 patent are fully disclosed in and fully covered by the '517 patent the holding in *In re Schneller* is devastating to Bayer's '942 patent. Simply put, if *Schneller* is the law the '942 patent is dead.

Reddy relies on *Schneller* as controlling precedent because it is a decision of one of the predecessor courts to the Federal Circuit. *South Corp. v. United States*, 690 F.2d 1368, 1369-71 (Fed. Cir. 1982) (en banc) (decisions by the C.C.P.A. are binding as precedent for the Federal Circuit). The Examiner of the '942 patent relied on *Schneller* for the same proposition asserted here by Reddy. PTX 4 at BL020-002072-2073. The MPEP includes a section regarding the applicability of *Schneller* to the situation presented here. PTX 64 at 800-26; *see* Reddy Br. at 47.

### 3.    If *Schneller* is not the law it should be

Even if *Schneller* is not controlling precedent, this Court should find the asserted claims of the '942 patent invalid nonetheless. "The fundamental reason for the rule [against double patenting] is to prevent unjustified timewise extension of the right to exclude granted by a patent no matter how the extension is brought about." *Schneller* 397 F.2d at 354. *Schneller*'s recitation of the reason for the rule against double patenting was quoted and followed by the Federal Circuit in *Eli Lilly & Co. v. Barr Labs., Inc.*, 251 F.3d 955, 968 (Fed. Cir. 2001) and by the Court of Custom and Patent Appeals in *In re Van Ornum*, 686 F.2d 937, 943-44 (C.C.P.A. 1982). The same reasoning applies here. Bayer should not be rewarded for its failure to include specific claims directed to the

41

subject matter of the later '942 patent in the earlier '517 patent. Bayer's failure to include the claims of the '942 patent as specific claims in an earlier patent that fully discloses and fully covers the later claims dedicates those claims to the public in the absence of a terminal disclaimer, the circumstance presented here.

### 4. Unexpected properties are not relevant to *Schneller*-type double patenting

As discussed in Reddy's Opening Brief, at 47-48, unexpected properties are not relevant to double patenting under *Schneller* because this type of double patenting is based on the extension of the right to exclude and not on whether the claims of the '942 patent are obvious variants of any claim in the '517 patent.

### CONCLUSION

Based on the foregoing, Reddy respectfully asks the Court to:

FIND the '517 patent unenforceable for inequitable conduct;

FIND the '942 patent unenforceable;

FIND the asserted claims of '517 patent invalid for obviousness;

FIND the asserted claims of the '942 patent invalid for obviousness-type double patenting;

FIND the asserted claims of the '942 patent invalid under the holding in *In re Schneller*;

ORDER the relief requested in Reddy's Opening Brief; and

ORDER such further relief that the Court deems just and proper.


Respectfully submitted,

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

By: /s/ David E. Moore

Louis H. Weinstein
David J. Novack
A. Michael Covino
Michael H. Imbacuan
BUDD LARNER, P.C.
150 John F. Kennedy Parkway CN1000
Short Hills, New Jersey 07078
Tel: (973) 379- 4800

Richard L. Horwitz (#2246)
David E. Moore (#3983)
Hercules Plaza, 6th Floor
1313 North Market Street
Wilmington, Delaware 19801
Tel: (302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

Dated: November 8, 2006

*Attorneys for Defendants/Counterclaim Plaintiffs*
*Dr. Reddy's Laboratories, Ltd. and*
*Dr. Reddy's Laboratories, Inc.*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

## CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on November 8, 2006, the attached document was

hand delivered to the following persons and was electronically filed with the Clerk of the Court

using CM/ECF which will send notification of such filing(s) to the following and the document

is available for viewing and downloading from CM/ECF.

Frederick L. Cottrell , III
Richards Layton & Finger
One Rodney Square
920 North King Street
Wilmington, Delaware  19801
Cottrell@RLF.com

I hereby certify that on November 8, 2006, I have Electronically Mailed the documents to

the following non-registered participants:

Bruce R. Genderson
Adam L. Perlman
Aaron P. Maurer
David I. Berl
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, DC  20005
bgenderson@wc.com
aperlman@wc.com
amaurer@wc.com
dberl@wc.com

/s/ David E. Moore
Richard L. Horwitz
David E. Moore
Potter Anderson & Corroon LLP
Hercules Plaza – Sixth Floor
1313 North Market Street
P.O. Box 951
Wilmington, DE  19899-0951
(302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

677083