# EXHIBIT A

Westlaw.

--- F.3d ----                                                                                                Page 1

--- F.3d ----, 2006 WL 3792689 (C.A.Fed. (Ind.))
**(Cite as: --- F.3d ----)**

**H**
Briefs and Other Related Documents
Eli   Lilly   and   Co.   v.   Zenith   Goldline
Pharmaceuticals, Inc.C.A.Fed. (Ind.),2006.Only the
Westlaw citation is currently available.
United States Court of Appeals,Federal Circuit.
ELI LILLY AND COMPANY and Lilly Industries
Limited, Plaintiffs-Appellees,
v.
ZENITH GOLDLINE PHARMACEUTICALS,
INC. (now known as Ivax Pharmaceuticals, Inc.),
Defendant-Appellant,
andTeva Pharmaceuticals USA, Inc.,
Defendant-Appellant,
andDr. Reddy's Laboratories, Ltd.,
Defendant-Appellant.
**Nos. 05-1396, 05-1429, 05-1430.**

Dec. 26, 2006.

**Background:** Patent holder brought infringement
action after generic drug manufacturers filed
Abbreviated New Drug Application (ANDA) to
manufacture patented drug. The United States
District Court for the Southern District of Indiana,
Richard L. Young, J., 364 F.Supp.2d 820, granted
judgment for patent holder. Defendants appealed.

**Holdings:** The Court of Appeals, Rader, Circuit
Judge, held that:

(1) prior article that identified compounds from
same family of compounds as subsequently patented
drug did not anticipate that drug;

(2) claims in subsequently patented drug were not
obvious based upon prior art compound;

(3) patentee overcame any prima facie case of
obviousness;

(4) patentee's clinical trials of claimed invention
were experimental use that negated any public use

bar; and

(5) patent could not be invalidated on basis of
inequitable conduct.

Affirmed.

**[1] Patents 291 ⊙═66(1.12)**

291 Patents
    291II Patentability
        291II(D) Anticipation
            291k63 Prior Patents
                291k66 Operation and Effect
                    291k66(1.12)   k.   Compositions,
Compounds, and Medicinal Preparations. Most
Cited Cases
Prior article that identified compounds from same
family of compounds as subsequently patented drug
did not anticipate that drug, where number of
compounds that actually had been disclosed by
article numbered in millions, preferred compounds
and substituents listed in article did not resemble
patented drug, no possible combination of preferred
substituents would have led to components that
made up patented drug, and departure from teaching
of article, and recombination of components of
specific illustrative compounds with hindsight,
would have been required to make patented drug
from article. 35 U.S.C.A. § 102.

**[2] Patents 291 ⊙═314(5)**

291 Patents
    291XII Infringement
        291XII(C) Suits in Equity
            291k314 Hearing
                291k314(5)   k.   Questions of Law or
Fact. Most Cited Cases
The question of whether a patent had been
anticipated by prior art is one of fact, including
whether or not an element is inherent in the prior

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                        Page 2

--- F.3d ----, 2006 WL 3792689 (C.A.Fed. (Ind.))
**(Cite as: --- F.3d ----)**

art. 35 U.S.C.A. § 102.

**[3] Patents 291 ☞324.55(4)**

291 Patents
   291XII Infringement
     291XII(C) Suits in Equity
      291k324 Appeal
        291k324.55    Questions    of    Fact,
Verdicts, and Findings
          291k324.55(3) Issues of Validity
           291k324.55(4)    k.    Novelty,
Invention, Anticipation, and Obviousness. Most
Cited Cases
A finding on the issue of whether a patent had been
anticipated by prior art is reviewed under the clearly
erroneous standard. 35 U.S.C.A. § 102.

**[4] Patents 291 ☞72(1)**

291 Patents
   291II Patentability
     291II(D) Anticipation
      291k72 Identity of Invention
        291k72(1) k. In General. Most Cited
Cases
A prior art reference must place the inventive
compound or composition in the possession of the
public to have anticipated the patented invention;
thus, the prior art reference must disclose each and
every feature of the claimed invention, either
explicitly or inherently. 35 U.S.C.A. § 102.

**[5] Patents 291 ☞66(1.12)**

291 Patents
   291II Patentability
     291II(D) Anticipation
      291k63 Prior Patents
        291k66 Operation and Effect
          291k66(1.12)    k.   Compositions,
Compounds, and Medicinal Preparations. Most
Cited Cases
A claimed patent on a drug is anticipated when the
prior art expressly spells out a definite and limited
class of compounds that enabled a person of
ordinary skill in the art to at once envisage each
member of a limited class. 35 U.S.C.A. § 102.

**[6] Patents 291 ☞16.25**

291 Patents
   291II Patentability
     291II(A) Invention; Obviousness
      291k16.25 k. Chemical Compounds. Most
Cited Cases
Prior art compound did not make claims in
subsequently patented drug obvious, although
patented drug was adjacent homolog of prior art
compound; person of ordinary skill in art would not
have selected prior art compound as lead
compound, state of art at time of invention would
have directed person of ordinary skill in art away
from prior art compound, and prior art did not
suggest any other modifications necessary to reach
patented drug. 35 U.S.C.A. § 103.

**[7] Patents 291 ☞324.5**

291 Patents
   291XII Infringement
     291XII(C) Suits in Equity
      291k324 Appeal
        291k324.5 k. Scope and Extent of
Review in General. Most Cited Cases
A finding on the issue of whether a patent was
obvious in light of prior art is reviewed without
deference as a legal conclusion, and the underlying
factual determinations are reviewed for clear error.
35 U.S.C.A. § 103.

**[8] Patents 291 ☞16(2)**

291 Patents
   291II Patentability
     291II(A) Invention; Obviousness
      291k16 Invention and Obviousness in
General
        291k16(2) k. Prior Art in General.
Most Cited Cases
The factual underpinnings on the issue of whether a
patent was obvious in light of prior art are: (1) the
scope and content of the prior art, (2) the
differences between the prior art and the claimed
invention at the time of invention, (3) the level of
ordinary skill in the art, and (4) the objective indicia
of nonobviousness. 35 U.S.C.A. § 103.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                      Page 3

--- F.3d ----, 2006 WL 3792689 (C.A.Fed. (Ind.))
**(Cite as: --- F.3d ----)**

**[9] Patents 291 ☞16.25**

291 Patents
    291II Patentability
        291II(A) Invention; Obviousness
            291k16.25 k. Chemical Compounds. Most
Cited Cases
For a chemical compound, a prima facie case of
obviousness requires structural similarity between
claimed and prior art subject matter where the prior
art gives reason or motivation to make the claimed
compositions; a reasonable expectation of success,
not absolute predictability supports a conclusion of
obviousness. 35 U.S.C.A. § 103.

**[10] Patents 291 ☞16.25**

291 Patents
    291II Patentability
        291II(A) Invention; Obviousness
            291k16.25 k. Chemical Compounds. Most
Cited Cases
A relevant property of a compound will not be
ignored in the obviousness calculus; when claimed
properties differ from the prior art, those
differences, if unexpected and significant, may lead
to nonobviousness. 35 U.S.C.A. § 103.

**[11] Patents 291 ☞36.1(3)**

291 Patents
    291II Patentability
        291II(A) Invention; Obviousness
          291k36 Weight and Sufficiency
            291k36.1 Secondary Factors Affecting
Invention or Obviousness
                291k36.1(3) k. Longstanding Need
and Solution to Problems. Most Cited Cases

**Patents 291 ☞36.1(4)**

291 Patents
    291II Patentability
        291II(A) Invention; Obviousness
          291k36 Weight and Sufficiency
            291k36.1 Secondary Factors Affecting
Invention or Obviousness
                291k36.1(4) k. Failure of Others.
Most Cited Cases

Drug patentee overcame any prima facie case of
obviousness, through long-felt need for safer, less
toxic, and more effective drug, decade of failure to
find replacement for prior art, reasonable amount of
commercial success for patented drug, number of
awards for patented drug as indicators of industry
acclaim, and evidence of unexpected differences
between patented drug and its closest analog. 35
U.S.C.A. § 103.

**[12] Patents 291 ☞75**

291 Patents
    291II Patentability
        291II(E) Prior Public Use or Sale
            291k75 k. What Constitutes Public Use.
Most Cited Cases
Drug patentee's clinical trials of claimed invention
were experimental use that negated any public use
bar to patenting or enforcement of patent, where
patentee tailored its tests to experimental drug
safety and efficacy purposes, patentee adequately
monitored for results, and patentee maintained
confidentiality throughout duration of study. 35
U.S.C.A. § 102.

**[13] Patents 291 ☞75**

291 Patents
    291II Patentability
        291II(E) Prior Public Use or Sale
            291k75 k. What Constitutes Public Use.
Most Cited Cases
Any public use of the claimed invention by a person
other than the inventor who is under no limitation,
restriction, or obligation of secrecy to the inventor
constitutes "public use" which bars patenting or the
enforcement of a patent on a claimed invention. 35
U.S.C.A. § 102(b).

**[14] Patents 291 ☞75**

291 Patents
    291II Patentability
        291II(E) Prior Public Use or Sale
            291k75 k. What Constitutes Public Use.
Most Cited Cases
The policies underlying the public use bar are
considered when considering whether a particular

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                    Page 4

--- F.3d ----, 2006 WL 3792689 (C.A.Fed. (Ind.))
**(Cite as: --- F.3d ----)**

use was "public," and thus preventing patenting or the enforcement of a patent on a claimed invention. 35 U.S.C.A. § 102(b).

**[15] Patents 291 ☞75**

291 Patents
    291II Patentability
        291II(E) Prior Public Use or Sale
            291k75 k. What Constitutes Public Use. Most Cited Cases
Even a use that occurs in the open may not invoke the public use bar to patenting or the enforcement of a patent on a claimed invention when the use was undertaken to experiment on, or with, the claimed invention. 35 U.S.C.A. § 102(b).

**[16] Patents 291 ☞75**

291 Patents
    291II Patentability
        291II(E) Prior Public Use or Sale
            291k75 k. What Constitutes Public Use. Most Cited Cases
For the purpose of the public use bar to patenting or the enforcement of a patent on a claimed invention, several indicia may show the negating experimental character of a use, including: (1) the length of the test period; (2) any confidentiality agreement; (3) any records of testing; (4) any monitoring and control of the test results, (5) the number of tests; and (6) the length of the test period in relation to tests of similar inventions. 35 U.S.C.A. § 102(b).

**[17] Patents 291 ☞97**

291 Patents
    291IV Applications and Proceedings Thereon
        291k97 k. Patent Office and Proceedings Therein in General. Most Cited Cases
Patentee did not fail to disclose information or contradict its later patentability arguments when pursuing patent on claimed invention, and thus patent could not be invalidated on basis of inequitable conduct. 35 U.S.C.A. § 102(b).

**[18] Patents 291 ☞97**

291 Patents

291IV Applications and Proceedings Thereon
    291k97 k. Patent Office and Proceedings Therein in General. Most Cited Cases
Inequitable conduct occurs when a patentee breaches his or her duty to the United States Patent and Trademark Office (PTO) of candor, good faith, and honesty; inequitable conduct includes affirmative misrepresentations of material facts, non-disclosure of material information, or submission of false material information, coupled with an intent to deceive.

**[19] Patents 291 ☞97**

291 Patents
    291IV Applications and Proceedings Thereon
        291k97 k. Patent Office and Proceedings Therein in General. Most Cited Cases
To assess inequitable conduct, a trial court must determine whether the withheld reference meets a threshold level of materiality, and the trial court must also determine whether the evidence shows a threshold level of intent to mislead the Patent and Trademark Office (PTO); after finding the threshold levels of materiality and intent, the trial court then balances those factors.

**[20] Patents 291 ☞97**

291 Patents
    291IV Applications and Proceedings Thereon
        291k97 k. Patent Office and Proceedings Therein in General. Most Cited Cases
On a claim of inequitable conduct, gross negligence alone is insufficient to justify an inference of intent to deceive the Patent and Trademark Office (PTO).

**[21] Patents 291 ☞97**

291 Patents
    291IV Applications and Proceedings Thereon
        291k97 k. Patent Office and Proceedings Therein in General. Most Cited Cases
On a claim of inequitable conduct, in a case involving an omission of a material reference to the Patent and Trademark Office (PTO), the record must contain clear and convincing evidence that the applicant made a deliberate decision to withhold a known material reference; beyond that, the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----

Page 5

--- F.3d ----, 2006 WL 3792689 (C.A.Fed. (Ind.))
**(Cite as: --- F.3d ----)**

applicant must have withheld the material subject matter with the intent to deceive.

**[22] Patents 291 ☞97**

291 Patents
    291IV Applications and Proceedings Thereon
        291k97 k. Patent Office and Proceedings Therein in General. Most Cited Cases
On a claim of inequitable conduct, intent to deceive cannot be inferred simply from the decision to withhold the reference where the reasons given for the withholding are plausible.

**Patents 291 ☞328(2)**

291 Patents
    291XIII Decisions on the Validity, Construction, and Infringement of Particular Patents
        291k328 Patents Enumerated
            291k328(2) k. Original Utility. Most Cited Cases

**Patents 291 ☞328(2)**

291 Patents
    291XIII Decisions on the Validity, Construction, and Infringement of Particular Patents
        291k328 Patents Enumerated
            291k328(2) k. Original Utility. Most Cited Cases
4,115,568, 4,115,574. Cited as Prior Art.

5,229,382. Valid and Infringed.

Appealed from United States District Court for the Southern District of Indiana, Judge Richard L. Young.

Charles E. Lipsey, Finnegan, Henderson, Farabow, Garrett & Dunner, L.L.P., of Reston, VA, argued for plaintiffs-appellees. With him on the brief were L. Scott Burwell; David S. Forman and Laura P. Masurovsky, of Washington, DC; Robert F. McCauley, of Palo Alto, CA; and Jan M. Carroll, Barnes & Thornburg, LLP, of Indianapolis, IN. Of counsel on the brief were James P. Leeds, David M. Stemerick, and Robert D. Titus, Eli Lilly and

Company, of Indianapolis, IN.
William L. Mentlik, Lerner, David, Littenberg, Krumholz & Mentlik, LLP, of Westfield, NJ, argued for defendant-appellant, Zenith Goldline Pharmaceuticals, Inc. (now known as Ivax Pharmaceuticals, Inc.). With him on the brief were Roy H. Wepner and Michael H. Teschner. Of counsel on the brief were Jeffrey S. Ward and Thomas P. Heneghan, Michael Best & Friedrich LLP, of Madison, WI. Joining in the brief were Steven J. Lee, Elizabeth Holland, and Patrice P. Jean, Kenyon & Kenyon, of New York, NY, for defendant-appellant, Teva Pharmaceuticals USA, Inc.
Stuart D. Sender, Budd Larner, P.C., of Short Hills, NJ, argued for defendant-appellant, Dr. Reddy's Laboratories, Ltd. With him on the brief were Ellen T. Lowenthal and Michael H. Imbacuan.

Before RADER, SCHALL, and GAJARSA, Circuit Judges.
RADER, Circuit Judge.
*1 Zenith Goldline Pharmaceuticals, Inc. (now known as IVAX Pharmaceuticals, Inc.) (IVAX); Dr. Reddy's Laboratories, Ltd. (DRL); and Teva Pharmaceuticals USA, Inc. (Teva) (defendants), filed an Abbreviated New Drug Application (ANDA). In response, the plaintiffs, Eli Lilly and Company and Lilly Industries Ltd. (collectively Lilly), filed suit against all defendants for infringement of United States Patent No. 5,229,382 (382 patent). Following a two and one-half week bench trial, the United States District Court for the Southern District of Indiana found the 382 patent valid and infringed. *Eli Lilly & Co. v. Zenith Goldline Pharm.,* 1:01-cv-443-RLY-VSS (S.D.Ind. Apr. 14, 2005) *(Final Judgment); Eli Lilly & Co. v. Zenith Goldline Pharm.,* 1:01-cv-443-RLY-VSS (S.D.Ind. May 9, 2005) (*Amended Final Judgment* ). In 221 pages of written analysis, the trial court documented its findings and conclusions. *Eli Lilly & Co. v. Zenith Goldline Pharm.,* 1:01-cv-443-RLY-VSS (S.D.Ind. Apr. 14, 2005) ( *Findings of Fact and Conclusions of Law* ). The defendants appeal the trial court's conclusions on the validity of the 382 patent and inequitable conduct. Finding no reversible error, this court affirms.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----, 2006 WL 3792689 (C.A.Fed. (Ind.))
**(Cite as: --- F.3d ----)**

I.

The 382 patent claims both olanzapine and use of the compound to treat schizophrenia. *Findings of Fact and Conclusions of Law,* slip op. at 3. A Lilly research chemist first synthesized olanzapine in the United Kingdom in 1982. *Id.* at 12. Lilly filed the 382 patent application on May 22, 1992. The patent issued on July 20, 1993. The United States Food and Drug Administration (FDA) approved olanzapine, sold by Lilly under the trademark Zyprexa®, in late 1996. *Findings of Fact and Conclusions of Law,* slip op. at 3. By filing an ANDA, the defendants stipulate to infringement if the 382 patent is valid and enforceable. *Amended Final Judgment,* slip op. at 1.

Claims 1, 2, 3, 7, 8, and 15 of the 382 patent set forth the boundaries of the invention:
1. 2-Methyl-10-(4-methyl -1-piperaziny1)-4H-thieno[2,3-b][1,5]benzodiazepine, or an acid addition salt thereof.
2. A pharmaceutical composition comprising a compound according to claim 1 or a pharmaceutically acceptable acid addition salt thereof together with a pharmaceutically acceptable diluent or carrier therefor.
3. A pharmaceutical composition in capsule or tablet form comprising from 2.5 to 5 mg of the compound of claim 1 together with a pharmaceutically acceptable diluent or carrier therefor.
* * * *
7. A method of claim 5 for treating an animal, including a human, suffering from or susceptible to schizophrenia.
8. A method of claim 7 wherein the effective amount is from 0.1 to 20 mg per day of 2-methyl-10-(4-methyl-1
-piperaziny1)-4H-thieno[2,3-b]
[1,5]benzodiazepine, or a pharmaceutically acceptable acid addition solution salt thereof.
* * * *
15. A pharmaceutical composition in capsule or tablet form comprising from 0.1 to 20 mg of the compound of claim 1 together with a pharmaceutically acceptable diluent or carrier therefor.

*2 382 patent, col. 12, ll. 10-20, ll. 33-40, ll. 64-67.

Before discovery of olanzapine, Lilly discovered other drugs in the same family of compounds (thienobenzodiazepines), namely clozapine, flumezapine, ethyl flumezapine and ethyl olanzapine (a.k.a. Compound 222). *Findings of Fact and Conclusions of Law,* slip op. at 6-8. These compounds share a common structural nucleus as thienobenzodiazepines, namely a piperazine ring (R), a benzene ring (R1), and a thiophene ring (R2).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----, 2006 WL 3792689 (C.A.Fed. (Ind.))
**(Cite as: --- F.3d ----)**



Lilly used clozapine to treat some forms of schizophrenia in the late 60s and early 70s. *Findings of Fact and Conclusions of Law,* slip op. at 6. Clozapine was thus the first "atypical" antipsychotic drug. Structurally, olanzapine differs from clozapine in that olanzapine has a methyl-substituted thiophene ring in place of the benzene ring in clozapine. *Id.* at 40. Olanzapine also has hydrogen in place of the chlorine on its benzene ring. *Id.* at 41.

Despite its advantages, researchers discovered in 1975 that clozapine caused an often fatal blood disorder (agranulocytosis) in one percent of patients. For that reason, Lilly withdrew clozapine from the market. *Id.* Nevertheless, after a general failure to replace clozapine, reflected by many documented reports of promising compounds that failed either for lack of efficacy or toxic side-effects, the FDA, in late 1989, approved clozapine with careful blood-monitoring. *Id.* at 7.

Until discovery of olanzapine, researchers attributed the efficacy of clozapine and typical antipsychotics to their "neuroleptic substituent"-an electron-withdrawing group considered important to the antipsychotic activity of the compounds. *Id.* Halogen-a fluorine (F) or chlorine (Cl) atom-is such an electron withdrawing group. *Id.* at 7, 48.

Olanzapine does not have a halogen atom, i.e. a fluorine (F) or chlorine (Cl) atom. Instead, it has a

hydrogen atom (H), which is not an electron withdrawing (or electronegative) group. *Id.* at 48.

**Olanzapine**

The prior art to olanzapine includes ethyl flumezapine and flumezapine, both disclosed in U.S. Patent No. 4,115,574 ( 574 patent) that issued in 1978. The prior art also includes ethyl olanzapine (a.k.a. Compound 222). Ethyl flumezapine caused widespread blood problems in dogs. *Id.* at 41. Flumezapine caused extra-pyramidal symptoms (EPS) and an increase in liver enzymes and a muscle enzyme called creatine phosphokinase (CPK). Ethyl olanzapine caused a significant increase in cholesterol in female beagle dogs. *Id.* Thus, the prior art to olanzapine had significant detrimental side effects.

Olanzapine differs structurally from flumezapine, by substitution of a hydrogen atom (H) for the fluorine atom (F) in flumezapine at the 7-position of the benzene ring. *Id.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----, 2006 WL 3792689 (C.A.Fed. (Ind.))
(Cite as: --- F.3d ----)



**Flumezapine**

Olanzapine differs structurally from ethyl flumezapine by replacement of the fluorine atom (F) and ethyl group (CH2CH3) in ethyl flumezapine with a hydrogen atom (H) and methyl group (CH3) respectively. *Id.*

**Ethyl Flumezapine**

*3 Olanzapine differs structurally from its ethyl analog, Compound 222 (ethyl olanzapine), by replacement of the ethyl group (CH2CH3) with a methyl group (CH3) at the 2-position of the thiophene ring. *Id.*

**Ethyl Olanzapine
(Compound '222)**

(Compound 222)

I

[1] The trial court found that the defendants did not prove by clear and convincing evidence that claims 1, 2, 3, 7, 8, and 15 of the 382 patent were invalid as anticipated under 35 U.S.C. § 102. *Findings of Fact and Conclusions of Law,* slip op. at 212. The primary reference the defendants cited for anticipation of these claims is an article entitled " 4-Piperazinyl-10*H*-thieno[2,3-*b* ][1,5]benzodiazepines as Potential Neuroleptics" from the Journal of Medicinal Chemistry in 1980 ( *Chakrabarti 1980a* ). Jiban K. Chakrabarti, Linda Horsman, et al., *4-Piperazinyl-10H-thieno[2 ,3-b][1,5]benzodiazepines as Potential Neuroleptics,* 23 J. Med. Chem. 8 (1980).

[2][3][4] Anticipation is a question of fact, including whether or not an element is inherent in the prior art. *See In re Schreiber,* 128 F.3d 1473, 1477 (Fed.Cir.1997). Therefore, this court reviews a finding of anticipation under the clearly erroneous standard. *Atlas Powder Co. v. Ireco, Inc.,* 190 F.3d 1342, 1346 (Fed.Cir.1999). To anticipate, a prior art reference must place the inventive compound or composition in the possession of the public. *In re Brown,* 51 C.C.P.A. 1254, 329 F.2d 1006, 1011 (C.C.P.A.1964). Thus, the prior art reference must disclose each and every feature of the claimed invention, either explicitly or inherently. *Glaxo Inc. v. Novopharm Ltd.,* 52 F.3d 1043, 1047 (Fed.Cir.1995).

Pointing to *In re Petering,* 49 C.C.P.A. 993, 301 F.2d 676 (C.C.P.A.1962) and *In re Schaumann,* 572 F.2d 312 (C.C.P.A.1987), IVAX asserts that *Chakrabarti 1980a* anticipated claim 1 of the 382 patent because it identified compounds from the same family of compounds (thienobenzodiazepines). Indeed, in *Petering,* the Board of Patent Appeals affirmed the examiner's rejection of claims 1, 2, 4, 5, 7, and 10-12 of the patent applicant's application on "isoalloxazines." 301 F.2d at 677. However, in contrast to this case, the prior art in *Petering* did more than make a broad generic disclosure. In *Petering,* the prior art disclosed a limited number of specific preferences

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                   Page 9

--- F.3d ----, 2006 WL 3792689 (C.A.Fed. (Ind.))
**(Cite as: --- F.3d ----)**

from a specifically defined group of isoalloxazines. *Id.* As a result, *Petering* actually disclosed to one skilled in the art a limited class of only "some 20 compounds," including "6, 7-dimethyl-9-(Bmonohydroxyethyl)-isoalloxazine." *Schaumann,* 572 F.2d 315 (citing *Petering,* 301 F.2d at 682).

[5] Similarly, the prior art in *Schaumann* disclosed 14 compounds, later further narrowed to 7, considering express preferences. Additionally, the structural formula of this prior art contained but a single variable. 572 F.2d at 314. Thus, in *Schaumann,* the prior art patent embraced a very limited number of closely related compounds and specifically disclosed the claimed compound. 572 F.2d at 316. Thus, unlike this case, the prior art in both *Petering* and *Schaumann* expressly spelled out a definite and limited class of compounds that enabled a person of ordinary skill in the art to at once envisage each member of this limited class. *Schaumann,* 572 F.2d at 315; *Petering,* 301 F.2d at 681-82.

*4 By contrast, the number of compounds actually disclosed by *Chakrabarti 1980a* numbers in the millions (including all proposed alternative substituents). *Chakrabarti 1980a* examined forty-five specific compounds (as opposed to a genus of compounds) in the 4-piperazinyl-10H-thieno[2,3-b] [1,5]benzodiazepine family and fourteen analogous 5-piperazinyl-substituted 4H-thieno[2,3-b][1,4]benzodiazepines, which were created to compare activity. *Findings of Fact and Conclusions of Law,* slip op. at 43. Indeed, *Chakrabarti 1980a* listed several preferred compounds and substituents, none of which resemble olanzapine:

for R-a methyl, hydroxyethyl, or hydroxypropyl;
for R1-a fluorine, chlorine, or 7, 8, di-fluoro *[no hydrogen];* and
for R2-a methyl, 2-ethyl, or 2-isopropyl group.

*Id.* at 43, 301 F.2d 676. Five of the preferred individual compounds (9, 12, 17, 29, and 34) are more potent than clozapine (scoring a 3 CAR [FN1] or higher) and have clozapine-like effect. For those five preferred compounds, the *Chakrabarti 1980a*

authors expressed a preference for specific, complete compounds without any variation of the individual substituents on those molecules. *Chakrabarti 1980a* also always expressed a preference for halogen-containing compounds (fluorine or chlorine), not hydrogen. *Id.* at 8-9, 301 F.2d 676. Furthermore, compounds 9, 12, 17, and 29 all have fluorine at the 7-position of the benzene ring. And though Compound 34 does have hydrogen at the 7-position of the benzene ring, it has a hydroxyethyl on its piperazine ring, unlike olanzapine. *Id.* In sum, *Chakrabarti 1980a* discloses nothing close to the claimed invention.

*Chakrabarti 1980a* does provide a general structural formula with possible substituents of "R," "R1," and "R2," but it does not define them at all. *Findings of Fact and Conclusions of Law,* slip op. at 161. No possible combination of those preferred substituents would lead to the components that make up olanzapine, because each would contain a fluorine or a chlorine. To make olanzapine from Chakrabarti 1980a, one would have to depart from the teaching of the article and recombine the components of the specific illustrative compounds with hindsight. Thus, *Chakrabarti 1980a* does not anticipate because: (1) the article prefers complete compounds, not individual substituents, (2) the article discloses no generic disclosure encompassing olanzapine or even stating that substituents on different compounds were interchangeable, and (3) the article does not suggest transforming unpreferred compound 7 [FN2] into a preferred compound. Thus, *Chakrabarti 1980a* did not place olanzapine in the possession of the public. Therefore, this court detects no clear error in the trial court's finding of no anticipation.

II

[6] The trial court found that the defendants did not prove by clear and convincing evidence that claims 1, 2, 3, 7, 8, and 15 of the 382 patent were invalid as obvious under 35 U.S.C. § 103. *Findings of Fact and Conclusions of Law,* slip op. at 212. On appeal, IVAX argues that the district court erred by erecting "a threshold requirement that defendants establish a teaching or incentive to treat the closest prior art

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                    Page 10

--- F.3d ----, 2006 WL 3792689 (C.A.Fed. (Ind.))
**(Cite as: --- F.3d ----)**

(i.e., Compound 222) as a 'lead compound.' " IVAX also charges that the district court disregarded (1) the structural characteristic of olanzapine as the adjacent homolog of Compound 222, (2) the suggestions to delete fluorine from the prior art compound flumezapine, and (3) the observation that Compound 222 and flumezapine " bracket" olanzapine.

**\*5** [7][8][9] This court reviews obviousness without deference as a legal conclusion with underlying factual determinations which are reviewed for clear error. *Medichem, S.A. v. Rolabo, S.L.,* 437 F.3d 1157, 1164 (Fed.Cir.2006). The factual underpinnings are: (1) the scope and content of the prior art, (2) the differences between the prior art and the claimed invention at the time of invention, (3) the level of ordinary skill in the art, and (4) the objective indicia of nonobviousness. *See Graham v. John Deere Co.,* 383 U.S. 1, 17, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966); *Panduit Corp. v. Dennison Mfg.,* 810 F.2d 1561, 1566-67 (Fed.Cir.1987). For a chemical compound, a prima facie case of obviousness requires "structural similarity between claimed and prior art subject matter ... where the prior art gives reason or motivation to make the claimed compositions." *In re Dillon,* 919 F.2d 688, 692 (Fed.Cir.1990) (en banc). "[A] reasonable expectation of success, not absolute predictability" supports a conclusion of obviousness. *In re Longi,* 759 F.2d 887, 896 (Fed.Cir.1985).

For the following reasons, the district court did not err in reaching its conclusion. As succinctly stated by the district court:
175. In light of the general state of the art, including the teachings of the 574 patent and *Chakrabarti 1980a, Chakrabarti 1982,* and *Chakrabarti 1989,* one of ordinary skill in the art would have expected that replacing the fluorine atom with a hydrogen atom would produce a compound without sufficient antipsychotic activity. Nichols Tr. 2776:5-11.
176. While *Chakrabarti 1980a* suggests that a chlorine atom in place of the fluorine atom would also enhance the compound's activity, it *does not specifically suggest that the same result could be obtained with a hydrogen atom.* Nichols Tr. 2779: 17-24; TX 3465 at 879, col. 2. Nor does anything in *Sullivan and Franklin* suggest the desirability of

using a hydrogen atom at this position. Nichols 2776:5-11; TX 3161; Findings of Fact § IV. B.l.d. *If one were looking to replace the fluorine, one would replace the fluorine with other electronegative groups, not hydrogen.* TX 1315 at 3172; LaVoie Tr. 1572:12-1573:18. Indeed, the art as a whole teaches directly away from using hydrogen because it is not an electron-withdrawing substituent.

*Findings of Fact and Conclusions of Law,* slip op. at 48 (emphases added). Though the 574 patent disclosed Compound 222, the patent expressed *a preference* for halogen containing compounds and specifically those with a halogenated substituent on the benzene ring in a location analogous to the chlorine in clozapine. *Findings of Fact and Conclusions of Law,* slip op. at 36. These teachings do not suggest or make obvious, among other things, olanzapine's hydrogen component. The prior art references at the time of this invention taught away from using a non-halogenated compound as a substituent in the benzene ring, exactly where olanzapine has a hydrogen atom.

**\*6** Furthermore, the trial court found that a person of ordinary skill in the art would not have chosen Compound 222 as the beginning compound because it contained a hydrogen atom instead of a halogen atom, which again is not a preferred substituent. *Findings of Fact and Conclusions of Law,* slip op. at 46. In addition, the prior art supplied no motivation to change the 2-ethyl in Compound 222 to a 2-methyl. The prior art would have instead suggested modification by adding a halogen atom to supply the neuroleptic substituent as a trigger for antipsychotic activity. *Id.* The district court found that, at the relevant time, a person with ordinary skill in the art would not have expected any reasonable chance of success with other clozapine-like compounds. *Id.* at 49-51.

[10] And though olanzapine is also the adjacent homolog of Compound 222, patentability for a chemical compound does not depend only on structural similarity. *Comm'r of Patents v. Deutsche Gold-und-Silber-Scheideanstalt Vormals Roessler,* 397 F.2d 656 (D.C.Cir.1968). This court will not ignore a relevant property of a compound in the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

obviousness calculus. *In re Lalu,* 747 F.2d 703 (Fed.Cir.1984). When claimed properties differ from the prior art, those differences, if unexpected and significant, may lead to nonobviousness. *In re Mehta,* 52 C.C.P.A. 1615, 347 F.2d 859 (C.C.P.A.1965); *In re Grabiak,* 769 F.2d 729 (Fed.Cir.1985). In this case, the trial court noted some structural similarity of olanzapine and the prior art, but also accounted for the unexpected beneficial properties in olanzapine.

This case is similar in many respects to *Yamanouchi Pharm. Co., Ltd. v. Danbury Pharmacal, Inc.,* 231 F.3d 1339, 1344 (Fed.Cir.2000). In *Yamanouchi,* this court held that the ANDA filer did not show obviousness of the famotidine compound:

[The ANDA filer] did not show sufficient motivation for one of ordinary skill in the art at the time of invention to take any one of the following steps, let alone the entire complex combination: (1) selecting example 44 as a lead compound, (2) combining the polar tail from example 44 with the substituted heterocycle from tiotidine, and (3) substituting the carbamoyl (CONH2) group in the intermediate compound with a sulfamoyl group (SO2NH2) to create famotidine.

*Id.* Likewise, in this case, the defendants have not shown that a person ordinarily skilled in this art would have selected Compound 222 as a lead compound because it contained hydrogen rather than fluorine or chlorine. At the time of invention, the state of the art would have directed the person of ordinary skill in the art away from unfluorinated compounds like Compound 222. After all, the primary example of the state of the art at that time, the 574 patent, did not provide any biological data for compound 222, suggested a preference for halogen-containing compounds, and identified a fluorine-containing compound, ethyl flumezapine, as "particularly active." *Findings of Fact and Conclusions of Law,* slip op. at p. 170. Moreover, as the trial court detailed, *Chakrabarti 1980a* expressly taught that the addition of a fluorine or chlorine enhanced anti-psychotic activity. It also taught that the unfluorinated Compound 222 was less active than the benchmark compound, clozapine. *Id.* Thus, rather than providing the requisite motivation, the prior art taught away from

selecting Compound 222 as a lead compound for further development.

*7 Nevertheless, citing to an article entitled *"In Vitro* Thiomethylation: Studies with Flumezapine," written by H.R. Sullivan and R.B. Franklin (S & F article), IVAX argues that removal of fluorine from flumezapine would have resulted in a default to a hydrogen atom. H.R. Sullivan and R.B. Franklin, *In Vitro Thiomethylation: Studies with Flumezapine,* 13 Drug & Metabolism Disposition 276 (1985). To the contrary, however, the *S & F* article says nothing whatsoever about removal of fluorine. Specifically, the article discusses the metabolism of flumezapine in dogs that produces methylthio metabolite. *Id.* The *S & F* article does not state that flumezapine is toxic or that the methylthio metabolite could be avoided by replacement of fluorine with hydrogen. As noted by the district court, the *S & F* article "does not teach that replacing the fluorine with a hydrogen atom would stop the formation of the methylthio metabolite. Indeed, acetaminophen (Tylenol ®), a non-fluorinated compound, also forms methylthio metabolite." *Findings of Fact and Conclusions of Law,* slip op. at 39. The trial court correctly concluded that nothing in the *S & F* article suggested "that a hydrogen atom in place of the fluorine atom ... would be desirable ... or that to make such a substitution would avoid the formation of the methylthio metabolite." *Id.*

Beyond the nonobvious selection step, the prior art also did not suggest any of the other modifications necessary to reach olanzapine. Thus, even if the *S & F* article taught what IVAX claims, the skilled artisan would still need to combine those teachings with compound 34 in *Chakrabarti 1980a* to reach olanzapine. As taught by *Yamanouchi Pharm. Co.* and other precedent, mere identification in the prior art of each component of a composition does not show that the combination as a whole lacks the necessary attributes for patentability, i.e. is obvious. *In re Kahn,* 441 F.3d 977, 986 (Fed.Cir.2006) (citing *In re Rouffet,* 149 F.3d 1350, 1355 (Fed.Cir.1998)). Rather, to establish a prima facie case of obviousness based on a combination of elements in the prior art, the law requires a motivation to select the references and to combine

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----, 2006 WL 3792689 (C.A.Fed. (Ind.))
**(Cite as: --- F.3d ----)**

them in the particular claimed manner to reach the claimed invention. *Id.* In conclusion, because flumezapine caused EPS in two patients, elevations in CPK and a variety of liver enzymes in a number of patients, substantial evidence supports the trial court's conclusion that the S & F article would not have led a person of ordinary skill in the art to believe that flumezapine could be successfully modified with a hydrogen atom. The district court correctly concluded that nothing in the S & F article and *Chakrabarti 1980a* made the combination reached in olanzapine obvious.

Nonetheless, IVAX also cites to *In re Payne,* 606 F.2d 303 (C.C.P.A 1979) to argue that Compound 222 and flumezapine "bracket," and thereby make olanzapine prima facie obvious. To the contrary, *Payne* did not feature prior art that taught away from making the structural alterations as in this case. In this case, the prior art would have directed one of skill away from making flumezapine and ethyl-olanzapine (Compound 222). The "bracket" notion from *Payne* simply characterized the structural similarity in that case, which this court has noted does not control this case.

**\*8** **[11]** Furthermore, Lilly overcame any prima facie case of obviousness. Among other things, Lilly proved extensive secondary considerations to rebut obviousness. The trial court found the evidence clearly established four of the five proffered secondary considerations. *Findings of Fact and Conclusions of Law,* slip op. at 52-101, 173-87. Lilly established (1) a long-felt and unmet need; (2) failure of others; (3) industry acclaim; and (4) unexpected results. *Id.* The record shows a long-felt need for a safer, less toxic, and more effective clozapine-like drug; a decade (or more) of failure to find a replacement for clozapine; a reasonable amount of commercial success for olanzapine; and a number of awards for olanzapine as indicators of industry acclaim. *Id.* at 52-54. Specifically, the trial court noted a "long-felt but unsolved need for a safe atypical antipsychotic from 1975 until 1990," as well as extensive evidence supporting the other objective criteria. *Id.* at 8-11, 174-75. The trial court also discussed the unexpected differences between the closest analog, Compound 222 and olanzapine, most of which

focused on olanzapine not raising cholesterol levels in dogs, and a comparison of some humans tests with other similar drugs that raised CPK. *Id.* at 55-100. In sum, these objective criteria buttressed the trial court's conclusion of nonobviousness.

III

**[12][13]** The trial court concluded that Lilly's clinical trials of olanzapine were not a public, but an experimental, use that negated any section 102 bar. *Findings of Fact and Conclusions of Law,* slip op. at 192-93. Under section 102, a person is entitled to a patent, unless "the invention was ... in public use ... in this country, more than one year prior to the date of the application for patent in the United States." 35 U.S.C. § 102(b) (2000). Public use includes "any [public] use of [the claimed] invention by a person other than the inventor who is under no limitation, restriction or obligation of secrecy to the inventor." *In re Smith,* 714 F.2d 1127, 1134 (Fed.Cir.1983) (citing *Egbert v. Lippmann,* 104 U.S. 333, 336, 26 L.Ed. 755 (1881)).

**[14]** In considering whether a particular use was "public" within the meaning of section 102(b), this court considers the policies underlying the bar. *Tone Bros., Inc. v. Sysco Corp.,* 28 F.3d 1192, 1198 (Fed.Cir.1994), *cert. denied,* 514 U.S. 1015, 115 S.Ct. 1356, 131 L.Ed.2d 214 (1995). In assessing this case, the trial court found that Lilly personnel conducted the HGAA, HGAB, and HGAC Phase I clinical trials of olanzapine in the Lilly clinic. *Findings of Fact and Conclusions of Law,* slip op. at 189. In all three stages, Lilly restricted access to the facility and provided full-time security. *Id.* Lilly closely monitored and confined the movements of the volunteers, who were healthy and not suffering from schizophrenia, for the duration of the study. *Id.* Visitors to the volunteers did not interrupt the control or confidentiality of the study. *Id.* Moreover, as the trial court noted, the clinical trials did not use the drugs to treat schizophrenic patients, but merely to test the safety and efficacy of the drug. *Findings of Fact and Conclusions of Law,* at 190-91.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                    Page 13

--- F.3d ----, 2006 WL 3792689 (C.A.Fed. (Ind.))
(Cite as: --- F.3d ----)

*9  [15][16]  Beyond  this  convincing  record
evidence, the experimental character of these tests
negated any statutory bar. Even a use that occurs in
the open may not invoke a bar when undertaken to
experiment on or with the claimed invention. *TP
Labs., Inc. v. Prof'l Positioners, Inc.,* 724 F.2d 965,
971, (Fed.Cir.1984), *cert. denied,* 469 U.S. 826,
105 S.Ct. 108, 83 L.Ed.2d 51 (1984). In the words
of the Supreme Court, "[t]he use of an invention by
the inventor himself, or of any other person under
his direction, by way of experiment, and in order to
bring the invention to perfection, has never been
regarded as [a public] use." *City of Elizabeth v. Am.
Nicholson Pavement Co.,* 97 U.S. 126, 134, 24
L.Ed. 1000 (1877). Several indicia may show the
negating experimental character of a use, including
(1)  the  length  of  the  test  period,  (2)  any
confidentiality  agreement,  (3)  any  records  of
testing, (4) any monitoring and control of the test
results, (5) the number of tests, and (6) the length of
the test period in relation to tests of similar
inventions. *TP Labs.,* 724 F.2d at 971-72; *see also
In re Brigance,* 792 F.2d 1103, 1108 (Fed.Cir.1986)
. In this case, Lilly tailored its tests to their
experimental drug safety and efficacy purpose,
adequately monitored for results, and maintained
confidentiality throughout the duration of the study.
The trial court did not err in finding no public use.


IV

[17][18][19] DRL argues that the district court
erred in not finding inequitable conduct because if it
had looked at the totality of the circumstances, the
evidence would have shown that Lilly intentionally
made *per se* material statements that misled the
examiner. "Inequitable conduct occurs when a
patentee breaches his or her duty to the United
States Patent and Trademark Office (PTO) of '
candor,  good  faith,  and  honesty.'  "
*Warner-Lambert Co. v. Teva Pharms. USA, Inc.,*
418 F.3d 1326, 1342 (Fed.Cir.2005) (quoting
*Molins PLC v. Textron, Inc.,* 48 F.3d 1172, 1178
(Fed.Cir.1995)).  Inequitable  conduct  includes
affirmative misrepresentations of material facts,
non-disclosure  of  material  information,  or
submission of false material information, coupled
with an intent to deceive. *See Nobelpharma AB v.*

*Implant Innovations, Inc.,* 141 F.3d 1059, 1068-71
(Fed.Cir.1998) (citing Molins, 48 F.3d at 1178). To
assess inequitable conduct, the trial court must
determine whether the withheld reference meets a
threshold level of materiality. *Dayco Prods., Inc. v.
Total Containment, Inc.,* 329 F.3d 1358, 1362-63
(Fed.Cir.2003) (quoting *Purdue Pharma L.P. v.
Boehringer Ingelheim GMBH,* 237 F.3d 1359, 1366
(Fed.Cir.2001)). Then, the trial court must also
determine whether the evidence shows a threshold
level of intent to mislead the PTO. *See Halliburton
Co. v. Schlumberger Tech. Corp.,* 925 F.2d 1435,
1439 (Fed.Cir.1991). After finding the threshold
levels of materiality and intent, the trial court then
balances those factors. *See Molins,* 48 F.3d at 1178.

[20][21][22] Gross negligence alone is insufficient
to justify an inference of intent to deceive the PTO.
*See Kingsdown Med. Consultants, Ltd. v. Hollister,
Inc.,* 863 F.2d 867, 876 (Fed.Cir.1988); *FMC Corp.
v. Manitowoc Co.,* 835 F.2d 1411, 1415 n. 9
(Fed.Cir.1987). In a case involving an omission of a
material reference to the PTO, the record must
contain clear and convincing evidence that the
applicant made a deliberate decision to withhold a
known material reference. *See Molins,* 48 F.3d at
1181.  Beyond that, the applicant must have
withheld the material subject matter with the intent
to deceive. *Ferring B.V. v. Barr Labs., Inc.,* 437
F.3d 1181, 1190 (Fed.Cir.2006). "Intent to deceive
cannot be inferred simply from the decision to
withhold the reference where the reasons given for
the withholding are plausible." *Dayco Prods.,* 329
F.3d at 1368.

*10  Before  the  Swedish  Board,  Lilly  noted
idiosyncratic blood toxicity problems in isolated
dogs at 10 mg/kg, and DRL claims Lilly's failure to
mention this to the PTO is inequitable conduct.
However, the PTO had questions only about blood
cholesterol levels. Before the Swedish Board, Lilly
never commented about cholesterol levels. Indeed,
Lilly's statements to the Swedish Board about the
idiosyncratic blood toxicity resulted from Lilly's
desire to conduct human clinical studies of
olanzapine in Scandinavia. *Findings of Fact and
Conclusions of Law,* slip op. at 105. Before
allowing human clinical studies, the Swedish Board
required Lilly to respond to concerns about the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----

--- F.3d ----, 2006 WL 3792689 (C.A.Fed. (Ind.))
(Cite as: --- F.3d ----)

Page 14

toxic effects of olanzapine on blood cells and bone marrow in dogs during the D07290 Dog Study. *Id.* at 205. Lilly replied that these findings of hematotoxicity "were believed not to have clinical relevance to humans since the effects occurred at large multiples of the clinical dose." *Id.* at 105. These statements to the Swedish Board discounted the results of the blood studies by reference to idiosyncratic hematotoxicity, not cholesterol problems. Thus, Lilly did not fail to disclose information or contradict its later patentability arguments.

Furthermore, contrary to DRL's argument, Dr. David Scruby's declaration did not create a "false" impression that the D07290 Dog Study cholesterol findings could be extrapolated to humans. Dr. Scruby had been a staff physician at Lilly since 1983. *Findings of Fact and Conclusions of Law,* slip op. at 121. This court acknowledges that *Rohm & Haas, Co. v. Crystal Chem. Co.,* 722 F.2d 1556, 1571 (Fed.Cir.1983) states: "[T]here is no room to argue that submission of false affidavits is not material." In this case, however, the record shows that Dr. Scruby's affidavit was not false.

Dr. Scruby's affidavit could only be considered false if read to suggest that Dr. Scruby was telling the examiner to extrapolate point-by-point to humans olanzapine's improved cholesterol levels in dogs as compared to Compound 222. Dr. Scruby's affidavit does not suggest such an extrapolation of the benefits of olanzapine from dogs to humans. Dr. Scruby, in fact, separates into different paragraphs his discussions of olanzapine's benefits for cholesterol levels in humans and the effects of Compound 222 for dogs. Furthermore, he expressly relies on the declarations of Dr. Jeffrey Means and Dr. James Symanowski as "the basis for my clinical statements concerning the dog toxicology studies." Dr. Means is a pharmacologist and toxicologist; and Dr. Symanowski is a statistician. *Findings of Fact and Conclusions of Law,* slip op. at 20.

Dr. Scruby's affidavit appears in the prosecution history as a Response After Final (*Response* ) for the following propositions: (1) that "cholesterol is recognized as a factor in coronary artery disease;" (2) that the Framingham Study "indicated that a 1%

reduction in the cholesterol level results in a 2% reduction in coronary artery disease;" and (3) that " there is overwhelming evidence in the literature that serum cholesterol in excess of 240 mg/dL is a significant contributor to the genesis of atherosclerosis ." These statements are not false. The trial court did not err in discerning no clear and convincing evidence that Dr. Scruby misrepresented or withheld information from the PTO with an intent to deceive. *Id.,* at 124.

**\*11** Lilly's *Response* did not intentionally blur the distinctions between humans and dogs. Rather, Lilly's *Response* expressly replied to the examiner's request for human clinical comparisons of olanzapine and Compound 222 by stating:
Applicants maintain that the Examiner's *request for human clinical comparison of olanzapine and compound 222 is inappropriate ....* In light of serious consequences associated with artificially altering the balance of cholesterol synthesis, Applicants *assert that human clinical trials with 222 would be unethical and well as unreasonable.*

*Response,* at p. 11 (emphases added). Lilly made clear that it based none of its statements about the effects of either olanzapine or Compound 222 on human testing. Furthermore, the examiner also understood that the cholesterol data was based on the D07290 Dog Study because he asked about those results without any reference to cholesterol benefits for humans. *Findings of Fact and Conclusions of Law,* slip op. at 121.

In addition, on a separate inequitable conduct question, the trial court concluded that Lilly did not omit material subject matter from its Information Disclosure Statement in April 1991, which did not disclose the 574 patent and *Chakrabarti 1980a. Id .* at 199. The trial court also found no clear and convincing evidence that Lilly withheld *Chakrabarti 1980a* or the 574 patent with an intent to deceive the PTO. *Id.* at 199-200. The trial court noted that Lilly did disclose U.S. Patent No. 4,115,568 ( 568 patent) to the PTO, and specifically explained that "[t]he reference fails to disclose the compound which is now claimed, but does describe the adjacent homologue [Compound 222]." *Id.* at 148. It also noted that the technical disclosures of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                    Page 15

--- F.3d ----, 2006 WL 3792689 (C.A.Fed. (Ind.))
**(Cite as: --- F.3d ----)**

the 574 and 568 patents are identical and each
discloses the genus of compounds that generically
includes olanzapine. Moreover, Lilly cited the
British counterpart of the 574 and 568 patents in
the olanzapine patent application. In addition, the
examiner found and relied on *Chakrabarti 1980a*
during prosecution. As a result, the trial court did
not err in its conclusion that nondisclosure of
*Chakrabarti 1980a* or the 574 patent was neither a
material omission nor done with an intent to deceive.

V

In conclusion, this court affirms the trial court on
anticipation, obviousness, and public use questions.
Because the parties do not dispute the facts, this
court also affirms the trial court's legal conclusions
on inequitable conduct finding no abuse of
discretion therein.

COSTS

Each party shall bear its own costs.

*AFFIRMED.*

> FN1. Conditioned Avoidance Response
> (CAR): The CAR test evaluates the
> inhibition of a behavioral response in rats.
> The CAR test was the only measure of
> potential antipsychotic activity, and if the
> compound did not achieve a CAR score of
> three or four at a dose of less than 30
> mg/kg, it was not considered active.

> FN2. Furthermore, compound 7 (like
> compound 222) lacks the electron
> withdrawing "neuroleptic substituent"
> believed at that time to be necessary for
> antipsychotic efficacy.

C.A.Fed. (Ind.),2006.
Eli  Lilly  and  Co.  v.  Zenith  Goldline
Pharmaceuticals, Inc.
--- F.3d ----, 2006 WL 3792689 (C.A.Fed. (Ind.))

Briefs and Other Related Documents (Back to top)

• 2005 WL 3609050 (Appellate Brief) Reply Brief
for Defendant-Appellant Dr. Reddy's Laboratories,
Ltd. (Dec. 12, 2005) Original Image of this
Document (PDF)
• 2005 WL 3609051 (Appellate Brief) Reply Brief
for Defendant-Appellant IVAX Pharmaceuticals,
Inc. (Dec. 12, 2005) Original Image of this
Document (PDF)
• 2005 WL 3227473 (Appellate Brief) Brief of
Plaintiffs-Appellees Eli Lilly and Company and
Lilly Industries Limited (Nov. 10, 2005)
• 2005 WL 3817991 (Appellate Brief) Brief for
Defendant-Appellant Dr. Reddy's Laboratories, Ltd.
(Aug. 15, 2005) Original Image of this Document
with Appendix (PDF)
• 2005 WL 2235507 (Appellate Brief) Brief for
Defendant-Appellant IVAX Pharmaceuticals, Inc.
(Aug. 12, 2005)
• 05-1430 (Docket) (Jun. 13, 2005)
• 05-1429 (Docket) (Jun. 13, 2005)
• 05-1396 (Docket) (May 23, 2005)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.